Case 5:21-cv-00165-OLG  Document 1-8  Filed 02/22/21  Page 1 of 239    1
Jury Voir Dire and Trial on Merits
June 5, 2017

1          REPORTER'S RECORD
          VOLUME 2 OF 5 VOLUMES
2       TRIAL COURT CAUSE NO. CR2016-233
        COURT OF APPEALS NO. 01-17-00534-CR
3

4  STATE OF TEXAS            ) IN THE DISTRICT COURT
                             )
5  vs.                       ) COMAL COUNTY, TEXAS
                             )
6  DEREK DALE PORTER         ) 207TH JUDICIAL DISTRICT

7

8

9       ------------------------------------------------
10          JURY VOIR DIRE AND TRIAL ON MERITS
11      ------------------------------------------------

12

13     On the 5th day of June, 2017, the following

14  proceedings came on to be held in the above-titled and

15  numbered cause before the Honorable Dibrell W. Waldrip,

16  Judge Presiding, held in New Braunfels, Comal County,

17  Texas.

18     Proceedings reported by computerized stenotype

19  machine.

20

21

22

23

24

25

Jury Voir Dire and Trial on Merits
June 5, 2017

1                              APPEARANCES

2

Counsel for the State of Texas:
3
Ms. Jacqueline H. Doyer
4   SBOT NO. 24086703
Ms. Kiera L. Kilday
5   SBOT NO. 24090854
Comal County District Attorney's Office
6   150 N. Seguin Street
Suite 307
7   New Braunfels, Texas 78130
Telephone: 830-221-1300
8   Fax: 830-620-5599

9

10  Counsel for the Defendant:

11  Mr. James E. Millan
SBOT NO. 24031569
12  Law Office of James E. Millan PLLC
816 Camaron, Suite 1.15
13  San Antonio, Texas 78212
Telephone:  210-223-1060
14  Fax:  210-738-1000

15
Mr. Edwin Matias
16  SBOT NO. 13196700
Attorney at Law
17  8600 Wurzbach Road
Suite 1000
18  San Antonio, Texas 78240
Telephone:  210-331-3132
19  Fax:  210-568-4518

20

21

22

23

24

25

Case 5:21-cv-00165-OLG   Document 1-8   Filed 02/22/21   Page 3 of 239      3
Jury Voir Dire and Trial on Merits
June 5, 2017

```
1                        VOLUME 2

2              JURY VOIR DIRE AND TRIAL ON MERITS

3     June 5, 2017
                                        PAGE  VOL.
4     Panel sworn              .................5     2

5     Court's Instruction to Prospective Jurors ........8     2

6     Motions in limine        ................46    2

7     General Voir Dire by Ms. Doyer .................49    2

8     General Voir Dire by Mr. Millan ................130   2

9     Objections to jury panel  ...............169   2

10    Jury seated              ...............170   2

11    Panel released           ...............171   2

12    Indictment read          ...............179   2

13    Defendant enters plea    ...............181   2

14    Opening Statement by Ms. Kilday ................181   2

15    Defendant reserves opening  ...............185   2

16    Jury sworn               ...............185   2

17    Rule invoked             ...............186   2

18    GEORGANNE SHIRLEY            Direct   Cross  V.Dire

19       By Ms. Doyer              186 v2
         By Mr. Millan                     208 v2
20       By Ms. Doyer              213 v2

21    JOSEPH LORETT                Direct   Cross  V.Dire

22       By Ms. Kilday             214 v2
         By Mr. Millan                     216 v2
23
      GABRIEL SEPEDA               Direct   Cross  V.Dire
24
         By Ms. Doyer              217 v2
25       By Mr. Millan                     229 v2
```

CINDY CUMMINGS, CSR
OFFICIAL COURT REPORTER - 433RD DISTRICT COURT
TEL. (830) 221-1279   FAX (830)608-2030

Jury Voir Dire and Trial on Merits
June 5, 2017

```
 1  Adjournment  .................................238   2

 2  Reporter's Certificate .........................239   2

 3

 4              ALPHABETICAL INDEX OF WITNESSES

 5                                 Direct    Cross   V.Dire

 6  Lorett, Joseph                 214 v2   216 v2

 7  Sepeda, Gabriel                217 v2   229 v2

 8  Shirley, Georganne             186 v2   208 v2
                                   213 v2
 9

10              EXHIBITS OFFERED BY STATE

11  EXHIBIT        DESCRIPTION        OFFERED   ADMITTED

12  1              Photograph         196 v2    196 v2

13  2              Photograph         196 v2    196 v2

14  3              Photograph         196 v2    196 v2

15  4              Photograph         196 v2    196 v2

16  5              Photograph         196 v2    196 v2

17  6              Photograph         196 v2    196 v2

18

19

20

21

22

23

24

25
```

Jury Voir Dire and Trial on Merits
June 5, 2017

```
1              P R O C E E D I N G S
2              (Open court, defendant and panel present)
3              THE COURT:  Okay.  Good morning, ladies
4     and gentlemen.  I appreciate you putting up with all of
5     our processes here to make sure that we're able to do
6     this in accordance with the law.
7              At this time, though, I would ask you just
8     to raise your right hand and take an oath issued by the
9     clerk.
10             (Panel sworn)
11             THE COURT:  Does anybody feel unable to
12    take that oath or make such an affirmation?  Okay.  I
13    see nobody.  I appreciate it.
14             Ladies and gentlemen, I thank you for
15    responding to that juror card or summons, however you
16    want to refer to it.  One of the most important reasons
17    for you to do so is to protect your own rights, the
18    rights of your family members, your friends, your
19    neighbors.  Because without having a good cross-section
20    of the community, people willing to respond to that
21    little nasty gram when it hits your mailbox, your own
22    personal rights and those of your friends and
23    neighbors -- your constitutional rights would be nothing
24    more than 200-year-old ink on 200-year-old paper behind
25    about two inches of thick green glass over in
```

**Jury Voir Dire and Trial on Merits**
**June 5, 2017**

```
 1  Washington, D.C., and nothing more.  And so without your
 2  willingness to show up where the rubber meets the road
 3  to put those rights into action, they would be rather
 4  meaningless.
 5              Beyond that, I thank you on behalf of all
 6  of the ladies and gentlemen in our military that are
 7  getting shot at and crapped on and windblown and
 8  everything else over across the pond just for us to have
 9  the opportunity to walk down the sidewalk, much less
10  come inside of a building such that we can put these
11  rights into action.  So on their behalf, I appreciate
12  your presence here today.
13              This jury selection process is part of
14  what we all call due process under our constitution.
15  And that process is intended to be due and fair for all
16  of us, including you as jurors.  To make sure that the
17  litigants in this particular case get a fair trial,
18  they're going to have due process as well.
19              But whether it's for you or for the
20  litigants in this trial, due process includes a number
21  of things:  Questions by me and then questions by the
22  attorneys and then maybe some more by me.  But also,
23  your responses are incredibly important.  This is the
24  one time that you have an opportunity to interact with
25  the Court, with the lawyers and -- regarding reasons why
```

Jury Voir Dire and Trial on Merits
June 5, 2017

 1  or why you may not be good for this or any jury here in
 2  Comal County.
 3            I will tell you that if you have got some
 4  other place you'd rather be this week -- anybody got a
 5  place they'd rather be?  If you've got some other place
 6  you'd rather be, you need to speak up because invariably
 7  it's the ones that sit quiet who end up on the jury.
 8            It's really not a selection process.  We
 9  call it jury selection, but nobody gets to pick and
10  choose who they want.  Rather, the attorneys end up
11  making strikes against people that they think might be
12  predisposed to the other side.  So we're striking people
13  as opposed to picking people.
14            And so if the attorneys haven't heard
15  anything from you all day long, they don't know why they
16  should strike you; right?  So if you get my drift, we
17  just -- it's a free flow of discourse of your ideas,
18  your beliefs, your experience that will determine
19  whether or not you get struck, whether or not you get to
20  go fishing this week or whatever else you've got
21  planned.
22            I will tell you as well that there's no
23  question that's intended to annoy or embarrass or harass
24  anybody.  And for that reason, I will periodically loop
25  back and say, has anybody thought of anything else?  And

**Jury Voir Dire and Trial on Merits**
**June 5, 2017**

1    then nobody will know what we're talking about and you

2    can say, well, Judge, can I approach the bench?  And

3    instead of speaking in front of 70 or 80 strangers, we

4    can just huddle amongst seven or eight strangers up here

5    at the bench.  We'll give you as much privacy as we

6    possibly can in doing so.

7              My questioning here this morning will have

8    three phases.  One are what I nickname the absolutes.

9    They are regarding the legal qualifications, those

10   things that either must or must not apply depending upon

11   the -- how the question is phrased in order for you to

12   be legally qualified to sit on a jury.

13             And so by reason of their legal

14   qualifications, that's why I say that they are

15   absolutes.  And so if you believe or have a concern

16   about whether or not any of those apply, I would

17   appreciate your candor in letting us know such that your

18   tax dollars are not wasted.  If we got through the

19   middle of a trial and figured out that somebody was not

20   legally qualified to be on a jury, it could cause a

21   problem obviously as you can see.

22             The second phase are what I call the

23   optional ones.  They are your options to exercise if you

24   so choose, if they do apply.  They are the legal

25   exemptions written by the -- by the legislature that if

1    they apply, you may opt out -- it's your option to do so

2    if you want to opt out of jury service this week.

3              And then the last one are the excuses that

4    you've been thinking of ever since that nasty gram hit

5    your mailbox.  I will tell you by reason of the fact

6    that we always have good, civic-minded folks here in

7    Comal County willing to respond, enough people that are

8    able to do so here in Comal County, that we have the

9    ability to defer you to a later panel.  I can't just

10   outright excuse you because this is not the best week

11   for you be it at home, at work or something like that.

12             You'll kind of know what the process is.

13   And then I'll ask you -- say, well, if -- if this week

14   is just absolutely impossible for you, you know, what is

15   a good week in the upcoming few months, and then you'll

16   be able to kind of pick that time.  You'll know when to

17   expect that that little nasty gram will come back in the

18   mail again.  You'll kind of be able to adjust your

19   schedule accordingly for that week.

20             I will tell you -- I say week.  This

21   trial, I'm anticipating, is likely to take up the

22   majority of this week.  There are times where we have

23   two and three and four -- I have even had a seven-week

24   trial.  I mean, that is rather uncommon, about once in

25   11 years.  It's not uncommon to have a two or three-week

**Jury Voir Dire and Trial on Merits**
**June 5, 2017**

1  trial.  We have at least one of those a year.

2           I cannot project when that will be.  If

3  you pick October as being a good month for you, right

4  now I don't know what trial is going to be had in

5  October.  It's kind of the roll of the dice, if you

6  think this week is not good for you and you tell me what

7  week you want in the future.  I'll leave that up to you

8  to decide.

9           In regard to the absolutes, the legal

10 qualifications, that first phrase that I talked about,

11 you absolutely must be at least 18 years of age or

12 older.  You absolutely must be a United States citizen

13 and a resident of the State of Texas and Comal County.

14           As well, you must be qualified to register

15 to vote if you wanted to here in Comal County.  You must

16 also be of sound mind and good moral character.  You

17 must be able to read and write the English language.

18           And then there are a couple of must nots.

19 You must not have served on a Comal County jury for six

20 straight days in the preceding six months.  You must

21 also not have been convicted of theft or any

22 felony-level offense or currently be under a formal

23 legal accusation for theft or a felony offense.

24           Just to go back and loop a couple of those

25 together, is anybody here under the age of 18 or has any

Jury Voir Dire and Trial on Merits
June 5, 2017

1  issues or concerns regarding their citizenship or

2  residence in the U.S. or residency in Comal County?  And

3  that's kind of where do you put your head down at night,

4  where do you call home.  Some people have more than one

5  residence, but where is your main home residence.  As

6  long as you believe that's here in Comal County, that's

7  fine.

8           Sometimes we have issues with County Line

9  Road.  If you live on one side of County Line Road,

10  you're in Comal County.  If you live on the other side,

11  you're in Guadalupe.

12           Yes, ma'am?

13           UNIDENTIFIED VENIREPERSON:  My permanent

14  residence is in Comal County, but I do not live here.

15  Is that --

16           THE COURT:  If you call your permanent

17  residence here, that's fine.  A lot of people do travel

18  and work and, you know, maybe live five nights out of

19  the week somewhere else and come home either once a

20  week, once every two weeks or something, but if -- it's

21  a state of mind really, whatever you call home.

22           UNIDENTIFIED VENIREPERSON:  Okay.

23           THE COURT:  Yes, sir?

24           UNIDENTIFIED VENIREPERSON:  My house is

25  closing on Saturday.  We're moving out of the county --

Jury Voir Dire and Trial on Merits
June 5, 2017

1   or excuse me, Friday.

2                   THE COURT:  I take it as long as you're

3   good today, you're good today.  I appreciate it.

4                   Anybody else have any issues or concerns?

5   And you see there's no hairy-legged bouncers that drop

6   out of the ceiling to beat anybody about the head or

7   neck for answering.  I appreciate everybody's concern

8   and candor about those issues.

9                   Anybody have any concerns about their

10  qualifications to register to vote?  It doesn't mean

11  that you are registered to vote here in Comal County.

12  As well as your soundness of mind and goodness of moral

13  character, again, that's one of those things I'm going

14  to probably leave up to you.  If you've got an issue or

15  concern, please let me know.  Otherwise, I'm going to be

16  a rather poor judge of that here in the very short

17  period of time that we have here this morning.

18                  And then lastly, just -- well, a couple

19  more, just reading and writing the English language, as

20  long as you can pick up a morning newspaper and figure

21  out the headlines and the captions underneath the

22  photos, that kind of thing, you probably are sufficient.

23                  And then anybody that has any concerns

24  about recent jury service, if you've recently served on

25  a Comal County jury, let me know; or as well, if you

Jury Voir Dire and Trial on Merits
June 5, 2017

```
 1   have a theft conviction or felony conviction or
 2   currently under a formal legal accusation of theft or
 3   any felony.  Any of those anybody have any issues or
 4   concerns about?  I see none at the moment.
 5                    Yes, ma'am?  You can approach, if you
 6   would like.  Sometimes the fans in the ceiling between
 7   me and you will prevent me from being able to hear you.
 8                    (At the bench, on the record)
 9                    THE COURT:  Yes, ma'am, how are you doing?
10                    VENIREPERSON 146:  I had an embezzlement
11   of rental property back in 1989.
12                    THE COURT:  Okay.
13                    VENIREPERSON 146:  My husband had moved
14   stuff -- ex-husband had moved stuff out of the state and
15   everything was in my name.  I ended up going to court
16   for it.
17                    THE COURT:  Was it just a civil action or
18   were you charged?
19                    VENIREPERSON 146:  All I got was -- all we
20   did is -- well, I just paid a fine and that was it.  I
21   didn't have to do time or anything like that.
22                    THE COURT:  No.  I appreciate that.  I've
23   never heard of that, but --
24                    MR. MILLAN:  What was the charge?
25                    VENIREPERSON 146:  Embezzlement of rental
```

Jury Voir Dire and Trial on Merits
June 5, 2017

1 property.

2           THE COURT:  Was it in Texas?

3           VENIREPERSON 146:  No.  That was back in

4 1989 when I was married to my ex-husband.  Everything

5 was in my name because of my driver's license.  So when

6 he moved it out of state, I was in the hospital.  I got

7 arrested for embezzlement of rental property because it

8 was in my name.

9           THE COURT:  Okay.

10           VENIREPERSON 146:  I didn't do time.  I

11 didn't do anything like that.

12           MR. MILLAN:  You paid a fine?

13           VENIREPERSON 146:  Uh-huh.

14           THE COURT:  Okay.  I mean, I -- there's no

15 way -- I doubt seriously that that's going to come up,

16 but we can look it up.

17           MS. DOYER:  Yes, sir.

18           What was your number, ma'am?

19           VENIREPERSON 146:  146, Shawna Jacobs.

20           THE COURT:  We'll let you know if there's

21 an issue, but I appreciate your candor.

22           MR. MILLAN:  146, right?

23           VENIREPERSON 146:  Yes, Shawna Jacobs.

24           (At the bench, concluded)

25           THE COURT:  And also just looping back as

**Jury Voir Dire and Trial on Merits**
**June 5, 2017**

1    mentioned and promised, anybody thought of anything out

2    of the absolutes that you have any questions or -- yes,

3    ma'am?

4                    VENIREPERSON 173:  May I come up?

5                    THE COURT:  You may.

6                    (At the bench, on the record)

7                    VENIREPERSON 173:  I don't know if it

8    matters, but I have a theft that's from like when I was

9    18 years old.  It -- it probably is on my record.

10                   THE COURT:  Okay.  Was it here in Texas?

11                   VENIREPERSON 173:  Yes.

12                   THE COURT:  Do you remember what that was?

13                   VENIREPERSON 173:  It was for Kohl's.  I

14   had stole something at Kohl's.

15                   THE COURT:  Did you get like deferred

16   adjudication?

17                   VENIREPERSON 173:  I believe that's

18   what -- I'm sorry, I'm 30 now.  I don't remember

19   exactly.  I remember I had probation.

20                   THE COURT:  Served some kind of probation?

21                   VENIREPERSON 173:  Yeah.

22                   THE COURT:  Was it here in Comal County?

23                   VENIREPERSON 173:  Yes.

24                   THE COURT:  Okay.

25                   MR. MILLAN:  What was your number?

**Jury Voir Dire and Trial on Merits**
**June 5, 2017**

```
1              VENIREPERSON 173:  173.

2              MS. DOYER:  I ran her, Your Honor.  It's a

3    deferred.

4              THE COURT:  It was a deferred?

5              MS. DOYER:  It was.

6              THE COURT:  Okay.  You're still good.

7    Thank you.

8              MR. MILLAN:  She got deferred?

9              THE COURT:  Yeah, it was a deferred.

10             (At the bench, concluded)

11             THE COURT:  Okay.  Again, kind of looping

12   back, anybody kind of -- last opportunity.

13             Then to move from the absolutes into the

14   optional ones.  If these do legally apply, you may

15   exercise them.  If you are 70 years of age or older and

16   would like to opt out, you may do so.  If you're active

17   duty military, deployed beyond Comal County, likewise,

18   you may also opt out.  If you're a student in high

19   school or any kind of post-secondary school pursuant, if

20   you're currently enrolled in some -- summer school or

21   any kind of trade school or anything like that, you may

22   opt out.

23             If you have legal custody of a child, that

24   means there's some legal responsibility that you have or

25   a piece of paper, either that or they're born to you and
```

**Jury Voir Dire and Trial on Merits**
**June 5, 2017**

1  you can't get away from them, a child younger than the

2  age of 12 and your service on a jury would leave that

3  child inadequately tended to sometime during the day,

4  you may also opt out.

5            Likewise, if you're the primary

6  caretaker -- primary caretaker is not defined, so I'll

7  kind of leave that up to you as well.  If you're the

8  primary caretaker for somebody, a neighbor, a relative,

9  somebody that's currently infirm, disabled or just has a

10  medical appointment that you need to make sure they get

11  to and those kind of things this week, again, that your

12  service on the jury would leave that person inadequately

13  tended to this week.

14            And then also, if you're a member of the

15  legislature and would like to admit it, you may opt

16  out -- a member of the legislature or work for any

17  office, agency or department affiliated with the

18  legislature.  They wrote it; I didn't.  I just let you

19  know what the law is.

20            Looping back to grab a few of these at a

21  time, anybody here over the age of 70 or alternatively

22  in the military that would like to opt out?  Also,

23  anybody that has -- in high school or any other type of

24  post-secondary school pursuit of any kind?  Legal

25  custody of a child younger than 12 and your service --

Jury Voir Dire and Trial on Merits
June 5, 2017

```
 1   yes, ma'am?

 2                   VENIREPERSON 228:  I do.  I have four that

 3   I won't have care for for the rest of the week.

 4                   THE COURT:  And your number?

 5                   VENIREPERSON 228:  228.

 6                   THE COURT:  Let me just double-check.  I

 7   hate to reduce anybody to a number, but Ms. Silva?

 8                   VENIREPERSON 228:  Yes.

 9                   THE COURT:  Thank you.  You may be

10   excused.

11                   VENIREPERSON  228:  Thank you.

12                   VENIREPERSON 105:  Sir, I have a question.

13                   THE COURT:  Yes, ma'am.

14                   VENIREPERSON 105:  My mother is staying

15   with me.  She is just out of the hospital this week.  I

16   still work, but I take off and take her to the doctor's

17   appointments.

18                   THE COURT:  If you're expecting something

19   like that this week potentially or -- I just don't know.

20   I mean, it's up to you.

21                   VENIREPERSON 105:  I know she has an

22   appointment on Tuesday, but I'm just asking.

23                   THE COURT:  Well, I mean, if you're

24   planning to take her, I mean, that's -- or need to

25   assist in that, we can certainly excuse you.
```

Jury Voir Dire and Trial on Merits
June 5, 2017

```
 1              VENIREPERSON 105:  Okay.

 2              THE COURT:  I mean, it's up to you.  Would

 3  you like to be excused?

 4              VENIREPERSON 105:  Yes, sir.

 5              THE COURT:  Okay.  Your number, please,

 6  ma'am?

 7              VENIREPERSON 105:  105.

 8              THE BAILIFF:  Okay.  Ms. Rosales?

 9              VENIREPERSON 105:  Yes, sir.

10              THE COURT:  Okay.  Thank you, ma'am.  I

11  appreciate you being here.

12              Yes, sir?

13              VENIREPERSON 224:  May I approach?

14              THE COURT:  You may.

15              (At the bench, on the record)

16              VENIREPERSON 224:  Morning, Your Honor.

17  I'm self-employed and my son-in-law is -- came back from

18  Afghanistan.  He's got cancer in his throat and he's off

19  work right now.  I'm helping to support them

20  monetarily-wise.  He's off work until August for right

21  now.

22              So that's -- and my wife is retired and

23  she's helping watch the grandkids and everything.  So I

24  just wanted to --

25              THE COURT:  I gotcha.  That's probably one
```

Jury Voir Dire and Trial on Merits
June 5, 2017

1   of those situations that falls in the gray areas.  Can

2   we just defer you until September or something like that

3   and get maybe over this hump?

4                VENIREPERSON 224:  Yeah.

5                THE COURT:  We want to make this a --

6                VENIREPERSON 224:  I understand.  I

7   understand, but I just -- at the same time --

8                THE COURT:  -- as easy as possible for

9   everyone.

10                VENIREPERSON 224:  And at the same time, I

11   just can't really afford to miss work.  I'm

12   self-employed.

13                THE COURT:  Well, I can't just excuse

14   somebody for that.  But for the moment, I understand the

15   circumstance and the situation and we want to try to

16   ease that as best possible.  Is September, October, one

17   of those months, okay?

18                VENIREPERSON 224:  September, yeah.

19                THE COURT:  That's fine.  We'll just send

20   you that card again.  Your number, please, sir?

21                VENIREPERSON 224:  224, Gerald McKinnon.

22                THE COURT:  Thank you, sir.

23                VENIREPERSON 224:  Thank you, sir.  God

24   bless you.

25                THE COURT:  Yes, sir.

Jury Voir Dire and Trial on Merits
June 5, 2017

```
 1              (At the bench, concluded)
 2              THE COURT:  Anybody else -- yes, sir?
 3              VENIREPERSON 163:  Approach?
 4              THE COURT:  Yes, sir, you may.
 5              (At the bench, on the record)
 6              THE COURT:  Good morning.
 7              VENIREPERSON 163:  Good morning.  Mine is
 8  I have appointments this week and next week for doctors
 9  at the VA that I've tried for four years and I finally
10  got.  I don't want to have to cancel.
11              THE COURT:  No, sir.
12              VENIREPERSON 163:  I'm free until the end
13  of the month.
14              THE COURT:  We'll be glad to send you a
15  card and just defer you to that time if you would like
16  to come back.
17              VENIREPERSON 163:  Yes, I would.
18              THE COURT:  Your number, please, sir?
19              VENIREPERSON 163:  163.
20              THE COURT:  Is July okay or August?
21              VENIREPERSON 163:  The tail end of June
22  here, the last two weeks, or July.
23              THE COURT:  Okay, sir.  They'll send you
24  another card again.  Appreciate it.  That's Mr. Slings?
25              VENIREPERSON 163:  Yes.
```

Jury Voir Dire and Trial on Merits
June 5, 2017

```
 1              THE COURT:  Thank you, sir.  Good luck
 2   with those appointments.
 3              MR. MILLAN:  Thank you, sir.
 4              (At the bench, concluded)
 5              THE COURT:  All right.  As well, I -- just
 6   continuing on with those optional ones, anybody else
 7   have, you know, primary caretaker-type concerns
 8   regarding somebody in your family or a neighbor or
 9   somebody that you need to take care of?  Okay.  I see --
10              THE BAILIFF:  We've got one, Judge.
11              THE COURT:  Okay.
12              THE BAILIFF:  It's medical.
13              THE COURT:  Okay.
14              (At the bench, on the record)
15              VENIREPERSON 178:  I have anxiety and I
16   have trouble in closed areas, so I'm just -- I'm trying
17   hard sitting by the door just so you know.
18              THE COURT:  Very good.  If you think that
19   that would prevent you from being able to concentrate on
20   evidence and stuff, I can give you a medical deferment.
21   And if you would like, they can send you a permanent one
22   so that we don't call you back at least -- I think they
23   last for a year or something like that.
24              VENIREPERSON 178:  That would be
25   wonderful.
```

CINDY CUMMINGS, CSR
OFFICIAL COURT REPORTER - 433RD DISTRICT COURT
TEL. (830) 221-1279   FAX (830)608-2030

Jury Voir Dire and Trial on Merits
June 5, 2017

```
1              THE COURT:  And your number, please,
2    ma'am?
3              MR. MILLAN:  Ms. Hensley, 178.
4              VENIREPERSON 178:  Yes.
5              THE COURT:  Okay.  Thank you, ma'am.
6    Appreciate it.
7              (At the bench, concluded)
8              THE COURT:  Any other of the optional ones
9    regarding over the age of 70 or military or if you are a
10   student in high school or have legal custody of a child
11   or otherwise primary caretaker for anyone of any age
12   that your service would leave that person inadequately
13   tended to; or alternatively, if you're a member of the
14   legislature?
15             All right.  Other than that -- just kind
16   of by a show of hands will help us figure out how much
17   time for the most part that we're going to need.  If
18   there's other excuses or anything, again looping back as
19   promised, whether it's the absolutes, the optionals or
20   just a scheduling issue for this week that you have
21   something, just by a show of hands how many people might
22   I need to speak with?  It's usually about a dozen.
23             And so what we'll do -- and then we'll
24   clean up the list, and we've excused some or deferred
25   some.  We'll try to consolidate and make the seating
```

Case 5:21-cv-00165-OLG   Document 1-8   Filed 02/22/21   Page 24 of 239      24
Jury Voir Dire and Trial on Merits
June 5, 2017

1    arrangements maybe a little bit better and -- and maybe,

2    maybe not.  Sometimes we shuffle the cards, so to speak,

3    to get everybody in a completely even more randomized

4    order.  I don't know if that will happen.

5              But if you will, just remain in your seats

6    if you need to speak with me about anything that we've

7    talked about this morning or just scheduling this week

8    and -- and maybe resetting you to a more convenient time

9    for -- whether it's personal, work or otherwise, just

10   remain in your seats.  Otherwise, I'll give everybody

11   just about a 15-minute break.

12             And according to that clock at the back of

13   the courtroom, that will be five until 10:00 and then

14   we'll call everybody in here reseated and get started

15   with the attorneys.  If you need to speak with me about

16   anything so far this morning, just remain in your seats.

17             (Panel leaves the courtroom)

18             THE COURT:  I'll kind of work my way back.

19   Usually I'll start on the left-hand side of the room,

20   but you may either speak from your seats or come forward

21   at your discretion.

22             Yes, ma'am?

23             VENIREPERSON 2:  So I live in Austin and I

24   don't have transportation.  My permanent address is

25   still with my parents because I'm a student and I leave

Case 5:21-cv-00165-OLG   Document 1-8   Filed 02/22/21   Page 25 of 239        25
Jury Voir Dire and Trial on Merits
June 5, 2017

1  for medical school in a month to Virginia.

2                  THE COURT:  Okay.  Very good.

3                  VENIREPERSON 2:  I wouldn't have a way to

4  get here this week is my only thing.  I borrowed my

5  father's car today.

6                  THE COURT:  Let me just speak with counsel

7  and we'll let you know, but -- I mean, I -- there's

8  really probably no point in deferring you to a later

9  panel if you're getting ready to move to Virginia.

10 Congratulations, by the way, on that.

11                 VENIREPERSON 2:  Thank you.

12                 THE COURT:  Also, we obviously we need

13 people to be able to get here.

14                 VENIREPERSON 2:  Absolutely.

15                 THE COURT:  I don't know if that would be

16 an option for the rest of the week to stay here with

17 your -- I don't know.

18                 VENIREPERSON 2:  Okay.

19                 THE COURT:  Sometimes if somebody lives,

20 you know, within 15 or 20 miles or something, we can --

21 if somebody ends up on a jury, we can try to arrange

22 some transportation in the front seat of a patrol car or

23 something.

24                 VENIREPERSON 2:  Right.

25                 THE COURT:  But anyway, let me just talk

**Jury Voir Dire and Trial on Merits**
**June 5, 2017**

1    with counsel and I'll let you know.

2              VENIREPERSON 2:  Do you want me to wait in

3    the hall or back in my seat?

4              THE COURT:  You can just sit down and

5    we'll probably come up with a solution here in just a

6    second.

7              If y'all can kind of get close, anybody

8    object to me cutting her loose?

9              MR. MILLAN:  I don't object.

10             MS. DOYER:  I don't object, but I see a

11   lot of people sitting out there.

12             THE COURT:  I won't probably announce it

13   right now, but --

14             MS. DOYER:  Okay.

15             THE COURT:  Okay.  We'll probably -- I

16   forget, what was her number?

17             MS. DOYER:  Number 2.

18             THE COURT:  She's number 2.  That's Kristi

19   Cowsar.

20             MR. MILLAN:  This is the first week out of

21   school.  I mean, I can tell you right now my wife was

22   expecting me to be doing stuff at home.

23             THE COURT:  Okay.

24             MR. MILLAN:  I'm sure a lot of people have

25   things that they want to do this week.

Jury Voir Dire and Trial on Merits
June 5, 2017

1         THE COURT:  And just -- next?  Anybody

2  else?  And again, you can come up here if you would like

3  to.

4         VENIREPERSON 34:  Hi.  I work for a large

5  telecommunication company.  Last week we were told that

6  we needed to come up with a list of layoffs.  I have to

7  make mine due by Friday.  This is the like the worst

8  week for me.  Can I defer?

9         THE COURT:  Sure.  Your name?

10         VENIREPERSON 34:  Kutac, number 34.

11         THE COURT:  Okay.  Is there a month that

12  you think would be better for you?

13         VENIREPERSON 34:  August would be

14  better -- beginning of August or the end of July.

15         THE COURT:  Okay, sir.  Thank you.  We'll

16  defer you until then.

17         MR. MILLAN:  Thank you.

18         THE COURT:  Yes, ma'am?

19         VENIREPERSON 17:  Morning.  I have a

20  medical condition that actually keeps me from sitting

21  for long periods of time, so I don't know -- I don't

22  think --

23         THE COURT:  Number one, I will leave it up

24  to you.  I'll certainly grant you a medical exemption,

25  if you would like.  You may stand at any time, if you

**Jury Voir Dire and Trial on Merits**
**June 5, 2017**

```
1   would like.  In other words, I don't want to prevent you
2   from serving, but I'll give you the option.  Even if you
3   end up on the jury, people do -- I mean, sometimes we
4   have folks that just need to stand.  They can certainly
5   just step out of the box and just stand if they would
6   like, but it's purely up to you.
7                   VENIREPERSON 17:  Okay.
8                   THE COURT:  If you would prefer just to
9   maybe at the moment be -- have a medical exemption --
10                  VENIREPERSON 17:  Let's do it this one
11  time.
12                  THE COURT:  We'll see where we go from
13  there.
14                  VENIREPERSON 17:  Yeah.
15                  THE COURT:  Okay.  Your number?
16                  VENIREPERSON 17:  17.
17                  THE COURT:  Ms. Martin?
18                  VENIREPERSON 17:  Yes.
19                  THE COURT:  Thank you, ma'am.  Appreciate
20  you being here.
21                  Just again kind of working my way back on
22  the left, if you need to speak with me.
23                  VENIREPERSON 59:  Good morning.
24                  THE COURT:  How are you doing, sir?
25                  VENIREPERSON 59:  Point of concern.  I
```

**Jury Voir Dire and Trial on Merits**
**June 5, 2017**

1    have a situation called narcolepsy.  I'm under

2    medication for it.  And if I'm sitting for -- I fall

3    asleep and I -- and I really have no control.  I have

4    transportation issues because of it and we live out in

5    Canyon Lake.

6                    THE COURT:  All right, sir.

7                    VENIREPERSON 59:  So I just don't know if

8    I'm going to be able to be here.

9                    THE COURT:  Your number, please, sir?

10                   VENIREPERSON 59:  59.

11                   THE COURT:  59.  Mr. Gum?

12                   VENIREPERSON 59:  Yes, sir.

13                   THE COURT:  All right.  We can do a

14   medical exemption and -- if you would like.  The clerk's

15   office can send you a card.

16                   VENIREPERSON 59:  That would be fine.

17                   THE COURT:  It will last for a year.

18                   VENIREPERSON 59:  I prefer that.  Thank

19   you.

20                   THE COURT:  Okay.  Thank you.  Appreciate

21   it.

22                   How are you doing today?

23                   VENIREPERSON 56:  I am flying out Friday

24   for my granddaughter's christening.  I don't mind -- I

25   love to serve.  I've been on a jury, but I can't -- I'm

Jury Voir Dire and Trial on Merits
June 5, 2017

1    flying out Friday, so if it -- you said it's most of the
2    week?
3                    THE COURT:  Yeah.  And then what happens
4    is I can't ever tell how long a jury might deliberate.
5                    VENIREPERSON 56:  And I brought the --
6                    THE COURT:  We'll just defer you.  Is
7    there a month coming up that's better?
8                    VENIREPERSON 56:  Yes, sir, August or
9    September.
10                   THE COURT:  And your number, please,
11   ma'am?
12                   VENIREPERSON 56:  56.
13                   THE COURT:  Ms. Tasler?
14                   VENIREPERSON 56:  Yes, sir.
15                   THE COURT:  Appreciate it.  Y'all have a
16   great time.
17                   Yes, ma'am?
18                   VENIREPERSON 66:  I'm scheduled to leave
19   out of the country for a trip on Sunday.  I'm more than
20   willing to serve.  But not knowing how long this could
21   possibly go, is there any way to defer?
22                   THE COURT:  Well, I mean, let me
23   double-check with counsel.  I imagine we'll be done.
24                   MR. MILLAN:  I can't imagine it's going
25   into next week.

Jury Voir Dire and Trial on Merits
June 5, 2017

```
1              VENIREPERSON 66:  That will be fine.  As
2    long as there's a pretty good chance that it won't go
3    past this week, then I'm willing to stay, so --
4              THE COURT:  Okay.  Thank you.
5              MR. MILLAN:  What was your number?
6              VENIREPERSON 66:  66.
7              THE COURT:  Yes, sir?
8              VENIREPERSON 113:  Judge, I'm dealing with
9    some medical issues right now.  I've been doing physical
10   therapy.  I broke my neck.  It's an old injury, but I've
11   got a lot of arthritis.  I don't sleep well.  I take a
12   lot of drugs and muscle relaxers.  It's really hard for
13   me to sit for a long period of time.
14             THE COURT:  Sure.  I will leave that up to
15   you.  I've told a couple of people actually here this
16   morning if you want to, you can certainly -- while
17   you're back there, you can stand up.  If you do by
18   chance end up on the jury, you're also free to, you
19   know, stand up, if you would like.  But alternatively,
20   you know your situation better than I.  If this is just
21   not the right time, then --
22             VENIREPERSON 113:  It's definitely not a
23   good time.
24             THE COURT:  All right.
25             VENIREPERSON 113:  I appreciate your
```

Jury Voir Dire and Trial on Merits
June 5, 2017

1    consideration.

2              THE COURT:  Your number, please, sir?

3              VENIREPERSON 113:  113.

4              THE COURT:  And we'll just grant you a

5    medical exemption.  Thank you, sir.

6              VENIREPERSON 113:  I appreciate it.  Thank

7    you very much, sir.

8              MR. MILLAN:  113:

9              THE COURT:  Yes, sir?

10              VENIREPERSON 111:  Good morning,

11    Your Honor.  I don't want to defer, but I'm retired

12    military.  I work as a contractor for DoD.  I leave

13    Saturday for Tucson.  And if I could defer, I mean, I --

14    I would be good with that.  I just want to let you know,

15    but I average two weeks -- every month I go do training

16    exercises with these guys, though.  What happens if I

17    have to leave Saturday?

18              THE COURT:  I'm told that -- I don't know

19    anything about the case, but I -- I think they're saying

20    they're going to be done midweek sometime.  I don't

21    think we're going to push into --

22              VENIREPERSON 111:  Then I'm fine with

23    serving.  I don't want to take the gamble of coming back

24    up and I'm already gone.

25              MR. MILLAN:  I'm sorry, what's your

Jury Voir Dire and Trial on Merits
June 5, 2017

1    number, sir?

2              VENIREPERSON 111:  111.

3              THE COURT:  Thank you.

4              Yes, sir?

5              VENIREPERSON 102:  Hi.  Just this week I

6    have two night shifts coming up on Wednesday and

7    Thursday.  Then I'm on back-up call all day Friday.

8              THE COURT:  What type of work is it?

9              VENIREPERSON 102:  I'm an ER physician at

10   Resolute Hospital.  I'm happy to reschedule another

11   week, another month, but this week is difficult.

12             THE COURT:  And I think these cards go out

13   about three weeks in advance or something like that.  So

14   now you kind of know what the drill is.  And if there's

15   just a way that you can help ensure --

16             VENIREPERSON 102:  Our schedule is made

17   out all the way to October right now.  We don't have the

18   staff here right now, but --

19             THE COURT:  Okay.  I don't know if the --

20   I always let people defer at least -- maybe one time.

21   But just so you kind of know what the situation is --

22   and once you get that card, if there's a way to alter

23   the schedule even though it's already made such that

24   just, you know, the week could be kind of freed up a

25   little bit.

Jury Voir Dire and Trial on Merits
June 5, 2017

```
 1              VENIREPERSON 102:  I would work nights.
 2   Like I'm coming off post-night shift right now.  I can
 3   come during the day and just shift my nights.  I just
 4   worked last night from seven to seven.  And if you want
 5   me on the jury, I'll work after that, but --
 6              THE COURT:  Okay.  Well, I appreciate it.
 7   But my point is if you would rather defer this time,
 8   that's fine, just so you know what the drill is.
 9              VENIREPERSON 102:  Okay.
10              THE COURT:  I mean, you know your
11   situation more than -- or better than I do.
12              VENIREPERSON 102:  If I can defer for
13   another week or something.
14              THE COURT:  Okay.  It would probably be a
15   month or two.
16              VENIREPERSON 102:  Okay.  That's fine.
17              THE COURT:  Your number, please, sir?
18              VENIREPERSON 102:  102.
19              THE COURT:  Mr. del los Santos?
20              VENIREPERSON 102:  Yes, sir.
21              THE COURT:  Thank you, sir.  Appreciate
22   it.  We'll defer you.
23              Yes, sir?
24              VENIREPERSON 171:  I'm working nights in
25   Austin, Texas.  I don't know if it would be better -- it
```

Jury Voir Dire and Trial on Merits
June 5, 2017

```
 1   makes for kind of a long day if I've --
 2              THE COURT:  What type of work do you do?
 3              VENIREPERSON 171:  I work at Tri-Pak
 4   Marine.  We manage the terminals in L.A.  So it's from
 5   7:00 at night to 5:00 a.m.
 6              THE COURT:  I take it -- how do you manage
 7   the -- from Austin?
 8              VENIREPERSON 171:  We have a centralized
 9   system.  It's all automated terminals, so --
10              THE COURT:  Okay.  Very good.  I'll be
11   glad to defer you.  I'm giving everybody just one time.
12              VENIREPERSON 171:  Yeah, that's what I'm
13   thinking.
14              THE COURT:  And then you'll know -- once
15   you get that card back in the mail again --
16              VENIREPERSON 171:  Okay.
17              THE COURT:  -- you'll kind of know what
18   the drill is.  And if there's a way to just kind of keep
19   that schedule freed up.
20              VENIREPERSON 171:  See, I don't think I'm
21   going to be on day shift any time soon, so I might as
22   well get it over with now.
23              THE COURT:  Yeah, you're not on the jury
24   yet, so you might as well stay with us.
25              MR. MILLAN:  What's your number?
```

Jury Voir Dire and Trial on Merits
June 5, 2017

| | |
|---|---|
| 1 | VENIREPERSON 171:  171. |
| 2 | THE COURT:  Okay.  Thank you. |
| 3 | Yes, ma'am? |
| 4 | VENIREPERSON 166:  Yes, sir.  I know you |
| 5 | said 12 and under, but I have a 14-year-old girl and |
| 6 | she's in camps all week.  I'm the only one that stays |
| 7 | home with them.  I don't know if that makes a |
| 8 | difference, you know, like to drop her off and -- they |
| 9 | start at 8:00 in the morning and they need to get picked |
| 10 | up like at 11:30.  I don't really depend on anybody else |
| 11 | to pick up my kids. |
| 12 | THE COURT:  Okay.  So just this week is |
| 13 | not good or -- |
| 14 | VENIREPERSON 166:  Well -- |
| 15 | THE COURT:  I mean, if we defer you to a |
| 16 | later panel, when would be a good time? |
| 17 | VENIREPERSON 166:  That's just it.  She's |
| 18 | in camps all summer. |
| 19 | THE COURT:  Through September? |
| 20 | VENIREPERSON 166:  When they're in school |
| 21 | is probably a better time for me.  When they're in |
| 22 | school, that's better for me.  But I can still -- I can |
| 23 | stay and wait because I have somebody picking her up |
| 24 | today because I don't know like you said, if I'm going |
| 25 | to -- |

Jury Voir Dire and Trial on Merits
June 5, 2017

```
1              THE COURT:  You may not be on the jury.
2              VENIREPERSON 166:  I can wait.  I guess I
3    can --
4              THE COURT:  But I mean --
5              VENIREPERSON 166:  Oh, yeah.
6              THE COURT:  -- if you end up on the
7    jury --
8              VENIREPERSON 166:  Okay.  Right.  Yikes.
9              THE COURT:  We can defer you.
10             VENIREPERSON 166:  I just -- you know, I
11   just -- I never depend on anybody to pick up my kids.
12             THE COURT:  I gotcha.  Why don't we just
13   defer you until September?
14             VENIREPERSON 166:  That would be fine.
15             THE COURT:  Your number, please, ma'am?
16             VENIREPERSON 166:  166.  It's better when
17   they're in school -- when she's in school.
18             THE COURT:  Ms. Silva?
19             VENIREPERSON 166:  Yes, sir.
20             THE COURT:  Okay.  Thank you, ma'am.
21             VENIREPERSON 166:  Thank you.
22             THE COURT:  We'll send you that card
23   again.
24             Okay.  And over on the right-hand side?
25             VENIREPERSON 195:  Good morning.  Just a
```

1  hardship question this morning.

2              THE COURT:  Yes, sir.

3              VENIREPERSON 195:  I'm a federal

4  contractor paid by the hour.  Of course, a week is going

5  to hurt.  I just wanted to know if there's any kind of

6  exemption for that.

7              THE COURT:  No.  There's -- there's not.

8  Again, you're not on the jury yet.  There may be

9  something that you say that would cause people to strike

10 you.  I don't know.

11             MR. MILLAN:  The other question is, is

12 there anything special about this particular week that's

13 any different?

14             VENIREPERSON 195:  No.

15             THE COURT:  It's just the same thing every

16 week?

17             VENIREPERSON 195:  I've been doing it for

18 seven years.  I just wanted to ask.

19             MR. MILLAN:  Your number, sir?

20             VENIREPERSON 195:  195.

21             THE COURT:  Okay.  We'll see you in a

22 little bit.

23             Yes, ma'am?  Hi.  How are you doing?

24             VENIREPERSON 213:  I would probably rather

25 be here.  I have a colonoscopy scheduled on Wednesday.

Jury Voir Dire and Trial on Merits
June 5, 2017

```
1              THE COURT:  All right.  We can probably
2   reschedule you --
3              VENIREPERSON 213:  Okay.
4              THE COURT:  -- here a lot easier.
5              VENIREPERSON 213:  Yeah.
6              THE COURT:  What's your number?
7              VENIREPERSON 213:  213.
8              THE COURT:  Ms. Johnson?
9              VENIREPERSON 213:  Yes, sir.
10             THE COURT:  Okay.  Thank you, ma'am.
11             VENIREPERSON 213:  September is good.
12             THE COURT:  Okay.  We'll send you that
13  card.
14             Yes, ma'am?
15             VENIREPERSON 227:  I have three days of
16  staff development this week for school.  Can I defer it
17  until the end of September?
18             THE COURT:  Sure.  That would be good.
19  Your number, please, ma'am?
20             VENIREPERSON 227:  227.
21             THE COURT:  Ms. Hanson?
22             VENIREPERSON 227:  Yes, sir.
23             THE COURT:  Thank you.  We'll defer you
24  until September.
25             VENIREPERSON 227:  Okay.  Perfect.  Thank
```

Jury Voir Dire and Trial on Merits
June 5, 2017

```
 1   you.
 2              THE COURT:  Good morning.  How are you
 3   doing?
 4              VENIREPERSON 236:  I'm a sponsor at the
 5   Sunshine Kids event Wednesday morning at 8:00.
 6              THE COURT:  Is that a --
 7              VENIREPERSON 236:  It's cancer kids.  We
 8   run them up to Austin.
 9              THE COURT:  Well, we thank you for your
10   effort in that regard.  Your number, please, ma'am?
11              VENIREPERSON 236:  236.
12              THE COURT:  Ms. Dash?
13              VENIREPERSON 236:  Yes.
14              THE COURT:  You think September would be a
15   good --
16              VENIREPERSON 236:  That would be
17   wonderful.
18              THE COURT:  Thank you, ma'am.
19              Good morning.  How are you doing?
20              VENIREPERSON 242:  Morning.  Good.  I've
21   been chosen as a trainer for my campus for Seele to do
22   this -- we've got a new behavior initiative in the
23   district.  I'm supposed to attend my training on
24   Wednesday and Thursday and Monday.
25              THE COURT:  Okay.  Why don't we reschedule
```

Jury Voir Dire and Trial on Merits
June 5, 2017

1   you.  Would you prefer to come back before school starts

2   or --

3                    VENIREPERSON 242:  Not really, because

4   I've also got a 15-year-old who swims twice a day and

5   I've got to get her to her swimming.

6                    THE COURT:  Is September better then?

7                    VENIREPERSON 242:  September, October.

8                    THE COURT:  And your number, please,

9   ma'am?

10                   VENIREPERSON 242:  242.

11                   THE COURT:  Dana Williams?

12                   VENIREPERSON 242:  Yes.

13                   THE COURT:  Thank you.  We'll defer you

14   until the fall.

15                   VENIREPERSON 242:  Okay.  Thank you.

16                   THE COURT:  Yes, sir?

17                   VENIREPERSON 77:  James Gallaher, juror

18   number 77.  I am in charge of the church alone this

19   week.  My dad, Dennis Gallaher, and my mom had to go to

20   M.D. Anderson for the next eight weeks for radiation.

21   I've got the next eight weeks along with that.

22                   My wife is a schoolteacher and is in

23   conferences all week this week.  That leaves my nine and

24   ten-year-old at home by themselves.

25                   THE COURT:  Technically speaking, I guess,

CINDY CUMMINGS, CSR
OFFICIAL COURT REPORTER - 433RD DISTRICT COURT
TEL. (830) 221-1279   FAX (830)608-2030

Jury Voir Dire and Trial on Merits
June 5, 2017

1   under that circumstance, you would be entitled to a

2   child care exemption.

3                    VENIREPERSON 77:  That I can get taken

4   care of if I need to, so --

5                    THE COURT:  If just right now the next

6   couple of months is not good, we can just defer you

7   until September or so.

8                    VENIREPERSON 77:  No.  I'll tell you what,

9   if July -- I can make July work, no problem.

10                   THE COURT:  Okay.

11                   VENIREPERSON 77:  Yeah, as long as it's

12  the -- I think she has radiation through the second week

13  of July.

14                   THE COURT:  Okay.  Just the latter part of

15  July?

16                   VENIREPERSON 77:  Yes, sir, the latter

17  part of July and maybe even the -- I think the beginning

18  part of August would work as well.

19                   THE COURT:  Okay.  We'll defer you

20  until -- until then.

21                   VENIREPERSON 77:  Great.  I appreciate it.

22  Thank you, Judge.

23                   MR. MILLAN:  77?

24                   THE COURT:  Yes.

25                   Yes, sir?

Jury Voir Dire and Trial on Merits
June 5, 2017

 1              VENIREPERSON 294:  My son is graduating

 2    from basic training this week, Thursday and Friday, and

 3    my wife and I had taken off time.  He's going to then go

 4    immediately to tech school and be deployed.  It may be

 5    years before I see him again.  It just so happens it

 6    would be the same week that this happens.  I would love

 7    to be deferred, if at all possible.

 8              THE COURT:  And your number please, sir.

 9              VENIREPERSON 294:  294.

10              THE COURT:  Mr. Collins?

11              VENIREPERSON 294:  Yes, sir.

12              THE COURT:  All right.  Thank you.  I

13    appreciate your son's service.

14              VENIREPERSON 294:  Thank you, sir.

15              THE COURT:  Is there a month in particular

16    that you think is better for you?

17              VENIREPERSON 294:  Actually September.  I

18    texted my wife.  She has some trips planned and we have

19    elderly people that we take care of, so September would

20    be perfect.

21              THE COURT:  All right.  Thank you.

22              James, is he going to the judge or jury?

23              MS. DOYER:  He just told me they're going

24    to the judge.

25              THE COURT:  Okay.  So that might make

Jury Voir Dire and Trial on Merits
June 5, 2017

1   things a little simpler.

2                James, we've got 54 people with us.  I was

3   thinking of keeping this lady so far, but do you mind --

4   I don't know what the issues are.

5                MR. MILLAN:  I mean, we're going to you

6   for punishment, Judge.  Those are usually the big

7   issues.

8                THE COURT:  Okay.  So I'll let her go, if

9   you're okay with that.

10               MR. MILLAN:  Okay.  What number was she?

11               THE COURT:  2.

12               Ms. Cowsar, I believe we're going to be

13   able to make things work without keeping you here, so --

14   but I appreciate you being here today.

15               VENIREPERSON 2:  Okay.

16               THE COURT:  Thank you.

17               VENIREPERSON 2:  Thank you.

18               MS. DOYER:  Your Honor, we ran that

19   criminal history on Ms. Jacobs.  There is nothing that

20   shows up on her criminal history, so I think she's good

21   to go.

22               THE COURT:  I have no way of knowing what

23   embezzlement of rental property is considered.

24               MS. DOYER:  She has no record at all.

25               THE COURT:  Yeah.

Jury Voir Dire and Trial on Merits
June 5, 2017

 1          MS. DOYER:  There's one, a Jeffrey
 2  Henslee, he's number 215.  It looks like we filed
 3  charges out of Comal County on a felony tampering with a
 4  governmental record.  I just want to see what happened
 5  to that.
 6          THE COURT:  Okay.  You think it's --
 7  there's an indictment pending or --
 8          MS. DOYER:  Well, I don't know.  It
 9  doesn't have the disposition information.  It just shows
10  that charges were filed.  I was going to go look in
11  Odyssey real quick and see if it's been dismissed.
12          THE CLERK:  Is it in this county?
13          MS. DOYER:  Yes, ma'am.
14          THE COURT:  Are you anticipating a
15  shuffle?
16          MR. MILLAN:  No.
17          THE COURT:  Okay.  So we'll just fill in
18  the gaps and go ahead and start calling them in.  It
19  won't take us too long, if you can just tell -- like
20  when you say next door, are you talking about Judge
21  Boyer?
22          MS. DOYER:  Yeah.  I've got a 90-day writ
23  that I just wanted to make sure we got taken care of and
24  another one that was supposed to get reset.
25          (Recess taken)

Jury Voir Dire and Trial on Merits
June 5, 2017

```
 1                  (Open court, defendant present, no panel)

 2                  MS. DOYER:  I filed a motion in limine, if

 3    we could do that before voir dire -- he has it -- and a

 4    motion for fingerprints because he's not going to

 5    stipulate to the priors.  I can send Ronnie over there

 6    to print him at the jail.

 7                  THE COURT:  Is that a jurisdictional or a

 8    punishment issue?

 9                  MS. DOYER:  It will end up being both.

10    But for the purposes this trial right now that we're

11    about to do, jurisdictional.

12                  THE COURT:  Okay.  We could probably do

13    that -- is he incarcerated?  He's incarcerated.  They

14    could probably do it during lunch, but I'll sign off on

15    that.

16                  As far as the motions in limine, what are

17    we dealing with that we might not be able to agree with

18    for the purposes of voir dire?

19                  MS. DOYER:  Generally, it says impeachment

20    with specific instances of conduct.

21                  The victim is currently incarcerated.

22    She's currently incarcerated on charges out of Hays

23    County.  It happened maybe two weeks ago.  So any

24    mention or allusion to those charges and any impeachment

25    with drug abuse or anything like that would be improper.
```

**Jury Voir Dire and Trial on Merits**
**June 5, 2017**

1   So I didn't want any of that being waived in front of

2   the jury in voir dire.

3           MR. MILLAN:  If I feel that the door is

4   opened to it, I can approach and we can take it up

5   outside their presence.

6           THE COURT:  Okay.  Obviously, we're just

7   talking about for voir dire at the moment.

8           MR. MILLAN:  Oh, yeah.  I don't anticipate

9   any voir dire issues on it.

10           THE COURT:  Okay.

11           MS. DOYER:  Okay.

12           THE COURT:  But then -- just even beyond

13   voir dire, just -- just if you think for some reason you

14   need to go into -- the during cross-examination of the

15   victim, if you think you're going to need to impeach --

16           MR. MILLAN:  Who do you plan on calling

17   today?

18           MS. DOYER:  The victim.  I was going to

19   start with her.

20           THE COURT:  Okay.  Maybe we'll have time

21   to get more specific about it.  But just impeachment

22   issues, I guess just bring it to our attention before

23   you go into it.

24           MR. MILLAN:  I will.

25           MS. DOYER:  If we could just have a

**Jury Voir Dire and Trial on Merits**
**June 5, 2017**

1   hearing outside the presence of the jury.

2                    THE COURT:  Okay.

3                    (Off the record, hearing another matter)

4                    (Open court, defendant and panel present)

5                    THE COURT:  Ladies and gentlemen, I do

6   apologize, but there was a matter of constitutional

7   importance that I needed to take up, otherwise I would

8   not have kept you out there cooling your heels.  It's a

9   matter that I just needed to take up.

10                   At this time the attorneys are getting

11  ready to explore certain matters to determine whether

12  it's appropriate for you to sit on this particular jury

13  from their point of view.  They're seeking just

14  information regarding your experiences, your training,

15  your beliefs, et cetera.

16                   They're not allowed to go into the facts

17  of this case and -- and this is not the time in which

18  there would be objections regarding evidence, et cetera.

19  They may make other objections, but they're not allowed

20  to go into the evidence at this time.

21                   And again, they're not trying to embarrass

22  or annoy anybody.  If you need to answer a question, if

23  you'll just say, I would like to approach at a later

24  time, tell the attorneys, they'll make a note of it.

25  And to the extent that we ultimately need to do that,

June 5, 2017
Jury Voir Dire by Ms. Doyer

1  we'll call you up here at a later time to answer that

2  question with as much privacy as we possibly can afford

3  you.

4          But beyond that, again please speak up.  A

5  lot many times what one person may have to say may clue

6  another potential juror in or create a thought that's

7  relevant and needs to be expressed.  If you make sure

8  just everybody in the courtroom can hear you, it would

9  be beneficial.

10          As well in doing so, if you can just show

11  my court reporter, Cindy Cummings, that -- the large

12  side of the number on your little card, that will help

13  her at a later time because we have deferred a few

14  people, excused a few people and so the numbers are

15  consolidated.

16          Your original juror number is somewhat

17  meaningless at this time.  If you'll just refer to that

18  card that you have kind of as a seat number, it will be

19  beneficial.  And the attorneys may also just as a

20  verification process double-check your name as well.

21          Ms. Doyer, if you're ready.

22          MS. DOYER:  Yes, Your Honor.

23          THE COURT:  You may proceed.

24                JURY VOIR DIRE

25          MS. DOYER:  May it please the Court,

June 5, 2017
Jury Voir Dire by Ms. Doyer

1   opposing counsel.

2               Ladies and gentlemen of the jury panel,

3   good morning.  My name is Jackie Doyer.  I am an

4   assistant district attorney here with the Comal County

5   District Attorney's Office.  Our office handles a

6   variety of matters.

7               In civil matters we represent The

8   Department of Family & Protective Services.  In criminal

9   matters we represent the State of Texas in everything

10  from a Class C traffic ticket up to and including

11  capital felonies.  I work in the felony division.  You

12  are here in a district court, so we will be trying a

13  felony-level jury trial this week.

14              Now, in order to try a felony jury, we

15  first need to get a jury.  And so everybody that's out

16  here is called -- what we will call the venire or the

17  panel, kind of the general panel.  Once you make the

18  jury, your name and your role change, but we'll get into

19  that a little bit more.

20              My name is Jackie Doyer.  My trial partner

21  this week is standing here.  Her name is Kiera Kilday.

22  We have an intern here from the University of Texas

23  School of Law.  Her name is Samantha Whitehead.  They're

24  going to assist me today by taking notes of pretty much

25  everything that is being said.  Despite what I tell my

June 5, 2017
Jury Voir Dire by Ms. Doyer

1   husband, I cannot do two things at once so I need their

2   help.

3                   That brings me to my next introduction.

4   Ms. Cumming here, this young lady, is our court

5   reporter.  She's creating a record of all of the

6   proceedings that take place.  So in order for her -- my

7   assistants' notes to be useful to us and for the record

8   to be useful, it's important to identify everybody by

9   name or juror number or that seat number that you have

10  in front of you so we can track back who said what.

11                  In addition to that, we're used to talking

12  in common, everyday conversations using body language.

13  We'll nod our head for yes or shake our head for no.

14  Unfortunately, that can't be taken down on a record.  So

15  I'll have to ask you, can you answer audibly for me or

16  can you answer that out loud because that's how we'll

17  take it down.  Does that make sense to everybody?

18                  I'm waiting for the PowerPoint here.

19  While they're getting that going -- before I start into

20  some of the legal issues, I noticed a couple of people

21  had some criminal jury service and so I wanted to ask

22  about that.

23                  So I see -- is it Ms. Sheffield here in

24  seat number 3?

25                  VENIREPERSON 3:  Yes.

```
 1                    MS. DOYER:  Yes, ma'am.  I saw that you
 2      had criminal jury service you listed on your card.  Was
 3      that here in Comal County?
 4                    VENIREPERSON 3:  Yes, ma'am.
 5                    MS. DOYER:  And were you able to reach a
 6      verdict in that that case?
 7                    VENIREPERSON 3:  I got disqualified.
 8                    MS. DOYER:  So you were not actually on
 9      the jury?
10                    VENIREPERSON 3:  No.
11                    MS. DOYER:  And jumping back, Ms. Johnson
12      in seat number 8, I saw that you also listed that you
13      had been on a jury.  Was that here in Comal County?
14                    VENIREPERSON 8:  No, it was not.
15                    MS. DOYER:  Okay.  Where was that?
16                    VENIREPERSON 8:  That was in California --
17      Woodland, California.
18                    MS. DOYER:  In California.  Is that where
19      you're originally from?
20                    VENIREPERSON 8:  I'm originally a Texan,
21      but lived away from Texas for over 40-plus years.
22                    MS. DOYER:  Oh, wow.
23                    VENIREPERSON 8:  I retired back.
24                    THE COURT:  Are you happy to be back?
25                    VENIREPERSON 8:  Yes.
```

June 5, 2017
Jury Voir Dire by Ms. Doyer

```
1              MS. DOYER:  I don't know if you're

2    enjoying the heat much.  Were you able to reach a

3    verdict in that case?

4              VENIREPERSON 8:  Yes, we were.

5              MS. DOYER:  Were you the foreperson in

6    that case?

7              VENIREPERSON 8:  No, I was not.

8              MS. DOYER:  Mr. Peterson, I see you're an

9    attorney.  What type of law do you practice?

10             VENIREPERSON 9:  Primarily family law.

11             MS. DOYER:  And where are you based out

12   of?

13             VENIREPERSON 9:  San Antonio and Comal

14   County.

15             MS. DOYER:  Do you know myself and Ms.

16   Tharp or Mr. Millan?

17             VENIREPERSON 9:  I've met Ms. Tharp years

18   back.

19             MS. DOYER:  In meeting Ms. Tharp, is there

20   anything about meeting her or that relationship that

21   would make it difficult for you to sit on this type of

22   case?

23             VENIREPERSON 9:  No.

24             MS. DOYER:  Okay.  Mr. McCabe here in seat

25   number 11 --
```

June 5, 2017
Jury Voir Dire by Ms. Doyer

1          VENIREPERSON 11:  Yes, ma'am.

2          MS. DOYER:  Sir, I have it that you also

3    had served on a criminal jury; is that correct.

4          VENIREPERSON 11:  That's correct.

5          MS. DOYER:  And where was that?

6          VENIREPERSON 11:  Here in Comal County.

7          MS. DOYER:  Sir, were you able to reach a

8    verdict in that case?

9          VENIREPERSON 11:  The -- I think there was

10   a plea bargain right before it started.

11         MS. DOYER:  Okay.  Didn't end up going to

12   y'all for deliberations?

13         VENIREPERSON 11:  Correct.

14         MS. DOYER:  I understand.  And then I

15   have -- is it Ms. Rudloff over here, seat number 33?

16         VENIREPERSON 33:  Yes.

17         MS. DOYER:  I have it that you also had

18   served on a criminal jury.  Where was that?

19         VENIREPERSON 33:  Here in Comal.

20         MS. DOYER:  Were you able to reach a

21   verdict in that case?

22         VENIREPERSON 33:  Yes, we were.

23         MR. MILLAN:  What number was that?

24         MS. DOYER:  Seat number 33.

25         Were you the foreperson, ma'am?

June 5, 2017
Jury Voir Dire by Ms. Doyer

1          VENIREPERSON 33:  Yes, I was.

2          MS. DOYER:  If my technical guru can get

3    this going, we'll try; if not, I'll just go.

4          Well, I'll just kind of go off the

5    PowerPoint.  The defendant in this particular case is

6    charged with the felony offense of assault family

7    violence with a prior conviction for assault family

8    violence.  That is a felony in the State of Texas.

9          So like I said earlier, in order for us to

10   get to a jury trial, we first have to pick a jury.  Now,

11   is there anybody here who thought that jury selection

12   looked something like myself and the defense would come

13   in here and we'd pick the six jurors that we liked best

14   and then we have our 12?  Anybody think that it would

15   look like that?  No one?

16          I always feel like an idiot when I ask

17   this because this is truly what I believed up until I

18   started working.  It doesn't work that way.  Each side

19   in a felony case gets what are called ten peremptory

20   strikes.  Those are strikes that can be used for pretty

21   much any reason other than constitutionally protected

22   areas.  You can't strike someone just for gender, for

23   race, things like that.

24          However, let's see -- Mr. Polson here,

25   seat number 2 -- Mr. Polson, if I were trying a felony

CINDY CUMMINGS, CSR
OFFICIAL COURT REPORTER - 433RD DISTRICT COURT
TEL. (830) 221-1279   FAX (830)608-2030

June 5, 2017
Jury Voir Dire by Ms. Doyer

1  possession of marijuana case and you showed up wearing a

2  T-shirt with a giant marijuana leaf on it, do you think

3  I might use one of my strikes on you?

4                VENIREPERSON 2:  I'm pretty sure you

5  would.

6                MS. DOYER:  Pretty sure.  You would not be

7  the best juror for that particular case in my opinion.

8  That's just an example of kind of how those strikes

9  work.

10               So if each side gets ten of those, the

11  first 12 people that are left make up your jury.  So

12  effectively through juror number 32, Ms. Cruz over

13  here -- it's kind of what we call the strike zone, the

14  splash zone.  Y'all are right now the most likely

15  individuals to make our jury because of the ten, the ten

16  and then the 12 who are remaining.

17               Now, as we go through different areas of

18  the law, we might find that some people may be not

19  appropriate for this type of case or there is an aspect

20  of the law that they cannot follow, then it jumps back a

21  person.  Then it gets back to Ms. Rudloff and so on and

22  so forth.

23               I tell you this because statistically my

24  jury will most likely come from the left side of the

25  room, first couple of rows on the right side.  So I'll

June 5, 2017
Jury Voir Dire by Ms. Doyer

1   focus most of my time and attention on those

2   individuals, not because what you in the back here have

3   to say is not important.  It's simply because I have a

4   limited amount of time and I need to get to know as much

5   about you as I possibly can.  Does that make sense to

6   everybody?

7               So a useful way to kind of distinguish

8   between the two roles that you have right now as a

9   member of the panel versus when you become a member of

10  the jury is to think about the oaths that you took.  So

11  the first oath that you took this morning was simply to

12  answer truthfully the questions that are asked of you.

13  That's all that we're asking you to do at this point is

14  to tell us how you feel, what you think.

15              And once you become a member of the

16  panel -- of the jury, you are asked to swear that you

17  will render a true verdict according to the law and to

18  the evidence regardless of what your feelings may be

19  about the law.  It's just -- you have to apply the law.

20  That's why it's so important for you to speak up now.

21              In this first phase of jury selection, we

22  can only talk to you about the law and hypotheticals

23  about the law.  I can't tell you any facts of the case.

24  And the second part of the trial, it's called the

25  guilt/innocence phase.  That's where the State presents

June 5, 2017
Jury Voir Dire by Ms. Doyer

1    evidence.  You basically apply the evidence to the law

2    and see, did this individual do what the State alleges

3    beyond a reasonable doubt.  It's a very cold application

4    of the evidence to the law and you have a result.

5              Should a defendant be convicted, you move

6    into what is called the punishment phase.  Now, in Texas

7    it's one of the few jurisdictions that lets a defendant

8    choose who will assess punishment.  In this particular

9    case, the defendant has elected to go to the Judge for

10   punishment.  So this jury will only decide basically

11   guilt/innocence, whether he's guilty or not guilty.

12             Now, procedurally he has to make that

13   election before we start the trial here today.  It's not

14   any indication of, oh, I think I'm going to be convicted

15   so I'm going to the judge or I'm going to the jury.

16   It's just what the law requires.  He has to make that

17   election ahead of time.

18             So when I say that it's important for

19   y'all to, you know, be honest in this regard and expose

20   any biases or prejudices, I want you to know that when I

21   say bias or when I say prejudice, it's not a bad word in

22   this setting.  It's really important.

23             How many of you own a company or are in

24   some type of managerial position where you have to

25   conduct interviews?  Quite a few.

June 5, 2017
Jury Voir Dire by Ms. Doyer

1          Let's see here, Ms. Choske?

2          VENIREPERSON 7:  Yes.

3          MS. DOYER:  Ma'am, when you interview an

4   individual for a position, how much time do you take to

5   interview a person?

6          VENIREPERSON 7:  About an hour.

7          MS. DOYER:  And do you always find out

8   everything that you need to know in that hour?

9          VENIREPERSON 7:  I try to, not

10  necessarily.

11          MS. DOYER:  All right.  If I spent one

12  hour with all 53 of you individually, we would be here

13  forever; right?

14          So I have to find out as much as I can in

15  a very limited amount of time.  That's why these

16  questions are going to be kind of structured in a funny

17  way.

18          There we go.  We got power.  I'm going to

19  skip through some of these.  So up here I have a little

20  graphic about kind of your roles as a panel versus as a

21  jury member.

22          Now, I know that not every case is

23  appropriate for every juror, not every juror is

24  appropriate for every case.  If you were the victim of a

25  home invasion and you came in today and this was a home

June 5, 2017
Jury Voir Dire by Ms. Doyer

1   invasion trial, that might not be the most appropriate

2   case for you.  You might not have had enough time where

3   that has passed where that's not so fresh in your mind.

4   It could have happened over the weekend and there's no

5   way you could set that aside.

6              As we move through these different topics,

7   there are going to be times when you say, I don't think

8   this is right for me.  I can't set that aside.  There

9   may be something that you want to discuss more

10  privately.  Please just raise your hand and I'll mark

11  you down because I know how -- some of these matters

12  will be sensitive.  You won't want to discuss them with

13  the other 52 individuals in the room.  So we'll be able

14  to do that more privately up at the bench.

15             How many of you are married or have been

16  to a wedding?  That usually gets me nearly everyone.

17  All right.  So let me see some hands again.

18             All right.  Ms. Walker?

19             VENIREPERSON 5:  Yes, ma'am.

20             MS. DOYER:  Ms. Walker, married?

21             VENIREPERSON 5:  Yes, ma'am.

22             MS. DOYER:  Okay.  What are some of the

23  vows that you took at your wedding?

24             VENIREPERSON 5:  Honor and obey.

25             MS. DOYER:  To love, to honor and obey.

June 5, 2017
Jury Voir Dire by Ms. Doyer

1    And when the preacher or the minister or whoever turned

2    to your husband and asked, do you take Ms. Walker to be

3    your lawfully wedded wife?  Will you love, honor and

4    obey her?  And if he looks at you so convincingly and

5    says not I do, but I'll try, how would you feel about

6    that?

7                    VENIREPERSON 5:  No.

8                    MS. DOYER:  No.  My husband and I just

9    celebrated our anniversary.  And I can tell you if that

10   had been the answer, there would not have been an

11   anniversary to celebrate.

12                   Why not?  Why do you think the "I'll try"

13   is not so good?

14                   VENIREPERSON 5:  It's a vow.  It's got to

15   be yes or no, not maybe.

16                   MS. DOYER:  Okay.  Everybody hear what she

17   said?  It's a vow.  You've got to be yes or no, not

18   maybe.

19                   Why am I bringing this up?  As we move

20   through these different provisions of the law, I will

21   have to get a conclusive answer from you as to whether

22   or not you can follow the law.  I always get, you know,

23   Ms. Doyer, I think I can.  I'll try.  I probably can.

24   I'm going to have to bring you back to wedding vows.

25   It's got to be a yes or a no.

June 5, 2017
Jury Voir Dire by Ms. Doyer

1            Okay.  Parties in this case -- I've

2    already introduced myself and some of the members of my

3    team.  The defendant in this case is Derek Porter.  He's

4    seated here in the light blue shirt.  Does anybody know

5    Derek Porter?

6            And I see a hand back there, seat number

7    25, Mr. Moon.  Okay, sir.  I'll mark that down.  Thank

8    you.

9            Anybody know his counsel, Mr. Millan or

10   ever been represented by him?  None.

11           And Mr. Matias here is also assisting.

12   Does anybody know Mr. Matias?

13           All right.  What about a civilian by the

14   name of Georganne Shirley?  Does anybody know her?  I

15   see none.

16           Let's talk about our roles in a criminal

17   jury trial.  So as a member of the jury, your role will

18   be to listen to the evidence.  That comes in the form of

19   testimony from the witness stand and any exhibits that

20   are introduced through the witness stand.

21           You have to wait until everything is

22   presented.  You cannot make a decision or start

23   deliberating until everything has been presented, until

24   both sides have rested and closed.  You will have to

25   evaluate the credibility of the witnesses.  Then you

1  will render that true verdict according to the law and
2  to the evidence.
3          Let's talk a little bit about witness
4  credibility.  Has anyone seen this TV show that I have
5  up here on the screen?  I see some yeses.
6          Yes, ma'am, Ms. Jacobs, seat number 26.
7  Ms. Jacobs, what show is this?
8          VENIREPERSON 26:  The Voice, I think it
9  is.
10          MS. DOYER:  The Voice.  And how does this
11  show work?  What's the premise of the show?
12          VENIREPERSON 26:  They listen to your
13  voice without looking at you.  And if they think you
14  have the talent and they can go somewhere with you, they
15  will turn around.
16          MS. DOYER:  Did everybody hear what
17  Ms. Jacobs says?  I can't say it verbatim.  Basically
18  you have these judges.  You have contestants who come in
19  and audition.  It's like a talent show, but the judges
20  can't see the contestant.  They make their evaluation
21  solely on what they hear, what comes out of that singer
22  or contestant's mouth.
23          Really that's what the law requires you to
24  do with witnesses.  Every witness has to come in on
25  equal footing.  If your witness is a prostitute, a

June 5, 2017
Jury Voir Dire by Ms. Doyer

1    police officer or a priest, they are all supposed to

2    walk in here on equal footing.

3              Now, once they start to testify, that's

4    when you can start to evaluate their credibility.  What

5    you can't do is give someone credibility solely because

6    they belong to a certain class or not give them

7    credibility solely because they belong to a certain

8    class or they have a certain profession, things like

9    that.  I've summarized that up here, but that applies to

10   officers, civilians and the defendant should he choose

11   to testify.

12             So my question at this point is, is there

13   anybody who feels like they can't do that, like maybe

14   they already have some preconceived notions about

15   credibility?  Like if a police officer takes the stand,

16   I'm automatically going to believe him.  Anybody feel

17   like that?  Looking at my left side of the room, anybody

18   over here?  I see none.  Anybody on my right side of the

19   room?  Anybody feel like that, like they couldn't wait

20   until the witness testifies to assess credibility?  I

21   seen none on the right side either.

22             Now, if you start changing answers when

23   Mr. Millan stands up here, I'm going to feel like a big

24   bully because I just want you to be honest with me.

25             The Judge's role in a criminal trial, he's

June 5, 2017
Jury Voir Dire by Ms. Doyer

1   kind of like a referee.  There are rules that Mr. Millan

2   and I have to play by, rules of evidence, rules of

3   procedure, rules of how to behave in a courtroom

4   basically.  The Judge will make rulings on some of those

5   evidentiary issues that come up in a trial.

6           And at the end of the trial, he also will

7   give the jury what is called the Court's charge.  And so

8   what I have up here is an example of one that we tried

9   here with Judge Waldrip, a far more complicated case,

10  but it's basically your little Bible or instruction

11  manual when you go back there.  It will have the

12  charges.  It will have what the defendant has pled:

13  Guilty, not guilty.  Then it will have all of the law

14  that applies to that case.

15          We're going to talk about the law in here

16  today so I can get your feelings about it and what you

17  think.  Don't feel like you have to memorize anything

18  because you're going to get it back there.

19          What about the defendant?  What do you

20  think a defendant's role in a criminal trial is?  Have

21  any ideas?

22          Ms. Organ, what do you think.

23          VENIREPERSON 1:  To answer truthfully when

24  asked questions and -- and present his cases as much as

25  possible to his own advantage obviously.

June 5, 2017
Jury Voir Dire by Ms. Doyer

1          MS. DOYER:  Okay.  Jump over to --
2     Ms. Campos, what do you think?
3          VENIREPERSON 4:  To defend themselves.
4          MS. DOYER:  Ms. Bell, what do you think?
5          VENIREPERSON 6:  Present his case if he's
6     guilty or not guilty.
7          MS. DOYER:  Let me change the question up
8     a little bit.  What are some rights that we as citizens
9     have under the United States Constitution, the Texas
10    Constitution?
11         Mr. Martinez, what do you think, sir?
12         VENIREPERSON 10:  I'm sorry, what was the
13    question?
14         MS. DOYER:  What are some rights that we
15    have as citizens under our constitution?
16         VENIREPERSON 10:  To be able to sit here
17    and -- and serve as a juror.
18         MS. DOYER:  Sure, to be able to sit as a
19    juror.  Every citizen has a right to a jury trial.
20    Y'all didn't know you were going to get a civics lesson,
21    did you?
22         Ms. Webb, what do you think?  What are
23    some other rights that we have?
24         VENIREPERSON 12:  Fair and speedy trial,
25    don't have to incriminate yourself, plead the Fifth if

June 5, 2017
Jury Voir Dire by Ms. Doyer

1   you don't want to take the stand.

2                    MS. DOYER:  The right to a fair and speedy

3   trial.  What she was just talking about, that you can

4   plead the Fifth.  That's the Fifth Amendment right to

5   remain silent and not give evidence against yourself.

6                    And, Mr. Garcia, can you think of anything

7   else?

8                    VENIREPERSON 13:  I'm not the best at it.

9                    MS. DOYER:  That's okay.  What about

10  Ms. Lawton right next to him?

11                   VENIREPERSON 14:  Freedom of speech and

12  religion.

13                   MS. DOYER:  So you hit on most of these

14  here.  So a defendant in a criminal trial has only

15  rights, no burdens, no responsibilities.  He has the

16  right to the jury trial.  He has the right to the

17  presumption of innocence.  He has the Fifth

18  Amendment right to remain silent.  He has the right to

19  elect who will assess his punishment, either a judge or

20  a jury.  He has equal subpoena power with the State and

21  he has the right to have the State prove the elements of

22  the offense beyond a reasonable doubt.

23                   So there are a couple of these that I want

24  to talk about in a little more detail.  We'll start with

25  the presumption of innocence.  All defendants are

June 5, 2017
Jury Voir Dire by Ms. Doyer

1  presumed innocent of charges that are brought against

2  them.  It's the State's burden and job to prove that

3  they're guilty.  The defendant can be acquitted by the

4  presumption alone.

5             So a defendant walks in here basically

6  cloaked in this presumption of innocence.  Anybody seen

7  Harry Potter or read the Harry Potter books?  I see a

8  couple.

9             Okay.  Mr. McCabe, are you familiar with

10 his cloak of invisibility?

11            VENIREPERSON 11:  Yes, ma'am.

12            MS. DOYER:  What is Harry Potter's cloak

13 of invisibility?

14            VENIREPERSON 11:  He just throws it around

15 himself and sneaks in, gets the bad guy and sneaks out.

16            MS. DOYER:  What he's wearing, can anybody

17 see him?

18            VENIREPERSON 11:  No.

19            MS. DOYER:  That's kind of how the

20 presumption of innocence works.  A defendant walks in

21 cloaked in that presumption of innocence.  He's

22 basically invisible.

23            Now, the presumption is rebuttable.  That

24 means that the State can overcome it.  As they present

25 evidence, they can kind of remove that cloak to prove

June 5, 2017
Jury Voir Dire by Ms. Doyer

1    the case beyond a reasonable doubt.  So I have here
2    Harry Potter when he first got his cloak.  It's part of
3    it being removed.
4            So, Mr. Peterson -- sir, if I sent you and
5    11 other jurors right now back to the jury room and I
6    said, Mr. Peterson, it's y'all's job to decide at this
7    point is Mr. Porter guilty or not guilty of assault
8    family violence with a prior conviction --
9            VENIREPERSON 9:  At this point having not
10   heard any evidence, I would say he's innocent.
11           MS. DOYER:  Okay.  Anybody disagree with
12   that?  Everybody understand how that works?
13           At this stage no evidence has been
14   presented.  He is still wearing the cloak of the
15   presumption of innocence.  Does that make sense to
16   everyone?
17           Okay.  Is there anybody who feels like,
18   hey, he's sitting here, must have done something.  I
19   can't afford him the presumption of innocence?
20           Yes, sir, is that Mr. Criddle?
21           VENIREPERSON 16:  Yes.
22           MS. DOYER:  So you understand the
23   presumption of innocence and how it works?
24           VENIREPERSON 16:  Yes.
25           MS. DOYER:  Tell me what you're thinking,

June 5, 2017
Jury Voir Dire by Ms. Doyer

```
 1  sir.
 2              VENIREPERSON 16:  It's just emotionally
 3  based, just understanding the -- I've got seven kids at
 4  home.  I've got a pretty big family.  I have a zero
 5  tolerance for family violence, so I'm -- like you said,
 6  he must have done something.  That's why he's here.
 7              MS. DOYER:  Okay.  So I kind of want to
 8  explain a couple of things.  One is, I don't think --
 9  you said you have zero tolerance for family violence.
10  And I think that's going to go for everybody in the
11  room.  I highly doubt anybody sitting here is going to
12  raise their hands and say, you know, family violence is
13  okay.  No one is going to say that.
14              At the same time, you've got a feeling
15  that he must have done something.  There -- there is a
16  procedure by which someone is indicted and that --
17  that's presented to the grand jury and all of that, but
18  that's just to bring him to court.  The State still has
19  to prove that he's guilty beyond a reasonable doubt.
20              Are you able to hold the State to their
21  burden?
22              VENIREPERSON 16:  Like I said, in my mind
23  I've already kind of made a decision, so I mean
24  unfortunately --
25              MS. DOYER:  That's okay.  Thank you,
```

June 5, 2017
Jury Voir Dire by Ms. Doyer

1   Mr. Criddle.  I appreciate your honesty.

2                   Is there anybody else that feels like

3   that?

4                   VENIREPERSON 17:  I would say maybe not to

5   his extent because I only have one kid, but I'm -- I

6   kind of rush to judge people, I guess.  I have a

7   little -- I interview people.  She says she interviews

8   people for an hour.  I give them about ten minutes.

9                   MS. DOYER:  And there's Mr. Wiatrek, seat

10  number 17?

11                  VENIREPERSON 17:  Yes, ma'am.

12                  MS. DOYER:  And would you be able to

13  afford him that presumption of innocence?

14                  VENIREPERSON 17:  Yes, but probably it

15  could take more.  I deal with people for a living, so I

16  tend to maybe judge people a little sooner than I

17  should.

18                  MS. DOYER:  Okay.  So perhaps the evidence

19  that it would take to convince you would be different

20  than it would be for someone else?

21                  VENIREPERSON 17:  Probably.

22                  MS. DOYER:  I understand, but you can

23  afford him that presumption of innocence?  And I see you

24  nodding.

25                  VENIREPERSON 17:  Yes.

June 5, 2017
Jury Voir Dire by Ms. Doyer

1        MS. DOYER:  Okay.  Thank you, sir.  I told
2   you, wedding vows.
3        All right.  The Fifth Amendment.  The
4   defendant has a right to remain silent.  I have some
5   little graphics that we'll go over.  He has a right to
6   remain silent, not give evidence against himself.  I
7   can't call him as a witness and he can't be forced to
8   testify.  This is a constitutional protection that he
9   has.
10       There are many reasons why a defendant may
11  not testify other than if I get up there, I'm going to
12  incriminate myself.  So what are some reasons -- and I
13  have some graphics up here.  What are some reasons why a
14  defendant may not testify other than fear of
15  self-incrimination?  What do y'all think?
16       Mr. Boozel back there?
17       VENIREPERSON 23:  Just rather play it out
18  with the evidence.
19       MS. DOYER:  Would rather play it out with
20  the evidence.  Sure, it's the State's burden; right?  I
21  see you nodding.
22       VENIREPERSON 23:  Yes.
23       MS. DOYER:  Okay.  Mr. Whitley, what do
24  you think?
25       VENIREPERSON 24:  I have no idea.

June 5, 2017
Jury Voir Dire by Ms. Doyer

1          MS. DOYER:  No idea.  You see something on

2     my little cartoons up here?  What do you think about

3     that guy who is hiding behind the curtain?

4          VENIREPERSON 18:  Nervous.

5          MS. DOYER:  I heard someone say nervous.

6     That would be Mr. Grell?

7          VENIREPERSON 18:  Yes.

8          MS. DOYER:  This one here on the far

9     right, he might be afraid to undergo cross-examination,

10    could be nervous, could have a speech impediment.  There

11    are many reasons why a defendant may not testify.  He

12    could take the advice of his attorney.

13          Much like Mr. Boozel said, he may be

14    waiting to see did the State meet their burden.  And the

15    defense attorney could say, they haven't met their

16    burden or I don't think you need to testify or whatever

17    it may be.  The point is, you wouldn't know the reason.

18    It doesn't matter.  It can't be considered against this

19    defendant.

20          Now, we live in a society that it's

21    frequently that you will hear -- you want to hear both

22    sides of every story.  You will typically hear both

23    sides of every story.  But in a courtroom, you walk into

24    this sterile environment where there is the constitution

25    that protects these individuals and their rights.

June 5, 2017
Jury Voir Dire by Ms. Doyer

1              And so it's not that you can't want to
2    hear from a defendant.  You can want to hear from him
3    all day long.  Where it becomes a problem is if he
4    exercises his constitutionally protected right and you
5    hold it against him.  Does that make sense?
6              Okay.  So my question is, is there anybody
7    who would hold it against a defendant if he chose not to
8    testify?
9              Yes, sir, Mr. Polson?
10             VENIREPERSON 2:  I just feel like if
11   you're innocent, that you would get up there whether
12   you're willing to or not or nervous about it.  I've
13   always had a problem with the Fifth Amendment.
14             MS. DOYER:  All right.  But you understand
15   how it works?
16             VENIREPERSON 2:  Yes.
17             MS. DOYER:  It's the same protection that
18   applies to you, to me should I ever need it, and it's
19   constitutional protection.
20             VENIREPERSON 2:  Yes.
21             MS. DOYER:  Are you saying that you would
22   not be able to afford that protection to this defendant?
23             VENIREPERSON 2:  It would be a little
24   rougher -- a little rougher for me to.
25             MS. DOYER:  Okay.  A little rougher.  So

June 5, 2017
Jury Voir Dire by Ms. Doyer

1   is that a no?

2                   VENIREPERSON 2:  It's a yes.

3                   MS. DOYER:  You would not be able to?

4                   VENIREPERSON 2:  That's correct.

5                   MR. MILLAN:  I'm sorry, is that yes, you

6   would not be able to --

7                   MS. DOYER:  Yes.  That's right.

8                   VENIREPERSON 2:  I would hold it against

9   him.

10                   MR. MILLAN:  Okay.  Thank you.

11                   MS. DOYER:  Does anybody else feel like

12   Mr. Polson?

13                   Is that Mr. Criddle?  Yes, sir, I've

14   already got you down for another, but I'll go ahead and

15   mark this one down.

16                   Anybody else on the left side of the room?

17                   VENIREPERSON 17:  I'm probably the same.

18                   MS. DOYER:  Mr. Wiatrek, you would hold it

19   against this defendant if he chose to exercise his right

20   to remain silent?

21                   VENIREPERSON 17:  Yes, ma'am, kind of the

22   same as the first gentleman said.

23                   MS. DOYER:  Okay.  And, Mr. Boozel, yes,

24   sir?

25                   VENIREPERSON 23:  I tend to associate that

June 5, 2017
Jury Voir Dire by Ms. Doyer

1  with guilt.

2              MS. DOYER:  You tend to associate that

3  with guilt.

4              All right.  Anybody on my right side of

5  the room?

6              Mr. Sowell, seat number 29, okay, sir.

7  Tell me how you feel about the Fifth Amendment .

8              VENIREPERSON 29:  The defendant should get

9  up there and he should be able to state what's going on

10  and why.  I mean, he was arrested for a reason.

11             MS. DOYER:  Okay.  And you believe that if

12  he did not testify, you would hold it against him?

13             VENIREPERSON 29:  Correct.

14             MS. DOYER:  Anybody else on that right

15  side of the room?  Okay.  I see no others.  Thank y'all

16  for your honesty.

17             What about the State?  What do y'all think

18  the State's role in the criminal trial is?

19             Ms. Torres, what do you think?  You're

20  pretty quiet back there.  Got any ideas?

21             Ms. Montez, right next to her, what do you

22  think, ma'am?

23             VENIREPERSON 19:  To gather the facts.

24             MS. DOYER:  To gather the facts.

25             And you had a card up, Mr. Garcia?

June 5, 2017
Jury Voir Dire by Ms. Doyer

1          VENIREPERSON 13:  To find the truth and to
2    uphold it to the fullest extent of the law.
3          MS. DOYER:  That's pretty close, sir.
4          My job as a prosecutor, what I'm ethically
5    required to do is to seek justice.  That's what I'm
6    sworn to do, sworn to uphold the laws of the State of
7    Texas, to enforce them.  I'm also in a criminal trial
8    tasked with proving the case beyond a reasonable doubt.
9          So let's talk about that standard of
10   proof.  Beyond a reasonable doubt, does anybody have any
11   idea what that means?  Anybody?
12          Mr. Boozel, yes, sir?
13          VENIREPERSON 23:  There's no question.
14   It's -- I mean, it is obviously guilty.
15          MS. DOYER:  Okay.  No question, obviously
16   guilty.
17          Anybody else have any other ideas?
18          VENIREPERSON 17:  100 percent.
19          MS. DOYER:  100 percent, Mr. Wiatrek.
20          VENIREPERSON 3:  You presented your case
21   that it can only be one person.
22          MS. DOYER:  That's Ms. Sheffield?
23          VENIREPERSON 3:  Yes, number 3.
24          MS. DOYER:  Thank you, ma'am.
25          How many people here would like a

June 5, 2017
Jury Voir Dire by Ms. Doyer

1   definition for that?  Anybody like a definition?  A

2   couple.

3               All right.  So we used to have a

4   definition for beyond a reasonable doubt.  It was about

5   four paragraphs long.  And in a case called Paulson

6   versus State, our highest court of appeals that deals

7   with criminal cases said, you know what, it doesn't

8   really make sense.  Jurors can figure it out on their

9   own and there is no definition now.  So basically beyond

10  a reasonable doubt now is whatever 12 members of the

11  community say that it is.

12              I can't tell you the definition.

13  Mr. Millan can't tell you the definition.  I could tell

14  you what it is not.  I could tell you it's not what you

15  see on TV, beyond a shadow of a doubt.  It's not beyond

16  all doubt.  It's not 100 percent.  It's beyond a

17  reasonable doubt.

18              I can give you an illustration that kind

19  of helps conceptualize this.  I'm looking up here at the

20  screen.  I've got -- so, Mr. Lopez, seat number 22?

21              VENIREPERSON 22:  Loper.

22              MS. DOYER:  I'm sorry, Mr. Loper, can you

23  tell me what's up there on the screen?

24              VENIREPERSON 22:  Looks like puzzle

25  pieces.

June 5, 2017
Jury Voir Dire by Ms. Doyer

1              MS. DOYER:  Can you tell what the puzzle
2    is of?
3              VENIREPERSON 22:  A puzzle.
4              MS. DOYER:  Can you tell what the puzzle
5    is of?
6              VENIREPERSON 22:  No.
7              MS. DOYER:  Okay.  What about now?
8              VENIREPERSON 22:  Yes.
9              MS. DOYER:  What's that a puzzle of?
10             VENIREPERSON 22:  It's a firearm.
11             MS. DOYER:  A picture of a gun; right?
12             VENIREPERSON 22:  Yeah.
13             MS. DOYER:  You know that beyond all
14   doubt; right?
15             VENIREPERSON 22:  Yes.
16             MS. DOYER:  There's nothing about that
17   that could be like an elephant or cotton candy.  That's
18   a gun, isn't it?
19             VENIREPERSON 22:  It looks like a gun to
20   me.
21             MS. DOYER:  All right.  What if I take
22   away a few pieces, Mr. Loper?  Is that still -- is that
23   a puzzle that is a picture of a gun?
24             VENIREPERSON 22:  Yes.
25             MS. DOYER:  Okay.  You know that beyond a

CINDY CUMMINGS, CSR
OFFICIAL COURT REPORTER - 433RD DISTRICT COURT
TEL. (830) 221-1279   FAX (830)608-2030

June 5, 2017
Jury Voir Dire by Ms. Doyer

1    reasonable doubt?

2              VENIREPERSON 22:  Yes.

3              MS. DOYER:  What if I take away more

4    pieces but leave you those, can you still tell what the

5    object of the picture is?

6              VENIREPERSON 22:  Yes.

7              MS. DOYER:  Okay.  That is kind of like an

8    illustration of what beyond a reasonable doubt is.  The

9    State is going to give you enough for you to be able to

10   determine this is the picture in front of me.  This is

11   beyond a reasonable doubt, but it's not necessarily

12   going to require every single piece.  It's not beyond

13   all doubt.  It's beyond a reasonable doubt.

14             That being said, is there anybody who

15   feels like beyond a reasonable doubt is not a high

16   enough burden of proof?

17             Mr. Wiatrek said 100 percent.  Is there

18   anybody who feels like they would need to be convinced

19   100 percent before convicting someone of a felony

20   offense?  Maybe the standard of proof isn't working.

21   Anybody feel like that over here on the left side?  I

22   see none.  Anybody over here on the right side feel like

23   that is just too high a burden of proof?  I see none on

24   the right side.

25             I told you this case is an assault family

June 5, 2017
Jury Voir Dire by Ms. Doyer

```
1   violence case with the allegation of a prior conviction.
2   So let's talk a little bit about family violence.  What
3   do y'all think about when I say family violence or when
4   you hear that term?
5               Ms. Bell, seat number 6?
6               VENIREPERSON 6:  I guess anger because
7   I've dealt with it --
8               MS. DOYER:  All right.
9               VENIREPERSON 6: -- not like in the law,
10  but personally.
11              MS. DOYER:  Okay.  Anger.  What else?
12              Yes, sir, Mr. Grell?
13              VENIREPERSON 18:  Physical and mental,
14  emotional torture, abuse.
15              MS. DOYER:  Mr. Grell, where do these
16  events typically occur?
17              VENIREPERSON 18:  At home.
18              MS. DOYER:  And who is typically present
19  for those events?
20              VENIREPERSON 18:  The family.
21              MS. DOYER:  When you say the family, who
22  do you mean?
23              VENIREPERSON 18:  Kids -- the kids, the
24  wife typically.
25              MS. DOYER:  Are these offenses that are
```

June 5, 2017
Jury Voir Dire by Ms. Doyer

1  typically committed out in public?

2          VENIREPERSON 18:  Sometimes.

3          MS. DOYER:  Are there typically a lot of

4  witnesses to these types of offenses?

5          VENIREPERSON 18:  Generally, no.

6          MS. DOYER:  Is domestic violence, do you

7  think, about -- just about the physical abuse?

8          Ms. Tilley?

9          VENIREPERSON 15:  Yes.

10          MS. DOYER:  I saw you shake your head no

11  there.  What are you thinking?

12          VENIREPERSON 15:  No.  I believe it's

13  emotional and physical -- and/or physical.

14          MS. DOYER:  What is an abuser trying to do

15  when he uses that physical force against his victim?

16  What do you think?

17          VENIREPERSON 15:  I think he's trying to

18  show his power and -- and bring fear into the home.

19          MS. DOYER:  All right.  Other than the

20  physical abuse, what are some other ways that an abuser

21  might use to exhibit control or power over his victim?

22  Can you think of any examples?  What about financial

23  isolation or isolation from friends and family, things

24  like that?

25          So would you agree with me, Ms. Tilley,

June 5, 2017
Jury Voir Dire by Ms. Doyer

1    that family violence is more than just the physical

2    beating that takes places?

3                    VENIREPERSON 15:  Absolutely.

4                    MS. DOYER:  Is there anybody that

5    disagrees with that?

6                    Yes, sir, Mr. Peterson?

7                    VENIREPERSON 9:  I thought you had to have

8    a reasonable fear of imminent bodily harm.

9                    MS. DOYER:  We're talking about -- that

10   would be actually aggravated assault or an assault by

11   threat.  But when we're talking about the term family

12   violence, kind of what does it mean to people in general

13   when they hear that?

14                   VENIREPERSON 9:  That's an apprehension of

15   physical violence, I thought.

16                   MS. DOYER:  It can be under the law, yes,

17   sir.

18                   VENIREPERSON 9:  I didn't know it included

19   mental.

20                   MS. DOYER:  So this would be just more

21   about the dynamics than about what actually constitutes

22   a charge.

23                   My question is generally when you think

24   about family violence, what do you think about in your

25   head?  Does it encompass more than just the actual

CINDY CUMMINGS, CSR
OFFICIAL COURT REPORTER - 433RD DISTRICT COURT
TEL. (830) 221-1279   FAX (830)608-2030

June 5, 2017
Jury Voir Dire by Ms. Doyer

1   beating or do you tend to think it's just about the

2   beating that takes place?

3              VENIREPERSON 17:  Just in general, just an

4   unhealthy situation.

5              MS. DOYER:  Okay.

6              VENIREPERSON 17:  Whatever leads to that.

7              MS. DOYER:  So my next question is, is

8   there anyone here who themselves was a victim of -- or

9   has a friend or family member who is a victim of

10  domestic violence?

11             All right.  Let me go row by row.  I've

12  got seat number 3.

13             VENIREPERSON 3:  Mary Sheffield.

14             MS. DOYER:  Ms. Sheffield, were you

15  yourself a victim or someone else?

16             VENIREPERSON 3:  I was a victim.

17             MS. DOYER:  Ma'am, based on that

18  experience, would you be able to set that aside and --

19  and judge this case solely on the facts of this case?

20             VENIREPERSON 3:  Yes.

21             MS. DOYER:  Ms. Sheffield, did you ever

22  call law enforcement on your abuser?

23             VENIREPERSON 3:  Yes.

24             MS. DOYER:  Was he ever prosecuted?

25             VENIREPERSON 3:  Yes.

```
 1              MS. DOYER:  And I had Ms. Bell.  You had
 2   indicated that you were a victim?
 3              VENIREPERSON 6:  Yes.
 4              MS. DOYER:  Ms. Bell, is that something
 5   that you would be able to set aside?
 6              VENIREPERSON 6:  Yes.
 7              MS. DOYER:  And did you ever call law
 8   enforcement --
 9              VENIREPERSON 6:  No.
10              MS. DOYER:  -- on your abuser?
11              Row two -- did I have anyone on row two?
12              Ms. Webb, yes, ma'am, was it someone you
13   knew?
14              VENIREPERSON 12:  My brother.
15              MS. DOYER:  Your brother?
16              VENIREPERSON 12:  Uh-huh.
17              MS. DOYER:  Ma'am, how did you know about
18   that?
19              VENIREPERSON 12:  My bother was in the ICU
20   from being stabbed by his stepson over a dozen times.
21              MS. DOYER:  Was the stepson prosecuted?
22              VENIREPERSON 12:  Nope, walked free.
23              MS. DOYER:  I'm sorry?
24              VENIREPERSON 12:  He walked free.
25              MS. DOYER:  Would that experience be
```

June 5, 2017
Jury Voir Dire by Ms. Doyer

1    something that you could set aside?

2                    VENIREPERSON 12:  Yes.

3                    MS. DOYER:  Moving back to row three, yes,

4    ma'am, Ms. Tilley?

5                    VENIREPERSON 15:  Yes.  I was a victim

6    and -- I and my children were victims many years ago.

7                    MS. DOYER:  Ms. Tilley, was law

8    enforcement ever called on any of those incidents?

9                    VENIREPERSON 15:  Yes.

10                   MS. DOYER:  Was the abuser prosecuted?

11                   VENIREPERSON 15:  No.

12                   MS. DOYER:  And would you be able to set

13   that experience aside?

14                   VENIREPERSON 15:  No.

15                   MR. MILLAN:  I couldn't hear that.

16                   MS. DOYER:  She said no.

17                   Anyone else on row three?

18                   Row four, Mr. Loper?

19                   VENIREPERSON 22:  Yeah, my daughter was a

20   victim.

21                   MS. DOYER:  Sir, how did you find out

22   about that?

23                   VENIREPERSON 22:  Phone call.  She lives

24   in Ohio, so I got a phone call.

25                   MS. DOYER:  And do you know if she ever

June 5, 2017
Jury Voir Dire by Ms. Doyer

1    called law enforcement?

2              VENIREPERSON 22:  Yes.

3              MS. DOYER:  And was that individual

4    prosecuted?

5              VENIREPERSON 22:  Yes, he was.

6              MS. DOYER:  Would you be able to set that

7    experience aside and look solely at the facts of this

8    case?

9              VENIREPERSON 22:  Yes.

10             MS. DOYER:  Moving back to row five,

11   anybody on row five?

12             Yes, sir, Mr. Whitley?

13             VENIREPERSON 24:  I had an ex-girlfriend

14   that was -- yeah, that was part of that.

15             MS. DOYER:  That she was a victim?

16             VENIREPERSON 24:  Yeah.  Yeah.

17             MS. DOYER:  Okay.  And how did you know

18   that she was a victim?

19             VENIREPERSON 24:  She told me.  It was

20   like in her childhood.

21             MS. DOYER:  Do you know if law enforcement

22   was ever called or that individual was prosecuted?

23             VENIREPERSON 24:  No.  No, it wasn't.

24             MS. DOYER:  It was not?

25             VENIREPERSON 24:  No.

```
 1            MS. DOYER:  Would you be able to set that
 2   experience aside, Mr. Whitley?
 3            VENIREPERSON 24:  I would say that it
 4   would affect it a little bit, but I think I could push
 5   it aside.
 6            MS. DOYER:  Okay.  So I heard you could
 7   set it aside a little bit and you think you could.  So
 8   I'm going to have to bring you back to those wedding
 9   vows, sir.  Do you think you could set it aside or you
10   could not?
11            VENIREPERSON 24:  Yes.
12            MS. DOYER:  Anybody else's on that row --
13   on the left side of the room?
14            Yes, sir, Mr. Garcia?
15            VENIREPERSON 13:  Mother in a previous
16   relationship, stabbing.
17            MS. DOYER:  She was stabbed?
18            VENIREPERSON 13:  Yes.
19            MS. DOYER:  And was law enforcement
20   called?
21            VENIREPERSON 13:  I don't believe so.
22            MS. DOYER:  Would you be able to set that
23   experience aside?
24            VENIREPERSON 13:  Yes.
25            MR. MILLAN:  Is that a yes?
```

June 5, 2017
Jury Voir Dire by Ms. Doyer

1           VENIREPERSON 13:  That's a yes.

2           MS. DOYER:  Moving over to the right side,

3    anybody who themselves was a victim or knew -- I was

4    going to go row by row over here.

5           I have Mr. Sowell.

6           VENIREPERSON 29:  Correct.

7           MS. DOYER:  And who was it that you knew?

8           VENIREPERSON 29:  My mother.

9           MS. DOYER:  How did you know about it?

10          VENIREPERSON 29:  I would hear it.

11          MS. DOYER:  Was law enforcement called?

12          VENIREPERSON 29:  No.

13          MS. DOYER:  Would you be able to set that

14   aside?

15          VENIREPERSON 29:  No.

16          MS. DOYER:  Anybody else on that row?

17          Moving back -- is that Ms. Cervantes?

18          VENIREPERSON 36:   yes.

19          MS. DOYER:  Yes, ma'am, who was it that

20   you knew?

21          VENIREPERSON 36:  Some of my students.  I

22   work at Comal Independent School District and I've had

23   to call CPS and DFPS because I had a student make an

24   outcry.  It was actually her and her twin sister.

25          MS. DOYER:  Okay.  And so that -- are you

June 5, 2017
Jury Voir Dire by Ms. Doyer

1   a teacher?

2                   VENIREPERSON 36:  Yeah, kind of.  I'm an

3   assistant director for an after-school curriculum-based

4   program.  I'm in charge of about -- between 30 to 40

5   student at a time.  At that time this past school year,

6   I've had to make the reports.

7                   MS. DOYER:  As a mandatory reporter, these

8   were all reported to law enforcement or to CPS?

9                   VENIREPERSON 36:  But I don't know the

10  outcome of it.  I just know that they were no longer in

11  their parents' care.  I don't know what happened beyond

12  that.

13                  MS. DOYER:  Okay.  Ma'am, with your

14  knowledge of those incidents, would you be able to set

15  that aside and sit on this jury?

16                  VENIREPERSON 36:  Yeah.

17                  MR. MILLAN:  Is that a yes?

18                  VENIREPERSON 36:  Yes.

19                  MS. DOYER:  Anybody else on that second

20  row?

21                  Row three, I have Mr. Cook, seat number

22  42.  Yes, sir?

23                  VENIREPERSON 42:  My wife.

24                  MS. DOYER:  And how did you know about

25  that, sir?

June 5, 2017
Jury Voir Dire by Ms. Doyer

1           VENIREPERSON 42:  She told -- we talked
2   about it quite a number of times.
3           MS. DOYER:  Do you know if law enforcement
4   was ever called in that case?
5           VENIREPERSON 42:  Not to my knowledge.
6           MS. DOYER:  Okay.  Sir, would you be able
7   to set that aside?
8           VENIREPERSON 42:  Yes.
9           MS. DOYER:  And I had someone else on that
10  row, seat number 44, Mr. Luttrell?
11          VENIREPERSON 44:  Uh-huh.
12          MS. DOYER:  Yes, sir, who was it?
13          VENIREPERSON 44:  I was a victim of it.
14          MS. DOYER:  You were a victim?  And who
15  was the perpetrator?
16          VENIREPERSON 44:  My dad.
17          MS. DOYER:  Your dad.  Sir, was he ever
18  prosecuted?
19          VENIREPERSON 44:  Yes.
20          MS. DOYER:  Would you be able to set that
21  experience aside and look solely at the facts and
22  circumstances of this case?
23          VENIREPERSON 44:  I would need more
24  information about the crime, about what happened.
25          MS. DOYER:  Okay.  I'll be able to give

June 5, 2017
Jury Voir Dire by Ms. Doyer

```
1   you more information about the charge itself, but
2   nothing about the facts.  I'll come back to you after
3   we've gone over that, okay?  Remind me.
4                  Seat number 41, Ms. Talley, yes, ma'am?
5                  VENIREPERSON 41:  I spent 22 years working
6   with children in a child welfare system.  Currently I'm
7   a pediatric social worker at the University Hospital.
8   We get all of the level-one traumas which include
9   nonaccidental trauma.
10                 MS. DOYER:  Mostly hurt children?
11                 VENIREPERSON 41:  Correct.
12                 MS. DOYER:  Ma'am, with your knowledge of
13  that and your experience, would you be able to set that
14  aside?
15                 VENIREPERSON 41:  Yes.
16                 MS. DOYER:  Row four?
17                 Yes, sir, seat number 46, Mr. Pozzi?  Who
18  was it that you knew?
19                 VENIREPERSON 46:  Sister.
20                 MS. DOYER:  And how did you know that she
21  was a victim?
22                 VENIREPERSON 46:  She told me.
23                 MS. DOYER:  Was law enforcement called?
24                 VENIREPERSON 46:  Yes.
25                 MS. DOYER:  And was that individual
```

June 5, 2017
Jury Voir Dire by Ms. Doyer

1    prosecuted?

2              VENIREPERSON 46:  I think they're in court

3    today actually.

4              MS. DOYER:  They have a case pending in

5    Comal County?

6              VENIREPERSON 46:  No, in Bexar.

7              MS. DOYER:  In Bexar?  And, Mr. Pozzi,

8    would you be able to set that experience aside?

9              VENIREPERSON 46:  Yes.

10             MS. DOYER:  And I have -- yes, ma'am, seat

11   number 51, Ms. Lorah?

12             VENIREPERSON 51:  Lorah.

13             MS. DOYER:  Who was it that you knew?

14             VENIREPERSON 51:  Me.

15             MS. DOYER:  Ma'am, was law enforcement

16   called in that situation?

17             VENIREPERSON 51:  Yes and no.

18             MS. DOYER:  Was that individual

19   prosecuted?

20             VENIREPERSON 51:  One of them was.

21             MS. DOYER:  And, ma'am, could you set

22   those experiences aside or would it be difficult for you

23   to sit on this type of jury?

24             VENIREPERSON 51:  It would be real

25   difficult.

June 5, 2017
Jury Voir Dire by Ms. Doyer

1           MS. DOYER:  Thank you, ma'am.  I
2   appreciate your honesty.  That's seat number 51.
3           And then I had -- is it Ms. Thrasher right
4   next to her?
5           VENIREPERSON 50:  My daughter.
6           MS. DOYER:  And how do you know?
7           VENIREPERSON 50:  Phone call and him
8   coming to my house.
9           MS. DOYER:  Was law enforcement called?
10          VENIREPERSON 50:  Yes.
11          MS. DOYER:  Do you know if that individual
12  was prosecuted?
13          VENIREPERSON 50:  No.
14          MS. DOYER:  And would you be able to set
15  that aside, ma'am?
16          VENIREPERSON 50:  No.
17          MS. DOYER:  Seat number 50.
18          Is there anybody that I've missed?
19          Yes, ma'am, Ms. Johnson?
20          VENIREPERSON 8:  Yes, ma'am.  The question
21  was specifically referring just to family members.  I
22  want you to know that I was an educator for 39 years.  I
23  was a mandatory reporter.  And in those 39 years, I've
24  had to deal with family violence in terms of some of my
25  students.  And right now I do volunteer work with women

June 5, 2017
Jury Voir Dire by Ms. Doyer

1   who have been involved with domestic violence.

2               MS. DOYER:  Okay.  So you volunteer with

3   some type of organization?

4               VENIREPERSON 8:  Yes, I do.

5               MS. DOYER:  Ma'am, with that prior

6   knowledge from your -- from your work and then the

7   volunteer work that you do, would that make it difficult

8   for you to sit on this type of case, or would you be

9   able to set that aside and look at the facts and

10  circumstances of this?

11              VENIREPERSON 8:  I could look at the facts

12  and circumstances.

13              MS. DOYER:  Thank you, ma'am.

14              Those of you who answered that you knew

15  somebody who was a victim or were yourselves a victim

16  and law enforcement was called, did you ever express or

17  know of that individual to express regret after calling

18  law enforcement?

19              Anybody know that -- know about that?

20  Anybody know someone who would return to a violent

21  relationship?  I see a couple of nods.

22              Is it Ms. Thrasher?

23              VENIREPERSON 50:  Yes, my daughter.

24              MS. DOYER:  Elaborate on that a little

25  bit.

June 5, 2017
Jury Voir Dire by Ms. Doyer

 1          VENIREPERSON 50:  My daughter would go
 2    back to the same situation over and over.
 3          MS. DOYER:  Did she ever give you any
 4    reasons for that?
 5          VENIREPERSON 50:  She loved him, and
 6    financial.
 7          MS. DOYER:  All right.  Anybody think of
 8    anything else?
 9          Yes, sir, Mr. Loper?
10          VENIREPERSON 22:  I know many people that
11    have went back to an abusive relationship.
12          MS. DOYER:  And did they ever tell you or
13    express to you any particular reasons?
14          VENIREPERSON 22:  Usually it's the person
15    was a breadwinner or they don't want to -- they want
16    somebody to be there for the kids, insecure, but those
17    things.  And I just run across a lot of people that go
18    back to those relationships.
19          MS. DOYER:  Is there anybody who thinks
20    that is unusual?  That it would be an unusual
21    circumstance for a victim to return to that type of
22    environment?  I see none.
23          Anybody who would hold it against a victim
24    if she did return to that type of environment?  I see
25    none on the left side.  Anyone on the right?

June 5, 2017
Jury Voir Dire by Ms. Doyer

```
 1              Mr. Womble, you kind of nodded your head
 2    there.  What are you thinking?
 3              VENIREPERSON 31:  That would not make
 4    sense.
 5              MS. DOYER:  Would you hold it against her
 6    if she did return?
 7              VENIREPERSON 31:  I would.
 8              MS. DOYER:  Anybody else feel like
 9    Mr. Womble?
10              Give me one second.  Seat number 45,
11    Mr. Gamboa?
12              VENIREPERSON 45:  Yes, ma'am.
13              MS. DOYER:  Tell me what you're thinking
14    there.
15              VENIREPERSON 45:  Like I don't understand
16    why they would go to that same situation knowing that
17    it's not going to get any better.
18              MS. DOYER:  So, Mr. Gamboa, let me ask
19    you, if the State proved beyond a reasonable doubt that
20    this offense occurred, but -- you know, that she went
21    back over and over again, would you hold it against the
22    State --
23              VENIREPERSON 45:  Against the State?
24              MS. DOYER:  -- in proving their case?
25              VENIREPERSON 45:  I would probably go with
```

June 5, 2017
Jury Voir Dire by Ms. Doyer

1  the defendant because of the fact that they didn't prove

2  the case the way they should have.

3           MS. DOYER:  Okay.  When you say that they

4  didn't prove the case the way they should have, what do

5  you mean by that?

6           VENIREPERSON 45:  Well, I mean, it depends

7  on what evidence they give is going to be the

8  determining factor.

9           MS. DOYER:  What evidence the defense

10  gives?

11           VENIREPERSON 45:  Well, both.

12           MS. DOYER:  Okay.  I do want to make --

13  make sure everybody understands that because the State

14  has the burden and the defense has the presumption of

15  innocence, the defense doesn't have to do anything.

16  They don't have to present a case.  They don't have to

17  present evidence.  Mr. Millan can sit here -- I know he

18  won't, but he can sit here and just play crosswords all

19  day if he wanted to.  That's this defendant's right.

20  It's for me to do my job, not for them to have to prove

21  him innocent.  Does that make sense to everybody?

22           VENIREPERSON 45:  Yeah.

23           MS. DOYER:  Okay.  So, Mr. Gamboa, I had

24  somebody else back there --

25           VENIREPERSON 47:  Me.

June 5, 2017
Jury Voir Dire by Ms. Doyer

1         MS. DOYER:  Yes, sir.  Is it

2   Mr. Koltermann?

3         VENIREPERSON 47:  Yes.  If they keep going

4   back to the same thing, what's the difference?  I'm

5   trying to figure out how to put it into words.  She's

6   not -- once they do get separated, what would be the

7   reason for them to go back to that same person other

8   than security or maybe something like that?  But like he

9   said, if they don't present the evidence, what's going

10  to keep her from going back again, or them going back to

11  that one person again?

12        MS. DOYER:  Okay.

13        VENIREPERSON 47:  That's the question that

14  I will have, you know.

15        MS. DOYER:  Why she keeps going back?

16        VENIREPERSON 47:  Yeah.

17        MS. DOYER:  Okay.  All right.  Anybody

18  else on that subject?

19        Does anybody know -- anybody themselves or

20  know a friend or family member who has been accused of

21  domestic violence?

22        That's seat number 4, Ms. Campos?

23        VENIREPERSON 4:  Yeah, my older brother,

24  he abused, I think, two of his older girlfriends.

25        MS. DOYER:  And do you know if he was

June 5, 2017
Jury Voir Dire by Ms. Doyer

1   prosecuted, ma'am?

2           VENIREPERSON 4:  I don't believe so.

3           MS. DOYER:  Do you believe that he was

4   treated fairly by -- was he -- was law enforcement ever

5   called?

6           VENIREPERSON 4:  Yes, law enforcement was

7   called.

8           MS. DOYER:  Do you believe he was treated

9   fairly by law enforcement and the system?

10          VENIREPERSON 4:  I believe -- no,

11  actually.

12          MS. DOYER:  No.  Why do you say that?

13          VENIREPERSON 4:  Because I saw the victim

14  and she did look like she was abused.

15          MS. DOYER:  Okay.  Was that circumstance

16  or your relationship with your brother, is that

17  something that you could set aside and look solely at

18  the facts of this case?

19          VENIREPERSON 4:  Yeah, I think I could.

20          MS. DOYER:  Anybody else on that first

21  row?  Second row?

22          VENIREPERSON 9:  As a younger man I was

23  accused of family violence.  There was no law

24  enforcement involved.  And the charges, though formal in

25  court, through a civil matter were eventually dropped.

June 5, 2017
Jury Voir Dire by Ms. Doyer

1              MS. DOYER:  And, Mr. Peterson, would that
2    experience -- do you feel like you were treated fairly
3    by the system?
4              VENIREPERSON 9:  Yes.
5              MS. DOYER:  Sir, do you think you could
6    set that aside, or would it be difficult for you to set
7    that aside in this type of case?
8              VENIREPERSON 9:  I think I could set it
9    aside.
10             MS. DOYER:  Anybody else on that second
11   row?  Third row?
12             Mr. Grell, yes, sir?
13             VENIREPERSON 18:  I have a friend that --
14   back from high school for many years, that had married a
15   woman who was not really all there.  She was prone to
16   mental breakdowns, aggressive, abusive and verbal
17   towards him.  Sometimes he would react.
18             Now, he never acted on it.  But at times
19   he would verbalize to me, because we were close friends,
20   that -- the desire to get rid of her in some fashion.  I
21   would calm him down and -- and tell him that this is not
22   how you handle it.
23             About 15 years -- he divorced her.  About
24   15 years later, the second husband hacked her to bits,
25   about 52 knife stabs and killed her and walked out of

June 5, 2017
Jury Voir Dire by Ms. Doyer

1   the house and told her son, I just killed your mom.

2              And it was a pretty heavy-duty thing to

3   deal with because I knew she was nuts.  And that was

4   a -- it was, you know -- it -- he never did anything

5   about it, but he verbalized it.  He never acted on it

6   because I stopped him from ever acting on it.  He

7   finally did the right thing.  But ten years later or

8   however long it was, the second husband acted on it.

9              MS. DOYER:  Okay.  So, Mr. Grell, it

10  sounds like the friend that you had was not prosecuted

11  and he was never charged.

12             VENIREPERSON 18:  No, but there was police

13  involvement on occasions to where they got close to

14  blows or to blows.  And in a way, he was defending

15  himself.

16             MS. DOYER:  Okay.  Now, would you -- do

17  you feel like your friend was treated fairly in that

18  situation by law enforcement or the criminal justice

19  system?

20             VENIREPERSON 18:  I mean, yeah, I guess.

21  It was -- they -- they sided on her side more than on

22  his because it's obviously always the guy's fault and

23  tends to be directed to the guy most of the time, but

24  she was nuts.

25             MS. DOYER:  And would you be able to set

June 5, 2017
Jury Voir Dire by Ms. Doyer

1   that experience all aside or would all of that --

2               VENIREPERSON 18:  I would definitely want

3   to hear about the spouse because of that experience.

4               MS. DOYER:  Would you be able to set your

5   experience aside and look solely at the evidence that is

6   presented in this case?

7               VENIREPERSON 18:  Sure, but -- yeah.

8               MS. DOYER:  The other -- the other portion

9   that you described where this individual ends up being

10  murdered, would you be able to set that experience aside

11  and look only at the evidence in this case?

12              VENIREPERSON 18:  I don't know.  That part

13  I don't know.

14              MS. DOYER:  So I kind of have to pin you

15  down here.

16              VENIREPERSON 18:  Could I set aside the

17  fact that she was killed ten years later by the second

18  husband?  No, that's hard to deal with.  That's always

19  been hard to deal with.

20              MS. DOYER:  Thank you, sir.

21              Moving back to row four and -- and row

22  five.

23              Yes, ma'am, Ms. Jacobs, who is it that you

24  knew?

25              VENIREPERSON 26:  I was accused of child

1   abuse.

2              MS. DOYER:  And, ma'am, were charges ever

3   filed?

4              VENIREPERSON 26:  No, I didn't do any jail

5   or anything for that.  They took my one daughter.

6              MS. DOYER:  Do you prefer to discuss that

7   more privately?

8              VENIREPERSON 26:  Yes.

9              MS. DOYER:  Anybody on the right side of

10  the room?

11             Okay.  I see -- I see seat number 51, yes,

12  ma'am?

13             VENIREPERSON 51:  My father.

14             MS. DOYER:  Was accused?

15             VENIREPERSON 51:  Yeah.

16             MR. MILLAN:  I'm sorry, what number again?

17             MS. DOYER:  Seat number 51.

18             And, ma'am, was he ever prosecuted or were

19  charges filed?

20             VENIREPERSON 51:  Charges were filed.  I

21  don't think my mother ever prosecuted him.

22             MS. DOYER:  Okay.  That relationship with

23  your father and knowing that he was charged with that,

24  do you feel like he was treated fairly by the system?

25             VENIREPERSON 51:  Probably more than fair,

1    yeah.

2                    MS. DOYER:  Okay.  Would you be able to

3    set that experience aside and look solely at the facts

4    and circumstances of this case?

5                    VENIREPERSON 51:  I doubt it.

6                    MS. DOYER:  Thank you, ma'am.

7                    All right.  Anybody else on this matter

8    before I move on?  I see none.

9                    When I say assault -- you know, this is a

10   family violence case.  What types of facts or scenarios

11   kind of pop into y'all's minds when I say the word

12   assault?

13                   Now, Mr. Peterson mentioned a fear of

14   imminent bodily injury.  What other things do y'all

15   think about?

16                   Ms. Torres, I'm going to pick on you a

17   little bit.  You're so quiet back there.

18                   VENIREPERSON 20:  Where there has been

19   violence or something.

20                   MS. DOYER:  Violence.

21                   I've got a couple of other quiet ones over

22   here.  Ms. Colie, what do you think?

23                   VENIREPERSON 27:  I think assault could be

24   anything from a gun to even a baseball bat.

25                   MS. DOYER:  Pretty close, ma'am.

June 5, 2017
Jury Voir Dire by Ms. Doyer

1           Mr. Fieseler, what do you think?

2           VENIREPERSON 28:  Like -- I think you can

3    thump them on the head and that's assault.  If you use

4    physical anything, be it with your hands or an object,

5    it's -- it's definitely a threat.

6           MS. DOYER:  Okay.  So in Texas we have a

7    huge list of assaults.  So a misdemeanor Class C assault

8    is offensive touching.  Say I'm at a soccer game and I

9    get mad because some kid was mean to my nephew on the

10   field and I go push the parent.  It's probably not going

11   to cause them pain.  It could be offensive to that

12   individual.  They could file a complaint in a JP court

13   for a Class C misdemeanor.  That is a fine-only

14   misdemeanor.  There's no jail time that attaches to it.

15          Moving up the chain you have a Class A

16   misdemeanor assault.  Basically what makes it a Class A

17   is that it causes bodily injury.  So take an assault and

18   you add the fact that it caused that other person bodily

19   injury, it becomes a Class A misdemeanor.

20          So maybe I pushed that person, but it was

21   into a rock or into a wall and that caused him or her

22   pain.  Then we're now looking at a Class A misdemeanor.

23   The legislature jumps the punishment up if you cause

24   pain to another person.

25          What might make that more serious?  There

June 5, 2017
Jury Voir Dire by Ms. Doyer

1   are a couple of ways regular assault can become a
2   felony.  One is if it is a family violence assault and
3   that individual has a prior conviction for family
4   violence assault.  Then it's a third-degree felony.
5             Another way is if you have two or more
6   incidents of family violence within a year, it becomes a
7   third-degree felony.  That's that continuous family
8   violence.  If you commit assault against a family member
9   by strangling or suffocating them, that's a third-degree
10  felony.
11            And then it kind of jumps up, if you cause
12  serious bodily injury, a second-degree felony.  If you
13  use or exhibit a deadly weapon kind of like Ms. Colie
14  was talking about, a bat or a gun, it's a second-degree
15  felony.  If you commit family violence, use or exhibit a
16  deadly weapon and cause serious bodily injury, it's a
17  first-degree felony.
18            So there's all of these factors that can
19  play into what level assault you're looking at.  What
20  we're looking at is family violence.  So it's basically
21  misdemeanor family violence assault, but it's a felony
22  because this individual has previously been convicted.
23  Does that make sense to everybody?
24            Okay.  So what does the State have to
25  prove beyond a reasonable doubt?  We have to prove what

June 5, 2017
Jury Voir Dire by Ms. Doyer

1  are called the elements of the offense.  These come

2  directly from the penal code.

3          So I have to prove that this defendant

4  committed assault.  The victim was someone he was in a

5  dating relationship with, had been in a dating

6  relationship with or was a member of his family or

7  household and that the defendant was previously

8  convicted of a family violence offense.

9          So assault in the State of Texas is to

10 intentionally, knowingly or recklessly cause bodily

11 injury.  It's that simple.  What is bodily injury?

12 Bodily injury is defined as physical pain, illness or

13 any impairment of the physical condition.

14         So when you look up at that definition of

15 bodily injury, what is not up there?  What do you not

16 see that's required?  Does it require visible injury?

17 Does it require broken bones or bruising?

18         Ms. Montez, if I came over there and I

19 pulled your hair and dragged you to the front of the

20 room, would that cause you pain?

21         VENIREPERSON 19:  Probably so, yep.

22         MS. DOYER:  Probably so.  Would it leave a

23 mark necessarily?

24         VENIREPERSON 19:  Perhaps.

25         MS. DOYER:  Perhaps, okay.  Where would it

June 5, 2017
Jury Voir Dire by Ms. Doyer

1   leave a mark, Ms. Montez?

2                   VENIREPERSON 19:  It depends where you

3   drug me.

4                   MS. DOYER:  If I take you from where

5   you're sitting and I drag you right here next to juror

6   number 1, I don't touch anything else, it's just the

7   pulling of the hair --

8                   VENIREPERSON 19:  No.

9                   MS. DOYER:  -- it won't leave any marks,

10  will it?  You will have felt pain, won't you?

11                  VENIREPERSON 19:  Yeah.

12                  MS. DOYER:  That's all that's required for

13  bodily injury.  It's as simple as that.

14                  Contrast that with serious bodily injury,

15  which is not what applies to this type of case, but I

16  want you to see the difference.  Serious bodily injury

17  is bodily injury that creates a substantial risk of

18  death or that causes death, serious permanent

19  disfigurement or the protracted loss or impairment of

20  the function of any bodily member or organ.

21                  So there we're talking more about the

22  broken bones, the severe beatings, things like that as

23  opposed to bodily injury where we're just looking at was

24  there pain, did it cause illness or any impairment of

25  the physical condition.

June 5, 2017
Jury Voir Dire by Ms. Doyer

1          So knowing that those are your
2  definitions, is there anybody who disagrees with that,
3  who thinks that I should have to prove visible injury or
4  I should have to prove more than just pain?  Anybody
5  feel like that on the left side of the room?  I see
6  none.  Anybody over here on the right side of the room?
7          Is it, Mr. Collier, you look like you're
8  kind of contemplating over there, so I'm going to pick
9  on you.  What do you think?
10          VENIREPERSON 38:  So ask me again.
11          MS. DOYER:  All right.  So I don't have to
12  prove visible injury.  All I have to prove is pain,
13  illness or impairment of the physical condition and that
14  is at the time of the assault.  I don't have to prove
15  any of the stuff under serious bodily injury.
16          So do you -- are you okay with that
17  definition of bodily injury or do you think I should
18  have to prove something more?
19          VENIREPERSON 38:  Not for that degree.
20          MS. DOYER:  Not for the third degree?
21          VENIREPERSON 38:  Right.
22          MS. DOYER:  What about you, sir?  What do
23  you think?
24          VENIREPERSON 37:  Yeah.  I mean, same.
25          VENIREPERSON 28:  I have a question.

June 5, 2017
Jury Voir Dire by Ms. Doyer

1              MS. DOYER:  Let me just identify this

2    juror by number.  That was Mr. Hurley, seat number 37.

3              And then I have Mr. Fieseler.

4              VENIREPERSON 28:  How do you prove pain?

5              MS. DOYER:  How do you think I prove pain?

6              VENIREPERSON 28:  Ma'am?

7              MS. DOYER:  How do you think I prove pain?

8              VENIREPERSON 28:  You say you're hurt.

9    Can you lie?

10             MS. DOYER:  Everybody can lie.  That goes

11   to credibility of the witnesses.  Does that make sense?

12             VENIREPERSON 28:  I understand.

13             MS. DOYER:  Okay.  So moving on from --

14   that was Mr. Fieseler, seat number 28.

15             Now that we've kind of discussed these

16   definitions, does anybody have any questions about that?

17             All right.  Previously convicted.  Under

18   the law, a person has been previously convicted of a

19   family violence assault if they were adjudged guilty of

20   the offense or they entered a plea of guilty or nolo

21   contendere in return for a grant of deferred

22   adjudication regardless of whether the offense -- the

23   sentence was ever imposed or the sentence was probated.

24             Basically what that is saying is someone

25   can commit family violence, be put on probation, never

June 5, 2017
Jury Voir Dire by Ms. Doyer

1   go to jail for it, be put on a special type of probation

2   where they never would get a conviction, but the law

3   looks at it as if they had been convicted.

4          Does anybody have a problem with that

5   being the law?

6          Yes, sir, seat number 17?

7          VENIREPERSON 17:  Will we know the details

8   of that first one?

9          MS. DOYER:  So the way it works is the

10  prior convictions are what are called jurisdictional

11  elements.  It's something that I have to prove to prove

12  it's a felony.  However, I can't get into the details of

13  the assault except for limited circumstances.

14          So you'll know or you'll have evidence of

15  the fact that this individual was previously convicted,

16  but that's pretty much all you'll get.  Does that make

17  sense?

18          VENIREPERSON 17:  Yeah, it makes sense.  I

19  guess I would -- that would affect -- I mean, I would

20  think that has a huge effect on this case.

21          MS. DOYER:  Meaning what?

22          VENIREPERSON 17:  Well, I mean, I don't

23  know all of the fine details, but if I get a speeding

24  ticket, I do the deferred adjudication because that's

25  what is easiest for me.  I don't know how that applies

June 5, 2017
Jury Voir Dire by Ms. Doyer

 1  here, but --

 2              MS. DOYER:  Well, I guess my question is,

 3  if someone was put on deferred adjudication for a family

 4  violence offense and then they commit family violence

 5  again, that would make it that third-degree felony.  So

 6  the law looks at that deferred adjudication as though

 7  it's a prior conviction.  Do you have a problem with

 8  that being the law?

 9              VENIREPERSON 17:  I would just like to

10  know the details of that first case.  But if it's just

11  that cut and dry, I mean, I -- I don't have a problem

12  with it, but it doesn't make sense to me.

13              MS. DOYER:  A lot of things in the

14  legislature do not make sense.

15              Yes, sir, Mr. McCabe?

16              VENIREPERSON 11:  Will we know what the --

17  how it was adjudicated, the first one, whether it was --

18  whether it was a plea or --

19              MS. DOYER:  I cannot give you the facts of

20  this particular case.

21              VENIREPERSON 11:  Okay.

22              MS. DOYER:  All I can tell you is I have

23  to prove he was previously convicted.  And it can be in

24  any of these manners, whether it was an actual final

25  conviction where he did jail time, a true conviction

June 5, 2017
Jury Voir Dire by Ms. Doyer

1   where he got probation or a deferred adjudication
2   probation.
3                   VENIREPERSON 11:  And the law says
4   regardless of how, that's --
5                   MS. DOYER:  That's previously convicted,
6   yes, sir.  Do you have a problem with that being the
7   law?
8                   VENIREPERSON 11:  No.
9                   MS. DOYER:  Does anybody have a problem
10  with that being the law?  Anybody on the right side of
11  the room?
12                  Yes, ma'am, Ms. Cervantes?
13                  VENIREPERSON 36:  It's a question.
14  Regardless of their punishment, that means they were
15  found guilty of that original case?
16                  MS. DOYER:  Whether they entered a plea of
17  guilty or a nolo contendere and received any of those --
18  basically the three types of punishment, whether it's
19  jail time, straight probation or deferred adjudication
20  probation, under the law they're considered previously
21  convicted.  Do you have a problem with that?
22                  VENIREPERSON 36:  I feel like it would
23  make a big difference if I was on the jury just
24  because -- if this is your first time or first -- the
25  first time you're accused of something, then I could

June 5, 2017
Jury Voir Dire by Ms. Doyer

1   say, okay, it was in the evidence.  Maybe he's innocent.

2   Maybe he's not.  But if you become what we call a repeat

3   offender at my job, it's hard for me to believe that --

4   that you're -- it's -- the more you've been accused of

5   something, the harder it is for me to believe that you

6   haven't done it because you've already been --

7                MS. DOYER:  Okay.  So that brings up a

8   good point.  This prior conviction is what I -- like

9   what I call the jurisdictional element.  It can't be

10  considered for the purposes of he did it here, he must

11  have done it again.  When we look at this particular

12  case, you're just looking at did he commit this new

13  assault.  And then the prior conviction is just what

14  gets us into this courtroom.  Does that make sense?

15               And so if you -- if you take that prior

16  conviction and you start to use it against him, what

17  you've done is started to erode his presumption of

18  innocence.  So can you afford him that presumption of

19  innocence knowing that those convictions are out there,

20  those are jurisdictional elements?

21               VENIREPERSON 36:  I can't give you a solid

22  yes, so I'm going to go with no.

23               MS. DOYER:  Okay.  I appreciate your

24  honesty, Ms. Cervantes.  That is seat number 36.

25               Yes, ma'am, seat number 21, Ms. Allison?

1              VENIREPERSON 21:  Yes, ma'am.  I also have

2    a -- if I'm honest with you, a problem with it being a

3    repeat offense.

4              MS. DOYER:  Okay.  And when you say you

5    have a problem with it being a repeat offense -- as a

6    prosecutor, I have problems with repeat offenses all the

7    time.  My question is, would you be able to look at this

8    as a jurisdictional element only or would it affect his

9    presumption of innocence?

10             VENIREPERSON 21:  For me it affects it.

11             MS. DOYER:  Okay.  Thank you, Ms. Allison.

12             Anybody else?

13             Yes, ma'am, Ms. Cruz?

14             VENIREPERSON 32:  It affects it.

15             MS. DOYER:  Okay.  This would affect his

16   presumption of innocence.  Thank you, Ms. Cruz.

17             Up there when I was talking about assault,

18   we looked at the mental states:  Intentionally,

19   knowingly or recklessly.  You're going to get the

20   definitions of this in the charge.  Intentionally is

21   basically was it your conscious objective or desire to

22   do this.  Knowingly is you do this knowing that this

23   result could occur.  Reckless, were you aware of the

24   risk that could happen and you disregarded the risks.

25             So that's kind of the summary of what

June 5, 2017
Jury Voir Dire by Ms. Doyer

1   those mean, but you'll get the full definitions.

2   Intentionally, knowingly or recklessly, I don't have to

3   prove the assault was premeditated or that, you know,

4   maybe he woke up that morning and he planned it out and

5   then he went out and executed it.  I don't have to prove

6   any of that.  It's just intentionally, knowingly or

7   recklessly at the time of the assault.  Does anybody

8   think that I should have to prove that it was a

9   premeditated assault?  I see none.

10              So that's it.  That's what the State has

11  to prove beyond a reasonable doubt, that it was this

12  defendant, that he caused that victim bodily injury and

13  that he had basically that special type of relationship

14  with that victim, whether it's dating, household or

15  family member, and that he was previously convicted for

16  this type of offense.  That's all that the State has to

17  prove beyond a reasonable doubt.

18              Does anybody have any questions about what

19  the elements are or what the State has to prove?

20              Does anybody disagree with the fact that

21  this is a felony offense?

22              So let's talk about a couple more things

23  and then I'll wrap up.  Evidence, what type of evidence

24  do you expect to see in a domestic violence case?  What

25  do y'all think?

June 5, 2017
Jury Voir Dire by Ms. Doyer

1          VENIREPERSON 3:  Pictures.

2          MS. DOYER:  Pictures.  That's

3    Ms. Sheffield.

4          Ms. Sheffield, what if it's a situation

5    where there's no visible injury?

6          VENIREPERSON 3:  You are probably going to

7    have to get witnesses or medical.

8          MS. DOYER:  Would you require pictures in

9    order to find a defendant guilty of this type of

10   offense?

11         VENIREPERSON 3:  No.

12         MS. DOYER:  Is there anybody who would

13   require pictures?  I've got a couple.

14         Ms. Campos, yes, ma'am?

15         VENIREPERSON 4:  Yes, I would require

16   pictures or a lot of -- a lot of witnesses, I guess.

17         MS. DOYER:  Or a lot of witnesses.  I'll

18   come back to that.  I had another hand back here.

19         VENIREPERSON 47:  That was me.  Pictures

20   will come -- like they say, a picture is worth a

21   thousand words, so --

22         MS. DOYER:  Is that seat number 48?

23         VENIREPERSON 47:  No, 47.

24         MS. DOYER:  47, Mr. Koltermann.

25         Okay.  Now, same question I asked

June 5, 2017
Jury Voir Dire by Ms. Doyer

1    Ms. Sheffield, what if there's no visible injury?

2                    VENIREPERSON 47:  Well, don't they take

3    pictures during -- if she goes to the hospital and they

4    have pictures taken then.

5                    MS. DOYER:  Okay.  Let me ask you this.  I

6    went over the definition of bodily injury.  All that it

7    requires is pain.

8                    VENIREPERSON 47:  It's just pain.

9                    MS. DOYER:  Okay.

10                   VENIREPERSON 47:  So it can be verbal like

11   bullying?

12                   MS. DOYER:  No.  It has to be physical

13   pain.  So it could be something like I was talking about

14   where I pulled her hair.  It could be a slap.  Do you

15   think that she's always going to go to the doctor for

16   that?

17                   VENIREPERSON 47:  No.

18                   MS. DOYER:  Do you think we're always

19   going to have pictures that will show you, yes, there

20   was pain?

21                   VENIREPERSON 47:  Okay.

22                   MS. DOYER:  Are you good?

23                   VENIREPERSON 47:  See, that's where it

24   gets confusing.

25                   MS. DOYER:  Sure.  I understand.  Knowing

June 5, 2017
Jury Voir Dire by Ms. Doyer

1  that that's the definition, would anybody require

2  photos?

3          Ms. Campos, what do you think?

4          VENIREPERSON 4:  Yeah, I would.

5          MS. DOYER:  You would still require them?

6          VENIREPERSON 4:  Yeah.

7          MS. DOYER:  Mr. Fieseler?

8          VENIREPERSON 28:  Is there such a thing as

9  psychological pain?

10          MS. DOYER:  There is, but that is not a

11  criminal offense.

12          VENIREPERSON 28:  That's not an offense.

13          MS. DOYER:  It's not a criminal offense.

14          VENIREPERSON 28:  Oh, okay.

15          MS. DOYER:  It might be a tort, something

16  you could sue over, but not something that I deal with.

17          What else might you expect to see?  We

18  talked about photos, witnesses.

19          Okay.  Ms. Organ, what type of witnesses?

20          VENIREPERSON 1:  Other family members,

21  friends, anybody who might have been present.

22          MS. DOYER:  Okay.  Anybody who might have

23  been present.

24          Ms. Organ, let me ask you, do you think

25  that there are typically witnesses to these types of

June 5, 2017
Jury Voir Dire by Ms. Doyer

1   offense?

2           VENIREPERSON 1:  Not necessarily.

3           MS. DOYER:  Would you require me to have

4   another witness?

5           VENIREPERSON 1:  Not necessarily.  It goes

6   to the witness' credibility.

7           MS. DOYER:  Okay.  What else?  What do

8   y'all think?

9           Mr. McCabe, yes, sir?

10           VENIREPERSON 11:  I think corroboration.

11           MS. DOYER:  In what fashion?

12           VENIREPERSON 11:  That sort of thing that

13   happens to other people perhaps.

14           MS. DOYER:  Okay.  So typically you cannot

15   show that it happened to somebody else because then it

16   could be considered we're just trying to convict him of

17   being a bad person in general; right?  There might be

18   other ways to corroborate a victim's accounts.

19           So what do you think when you say

20   corroboration?  Are there other things that you might

21   think about?

22           VENIREPERSON 11:  I would think witnesses

23   could corroborate it.

24           MS. DOYER:  Okay.  Maybe if there are

25   witnesses?

1          VENIREPERSON 11:  Right.

2          MS. DOYER:  What else?

3          VENIREPERSON 11:  I think police reports.

4          MS. DOYER:  This is the one that I was

5    waiting for, police reports.  By law I cannot introduce

6    police reports.  I'm required to call the witnesses in

7    here to testify.  So police reports, witness statements,

8    video statements, anything like that that might have

9    been given during the investigation, I can't just put it

10   into evidence.

11          He also has the constitutional right to

12   confront the witnesses, so I have to bring those

13   witnesses in.  A lot times people ask me when I get back

14   into the jury room, why didn't we see the police report

15   or why didn't we see the video or whatever it may be.

16   Because the law doesn't allow me to do it.  It's what's

17   called hearsay.  I can't put that in.  I have to bring

18   in the witness.  Does that make sense to everybody?

19          Okay.  So when we think about -- yes, sir,

20   Mr. Wiatrek?

21          VENIREPERSON 17:  Can the police officers

22   that responded be witnesses?

23          MS. DOYER:  They can be witnesses.  And it

24   depends on, you know, kind of what -- what their

25   function was.  I've talked about hearsay.  If all he did

June 5, 2017
Jury Voir Dire by Ms. Doyer

1  was take a statement from the victim, he can't just come

2  in here and say this is what the victim told me because

3  that's hearsay.  He can come in here and talk about his

4  observations, things like that.  But there are -- when I

5  talk about those legal rules, they're kind of funny and

6  they make things strange when we actually present this

7  case.

8           Now we talked about the definitions of

9  bodily injury.  Who is typically present when this type

10  of offense occurs?  I think it was Mr. Grell who was

11  saying, it's typically something that happens in the

12  home, not usually a lot of witnesses around.  That

13  leaves you with who?

14           Ms. Lawton, who does that leave you with?

15           VENIREPERSON 14:  The victim and the

16  defendant.

17           MS. DOYER:  The victim and the defendant.

18  And that defendant has a constitutional right to remain

19  silent.

20           So, Ms. Lawton, who does that leave you

21  with?  The victim or witnesses, if there are any; right?

22           Okay.  So I want to talk about something

23  called the one-witness rule in the State of Texas.  So

24  what if you're the victim of the crime and you're the

25  only witness?

June 5, 2017
Jury Voir Dire by Ms. Doyer

1          I'll pick on Mr. Schultz over here.

2          VENIREPERSON 30:  Yeah.

3          MS. DOYER:  Mr. Schultz, say you're at

4    H-E-B late at night.  You're loading your groceries up

5    into the car.  Someone comes up to you with a gun and

6    says, give me your wallet.  You do.  You give him the

7    wallet.  He takes off running.  You saw his face.  He

8    takes off running.  You call law enforcement.  You make

9    a report.  They do a photo lineup.  You're able to pick

10   him out of the lineup.  The wallet is never recovered.

11   Who knows what this yahoo did with it.

12          This is an aggravated robbery.  The case

13   gets presented to the district attorney's office.  The

14   district attorney presents it to the grand jury.  We get

15   an indictment.  He pleads not guilty and we go to trial.

16   I call you in to testify about what happened to you that

17   night.  All right.  Now, Mr. Schultz seems like a

18   credible individual.

19          Mr. Collier back there -- Mr. Collier, if

20   I called Mr. Schultz to testify about what happened to

21   him that night, is -- would you still require more

22   evidence before you could convict this individual of

23   aggravated robbery?

24          THE COURT:  You're going to have to

25   qualify that.  I mean, it's going to need to be, if you

1    find and believe.

2                    MS. DOYER:  I will, sir.

3                    THE COURT:  Okay.

4                    MS. DOYER:  Would you require additional

5    evidence?

6                    THE COURT:  Well, now, you didn't qualify

7    that.

8                    MS. DOYER:  I want to ask this question

9    first.

10                   THE COURT:  Okay.  Well, then, I'm not

11   going to allow it --

12                   MS. DOYER:  Okay.

13                   THE COURT:  -- because it's an improper

14   question.

15                   MS. DOYER:  What other evidence do you

16   think that there would be at this stage, Mr. Collier,

17   seat number 38?

18                   VENIREPERSON 38:  I'm thinking weapons.

19                   MS. DOYER:  Weapons, maybe if it was

20   recovered; right?

21                   VENIREPERSON 38:  Right.  DNA, blood.

22                   MS. DOYER:  Okay.  What if none of that

23   stuff was ever recovered because the gun wasn't

24   recovered, the wallet wasn't recovered, any of that?

25                   VENIREPERSON 38:  And there is no witness

June 5, 2017
Jury Voir Dire by Ms. Doyer

1  besides the two people?

2           MS. DOYER:  Yes.  So I'm just asking you

3  about the evidence.  There wouldn't be any other

4  evidence; right?

5           VENIREPERSON 38:  Right.

6           MS. DOYER:  So what we have in Texas is

7  called the one-witness rule.  So the way that rule works

8  is if you hear one witness, you believe that witness

9  beyond a reasonable doubt and that witness' testimony

10  proves all of the elements of the offense, would you

11  require additional evidence before returning a verdict

12  of guilty?

13           VENIREPERSON 38:  I certainly would want

14  it.

15           MS. DOYER:  Sure.  A lot of people would.

16  In fact, the State would, but would you require

17  additional evidence?

18           THE COURT:  And the qualification that is

19  important here is found starting on line two with the

20  "and," and you believe the witness beyond a reasonable

21  doubt all the way down through about the fourth or fifth

22  line where it says, proved all of the elements of the

23  offense.

24           The point being is if you find from one

25  witness that that witness is credible and you -- and you

June 5, 2017
Jury Voir Dire by Ms. Doyer

1  believe beyond a reasonable doubt all of the elements
2  have been proven to you, would you still require more.
3            MS. DOYER:  Let me move to kind of my
4  summary slide here.
5            THE COURT:  We've got about five minutes,
6  so you need to wrap up for lunch.
7            MS. DOYER:  Yes, sir.
8            So the law is a conviction can be
9  supported on the uncorroborated testimony of a single
10 witness if the witness testifies to all of the elements,
11 you believe that witness and that witness convinces you
12 beyond a reasonable doubt.  So that's the premise is
13 that they testify, you believe them and it convinces you
14 beyond a reasonable doubt.
15           My question is, if all of that is true,
16 would you still require more?  So let me start over here
17 on the left side.  Is there anybody here who would
18 require more?
19           VENIREPERSON 4:  Just so I'm understanding
20 this correctly, all you have is the word of the
21 victim --
22           MS. DOYER:  In this hypothetical.
23           VENIREPERSON 4: -- or the witness --
24           MS. DOYER:  Yes, ma'am.
25           VENIREPERSON 4: -- and you don't have

June 5, 2017
Jury Voir Dire by Ms. Doyer

1   anything else?

2               MS. DOYER:  Yes, ma'am.

3               VENIREPERSON 4:  I think I would require

4   more --

5               MS. DOYER:  Okay.

6               VENIREPERSON 4: -- more evidence.

7               MS. DOYER:  Anybody else on the left side?

8   Anybody on the right side?

9               UNIDENTIFIED VENIREPERSON:  The only thing

10  I will say in -- well, saying the witness or the guy

11  that was being held up described the tattoo -- if the

12  guy had a tattoo on his neck and he described it and we

13  see that -- the tattoo on him, I have no problem with

14  prosecuting that guy.  If there's some kind of hard

15  evidence that I can see, you know, that will help me

16  make the decision that -- of what it needs to be.

17              MS. DOYER:  Okay.  So it sounds like if

18  that witness would provide information to you that you

19  find credible, you believe that witness?

20              UNIDENTIFIED VENIREPERSON:  That's right.

21              MS. DOYER:  And that's all the law

22  requires you to do.

23              Anybody else on the one-witness rule that

24  feels like they would require more?

25              Finally -- oh, Mr. Boozel, I already have

June 5, 2017
Jury Voir Dire by Ms. Doyer

1   you down on a couple of things, so if -- the Fifth

2   Amendment and some other things, so I'm going to kind of

3   move along.  It's not that I don't think it's important,

4   but I've got some time issues here.

5                I went over the fact that this is a

6   guilt/innocence only issue for the jury.  So is there

7   anyone here who is uncomfortable with the fact that they

8   won't be able to assess punishment?

9                Is there anybody who feels like that would

10  make it -- make them unable to also decide

11  guilt/innocence?  I see none on the left.  Anybody on

12  the right side?

13               Finally, is there anybody who feels like

14  they could not sit in judgment of another?  Sometimes

15  there are moral, ethical or religious reasons why

16  someone feels they cannot sit in judgment of another

17  individual.  Is there anybody who feels like that?  I

18  see none.

19               It's about time for me to wrap up and I

20  bet you're hungry.  I thank you for your time and

21  attention and I look forward to sharing the case with

22  you.

23               THE COURT:  Okay.  Ladies and gentlemen,

24  if you will, just leave those little cards right there

25  on your seat.  That way none of them will get lost

June 5, 2017
Jury Voir Dire by Mr. Millan

1    during the lunch hour.  We'll be back here probably

2    about -- let's just say 1:20.  That will give everybody

3    time to get in and out of the building.

4                   Please -- at this juncture please do not

5    do any -- any research or whatever you want to call it,

6    investigation, Google or otherwise.  Just have a good,

7    safe lunch and we'll see you in about an hour and 20

8    minutes or so.  Thank you.

9                   (Panel leaves the courtroom)

10                  THE COURT:  Yes, ma'am?

11                  UNIDENTIFIED VENIREPERSON:  Did you need

12   to speak with me?

13                  MS. DOYER:  There was an indication of

14   child abuse.  I didn't know if she wanted to reveal it

15   now.

16                  THE COURT:  We'll do it after lunch.

17                  (Recess taken)

18                  (Open court, defendant and panel present)

19                  THE COURT:  Mr. Millan, you may proceed.

20                         JURY VOIR DIRE

21                  MR. MILLAN:  May it please the Court,

22   counsel for the State.

23                  Ladies and gentlemen, good afternoon.  I

24   now get the thankless task of talking to you after

25   lunch.  I'm a little bit tired.  I can't imagine you

June 5, 2017
Jury Voir Dire by Mr. Millan

1    guys, but this is where we're at.

2              Obviously being on the defense side, we

3    want to talk to you about the law in maybe a little bit

4    different way than the State does.  And if I could find

5    my presentation -- I'm doing this for the first time.

6              Okay.  My name is James Millan.  I

7    represent Mr. Derek Porter.  This is the State of Texas

8    versus Derek Porter.

9              My second chair here is retired Lieutenant

10   Colonel Edward Matias.  I told him I was going to give

11   him his whole title.  He's here to help me out.  It's

12   always nice to have a second set of eyes during voir

13   dire.  There's so many people here.  Trying to keep up

14   with everyone can be difficult for one person.

15             Just to introduce myself a little bit, I

16   was born and raised in San Antonio.  I went to Clark

17   High School, went to UT Austin for college.  I worked as

18   an accountant for a while, hated it.  I went to law

19   school in Colorado, came back.  I worked in Dallas for

20   about five years and then came back to San Antonio.

21             I office in San Antonio, but I do what I

22   call the triangle:  Bexar County, Comal County,

23   Guadalupe County.  Those are my main counties.  And I've

24   done a lot of work here for the last decade.  I've

25   worked with Judge Waldrip and tried a few cases against

June 5, 2017
Jury Voir Dire by Mr. Millan

1   Ms. Doyer.  We all know each other pretty well over

2   here.

3               Now, in terms of -- you know, the first

4   thing I like to talk about is presumption of innocence.

5   It's an easy thing to say, but it's more than just

6   words.  It's actually kind of somewhat emotional or

7   something more of a feeling even.  How many of you-all

8   when you walked into the room this morning were looking

9   around and going, I wonder where the defendant is.  And

10  then were asking yourselves, I wonder what he did.  How

11  many people asked that question?  Be honest.

12              Okay.  And that's natural in your -- in

13  your -- and the reason you're asking yourself that is

14  because, hey, we're in a courtroom.  You've been

15  trained.  I mean, there's lots of Law & Order shows on

16  TV.  You've seen it.  It's all been played out

17  dramatically on -- on TV and in movies and stuff.

18  And -- and it becomes kind of second nature just to

19  assume, hey, you must have done something.

20              And here's another question for you.  You

21  kept on hearing the word "victim."  What does victim

22  mean?  Something happened to this person.  And if you're

23  using that word victim, what does that say about the

24  presumption of innocence?  I'm going to be saying

25  complainant from here on out.

```
1              Okay.  And so if -- and the reason I don't
2   use the word -- because there is no victim at this
3   point.  All right.  There's no victim, period, as far as
4   I'm concerned.  So you're not going to hear that word
5   from me.  And I hope that you guys aren't going to use
6   it either because it flies in the face of the
7   presumption of innocence.  Is that fair enough?
8              Burdens of proof -- now, I'm going to go
9   through a few of them.  Preponderance of the evidence.
10  Let's talk about like a car accident case.  How many of
11  you-all have seen people go to civil court to fight it
12  out over a car accident; right?  And the burden of proof
13  in a car accident case is what they call preponderance
14  of the evidence.  That's just like 51, 49, just one -- a
15  little bit more than the other.  If one side is more
16  responsible than the other, they can be held liable for
17  damages.  And depending on how liable they are and --
18  and how much damage there is will determine how much
19  they have to pay; right?
20             And then you've got -- I've got here clear
21  and convincing evidence.  Anybody know what clear and
22  convincing evidence is?  Nobody does.  How many of y'all
23  have heard of Child Protective Services?  Okay.  Some of
24  y'all have dealt with them in your work; right?
25             Now, Child Protective Services will
```

June 5, 2017
Jury Voir Dire by Mr. Millan

1   determine whether or not a child has been placed -- you

2   know, had neglectful supervision, been abused; right?

3   And they make the determination of whether or not that

4   child should stay in the home; right?  And their

5   determination of whether or not that child should stay

6   in the home is based on clear and convincing evidence.

7              Now, how many of you-all have children

8   that are -- that are under the age of 18?

9              Okay.  Now, I'll start with you,

10  Mr. McCabe.  How old are your kids?

11             VENIREPERSON 11:  14, 19, 20 and 22.

12             MS. DOYER:  Okay.  So the 19-, 20- and

13  22-year-old, they can have them; right?

14             The 14-year-old, would you expect the

15  State of Texas to have to meet a pretty high burden in

16  order to take that child out of your home?

17             VENIREPERSON 11:  Yes.

18             MR. MILLAN:  Anybody on the next row that

19  said they have young children?

20             Mr. Wiatrek, would you expect the State of

21  Texas to meet a high burden to take your children out of

22  your home?

23             VENIREPERSON 17:  Absolutely.

24             MR. MILLAN:  Everybody agree with that?

25  Anybody think it should be a low burden?  I've never

June 5, 2017
Jury Voir Dire by Mr. Millan

1   heard anybody say it should be a low burden.

2                   Now, beyond a reasonable doubt is actually

3   is a higher standard than clear and convincing evidence.

4   Okay.  And so -- and I know this is difficult because,

5   you know, you're talking about somebody else versus your

6   own children.  And I know it's like, oh, you're trying

7   to play into the emotional dynamic of it, but I'm

8   talking about the very realistic standard here.

9                   And the legal standard says it is a higher

10  burden to place somebody -- to take away somebody's

11  liberty and to find them guilty of an offense than it is

12  to take your children out of your home.

13                  So I hope in seeing that difference, that

14  it -- that it brings it home.  Hey, this is a really

15  high burden that the State has to meet.  And the State

16  is right, this doesn't mean beyond a shadow of a doubt.

17  It doesn't mean 100-percent proof.  It means a pretty

18  high level of proof.  For those of you with young

19  children, I think you understand that; right?

20                  Now, what -- let me ask you a question.

21  Why do you think the -- the burden of proof is so high

22  for -- for a criminal case?

23                  I'm going to pick on you, Ms. Choske,

24  because I have a big blank box here.  You haven't said

25  very much.  Why do you think the burden is so high?

June 5, 2017
Jury Voir Dire by Mr. Millan

1        VENIREPERSON 7:  For proof of a crime
2   versus proof of protecting your children?
3        MR. MILLAN:  Versus any other standard of
4   proof.
5        VENIREPERSON 7:  I would say because -- I
6   would say because when you're talking about taking away
7   someone's freedom and their liberty, that could have a
8   greater effect on society.  I can have a negative effect
9   on my children in how I raise them, but they can be
10  rescued from me versus if I don't get punished for my
11  deeds, I could have a huge negative effect on society.
12        MR. MILLAN:  You said the keyword,
13  "liberty."  The liberty interest; right?  If you were
14  taking away somebody's liberty, you're essentially
15  taking away their decision-making ability; right?
16  People are making the decisions for them.  What's more
17  important than that?
18        You know, if you lose the ability to -- to
19  decide, you know, when you're going to wake up in the
20  morning, what you're going to do, what you're going to
21  eat, you know, that liberty interest -- I mean, that's a
22  pretty big deal, isn't it?
23        Does anybody think that the -- that the
24  burdens of proof are wrong, that the -- that the burdens
25  of proof should somehow be shifted and that -- and it

June 5, 2017
Jury Voir Dire by Mr. Millan

1    should be a lower standard for criminal offenses where

2    liberty is at stake?  Everybody agree with the standard

3    of proof?

4                Who is that?  Who do you see there?

5    Civilian versus police testimony.  It's the Village

6    People.  Who do you believe most?  The Indian or the

7    police officer?  No, I mean, it's -- it's -- and I

8    put -- look, I've got to wake you up somehow.  You're

9    going to be -- you've got all different kinds of people

10   that could testify.

11               Okay.  And -- and you're not going to know

12   them, you know -- if you know them, you're not going to

13   be on the jury panel more than likely; right?  You're

14   not going to know these people.  And so as they get up

15   on that stand, it's the first time you've ever dealt

16   with these people; right?

17               So my question to you-all is -- is just

18   because a person gets up there and they have -- they

19   have a badge and they have a uniform, are you going to

20   believe their testimony over a civilian witness just

21   because of the badge?  Anybody on this first row?

22   Second row?  Third row?  Fourth row?

23               Mr. Loper?

24               VENIREPERSON 22:  I believe I would.

25               MR. MILLAN:  And you're a retired police

June 5, 2017
Jury Voir Dire by Mr. Millan

1   officer; right?

2                   VENIREPERSON 22:  Yes.

3                   MR. MILLAN:  And thank you for your

4   service.

5                   VENIREPERSON 22:  Thank you.

6                   MR. MILLAN:  And why is it that you would

7   believe a police officer over a civilian witness?

8                   VENIREPERSON 22:  Well, because I was a

9   police officer for 26 years.  So I've seen both sides

10  and I would just lean towards the credibility and

11  honesty of a police officer.

12                  MR. MILLAN:  Okay.  And thank you for your

13  honesty.  And so it's -- you actually believe on average

14  you -- and without knowing anything about the witness

15  before they get up there, that the police officer is

16  going to just generally be a more honest person than the

17  average civilian?

18                  VENIREPERSON 22:  If it boils down to --

19  if I had to make a decision who I thought was telling

20  the truth, I would go towards the police officer.

21                  MR. MILLAN:  Okay.  Fair enough.

22                  Anybody else feel that way, that if it's

23  just --

24                  UNIDENTIFIED VENIREPERSON:  I'd have to

25  say the same thing.

June 5, 2017
Jury Voir Dire by Mr. Millan

1          MR. MILLAN:  And let me make this
2    distinction because I know this is going to come up and
3    I'm looking -- on a chessboard, I'm looking at several
4    moves ahead here.
5          Now, the question is going to become --
6    and I think Mr. Loper actually has answered it in a way
7    that obviates this question, but do you believe a police
8    officer's testimony more because of his training and
9    experience; or do you believe it more just because, in
10   general, you think that they're going to be more honest
11   and trustworthy?
12         UNIDENTIFIED VENIREPERSON:  The former,
13   and that's what I was going to say.  They're trained to
14   be more factual and to look at things in a more
15   impartial way.
16         MR. MILLAN:  So when choosing between the
17   way Mr. Loper described it of just generally believing
18   one is more honest and trustworthy than the other versus
19   just the training and experience angle, who falls on
20   Mr. Loper's side of saying, you know what, I just -- in
21   general, I think a police officer is going to be more
22   honest and trustworthy than a civilian?
23         Okay.  Let's -- we'll go through -- we've
24   got Mr. Criddle --
25         VENIREPERSON 16:  Yes, sir.

June 5, 2017
Jury Voir Dire by Mr. Millan

1          MR. MILLAN:  -- number 16.  Mr. Wiatrek,
2  number 17.  Number 21, is that Ms. -- Ms. Allison?
3          VENIREPERSON 21:  Yes, sir.
4          MR. MILLAN:  Was there anybody else on
5  that row?
6          On the back row, number 23, Mr. Boozel?
7          VENIREPERSON 23:  Yes.
8          MR. MILLAN:  Number 24, Mr. Whitley.
9          Who else was -- who else raised their
10  hands on this side?  Anybody else?
11          Okay.  I saw some on this side here.
12  Number 31, Mr. Womble; number 29, Mr. Sowell; number 37,
13  Mr. Hurley; number 36, Ms. Cervantes; number 43,
14  Ms. Schreiber.
15          Anybody else on this side?  I thought I
16  saw more numbers.  Y'all change your minds?  There's
17  nobody on the first row.  Nobody on the second row.
18  That was -- that had to do with training and experience.
19  No one on that row.  Okay.  Let me just make sure I
20  didn't miss anybody.  Let me get rid of the Village
21  People.  Did I miss one?
22          Okay.  Fifth Amendment, now, the State
23  touched on this, but, you know, I -- the way -- I like
24  to approach this one a little differently than they do
25  obviously.  And the way I do -- I've got three kids.

June 5, 2017
Jury Voir Dire by Mr. Millan

1    I'm married and three kids.  I have an 11-year-old, a
2    six-year-old and a four-year-old.  And my 11-year-old
3    Chloe is a sweetheart.  She's like a second mom, always,
4    you know, telling us if the -- if the little ones are
5    doing bad stuff and, you know, looking after them as
6    well.
7                Obviously you can't always be there.  Mom
8    can't always be there.  I can't always be there and --
9    and sometimes my six-year-old, Liam, and my
10   four-year-old, Hattie, are together in the backyard,
11   down in the living room or wherever doing stupid things
12   and -- and they fight a lot.  They are just ridiculous
13   sometimes.  I'll tell you it's unbelievable.  They like
14   try to outdo each other with their misdeeds sometimes it
15   seems like.
16               The problem is, you know, a lot of times
17   it's just the two of them and our dog Rufus, but he
18   can't talk.  You know, I hear something shatter
19   downstairs and I'm like, oh, gosh, sugar jar on the
20   ground broken.  Who did it?  He did it.  She did it.
21   You know, they're looking at each other and, you know --
22   of course, one is going to blame the other and -- and
23   how do you decide who is telling the truth?
24               Both are little liars.  They're going to
25   cover their own tracks, you know.  And unless you have

June 5, 2017
Jury Voir Dire by Mr. Millan

 1  actual evidence of who did it, it's just like one's word
 2  against the other.  And sometimes I can figure it out
 3  and sometimes you can't.  So you want to hear both sides
 4  of the story; right?
 5              You have got two kids arguing with each
 6  other.  You want to hear both sides of the story.
 7  And -- and so a lot of us as parents can -- we're
 8  trained to -- to want to hear those two sides and it
 9  becomes second nature, right, to want to hear those two
10  sides of the story.  There's other contexts in life
11  where it's, you know, the same deal; right?
12              So, you know, knowing that -- I mean, how
13  many of you want to hear both sides of the story if you
14  have got two kids who are arguing with each other?  How
15  many of you want to hear both sides of the story?
16              Okay.  Now, those of you who raised your
17  hands, the obvious follow-up is you may not hear both
18  sides of the story in this trial.  And the law actually
19  says that -- the Fifth Amendment of the United States
20  Constitution, one of the original Bill of Rights from
21  over 200 years ago gave the right that the defendant
22  does not have to testify and -- and beyond that, you as
23  a juror cannot hold that against them.
24              So knowing what your -- what your
25  instincts are in wanting to hear what both sides say and

June 5, 2017
Jury Voir Dire by Mr. Millan

1  knowing what the law says, how many of y'all who want to
2  hear both sides naturally and instinctively feel that
3  because of that, I don't think I could be fair to this
4  defendant if he chose not to testify?
5          Mr. Polson, you already -- you said it on
6  the first one, so I'm going to -- I'm going to agree
7  that you feel the same way.
8          Anybody -- and I know I said it maybe a
9  little different than the State did.  Did it change any
10 of y'all's minds?  Anybody on the second row?  Third
11 row?
12         You -- I believe you said the same thing
13 before, Mr. Criddle.
14         VENIREPERSON 16:  Yes, sir.
15         MR. MILLAN:  Anybody else?  Mr. Wiatrek.
16 And Ms. Allison and -- I'm sorry, Boozel and Whitley,
17 numbers 23 and 24.
18         Anybody on this side?  Mr. Sowell, 29.
19 Anybody else on the first row?  Second row?  Ms.
20 Cervantes.  Let's see, Mr. Schreiber, 43.  Thank you.
21 Anybody else from this side?
22         Okay.  Assault, you know, the State pretty
23 much explained this one.  Intentionally, knowingly,
24 recklessly causing bodily injury to another.  It's
25 pretty clear.  Intent or knowing is -- I guess intent

June 5, 2017
Jury Voir Dire by Mr. Millan

1    and knowing are somewhat the same.  It's like -- intent
2    is more like, well, I planned it out ahead of time.
3    Knowing is, yes, I'm doing it right now, but I maybe
4    didn't plan it out very well.  And recklessly is, well,
5    I -- I appreciated the risk that I was going to do
6    something wrong, but ignored it.  It's a pretty standard
7    statement over those definitions.  I'm not going to
8    repeat that for you.
9               Bodily injury, State talked about it.
10   Physical pain, illness or any impairment of the physical
11   condition.  I'm not arguing that.  I mean, obviously you
12   get -- a person has to feel pain for it to -- for it to
13   meet the level that's going to be necessary in this
14   trial.
15              Affirmative defenses, something the State
16   did not talk to you about.  How many of you-all own your
17   own home?  Most of you in here.  Now, those of you who
18   own your own home, if somebody came -- started going up
19   to your windows and smashing the windows around your
20   house -- walking around the house with a crowbar and
21   just smashing them, do you have a right to do something
22   to stop them from doing it?  You think you have a right
23   to stop them?  That's -- that's protection of property;
24   right?  That's your property.  They're destroying it.
25   You think you should have to wait for the police to show

June 5, 2017
Jury Voir Dire by Mr. Millan

1   up to stop them from doing it?  Why?

2            UNIDENTIFIED VENIREPERSON:  Because it's

3   my property and it's in the constitution.  My --

4   protection of my property.

5            MR. MILLAN:  You have a right to protect

6   your property; right?

7            UNIDENTIFIED VENIREPERSON:  Yes.

8            MR. MILLAN:  Anybody think you should have

9   to wait for the police to show up to protect your

10  property if somebody is smashing your windows?

11           UNIDENTIFIED VENIREPERSON:  First line of

12  defense.

13           MR. MILLAN:  And the person smashing your

14  windows, unless -- let's say that person, after smashing

15  your windows and you open your door, they start charging

16  at you.  Do you think at that point you might be able to

17  use force to stop them?  What about deadly force?

18  Anybody disagree that you should be able to use deadly

19  force to protect your home?

20           UNIDENTIFIED VENIREPERSON:  Question, are

21  they in your house?

22           MR. MILLAN:  You're standing at the door

23  and they're coming up to you after they smashed your

24  windows.

25           UNIDENTIFIED VENIREPERSON:  I'd probably

June 5, 2017
Jury Voir Dire by Mr. Millan

1   use it.

2           MR. MILLAN:  They've already proven that

3   they're willing to destroy your property, right, and

4   they're charging at you with a crowbar in their hand.

5           VENIREPERSON 52:  Shut the door.

6           MR. MILLAN:  Do you think that you should

7   have a duty to retreat from them?

8           VENIREPERSON 52:  Yes.

9           MR. MILLAN:  If somebody is charging at

10  you with a crowbar after they've been smashing your

11  windows, do you think you have a duty to run away from

12  them?  Ms. Lorah, 51.

13          Anybody else agree that you should have a

14  duty to retreat if somebody is smashing your windows and

15  attacking you with a crowbar or looking like they're

16  going to attack you at the front door with a crowbar?

17          What if you're in your car and somebody is

18  walking around your car smashing the windows in on your

19  car?  You're in the driver's seat and somebody comes up

20  with a -- with a -- they have some sort of road rage

21  incident where they try to cut you off and they get

22  out -- you can't get out of the way and they come up and

23  start smashing your car up with a crowbar.  You are in

24  an exposed situation inside your car.  Do you think at

25  that point you have the ability to defend yourself,

June 5, 2017
Jury Voir Dire by Mr. Millan

1    deadly force to a person who has a crowbar?

2              Number 45, Mr. Gamboa?

3              VENIREPERSON 45:  I thought it was a Texas

4    law that if you were in fear of your life, you could

5    defend yourself.

6              MR. MILLAN:  You're right.  It is Texas

7    law.  I'm asking, do you agree with that?

8              VENIREPERSON 45:  Yes.

9              MR. MILLAN:  Self-defense, a person is

10   justified in using force against another when and to the

11   degree the actor reasonably believes the force is

12   immediately necessary to protect the actor against the

13   other's use or attempted use of unlawful force.  Well,

14   let's take that a piece at a time.

15              This is the first time I'm doing this,

16   y'all, so bear with me.  Let's try to blow it up.

17              The first thing I'm seeing here is when

18   and to the degree the actor reasonably believes.  Let's

19   start with that.  You have to have a reasonable belief;

20   right?  So if you see somebody walking in front of your

21   house and they're kind of looking at your house and --

22   and maybe they're looking through the windows, maybe

23   they got on to your property a little bit and you're

24   wondering why -- why is this person on my property, but

25   not necessarily to -- in a way that seems like they're

June 5, 2017
Jury Voir Dire by Mr. Millan

1   aggressive, but -- well, maybe they aren't sure if

2   somebody lives there.  Maybe they're trying to figure

3   out the value of the home, if they want to make an offer

4   on it.  There could be a reason why other than them

5   being aggressive; right?

6           If you went out and just started beating

7   the person up, would that be -- do you think that that

8   would be reasonable under the circumstances?

9           (Panel responds)

10           MR. MILLAN:  I agree with you.  They have

11   to be doing something that is either use of force or you

12   immediately believe that that force is coming at you;

13   right?  It says the force is immediately necessary;

14   right?

15           So the example where the person is running

16   at you with a crowbar and you're standing at the door

17   and they are maybe a few feet away from you, it's pretty

18   immediate, isn't it?  You've got to make a quick

19   decision.  And if you don't make the right decision, it

20   could be the end; right?  So if -- and you don't want to

21   second-guess under those circumstances; right?

22           To protect the actor against the other's

23   use or attempted use of unlawful force.  So the person

24   either has to be using force against you or attempting

25   to use force against you and, once again, immediately

June 5, 2017
Jury Voir Dire by Mr. Millan

1   necessary.  So it's basically an attempt that is -- that

2   is really close to happening; right?  Y'all could think

3   of a -- of a situation where it's necessary.

4              Somebody throws a punch at you.  You block

5   the punch out of the way.  In that immediate moment

6   afterwards, do you have a right to punch them back?  In

7   the immediate moment when they're punching at you and

8   you're blocking the punch, do you think at that

9   particular moment you have a right to punch them?  Fist

10  against fist, and it's immediate.  Under the law of

11  self-defense, do you think that you have a right to

12  punch that person under those circumstances?  How many

13  of you say yes?  How many say no?

14              Mr. Gamboa?

15              VENIREPERSON 45:  Yes, sir, if they hit

16  you once and they stop.  That's not self-defense if you

17  hit them back.  If they keep hitting you, then you can

18  defend yourself to make them stop.  Once they stop,

19  that's it.

20              MR. MILLAN:  Do you think you have to wait

21  until the second punch or --

22              VENIREPERSON 45:  Yes.

23              MR. MILLAN:  Okay.  Thank you very much,

24  Mr. Gamboa.

25              And how many people agree with that, that

June 5, 2017
Jury Voir Dire by Mr. Millan

1    they have to keep hitting you before you can hit back?

2

3              UNIDENTIFIED VENIREPERSON:  Depends on who

4    is the biggest.

5              MR. MILLAN:  Well, no, that's actually --

6    thank you for bringing up that point because don't you

7    think that size has something to do with what is

8    reasonable -- what is reasonable force?

9              VENIREPERSON 3:  Not necessarily.

10             MR. MILLAN:  Not necessarily.  Maybe,

11   maybe not.  Say you've got -- you've got a, you know,

12   300 offensive -- NFL offensive lineman versus a

13   120-pound guy who is -- who is, you know, obviously very

14   weak.  Say that 120-pound guy decides he needs to have a

15   weapon to defend himself against the 300-pound offensive

16   lineman.

17             Under those circumstances, could the force

18   that that 120-pound guy uses against the 300-pounder

19   be -- be reasonable, if he's being attacked?

20             So a lot of the factors come into play;

21   right?  It's not necessarily fist against fist or bats

22   against bats or crowbars against crowbars or guns

23   against guns.  It could be one side is obviously weaker

24   than the other and needs to use greater force to defend

25   themselves; right?  Anybody disagree with that?

CINDY CUMMINGS, CSR
OFFICIAL COURT REPORTER - 433RD DISTRICT COURT
TEL. (830) 221-1279   FAX (830)608-2030

June 5, 2017
Jury Voir Dire by Mr. Millan

```
1           VENIREPERSON 36:  I have a question.
2           MR. MILLAN:  Ms. Cervantes, number 36.
3           VENIREPERSON 36:  I work in a school
4  district.  And if we have two kids that get into a
5  fistfight, it doesn't matter who started it.  If you hit
6  back, y'all are both in trouble.
7           MR. MILLAN:  There's interesting rules in
8  fighting in schools that don't take into account who the
9  primary aggressor is and I get that.  We're not talking
10 about that.  Those are special rules that involve
11 juveniles and school-related activities, but I get that.
12 I've dealt with that, but that's not what we're talking
13 about.  Thank you.
14          This was brought up I thought very well by
15 Mr. Grell.
16          VENIREPERSON 18:  Yeah, probably.
17          MR. MILLAN:  Yes.  It was an interesting
18 story and you brought up.  I mean, I already have the
19 slide ready to go.  I didn't have to make it up.  You
20 talked about it.
21          In general, when you're talking about a
22 family violence situation that involves a man and a
23 woman, Mr. Grell, do you think it's -- it's odd that --
24 that a woman would get the benefit of the doubt in a
25 family violence situation?
```

June 5, 2017
Jury Voir Dire by Mr. Millan

1           VENIREPERSON 18:  Yeah, because I've seen

2    it happen.

3           MR. MILLAN:  Does anybody disagree with

4    that and say, you know what, that's not true, that women

5    get the benefit of the doubt in a family violence

6    situation.  I'm not saying it's right or wrong.  Every

7    situation is different.  But just on average, is that

8    outside the realm of what is rational and -- and what

9    you know?

10           Okay.  Sometimes I get people arguing with

11   me on this one and we get into it, but everybody agrees

12   with -- with just the general premise that, you know,

13   it's not weird that -- that in some situations the woman

14   is going to be given the benefit of the doubt?  Okay.

15   That was easy.

16           The State talked about this one, whether

17   you served on the jury, and I'm not going to -- I think

18   I got everybody's answers on that.  Everybody who has

19   served on a criminal jury did raise their hands earlier;

20   right?

21           Okay.  The lone holdout.  Everybody

22   knows -- knows where that picture is from?

23           UNIDENTIFIED VENIREPERSON:  12 Angry Men.

24           MR. MILLAN:  12 Angry Men, my favorite

25   movie.

June 5, 2017
Jury Voir Dire by Mr. Millan

```
 1              Anyway, for anyone who doesn't know what
 2   this movie is about, it's essentially one juror, Jimmy
 3   Stewart -- in the old version, it's Jimmy Stewart.  He
 4   was the lone holdout.  And I -- and he -- he starts
 5   questioning the evidence that is put forward in this
 6   case.  The other 11 want to get out of there:  He's
 7   guilty, let's get out of here.
 8              What I'm asking you-all is that if you
 9   have an -- in good conscience believe that -- whether
10   you believe guilt or innocence, if you -- if you are --
11   in good conscience believe what you believe, don't let
12   yourself get bullied.  Be -- be strong.
13              I mean, you know, there are a few things
14   that -- that the -- that are asked of us civically.  One
15   of them is to serve on a jury and -- and, you know, look
16   at this as an opportunity to perform your civic duty and
17   perform it at the best possible level you can, like at
18   anything else in life.
19              You know, look at the evidence -- I know
20   you will, but I just really want this to hit home.
21   Stick to your conscience, don't -- don't let yourself
22   just make a quick decision that you regret later.  Look
23   at it closely.
24              I want to take issue with one thing and
25   I -- I was going to bring this up earlier, the Fifth
```

June 5, 2017
Jury Voir Dire by Mr. Millan

1    Amendment thing.  Did anybody else have a problem with

2    the cloak of invisibility thing, the Harry Potter cloak

3    of invisibility thing?  I know I have a real problem

4    with that analogy to the Fifth Amendment and I'll tell

5    you why.

6              In Harry Potter, he's putting that cloak

7    of invisibility on himself and he's choosing to open it

8    up and show his head.  The Fifth Amendment is not a

9    cloak of invisibility for an individual.  It is a right

10   that is given to all of us by the constitution.  So that

11   cloak of invisibility is on everyone until they're in a

12   situation like this.  Okay.  It's not one person putting

13   the cloak of invisibility on themselves.  It is a

14   constitutional right that is afforded to every single

15   one of us.  Every single one of us has a cloak of

16   invisibility that is given to us.

17             I went through this pretty quick.  The

18   State did a good job of covering all of this stuff.  One

19   thing I do want to tell you is that there are times

20   during the jury trial that I get kind of excited.  I

21   may, you know, ask some hard questions and I may come

22   across as kind of a jerk and -- and if you feel that way

23   and you want -- and you get upset with me for the way I

24   ask a question or did something, take it up with me

25   after the trial.  Don't take it out on the defendant.

1   You -- you have plenty of time after the trial to talk

2   to me and have a -- if you have an issue with me, we can

3   discuss it person to person.

4              I look forward to spending some time with

5   the 12 of you who are picked for this jury trial.  And I

6   will -- and I want to ask any of y'all if you have any

7   questions before we wrap things up and go to -- to the

8   choosing of the 12 who will be sitting there.

9              This is going to be your last chance.  If

10  you can't be fair, tell me right now because you -- you

11  know, you may end up sitting in that box and wondering

12  why -- how did I allow myself to do this?  Any

13  questions?

14             All right.  Thank you very much for your

15  time.  I look forward to spending some time with you.

16  Thank you.

17             THE COURT:  Okay.  Ladies and gentlemen,

18  if you would, to begin, let's just pass those cards to

19  the center aisle and then Adam will come by and pick

20  them up on behalf of the 433rd.  Right?

21             THE BAILIFF:  Yes, sir.  Absolutely.

22             THE COURT:  If you'll just kind of keep

23  quiet just for a little bit so that the attorneys can

24  come up here, we need to identify some people that we

25  may need to speak with a little bit further.  We'll

```
1    identify those people and we'll give everybody else a
2    break.
3                    Counsel, if y'all can approach.
4                    (At the bench, on the record)
5                    THE COURT:  Mr. Millan, if you'll recall,
6    what I like to do is just go down the list with the
7    State, people that they think --
8                    MR. MILLAN:  Do you want to start first?
9                    MS. DOYER:  I have seat number 2, Polson.
10                   MR. MILLAN:  Yes.  Agreed.
11                   THE COURT:  If you say yes, I'm going to
12   assume for the purposes of the record that that's an
13   agreement and that will help.
14                   MR. MILLAN:  Yes, Your Honor.
15                   THE COURT:  Just let me know if you would
16   like to speak with somebody rather than agreeing as we
17   go down the list.  If I don't hear that you want to
18   speak to them, I'm going to assume it's an agreed
19   strike.
20                   MS. DOYER:  Seat number 4, Campos.
21                   MR. MILLAN:  Agreed.
22                   MS. DOYER:  Seat 15, Tilley.
23                   MR. MILLAN:  Agreed.
24                   MS. DOYER:  Seats 16, 17 and 18, also.
25                   MR. MILLAN:  Agreed on all of them.
```

```
 1                    MS. DOYER:  Seat 21, Allison.

 2                    MR. MILLAN:  Agreed.

 3                    MS. DOYER:  Seat 23, Boozel.

 4                    MR. MILLAN:  Not 22?  Okay.

 5                    MS. DOYER:  23, Boozel.

 6                    MR. MILLAN:  Agreed.

 7                    MS. DOYER:  Seat 24, Whitley.

 8                    MR. MILLAN:  Agreed.

 9                    MS. DOYER:  I have 146 -- or 26 coming up.

10   She has an issue that she wanted to talk about.

11                    MR. MILLAN:  Approach.

12                    MS. DOYER:  And on the right side, seat

13   29, Sowell.

14                    MR. MILLAN:  Agreed.

15                    MS. DOYER:  Seat 31, Womble.

16                    MR. MILLAN:  Agreed.

17                    THE COURT:  Seat 32, Cruz.

18                    MR. MILLAN:  Agreed.

19                    MS. DOYER:  Seat 30, Cervantes.

20                    MR. MILLAN:  30?

21                    MS. DOYER:  I'm sorry, 36.

22                    MR. MILLAN:  Agreed.

23                    MS. DOYER:  Schreiber, 43.

24                    MR. MILLAN:  Agreed.

25                    MS. DOYER:  And then on the back I had 50
```

1 | and 51, Thrasher and Lorah.

2 |         MR. MILLAN:  Agreed and agreed.

3 |         THE COURT:  Okay.  Just back to the top,

4 | Mr. Millan, you can take the same route and then --

5 |         MR. MILLAN:  Let me scratch my -- hers out

6 | first and make sure because there's some I have

7 | accepted.  I got all messed up.

8 |         Okay.  I also have 22, Mr. Loper.  He said

9 | that based on honesty of the officer, that just in

10 | general he thinks officers are more honest.  I don't

11 | think that -- that's police versus civilian testimony.

12 |         MS. DOYER:  I'd like to speak to him.

13 |         MR. MILLAN:  I would actually like to call

14 | up number 25, Mr. Moon.  I didn't want to ask him any

15 | questions about how he knew Mr. Porter because I was

16 | afraid what his answer was going to be.

17 |         MS. DOYER:  I would agree to excuse him.

18 | He works in the jail.

19 |         THE COURT:  What does that mean?  Oh, you

20 | think he --

21 |         MS. DOYER:  Yes, sir.  I think he knows

22 | about Mr. Porter.

23 |         THE COURT:  Okay.

24 |         MR. MILLAN:  I'll agree.

25 |         THE COURT:  Does he work in the jail or is

```
 1   he on --
 2              MS. DOYER:  I had that he was a deputy and
 3   that he was in the jail, but --
 4              THE CLERK:  It's Captain Moon.  He's in
 5   administration.
 6              THE COURT:  We'll strike him.
 7              MR. MILLAN:  I had number 37, Mr. Hurley,
 8   also issues with police versus civilian testimony.
 9              MS. DOYER:  I'd like to speak to him,
10   also.
11              MR. MILLAN:  Number 44, she talked about
12   how her -- her dad was prosecuted and she wasn't sure if
13   she could be fair.  I don't know how much further than
14   that, but I think we need to call her up at a minimum.
15   And that's it, Judge.  So to approach, Judge --
16              THE COURT:  We just have four.
17              MR. MILLAN:  I've got 22, 26, 37 and
18   then --
19              MS. DOYER:  And then 44.
20              MR. MILLAN:  44.
21              (At the bench, concluded)
22              THE COURT:  Okay.  Looks like we will only
23   be needing to speak with four of you.  And then after we
24   finish that, the attorneys will be making their strikes.
25   And let's just -- if everybody will be at the doorway --
```

1   coming back into the courtroom at about 20 until 3:00,

2   that will be about 30, 35 minutes.  That will give us

3   time to do our work as well as the attorneys to make

4   their strikes.  The clerk can then compose the 12 and

5   we'll go from there.

6               I do need to speak with Randy Loper,

7   Shawna Jacobs, Brian Hurley and Clair Luttrell.  If the

8   four of you will remain, everybody can else can be on a

9   break for about 30 minutes.  Thank you.

10              (Panel leaves the courtroom)

11              THE COURT:  Mr. Loper, if you could just

12  come on up.

13              (At the bench, on the record)

14              THE COURT:  How are you doing, sir?

15              VENIREPERSON 22:  Good.

16              THE COURT:  Listen, I just need to talk to

17  you a little bit about your position regarding the

18  believability, so to speak, if you will, of police

19  officers.

20              VENIREPERSON 22:  Yes, sir.

21              THE COURT:  And just as -- we're not just

22  talking about somebody who is being honest.  We're also

23  talking about how people perceive or relate -- and then

24  relate things, how -- and so is it just because of your

25  experience as a police officer that no matter what,

1   every police officer is always going to be more
2   believable regardless of whether it's an honesty issue
3   or just how they perceive something?
4              VENIREPERSON 22:  No, sir.  I would look
5   at all of the evidence.  I would look at the case and
6   everything.  And what I meant to say was if it boiled
7   down to where I had to make a decision who I felt was
8   telling the truth, maybe the evidence wasn't swaying
9   either way, I would feel more likely to believe the
10  police officer.
11             I would look at the evidence.  And if the
12  evidence and everything else, you know, showed that the
13  officer wasn't telling the truth, I would have no
14  problem with that.  That's just the way the question
15  was --
16             THE COURT:  I got you.
17             VENIREPERSON 22:  You know what I'm
18  saying?
19             THE COURT:  And again, it's not
20  necessarily whether somebody is telling the truth.  It
21  may just be that they perceived it one way and somebody
22  else perceived it a different way.
23             VENIREPERSON 22:  I'm just being honest.
24             THE COURT:  Any questions from either of
25  you guys?

1          MR. MILLAN:  Would it be fair to say that

2     an officer is going to have a leg up over a civilian

3     witness in your eyes?

4          VENIREPERSON 22:  It depends on the

5     circumstances of the evidence.  Like I said, if -- if

6     they both came in to court and there was no evidence and

7     there was nothing else, I would have a tendency to

8     believe a police officer because I -- because of the

9     training and their experience and -- and because I was

10    one.  And I always feel that they would be honest and

11    credible.

12         MS. DOYER:  Mr. Loper, would that all be

13    based on things that you would know after they testified

14    as far training and experience?

15         VENIREPERSON 22:  With all the evidence

16    and everything presented to the Court.  Now, I would

17    know -- with my experience, I would probably know a bad

18    police officer if I saw one, too.

19         THE COURT:  Okay.  Thank you, sir.

20    Appreciate it.

21         VENIREPERSON 22:  Okay.

22         MR. MILLAN:  Judge, I move to strike for

23    cause.

24         THE COURT:  Denied.

25         Ms. Jacobs?

```
1              Again, I think it's just -- everything is
2  based upon the circumstances of the evidence.  That's
3  what he said.
4              How are you doing?  I think you just
5  wanted to let us know a little bit --
6              VENIREPERSON 26:  About the
7  unsubstantiated claims of child abuse.  It was more of
8  a -- my -- I was getting married.  My mom wanted to
9  control me still.  I was in my thirties, but she wanted
10 to control me, staying there and taking care of her, and
11 so she said that I abused my child.
12             And then I had moved to Virginia and left
13 my kids there because I didn't have a job yet.  And so
14 when I went back to get them, my mom pulled the abuse
15 card.
16             THE COURT:  Okay.  And are you able to
17 just, regardless of those details -- and I apologize
18 that you had to deal with that.  But regardless of those
19 details, do you understand that that situation has no
20 impact one way or the other?
21             VENIREPERSON 26:  No, it doesn't, but I
22 was just being honest.
23             THE COURT:  I gotcha.  And I appreciate
24 you bringing it up to us.  We're close to the vest here
25 as privately as we possibly can and -- but so is it
```

```
1   clear in your mind that that won't have any impact on
2   your decision --
3              VENIREPERSON 26:  No, sir, it won't have
4   no impact.
5              THE COURT:  -- if you're on this jury?
6   Okay.  Thank you.  I appreciate it.
7              Mr. Hurley?
8              I can't remember, what was the issue,
9   Mr. Millan, that you wanted to talk to -- wanted to
10  speak with Mr. Hurley about?  Was it some --
11             MR. MILLAN:  I believe it was police
12  versus civilian.
13             MR. MATIAS:  What's your number?
14             VENIREPERSON 47:  47.
15             MR. MILLAN:  Police versus civilian.
16             THE COURT:  Just in regard to every
17  witness who walks in the back door kind of with a --
18  kind of even-steven -- in other words, the Verizon man,
19  even though he walks in, he may or may not be the best
20  cell phone witness, so to speak.
21             VENIREPERSON 47:  Yes.
22             THE COURT:  Police officers are different.
23  Priests are different.
24             VENIREPERSON 47:  Right.
25             THE COURT:  And so does somebody with a
```

1   badge automatically have a halo over their head and

2   you're going to believe every word they say?  That's a

3   human nature thing --

4                   VENIREPERSON 47:  Yeah.

5                   THE COURT:  -- or are you willing to wait

6   and see their training and experience as well as how

7   why they perceive something to be true that they're

8   testifying about, or does -- do they -- automatically

9   every word that comes out of their mouth, is it going to

10  be true in your mind?  And that's okay.

11                  VENIREPERSON 47:  I wouldn't say

12  automatically, you know, every word just rings truth,

13  but there would just be more -- I would be, you know,

14  more open to hearing that side, I guess.  I don't know

15  really how to say it, but it wouldn't be like everything

16  is -- I take it as the truth.  But there's definitely,

17  you know, a -- an image for police officers and that's

18  just how I was raised.  My uncle was a police officer

19  and so I have that perception of them.

20                  THE COURT:  Any questions?

21                  MR. MILLAN:  Would you be biased in favor

22  of a police officer as a witness versus the civilian

23  witness?

24                  VENIREPERSON 47:  No.  I would still want

25  to hear -- because like I said, it wouldn't be

1  everything rings true, but I would have that image

2  because like I said, that's how I've been raised.

3          MR. MILLAN:  Would you be more likely to

4  believe that an officer is telling the truth more than a

5  civilian witness without knowing anything about them?

6          VENIREPERSON 47:  Yeah.

7          MS. DOYER:  Would you base that on your

8  prior experience with your family or would that be based

9  on after they testify and you hear their training and

10  experience and qualifications?

11          VENIREPERSON 47:  I mean, I think it would

12  just be as a whole.  It's just my perception of police

13  officers.  I don't think it even has anything to do with

14  my family.  It's just how I've been raised, and I would

15  definitely have that --

16          THE COURT:  I got you.

17          VENIREPERSON 47: -- perception.

18          THE COURT:  I appreciate your candor.  I'm

19  going to be -- I'm going to let you go.  You don't have

20  to come back.

21          VENIREPERSON 47:  Good.

22          THE COURT:  I appreciate it.  Thank you.

23          MR. MILLAN:  Thank you.

24          THE COURT:  I'm presuming there's a

25  challenge for cause.  There's a distinction there

```
 1   between the way he puts it versus the first one.
 2                   And, Mr. Luttrell -- is it Clair?
 3                   VENIREPERSON 44:  Yes.
 4                   THE COURT:  Did you have a question just
 5   regarding some prior allegations of family violence?  I
 6   don't know if it was --
 7                   MR. MILLAN:  Yeah, it had to do with -- it
 8   is when the State was talking to you about --
 9                   VENIREPERSON 44:  I'm 44.
10                   MR. MILLAN:  It had to do with -- and I
11   believe you said that you had -- your dad was prosecuted
12   with child abuse when you were younger.
13                   VENIREPERSON 44:  My dad was a violent
14   alcoholic.
15                   MR. MILLAN:  Okay.  And you were asked
16   whether or not that experience would make it to where
17   you couldn't be fair in a case like this and you said
18   you weren't sure.
19                   VENIREPERSON 44:  It's opening up wounds
20   that's been buried for years.
21                   THE COURT:  I understand.  This may not be
22   the best case.
23                   MR. MILLAN:  Would this -- this may not be
24   the best case for you?
25                   VENIREPERSON 44:  Yeah.
```

```
1              THE COURT:  Okay.  I appreciate it.  I'm
2    going to let you go.  I'm sorry you had to experience
3    that, but thank you, sir.  You don't need to come back.
4              VENIREPERSON 44:  Okay.
5              MR. MILLAN:  Okay.
6              THE COURT:  All right.  If my count is
7    correct, to get to the range --
8              MR. MILLAN:  I think we had 34.
9              THE COURT:  So the initial range would go
10   through seat number 49, Kathryn Martinez; is that
11   correct?
12             THE CLERK:  Yes, sir.
13             THE COURT:  And I think, just to
14   double-check, we did allow Mr. Luttrell to go and y'all
15   agreed on Schreiber.  Then I struck Hurley with a
16   defense challenge and agreed on Cervantes, Cruz -- I'm
17   going backwards -- Womble, Sowell.
18             And on the -- on the previous page, again
19   from the bottom moving upwards, we agreed on Scott Moon,
20   Justin Whitley, Jamie Boozel, Freda Allison, Ronald
21   Grell, Clayton Wiatrek, Jarod Criddle, Jan Tilley,
22   Stephanie Campos and Dennis Polson.  Is that correct?
23             MS. DOYER:  Yes, sir.
24             THE COURT:  And so -- I mean, if y'all
25   think that it's smart to have an alternate, we could let
```

```
 1   y'all just each try to make a strike on either of the
 2   last two.  If you strike both of them, we won't have an
 3   alternate.
 4              MR. MILLAN:  That's right.
 5              MS. DOYER:  Okay.  So one each, sir?
 6              THE COURT:  Yes, but just on those two
 7   down there.
 8              MR. MILLAN:  Okay.
 9              THE COURT:  And you can't use your
10   original ten obviously outside the zone.
11              MR. MILLAN:  Understood.
12              THE COURT:  Does everybody agree that --
13   technically speaking, that's not how the rules read.
14   Are you okay with doing it that way?
15              MR. MILLAN:  I'm okay with doing it that
16   way.
17              THE COURT:  Okay.
18              MS. DOYER:  Okay.  James, we'll let you
19   have the room.
20              MR. MILLAN:  Okay.  Thanks.
21              (Recess taken)
22              (Open court, defendant present, no panel)
23              THE COURT:  Any objection to the
24   composition of the jury?
25              MR. MILLAN:  No objection from the
```

```
1   defense, Your Honor.
2             THE COURT:  Okay.  Then we can let them on
3   in.
4             (Panel enters courtroom)
5             THE COURT:  Hopefully we've got everybody.
6   As your name is called, if you'll come on down.  It's
7   kind of like The Price Is Right.  If you'd just come up
8   here to the jury box, I'd appreciate it.
9             Madam Clerk?
10            THE CLERK:  If I could have Billy
11  Hilliard, Michael Cook, Jennifer Talley, Julian Casarez,
12  David Pfaff, Christopher Schultz, Harold Fieseler,
13  Sandra Colie, Wendy Walker, Dawn Choske, Michael McCabe,
14  Aaron Garcia and Alexandria Lawton.
15            THE COURT:  Okay.  Ladies and gentlemen, I
16  hope that everybody can see how important it is to
17  respond to that jury summons when it comes in the mail.
18            And we've got one seat up on the front row
19  there, I apologize.
20            Y'all can be all be seated.  Thank you.
21            Y'all can see how important it is to
22  protect everybody's rights -- your own, your neighbors',
23  your family members', this defendant's rights -- to make
24  sure we have a good cross-section of the community from
25  which to select a fair and impartial jury.
```

1                As well, those folks that are in the

2     military, such that their effort, their sacrifice, if

3     nothing more than being away from their family months on

4     end, is not without any moment to be appreciated.  So

5     thank you for just being here out of respect for them as

6     well.

7                And if you do need an excuse for where

8     you've been today for a boss or a spouse or anybody

9     else, you can get that down -- out the door to the right

10    and onto the carpeted hallway.  On the left will be Room

11    304.  I do thank you for being here and you are excused.

12    Thank you.

13                (Panel released)

14                THE COURT:  If y'all want to move your

15    chairs around, you may.

16                Y'all have just kind of a beginning set of

17    instructions.  I'm not going to endeavor to read them to

18    you verbatim.  However, I will just ask you to take them

19    with you and to glance at them and try to obviously

20    follow these instructions to you as jurors.

21                The gist of this entire legal sheet of

22    paper is such that all the testimony that you are to

23    receive has to come to you here in this courtroom and

24    not from any outside source.  Number one, it would -- if

25    one juror went and got something from outside the

1   courtroom, the others wouldn't be privy to it; right?

2   And so that would be obviously improper.

3            And also, the attorneys should have the

4   opportunity to properly vet, if you will, any potential

5   evidence such that there might be objections, if need

6   be, to be raised and rulings by the Court.  And without

7   that process as well, we can't, you know, have complete,

8   fair and impartial proper trial proceedings.  And that's

9   the gist of the entirety of these rules such that you're

10  not influenced by anything beyond this courtroom.

11           And so number one is just, in general,

12  again, not to use any electronic devices and not to go

13  on to, you know, any social media, blogging, those kinds

14  of things, no Google Earth.  Even if you hear about a

15  particular location, obviously we don't know when that

16  picture was taken from Google Earth relative to any

17  event.  I mean there's multiple, multiple reasons why it

18  would be inappropriate for anybody to do anything like

19  that.

20           I would just suggest to you, don't go home

21  and get on, say, any kind of social media, "guess what

22  happened to me "today," because what's going to happen?

23  That's going to invoke a response:  "What's the case

24  about" and -- and so it would -- we don't need that

25  dialogue, that -- because that may or may not be

1  accurate and we just don't need to start putting those

2  things out there.

3          As well, number two is just to avoid

4  looking like you're friendly to one side or the other.

5  Just other than casual greetings, avoid conversations

6  with the folks that are involved here in this trial.

7          Do not to accept any rides or favors.

8  That's pretty obvious, even change for the Coke machine,

9  is number three.  And number four, again, is kind of

10  covered along with number one about social media and

11  those kinds of things as we've discussed.

12          Number five is not to talk to anyone about

13  the case during the trial, not even amongst yourselves.

14  Even when you are deliberating, that you should do so

15  only when all 12 are present.  You can talk about how

16  strange it is that we get these little showers every day

17  for the last week or whatever, but you can't talk about

18  the case unless all 12 of you are together and after

19  you've heard all of the instructions and the arguments.

20  It's only then that you can go talk about and deliberate

21  to try to reach a verdict.

22          And number six is just kind of a laundry

23  list of different ways in which you should not do extra

24  things.  Don't even look up definitions in Webster's or

25  anywhere else.  If there's a particular definition that

1  I'm required to give you as a matter of law, I will give
2  it to you.  If there's not a definition in the charge
3  that we give you, you're entitled to use your own
4  current, common, ordinary usage and understanding of
5  that word.
6          It might be different amongst jurors, but
7  that's okay.  The law has decided what definitions
8  that -- should be given.  And if there's not one, again,
9  you just use your ordinary meaning.  But as well, don't
10  look up any terms, legal or otherwise.  I think you
11  can -- you can understand that.
12          Number seven is not to tell other jurors
13  of your own experiences, et cetera.  Obviously everybody
14  comes to the table with the filter through which you're
15  going to view all of the evidence.  That filter is yours
16  and that filter should not be cast upon somebody else.
17  And so to say to the other jurors in deliberations,
18  "Well, because I've experienced this, this is how I see
19  the evidence and you should agree with me," that's --
20  I'm being rather simplistic about it, but I think you
21  understand what I mean by that.
22          And then number eight is in regard to
23  note-taking.  If you would like to take notes, we will
24  allow you to do so.  We have some little tablets back
25  here that you can use.  What I would suggest -- just a

1  couple of things here, these instructions about the

2  notes, that you do need to pay attention to the

3  testimony as it's being provided because that's the one

4  chance you get to hear the witness testimony.  We can't

5  come back in later and say, I need have to that

6  testimony between 2:45 and 3:00 reread to us.  We just

7  can't do that.  The law doesn't allow it beyond that.

8           Don't let note-taking distract you, but

9  also understand that like myself, I might make an

10 error -- scrivener's error as I took something down.

11 That's why we don't share notes because one juror may

12 see things or hear something a little bit different.

13 You can say obviously when you're talking and

14 deliberating back there, this is what I recall.

15          But also in passing, you can't pass notes

16 around because you might be using an abbreviation that

17 somebody else might not understand.  Don't give any more

18 or less weight simply to the -- or to the arguments of

19 another juror simply because that juror did or did not

20 take notes on a given subject or given witness or at

21 all.  We will ultimately end up destroying all of those

22 at the end of the day.

23          At the conclusion of the evidence as well,

24 we'll submit to you a written charge.  And since you'll

25 need to consider all of the evidence admitted by me,

1   it's important, again, to pay close attention.

2                  I trust that everybody is going to follow

3   these rules, but you should know that if we have to, we

4   can have sworn testimony regarding any violations of

5   these rules.  So if you believe that there is a

6   violation of the rules, just -- just make sure, the best

7   you can, that it -- it stops.  And if it for some reason

8   continues, if you'll let Adam know immediately, we'll

9   deal with it.

10                 What I'm going to do probably here in just

11  a second is turn you loose with Adam so that he can go

12  back and he -- I'm sure he probably just wants to get

13  your best contact information just solely for our

14  purposes during this trial.

15                 But as well, we're going to try to start

16  the evidence I think today and to -- to be as efficient

17  with everybody's time.  We'll probably stop a little bit

18  before 5:00 or so every day and let everybody get on

19  about their business.

20                 Typically we will work 9:00 to 5:00.

21  We'll have a break in the morning, lunch break, maybe a

22  break or two in the afternoon so that everybody -- make

23  sure everybody is still staying with us, staying awake,

24  et cetera.

25                 The temperature does fluctuate here in

1   these rooms.  So if you're susceptible to that -- if you

2   need something today, let us know.  But otherwise, you

3   might bring a light wrap or whatever you can take on or

4   off.  Adam makes some pretty decent coffee back here.

5                   THE BAILIFF:  I try.

6                   THE COURT:  You're welcome to bring a cup

7   in here with you today.  Tomorrow, y'all are in such

8   close quarters, that if you've got a cup with a lid on

9   it, it might be beneficial just to make sure nobody gets

10  spilled on with hot drink or whatever.  But you can also

11  bring soda water, whatever you so desire, light snack if

12  you need it.

13                  Unless y'all have any questions of me

14  immediately, I'm -- I'll let Adam take you back there.

15  We may have a couple of matters we need to take up in

16  here, but we're going to get started here shortly.

17  Thank you.

18                  (Jury leaves courtroom)

19                  THE COURT:  All right.  Y'all can be

20  seated.

21                  The motion in limine, do we need to have

22  anything more formal put on the record about that?  I

23  think James agreed before he goes into anything

24  regarding impeachment of the --

25                  MR. MILLAN:  Oh, absolutely, Judge.  I'll

1    approach the bench and let you know if I think that
2    we've gotten to that point where there's something I
3    think should be admissible.
4             MS. DOYER:  The other -- the motion also
5    covers any self-serving hearsay of the defendant.
6    That's the other portion of the motion that we didn't
7    address earlier.
8             MR. MILLAN:  Self-serving hearsay in
9    regards to anything he said to the police?
10            MS. DOYER:  Yes.
11            THE COURT:  If you will, just refrain from
12   asking questions about what the defendant may have told
13   you.  It sounds to me like it's a self-defense case, so
14   that's probably -- or some kind of defensive issue and
15   so --
16            MR. MILLAN:  Right.  Well, I mean, I --
17   anything that the defendant said can and will be used
18   against him.  It seems that anything that the defendant
19   said to the officers is going to -- all right.
20            THE COURT:  If it's hearsay, it's hearsay.
21            MR. MILLAN:  All right.
22            MS. DOYER:  So both of those will be
23   granted, sir?
24            THE COURT:  Yes.
25            MS. DOYER:  Thank you.

1                    THE COURT:  If there's an exception, just

2     approach.  That's just a motion in limine.

3                    (Recess taken)

4                    (Open court, defendant and jury present)

5                    THE COURT:  Okay.  Everybody can be

6     seated.

7                    All right.  Are we ready with arraignment?

8                    MS. DOYER:  Yes, Your Honor.

9                    THE COURT:  Okay.  If the defendant would

10    please rise.

11                   MS. DOYER:  Cause Number CR2016-233, grand

12    jury date April 13th, 2016.  State of Texas versus Derek

13    Dale Porter, assault family violence with prior

14    conviction, in the 207th Judicial District Court.

15                   In the name and by the authority of the

16    State of Texas, the grand jurors, duly selected,

17    organized, sworn and empaneled as such for the County of

18    Comal, the State of Texas, at the January term A.D.

19    2016, in the 207th Judicial District Court for said

20    county, upon their oaths, present in and to said Court

21    that in the county and state aforesaid, and before the

22    presentment of this indictment, on or about the 30th day

23    of November, 2015, Derek Dale Porter, hereinafter styled

24    defendant, did then and there intentionally, knowingly

25    or recklessly cause bodily injury to Georganne Shirley,

1    a person whose relationship to or association with the

2    defendant is described by Section 71.0021(b), Section

3    71.003 or Section 71.005 of the Texas Family Code by

4    striking the said Georganne Shirley on her head with the

5    hand or hands of the said Derek Dale Porter by placing

6    Georganne Shirley in a chokehold with the arm of the

7    said Derek Dale Porter and by pulling the hair of the

8    said Georganne Shirley with the hand or hands of the

9    said Derek Dale Porter.

10              And it is further presented in and to said

11   Court that before the commission of the offense alleged

12   above, Derek Dale Porter had previously been convicted

13   of an offense under Section 22.01 of the Texas Penal

14   Code against a person whose relationship with the said

15   Derek Dale Porter was described by Section 71.0021(b),

16   Section 71.003 or Section 71.005 of the Texas Family

17   Code, to-wit, on or about the 2nd day of February, 2012,

18   in the 22nd District Court of Hays County, Texas, in

19   Case Number CR-11-0347, the defendant was convicted of

20   the offense of assault family violence which was alleged

21   to have been committed against LaToya Branecky, a person

22   who was a member of the defendant's family or household.

23              On or about the 2nd day of February, 2012,

24   in the 22nd District Court of Hays County, Texas, in

25   Case Number CR-11-03489, the defendant was convicted of

Opening Statement by Ms. Kilday
June 5, 2017

1   the offense assault family violence, which was alleged

2   to have been committed against the LaToya Branecky, a

3   person who was a member of the defendant's family or

4   household.  Against the peace and dignity of the State,

5   signed the foreperson of the grand jury.

6            THE COURT:  To that charge the defendant

7   pleads guilty or not guilty?

8            THE DEFENDANT:  Not guilty.

9            THE COURT:  Thank you.  You may be seated.

10           Ladies and gentlemen, at this time the

11  parties will have the opportunity to give you an opening

12  statement that is not evidence in and of itself.  It's

13  merely an outline to where they believe the evidence is

14  going to take you.

15           The defense will have the opportunity to

16  open immediately following the State's opening or they

17  can defer until a later time.

18           At this time, Ms. Kilday?

19           MS. KILDAY:  Thank you, Your Honor.  May

20  it please the Court.

21           THE COURT:  Yes, ma'am.

22                 OPENING STATEMENT

23           MS. KILDAY:  If you want to see the real

24  measure of a man, give him power.  Does he listen?  Is

25  he patient, or does he physically dominate and incite

Opening Statement by Ms. Kilday
June 5, 2017

1    fear?

2                As you remember from voir dire, my name is

3    Kiera Kilday.  Along with Jackie, we represent the State

4    of Texas against the defendant, Derek Porter, a man who

5    the evidence will show used his power to cause pain.

6                Now, this evidence all goes back -- you're

7    going to learn that the defendant was in a romantic

8    relationship with a woman named Georganne Shirley, and

9    Ms. Shirley is here.  She will testify for you.  You'll

10   learn it was somewhat of a rocky relationship,

11   tumultuous.  She wanted out.  At some point in time she

12   decides to leave.  She moves here to Comal.  She was

13   living with a friend out by Canyon Lake area.

14               Well, in late November 2015, the defendant

15   shows up at that residence.  Shirley will testify, she

16   didn't want him there.  And on the morning of November

17   30th, 2015, she wakes up and she still does not want the

18   defendant there.  He's asleep in the room.  She decides

19   to prepare breakfast.  She goes into the bedroom telling

20   him, once again, you need to leave.

21               Now, here's where things change because he

22   could have listened.  He could have been patient.  The

23   evidence will show that's not what he did.  And in fact,

24   by him asking -- by her asking him to leave, he becomes

25   enraged.  He grabs her by the top of the head and holds

Opening Statement by Ms. Kilday
June 5, 2017

1  her in a chokehold.  And in the meantime, he starts

2  striking her on the right side of her head all the while

3  she's screaming, call the police, call the police.

4          And her roommate is right next door, hears

5  the whole thing happening:  Call the police.  Call the

6  police.  And as she's calling out, he yanks her around

7  the room and drags her around.

8          Now, human beings are remarkably resilient

9  and Ms. Shirley is no different.  We all have fight or

10 flight responses.  But when you're locked in a headlock

11 and you've got nowhere to fly to, well, you're going to

12 fight back.  That's exactly what Ms. Shirley did.  She

13 turns her head and clamps down on his shoulder, right

14 here on the left inside of his arm.  He let's go.

15         Fortunately the roommate did go to a

16 neighbor's house.  He calls the police and the sheriff's

17 deputies arrive.  You're going to hear from the deputies

18 who arrived at the scene, how they walked into the

19 house.  Ms. Shirley comes out, thank you, thank you,

20 you're here.

21         The deputies will describe for you that

22 the defendant is laying down and appears to be asleep in

23 the room, but they call out and he pops up fully

24 dressed, shirt on, jeans on, shoes on.  He gets to the

25 side of the bed, ties his shoes.  All the while the

 1   deputies are saying, who are you?  What's going on?

 2   They're trying to identify him.

 3            The defendant walks out of the room and

 4   into the kitchen, takes off, runs out of the house and

 5   down the road.  Police -- well, the deputies chase after

 6   him.  They sprint, too.  And he would have gotten

 7   further if it weren't for one of Ms. Shirley's neighbors

 8   who happens to be an off-duty Austin Police Department

 9   officer, Joseph Lorett.

10            Mr. Lorett will testify to -- that when he

11   pulls up to the corner, he's in his truck and he sees

12   the defendant running away from the two sheriff's

13   deputies and he decides to help.  He gets out of his car

14   and he tackles the defendant to the ground.  The

15   sheriff's deputies apprehend him.

16            Once the scene calms down, they're able to

17   assess the scene and assess Ms. Shirley's injuries.

18   They'll describe for you the red marks on top of her

19   head which corroborate with hair pulling; the red marks

20   on the side of her head, how there were lumps from

21   swelling on the back and on the right side of her head;

22   and slight redness around the base of her neck.

23            Now, we -- as the State, we have the

24   burden of proving to you beyond a reasonable doubt that

25   that man intentionally, knowingly, recklessly caused

Opening Statement by Ms. Kilday
June 5, 2017

1   pain, bodily injury to Ms. Shirley when he locked her in

2   a chokehold and punched her and pulled her hair.

3              We also need to prove that we were in the

4   right place, where the jurisdiction is proper.  And so

5   you're going to hear testimony and evidence about a

6   prior conviction for family violence, I guess a

7   different individual, LaToya Branecky, that the

8   defendant was convicted for previously prior to us being

9   here today.

10             Derek Dale Porter is a dangerous man.  He

11  used his power to cause pain.  At the conclusion of all

12  of the evidence and testimony in this trial, we're going

13  to ask you to find him guilty.  Thank you.

14             THE COURT:  Do you wish to open now?

15             MR. MILLAN:  We'll reserve opening.

16             THE COURT:  Okay.  Thank you.

17             Ladies and gentlemen, I do need to get you

18  to do one other thing briefly before we proceed.  If

19  everybody will just raise their right hands to take a

20  little bit different oath.

21             (Jury sworn)

22             THE COURT:  Does anybody feel unable to

23  take that oath or make such an affirmation?  Okay.

24  Thank you.

25             I sent the clerk packing before I had her

GEORGANNE SHIRLEY - JUNE 5, 2017
Direct Examination by Ms. Doyer

```
 1   do that -- or I allowed her to go back to our office.
 2                   MR. MILLAN:  I'm sorry, we're going to
 3   need to invoke the rule.
 4                   THE COURT:  If there are any witnesses,
 5   State, I presume y'all can make sure they're not
 6   speaking about the case.
 7                   First witness?
 8                   MS. DOYER:  State calls Georganne Shirley.
 9                   THE COURT:  Good afternoon.  I just need
10   to get you to raise your right hand.
11                   (Witness sworn)
12                   THE COURT:  Thank you.  You may be seated.
13                       GEORGANNE SHIRLEY,
14   having been first duly sworn, testified as follows:
15                       DIRECT EXAMINATION
16   BY MS. DOYER:
17      Q.   Ms. Shirley, could you please tell us your name
18   for the record.
19      A.   Georganne Bernice Shirley.
20      Q.   I'm going to need you to scoot real close to
21   that mike for me.  Say that again.
22      A.   Georganne Bernice Shirley.
23      Q.   And, Georganne, can you spell Georganne for our
24   court reporter here?
25      A.   G-E-O-R-G-A-N-N-E.
```

GEORGANNE SHIRLEY - JUNE 5, 2017
Direct Examination by Ms. Doyer

1      Q.    Now, Ms. Shirley, where are you from
2  originally?
3      A.    Wimberley, Texas.
4      Q.    And how long have you lived in Wimberley?
5      A.    On and off for 45 years.
6      Q.    Do you have any children?
7      A.    Yes.
8      Q.    How many children do you have?
9      A.    Three.
10     Q.    And, Ms. Shirley, do you know an individual
11  named Derek Porter?
12     A.    Yes, I do.
13     Q.    How do you know Derek Porter?
14     A.    He is my ex-boyfriend.
15     Q.    When did you first meet Derek Porter?
16     A.    I can't recall.  It's been quite a while back,
17  probably five years ago.
18     Q.    How long after you met him did your
19  relationship become a romantic relationship?
20     A.    I would say three months into meeting him.
21     Q.    How long were the two of you in a romantic
22  relationship?
23     A.    A little over two years.
24     Q.    When did the relationship with Mr. Porter end?
25     A.    In December, two years ago.

GEORGANNE SHIRLEY - JUNE 5, 2017
Direct Examination by Ms. Doyer

1     Q.   About --

2     A.   November, two years ago.

3     Q.   Okay.  Ms. Shirley, I want to start with

4  talking about that time frame of November 2015.  Where

5  were you living back then?

6     A.   I was living at Eagles Peak in Fischer, Texas.

7     Q.   And who were you living with there?

8     A.   Gerard Nance.

9     Q.   And, Ms. Shirley, were you and the defendant,

10  Mr. Porter, together at that point in time?

11    A.   No.

12    Q.   Was there an incident that occurred that caused

13  law enforcement to respond to Mr. Nance's home?

14    A.   Yes.

15    Q.   How did that incident unfold?

16    A.   The day before the police came, I was getting

17  wood because it was raining and it was very cold.  I was

18  going to start a fire.  And Mr. Porter came strolling up

19  and demanded that he stay.  I told him that he could not

20  stay.  It was the day after Thanksgiving.  He came in

21  anyway, went straight in and fell asleep.

22    Q.   Did you know that he was coming over that day?

23    A.   No.

24    Q.   You said that he went to sleep.  What did you

25  do?

GEORGANNE SHIRLEY - JUNE 5, 2017
Direct Examination by Ms. Doyer

1    A.   I told Gerry that he was there and that I

2  didn't want him there and -- I call him Gerry.  Gerry

3  didn't want him there as well.  He said maybe if he

4  sleeps a little, we'll have him leave in the morning, so

5  he slept.

6    Q.   Okay.  What did you do next?

7    A.   I slept in the living room, came back into my

8  room that next morning, sat down beside him -- or rather

9  kind of laid near him and told him that we were leaving

10 and that he could not stay there.

11   Q.   And when you say we were leaving, who was

12 leaving?

13   A.   Gerry and I.

14   Q.   And when you told the defendant this, what did

15 he say or do?

16   A.   At first he ignored me.  And then when I asked

17 him again -- or told him rather, he grabbed me and

18 started punching me in my head.

19   Q.   How did he grab you?

20   A.   He grabbed me by my hair.  And I was laying --

21 sort of sitting up rather and he kind of straddled

22 across me, grabbed me by my hair and started punching

23 me, dragging me off the bed.

24   Q.   So what happened next?

25   A.   He dragged me into the hallway where I was

GEORGANNE SHIRLEY - JUNE 5, 2017
Direct Examination by Ms. Doyer

1    screaming, put his arm around me, started trying to

2    choke me and continued to punch me in my head.

3        Q.   When you say that he had his arm around you,

4    where on your body did he have his arm?

5        A.   He was trying to put it around my neck.

6        Q.   Okay.  And I see you motioning.  Just for the

7    record, that's kind of in a chokehold motion?

8        A.   Yes.

9        Q.   Okay.  What did you do when he had his arm

10   around your neck?

11       A.   Well, I was struggling and swaying back and

12   forth.  He continued to punch me in my head.  And then

13   when he finally got me in a stranglehold, the only thing

14   I could do was bite him -- nip him rather.

15       Q.   After you bit him, what happened?

16       A.   He let go, but he continued to punch.

17       Q.   When you say punching, where on your body was

18   he punching you?

19       A.   In my head, mostly on this side.

20       Q.   What side would that be, ma'am?

21       A.   On my right side.

22       Q.   You said you were in the hall and you were

23   screaming.  What happened next?

24       A.   Gerry came out of his room and said, hey, cut

25   it out.  Stop it.  Gerry is kind of a hippy kind of guy,

1    so he stopped rather -- well, slowed down rather.

2        Q.   Okay.  What did you do next?

3        A.   I just kind of got away from him, went behind

4    Gerry, was crying.

5        Q.   Where did Mr. Porter go?

6        A.   He was in the hallway standing kind of in a

7    bowed position.

8        Q.   So after y'all had separated, what did y'all

9    do?

10       A.   Gerry was talking to him and said --

11            MR. MILLAN:  Objection, hearsay.

12       Q.   (BY MS. DOYER) Ms. Shirley, don't tell me

13   anything that Gerry was saying, just tell me what did

14   y'all do next.

15       A.   Can you say that again?

16       Q.   Sure.  After the fight had separated, what did

17   you guys do next?

18       A.   I stood in the hallway while Gerry talked with

19   Mr. Porter.

20       Q.   After Gerry had talked to Mr. Porter, what did

21   you do?

22       A.   I went into the bathroom.  I was getting the

23   hair off -- clumps of hair coming out, hair coming out.

24   I washed my face, washed my -- the -- the blood off my

25   hair.

GEORGANNE SHIRLEY - JUNE 5, 2017
Direct Examination by Ms. Doyer

1    Q.   You say you were washing your hair.  What had
2    happened to your hair?
3    A.   Oh, I guess he was pulling my hair out.
4    Q.   Was -- was Mr. Porter pulling your hair during
5    this altercation?
6    A.   Yes.
7    Q.   While you were in the bathroom and you did all
8    of this, what happened after you were done in the
9    bathroom?
10   A.   He went back into the bedroom and laid down.
11   Q.   When you say "he," who would that be?
12   A.   Mr. Porter.
13   Q.   What happened next?
14   A.   Gerry left the room and then he said, are you
15   coming back in here?
16            MR. MILLAN:  Objection, hearsay.
17            THE COURT:  Just don't relate anything
18   that anybody else said.
19               Sustained.
20   A.   I was instructed to come back into the room.
21   Q.   (BY MS. DOYER) Okay.  Back into which room?
22   A.   My bedroom, which is across from the bathroom.
23   Q.   Who told you to come back into the bedroom?
24   A.   Mr. Porter.
25   Q.   Okay.  When you went back into the bedroom,

GEORGANNE SHIRLEY - JUNE 5, 2017
Direct Examination by Ms. Doyer

1  what happened?

2       A.   That's when I laid down.

3       Q.   And why did you lay down?

4       A.   I was told to.

5       Q.   Who told you to lay down?

6       A.   Mr. Porter.

7       Q.   Okay.  Georganne, were you afraid of Derek at

8  this point?

9       A.   Yes, I was.

10      Q.   Why did you lay down with him?

11      A.   Because I figured he might jump up and do

12  something worse.

13      Q.   Now, what do you remember happening next after

14  you had laid down with him?

15      A.   After he laid down, I looked at him.  When he

16  appeared to be asleep, I started to get up and put my

17  shoes on.

18      Q.   And then what happened?

19      A.   I heard a police officer and I whispered, I'm

20  in here.

21      Q.   What did you do next?

22      A.   I went out into the hallway.

23      Q.   Did you see the police officer?

24      A.   Yes, I did.

25      Q.   What did -- what happened when you saw the

GEORGANNE SHIRLEY - JUNE 5, 2017
Direct Examination by Ms. Doyer

1  police officer?

2      A.   He asked me my name.  He asked me where

3  Mr. Porter was.

4      Q.   Did you direct him to where Mr. Porter was?

5      A.   Yes, I did.

6      Q.   Then what did you do?

7      A.   He asked me to step aside.  And the officer

8  swayed me to the living away from where the bedroom was.

9      Q.   What did you see happen after you had been

10 separated from Mr. Porter?

11     A.   I was standing by the fireplace.  There was a

12 Foosball table between the hallway and the living room.

13 I saw Mr. Porter come out of the bedroom.  Two officers

14 were in the living room and Mr. Porter started to run

15 and one officer hit the Foosball table.  And at that

16 point, I just kind of went out of the house and out the

17 front door.

18     Q.   Now, Ms. Shirley, this may sound like kind of a

19 ridiculous question.  When Derek was hitting you in the

20 head, punching you in the head, did you feel pain?

21     A.   Yes, I did.

22     Q.   When he was pulling your hair, did that cause

23 you pain?

24     A.   Yes, it did.

25     Q.   When he had you in the chokehold, did that

GEORGANNE SHIRLEY - JUNE 5, 2017
Direct Examination by Ms. Doyer

1   cause you pain?

2       A.   Yes, it did.

3       Q.   Specifically, do you have any pre-existing

4   conditions to your neck?

5       A.   Do I what?

6       Q.   Do you have a pre-existing neck injury?

7       A.   Yes, I do.

8       Q.   What's the nature of that injury?

9       A.   I have a rotated (sic.) disc.  I was in a car

10  accident.

11      Q.   Had you ever communicated this to Mr. Porter?

12      A.   Can you repeat that?

13      Q.   Did Mr. Porter know this?

14      A.   Yes, he did.

15           MS. DOYER:  May I approach the witness,

16  Your Honor?

17           THE COURT:  Yes, ma'am.

18      Q.   (BY MS. DOYER) Ms. Shirley, I'm going to show

19  you what I've marked as State's Exhibits 1 through 6.

20  Have you had the opportunity to review these before

21  testifying here today?

22      A.   Yes, I have.

23      Q.   And what are these?

24      A.   They are bruising -- beginning of bruising.

25      Q.   And specific -- just more generally, what are

GEORGANNE SHIRLEY - JUNE 5, 2017
Direct Examination by Ms. Doyer

1    the documents I'm showing you?

2         A.    They are photos of me and injuries.

3         Q.    And who took these photos?

4         A.    One of the officers.

5         Q.    Do these photos fairly and accurately represent

6    how you appeared on that day?

7         A.    Yes.

8                   MS. DOYER:   State offers State's Exhibits

9    1 through 6.

10                  MR. MILLAN:   No objection.

11                  THE COURT:   They're admitted.

12                  MS. DOYER:   Permission to publish,

13   Your Honor?

14                  THE COURT:   Yes, ma'am.

15        Q.    (BY MS. DOYER) Ms. Shirley, I'm going to walk

16   through these.  I might have a question about a photo; I

17   might not.

18                  Okay.  So looking here at State's Exhibit

19   1 -- and who are we looking at?

20        A.    Me.

21        Q.    And State's Exhibit 2, what is that?

22        A.    My ear.

23        Q.    In that photo can you describe for the jury

24   where some of the injuries are?

25        A.    On the outer of the earlobe and on the inner

GEORGANNE SHIRLEY - JUNE 5, 2017
Direct Examination by Ms. Doyer

1   side of the earlobe, the center.

2        Q.   For the record, would that be this red portion?

3        A.   That entire area and on the outside.

4        Q.   And the outside of your ear?

5        A.   At the lobe here, too.

6        Q.   At the lobe down here?

7        A.   Yes.

8        Q.   So all of these marks, Ms. Shirley, that are in

9   State's Exhibit 2, were those marks there before Derek

10  Porter struck you?

11       A.   No.

12       Q.   Now, looking at State's Exhibit 3, it's more

13  difficult to see on the overhead, but what's depicted

14  here?

15       A.   In the center here is where he choked me.

16       Q.   State's Exhibit 4?

17       A.   Right in the crease of my ear and behind my

18  ear --

19       Q.   So for the record --

20       A.   -- into my hairline.

21       Q.   So this portion here that appears to be

22  bruising are petechiae?

23       A.   Also on the crease of my ear.

24       Q.   Up here?

25       A.   Yes.

GEORGANNE SHIRLEY - JUNE 5, 2017
Direct Examination by Ms. Doyer

1       Q.   So just behind the upper earlobe.  And then
2   State's Exhibits 5 and 6, why did officers take photos
3   of these portions of your hair?
4       A.   I had large lumps and some bruising occurring.
5       Q.   Ms. Shirley, that night did you want to press
6   charges on Mr. Porter?
7       A.   I did and I didn't.
8       Q.   Can you tell the jury a little bit about why
9   you did not?
10      A.   I did not -- I didn't want any future problems
11  because it was not the first incident.
12      Q.   You say it wasn't the first incident.  I want
13  to kind of walk backwards.  Was there an incident in
14  September of 2015 in Hays County that officers responded
15  to?
16      A.   Yes.
17      Q.   Can you describe for the jury what happened
18  that night?
19      A.   He would not leave.  I asked him continually to
20  leave.  He started telling me about some girls that he
21  was seeing.  And I said, I really don't care; maybe I'll
22  find somebody of my own.  And he came up the stairs,
23  started punching me and started kicking me, drug me down
24  the stairs.  Mr. Rein, who I was taking care of, asked
25  him to stop and to leave.  Mr. Rein is a senior citizen.

GEORGANNE SHIRLEY - JUNE 5, 2017
Direct Examination by Ms. Doyer

1   He just went back into his room.

2              We ended up in the kitchen where he threw

3   several items at me and started kicking me in my

4   kidneys.  And my neighbor -- at one point I got to the

5   front door where Mr. Porter drug me back inside,

6   continued to punch me in my head and kick me in my

7   kidneys.  My neighbor saw and came to my aid.

8        Q.   That neighbor that you're referring to, what

9   was her name?

10       A.   I can't recall her name.

11       Q.   Does Melissa --

12       A.   Melissa, I think -- Melissa.

13       Q.   That night does law enforcement respond?

14       A.   Yes.

15       Q.   Did you have any kind of lingering injuries or

16  conditions after the kicking in the stomach?

17       A.   Yes, I was peeing blood.

18       Q.   Did you go see a doctor for that?

19       A.   No.

20       Q.   Why not?

21       A.   Because I couldn't get out of bed.  I was

22  upstairs and we didn't have transportation.  Mr. Porter

23  took my keys, my -- my phone as well as my wallet.

24       Q.   Prior to the incident in September of 2015, was

25  there another incident in December of 2014 and --

GEORGANNE SHIRLEY - JUNE 5, 2017
Direct Examination by Ms. Doyer

1          MR. MILLAN:  Your Honor, may I approach?

2          THE COURT:  You may.

3          (At the bench, on the record)

4          MR. MILLAN:  Your Honor, I'm concerned

5  that we're getting far afield of the initial allegations

6  and to -- you know, for -- this is 404(b) that we're

7  talking about, things that are essentially propensity

8  evidence.  I'm concerned that we're getting --

9          THE COURT:  How is it admissible at this

10  time?

11          MS. DOYER:  Under 38.371, that new

12  provision with regards to the history of the

13  relationship.  And it all goes to his intent to assault

14  her.  I think it's pretty clear from the voir dire what

15  they're going with because of intent to assault her, his

16  motive, his knowledge, lack of mistake or accident.

17          MR. MILLAN:  Well, Judge, if that's the

18  case, I'm -- I'm at this point going to inform the Court

19  that I think that she's putting herself up to

20  potentially who is the primary aggressor.  And arrests

21  have been made against her and --

22          MS. DOYER:  How so?

23          THE COURT:  If it goes to the relationship

24  of the parties, it goes -- it probably would go both

25  ways, would it not?

GEORGANNE SHIRLEY - JUNE 5, 2017
Direct Examination by Ms. Doyer

1              MS. DOYER:  There are certain predicates
2    that have to be laid for what Mr. Millan is discussing.
3              MR. MILLAN:  It seems that the State is
4    really trying to go one way on this.
5              MS. DOYER:  No.  I have the law.
6              THE COURT:  We're going to follow the
7    rules on that regardless of which way either of you are
8    going.
9              MR. MILLAN:  I think we might need to
10   flesh this out outside the presence of the jury,
11   Your Honor.
12             THE COURT:  What's the number you're
13   saying this is in?
14             MS. DOYER:  38.371.
15             THE COURT:  371.
16             (At the bench, concluded)
17             THE COURT:  Ladies and gentlemen, I'm
18   probably going to have to send you out so we can take up
19   some matters which I was unaware of until now just
20   outside your presence.  We'll try to get back to you as
21   soon as possible.
22             (Jury leaves courtroom)
23             THE COURT:  I'm not real sure that this
24   particular provision, in effect, says a whole lot
25   because it says subject to the rules of evidence or

GEORGANNE SHIRLEY - JUNE 5, 2017
Direct Examination by Ms. Doyer

1   other applicable laws that -- that each party may offer

2   testimony or other evidence of all relevant facts and

3   circumstances that would assist the trier of fact in

4   determining whether the actor committed the offense

5   described by subsection A, which is the offense for

6   which he's on trial; correct?

7                    MS. DOYER:  Yes, sir.

8                    THE COURT:  So what predicate information

9   are you referring to me?  It seems like it just refers

10  to the rules of evidence.

11                   MS. DOYER:  So 38.371 is just saying that

12  the nature of the relationship would be admissible and

13  then it's subject to the rules of evidence.  And so

14  under 404 we would be offering it under motive, intent,

15  knowledge, absence of mistake or lack of accident.

16                   MR. MILLAN:  He hasn't even testified,

17  Your Honor.  They're throwing it out there.  I would

18  understand that if it was the -- something that was

19  meant to rebut something that he said, but they're just

20  throwing it out there and assuming what his motive,

21  intent, knowledge is before he even has an opportunity

22  to testify.  Those grounds under 404(b) would only be to

23  impeach the -- the defendant if he was testifying.

24                   MS. DOYER:  That's not accurate.

25                   THE COURT:  Well, I mean, that -- this is

GEORGANNE SHIRLEY - JUNE 5, 2017
Direct Examination by Ms. Doyer

1    probably going to be a stair-step approach.  I think

2    under the -- you know, under the rules -- I mean, even

3    in voir dire you can open a door, so to speak.  But if

4    you're going to go into it, they're obviously going to

5    be entitled to cross-examine.

6                   MR. MILLAN:  And, Your Honor, not only do

7    I think that the -- if -- I think if they want to get

8    into relationships in general, if that's where this

9    thing is going, because I'm -- what I'm -- if we're

10   talking about doors getting opened here, I mean, she's

11   in custody right now for a very serious offense -- two

12   very serious offenses, one of which was an aggravated

13   assault and -- which ties into -- could potentially be a

14   defensive theory in this case.

15                  MS. DOYER:  It could not actually because

16   when we're talking about the nature of their

17   relationship, which is clear --

18                  THE COURT:  We're talking about this

19   relationship.

20                  MS. DOYER:  Yes, sir.  You know the law.

21   And, you know, as far as she's got a pending charge,

22   there has to be a nexus.  And how could you possibly

23   show something that happened two weeks ago could in any

24   way be related to Mr. Porter's apprehension.

25                  MR. MILLAN:  Well, depending on how she

GEORGANNE SHIRLEY - JUNE 5, 2017
Direct Examination by Ms. Doyer

1   responds to certain questions.

2                THE COURT:  I don't know what may or may

3   not be.  I think that this statute plainly says that

4   each party may offer testimony that's relevant,

5   including -- I'm skipping over a few portions here, but

6   it's -- it's regarding the nature of the relationship.

7   That's the specific purpose for this statute being here.

8                However, it does plainly relate you back

9   to and says, subject to the rules of evidence and such

10  that -- I think the door can be opened, but let's --

11  right now let's not just go ad nauseam -- or let me just

12  put it this way.  The more you go into the details of

13  that, I think the more the door is opened for the

14  defendant to be able to respond and to cross-examine at

15  this stage of the trial.

16               Now, on redirect, depending upon the

17  cross, I don't know.  But this statute does specifically

18  preclude the presentation of character evidence that

19  otherwise would not be admissible, so --

20               MR. MILLAN:  That's exactly what I'm

21  saying, Judge.  I mean, they're trying to bring it in as

22  propensity evidence.

23               MS. DOYER:  That's not what I'm trying to

24  do. I've articulated the exceptions.

25               THE COURT:  No, no.  I'm talking more

GEORGANNE SHIRLEY - JUNE 5, 2017
Direct Examination by Ms. Doyer

1    about something that happened two weeks ago against

2    somebody else unless there's somehow some --

3              MS. DOYER:  That would be an attempt to

4    introduce the --

5              THE COURT:  Some relevance.

6              MS. DOYER:  -- character evidence.

7              THE COURT:  Y'all know what the evidence

8    is; I don't.  But is there something that you would --

9    while the jury is out just because -- like I said, I

10   wasn't aware of this issue.  I don't want the jury being

11   treated like yo-yos.

12             MR. MILLAN:  Well, she was arrested for

13   assaulting him as well.

14             MS. DOYER:  That charge was dismissed.

15             MR. MILLAN:  I understand that, Judge, but

16   she's talking about things that are un --

17             MS. DOYER:  Okay.  Hold on.  Mr. Porter's

18   on trial for assault.  We're talking about the nature of

19   the relationship and 404 exceptions.  I have articulated

20   exceptions.

21             MR. MILLAN:  You've already --

22             MS. DOYER:  If you're --

23             MR. MILLAN:  -- said that you're

24   anticipating --

25             MS. DOYER:  Can I please finish?

GEORGANNE SHIRLEY - JUNE 5, 2017
Direct Examination by Ms. Doyer

```
 1              THE COURT:  Why don't you just let me
 2    interject.  Number one, I've already said that you
 3    can -- I think you can bring out the facts of this case.
 4    But the door is going to be opened if -- if there was
 5    something between -- the relationship of the parties,
 6    whether it was prosecuted or not, I think you can go
 7    into it.
 8              MS. DOYER:  And that's what I would like
 9    to talk about outside the presence of the jury then is
10    that before we can get into -- that would be improper
11    impeachment with a specific instance of conduct because
12    38.371 is still subject to the rules of evidence.  So
13    what is the exception under which we're bringing this
14    assault that was dismissed against Derek Porter?
15              THE COURT:  Well, I think if you're
16    opening the door, it's --
17              MS. DOYER:  That's not an exception.
18              MR. MILLAN:  Intent, knowledge, absence of
19    mistake, she's not -- you know, this isn't a one-way
20    deal.
21              THE COURT:  I think if they have a
22    good-faith basis for the question -- I think if
23    there's -- if it's mutual combat --
24              MS. DOYER:  Mutual combat is not a
25    defense.
```

GEORGANNE SHIRLEY - JUNE 5, 2017
Direct Examination by Ms. Doyer

1          THE COURT:  I understand, but it's about
2    the relationship of the parties.
3          MR. MILLAN:  And self-defense is a
4    defense.
5          MS. DOYER:  Let me --
6          THE COURT:  That's part of what I'm
7    saying, is if there's a good-faith basis for it -- I
8    mean, unless we're going to have a mini trial here while
9    the jury is out -- I mean, please --
10          MR. MILLAN:  I wasn't anticipating they
11    were going to be using 38.371.  I guess I probably
12    should have and had case law ready for you.  I mean, if
13    you want to go this route, I would rather us have a mini
14    trial, have each party brief the issue and then we have
15    a hearing before we bring the jury back out.
16          MS. DOYER:  You were aware of it.  I
17    provided you with 404 and 38.371 notice.  I'm going to
18    move on for the purposes of right now.  I think it will
19    be opened soon enough.
20          THE COURT:  Okay.
21          All right.  Bring them back in.
22          (Jury enters courtroom)
23          THE COURT:  Okay.  Everybody can be
24    seated.
25      Q.   (BY MS. DOYER) Ms. Shirley -- can you hear me?

GEORGANNE SHIRLEY - JUNE 5, 2017
Cross-Examination by Mr. Millan

1    A.   Yes.

2    Q.   Ms. Shirley, after law enforcement responded

3 that night, have you gotten back together with or had

4 any other contact with Mr. Porter?

5    A.   No.

6    Q.   Do you see Mr. Porter here in the courtroom

7 today?

8    A.   Yes, I do.

9    Q.   Could you please identify him by something that

10 he's wearing?

11    A.   Blue shirt.

12         MS. DOYER:  For the record, the witness

13 has identified the defendant, and I'll pass the witness.

14                  CROSS-EXAMINATION

15 BY MR. MILLAN:

16    Q.   Ms. Shirley, you said that you didn't have any

17 contact with Mr. Porter after that incident.

18    A.   No.

19    Q.   You didn't send him any letters?

20    A.   No.

21    Q.   Okay.  Did you send any pictures to Mr. Porter?

22    A.   No.

23    Q.   Now, you testified that -- that you bit

24 Mr. Porter on the upper arm.  Do you remember where on

25 the upper arm you bit him?

GEORGANNE SHIRLEY - JUNE 5, 2017
Cross-Examination by Mr. Millan

 1     A.   No, I do not.

 2     Q.   And you testified that you -- that you bit him

 3   in self-defense because you were in a chokehold; is that

 4   right?

 5     A.   Yes.

 6     Q.   So his arm was around your neck, yet you were

 7   able to -- you were able to get his arm off of you and

 8   bite it?

 9     A.   I think it was a nip.

10     Q.   And you said you -- he punched you in the head.

11   How many times did you say he punched you in the head?

12     A.   I'm not sure, repetitively.

13     Q.   Was he punching you hard?

14     A.   Yes.

15     Q.   Full force?

16     A.   I'm not sure what full force is for Mr. Porter.

17     Q.   Okay.  And you testified that he pulled you

18   into the hallway; is that right?

19     A.   Yes.

20     Q.   When he pulled you into the hallway, was Gerry

21   there?

22     A.   No.

23     Q.   Did Gerry witness anything that you recall?

24     A.   No, not that I recall.

25     Q.   Other than the injury or the -- or the bite on

1    the arm, did you notice any other injuries on Derek

2    after the incident?

3        A.   No.

4        Q.   Did you not see a gash mark on his elbow?

5        A.   No.

6        Q.   Do you know how the gash mark on his elbow

7    could have gotten there?

8        A.   No.

9        Q.   Did you hit him with a machete?

10       A.   No.

11       Q.   With a garden hoe?

12       A.   No.

13       Q.   Now, approximately how long before the police

14   arrived at the -- had everything calmed down?

15       A.   Maybe four or five minutes.

16       Q.   And at the point that the police came to the

17   house, did you hear them knocking on the front door?

18       A.   No.

19       Q.   You never heard anybody knock on the front

20   door?

21       A.   No.

22       Q.   Okay.  Were you -- did you ever have to write a

23   statement about the incident?

24       A.   Excuse me?

25       Q.   Did you ever have to write a statement about

1    the incident?

2        A.   I believe, yes.

3             MR. MILLAN:  May I approach the witness,

4    Your Honor?

5             THE COURT:  Yes, ma'am -- or yes, sir.

6        Q.   (BY MR. MILLAN) Do you recognize this?

7        A.   Yes, I do.

8        Q.   And what is it?

9        A.   It's my statement.

10            MR. MILLAN:  I'm going to tender it to the

11   State to make sure there's no objection.

12            MS. DOYER:  No objection.

13       Q.   (BY MR. MILLAN) When is that statement dated?

14       A.   November 30th, 2015.

15       Q.   Now, in this statement did you ever state

16   that --

17            MS. DOYER:  Objection.  Calls for hearsay.

18       Q.   (BY MR. MILLAN) Did you tell the police that

19   on --

20            MS. DOYER:  Objection.  Calls for hearsay.

21       Q.   (BY MR. MILLAN) In this statement you had an

22   opportunity to tell the police that you were assaulted,

23   didn't you?

24       A.   Can you repeat that?

25       Q.   In this statement you had an opportunity to

GEORGANNE SHIRLEY - JUNE 5, 2017
Redirect Examination by Ms. Doyer

1    tell the police that you were assaulted; is that

2    correct?

3         A.   I don't understand the question.

4         Q.   In this statement you had the opportunity to

5    tell --

6         A.   In my written statement, yes.

7         Q.   -- in your written statement what had happened

8    to you?

9         A.   Yes.

10        Q.   Okay.  Were you looking to move from Eagles

11   Peak at that time period?

12        A.   Yes.

13        Q.   And where were you planning on moving?

14        A.   Ruidoso, New Mexico.

15        Q.   Now, how much longer were you planning on

16   staying in that location?

17        A.   I wasn't certain.

18        Q.   Approximately how long from then were you

19   planning on moving to New Mexico?

20        A.   Maybe a few months.

21        Q.   So were you hoping to stay in Gerry's house for

22   a few months?

23        A.   Yes, in the area.

24                  MR. MILLAN:  Pass the witness.

25

JOSEPH LORETT - JUNE 5, 2017
Direct Examination by Ms. Kilday

```
 1                    REDIRECT EXAMINATION
 2   BY MS. DOYER:
 3       Q.   Ms. Shirley, that statement form that
 4   Mr. Millan showed you, did you have a chance to look at
 5   it?
 6       A.   Briefly.
 7       Q.   Why didn't you want to fully disclose what took
 8   place that night?
 9       A.   I didn't want any problems and our future --
10   our previous attempts on statements failed miserably.  I
11   mean, nothing was accomplished.
12                   MS. DOYER:  Pass the witness.
13                   MR. MILLAN:  No further questions.
14                   MS. DOYER:  May this witness be excused?
15                   MR. MILLAN:  Subject to re-call,
16   Your Honor.
17                   THE COURT:  You can step down.
18                   MS. KILDAY:  State calls Joseph Lorett.
19                   THE COURT:  Come right up here, please,
20   sir.  How are you doing.  Let me get you to raise your
21   right hand.
22                   (Witness sworn)
23                   THE COURT:  Thank you.  Have a seat and
24   just get pretty close up there to that microphone.
25
```

JOSEPH LORETT - JUNE 5, 2017
Direct Examination by Ms. Kilday

1                    JOSEPH LORETT,

2    having been first duly sworn, testified as follows:

3                    DIRECT EXAMINATION

4    BY MS. KILDAY:

5         Q.    Good afternoon.

6         A.    Afternoon.

7         Q.    Please introduce yourself to the jury.

8         A.    Ma'am?

9         Q.    Will you please introduce yourself to the jury.

10        A.    I'm Joe Lorett.

11        Q.    Mr. Lorett, where do you work?

12        A.    I work for the Austin Police Department.

13        Q.    How long have you worked there?

14        A.    Just over 20 years.

15        Q.    And more importantly, when -- what county do

16   you reside in?

17        A.    I reside in Comal County.

18        Q.    All right.  So do you remember an incident that

19   occurred November 30th of 2015?

20        A.    I do.

21        Q.    What do you remember about that day?

22        A.    I was going -- I was on my street going down

23   the hill, coming to the stop sign at Eagles Peak.  I

24   seen two police officers chasing a man down the street.

25   Being a police officer, I couldn't just watch.  And so I

JOSEPH LORETT - JUNE 5, 2017
Direct Examination by Ms. Kilday

1   pulled up -- I was in a truck already.  I pulled up to

2   cut him off.  He turned and run back west.  And then I

3   obviously went west with him.

4              When he turned to go back to what would be

5   north, I jumped out of the truck and ran and caught him

6   and held him there until the police officers showed up

7   and took custody of him.

8       Q.   That day were you wearing the same uniform

9   you're wearing today?

10      A.   No, ma'am.  I was in civilian clothes.

11      Q.   You just jumped in to help?

12      A.   Correct.

13      Q.   Did you get a chance to look at the gentleman

14  that you tackled on that day?

15      A.   I did.

16      Q.   Do you recognize him here in the courtroom?

17      A.   I do.

18      Q.   Would you please identify him and a piece of

19  clothing he's wearing?

20      A.   He's wearing a light blue shirt, white male,

21  thin, looks much cleaner today.

22      Q.   And you held on to him until the Comal County

23  sheriff's deputies were able to catch up?

24      A.   I did.

25              MS. KILDAY:  Pass the witness.

JOSEPH LORETT - JUNE 5, 2017
Cross-Examination by Mr. Millan

```
 1                      CROSS-EXAMINATION
 2   BY MR. MILLAN:
 3        Q.   Good afternoon.
 4        A.   How are you doing, sir?
 5        Q.   Officer Lorett, question, do you think when you
 6   tackled the defendant, do you remember whether he --
 7   whether or not he had any injuries on his -- on his
 8   person?  Did you see any injuries on him?
 9        A.   I did not.
10        Q.   Do you think that you -- your tackling caused
11   any severe injuries?
12        A.   No, I don't.
13        Q.   Okay.  I mean, how -- when you tackled him, how
14   did you tackle him?
15        A.   I actually went up behind him.  He stumbled and
16   we went to the ground.  I got him and I held him in a
17   wristlock until they got there.
18        Q.   Did it seem like he fell in a severe fashion to
19   cause any deep injuries or cuts?
20        A.   I don't think so.  I could be wrong.  It's real
21   rocky.  Where we live, it's all rock.  I don't remember
22   seeing any blood or anything --
23        Q.   Okay.
24        A.   -- major.  Of course, I don't know where the
25   injury was, if it was under his pants or -- or I
```

GABRIEL SEPEDA - JUNE 5, 2017
Direct Examination by Ms. Doyer

```
 1   couldn't tell you.
 2       Q.   Okay.  Fair enough.
 3                MR. MILLAN:  Pass the witness.
 4                MS. KILDAY:  No further questions.
 5                THE COURT:  Thank you.  You can step down.
 6   Appreciate it.
 7                THE WITNESS:  Yes, sir.
 8                MS. DOYER:  State calls Deputy Gabriel
 9   Sepeda.
10                Just for formality, Your Honor, may this
11   witness be released from the subpoena?
12                MR. MILLAN:  I'm not planning on calling
13   him again.
14                THE COURT:  Yes, he may be released.
15                Let me get you to raise your right hand,
16   please, sir.
17                (Witness sworn)
18                THE COURT:  Thank you.  And if you'll get
19   pretty close to that microphone.
20                     GABRIEL SEPEDA,
21   having been first duly sworn, testified as follows:
22                     DIRECT EXAMINATION
23   BY MS. DOYER:
24       Q.   Deputy Sepeda, could you please state your name
25   for the record.
```

GABRIEL SEPEDA - JUNE 5, 2017
Direct Examination by Ms. Doyer

1      A.   Gabriel Sepeda.

2      Q.   And, Deputy Sepeda, how are you presently

3 employed?

4      A.   I'm a deputy with the Comal County Sheriff's

5 Office.

6      Q.   And how long have you been with the Comal

7 County Sheriff's Office?

8      A.   A total of 12 years.

9      Q.   You mentioned that you're a deputy.  Have you

10 held any other positions with the sheriff's office?

11     A.   Yes, ma'am.  I was a jailer for seven years.

12     Q.   Did you have to go to a special academy to

13 become a jailer?

14     A.   We have an in-house academy put on by the

15 sheriff's office.

16     Q.   And do you have to go to additional training to

17 become a peace officer or a deputy?

18     A.   Yes, ma'am.

19     Q.   Have you attended that training?

20     A.   Yes.

21     Q.   Do you currently hold a peace officer

22 certification?

23     A.   I do.

24     Q.   What level?

25     A.   Advanced.

GABRIEL SEPEDA - JUNE 5, 2017
Direct Examination by Ms. Doyer

1    Q.    Deputy Sepeda, were you working on November
2    30th, 2015?
3    A.    Yes, ma'am.
4    Q.    And in what capacity were you working?
5    A.    I was assigned to our traffic enforcement.
6    Q.    Did you respond to a call at 150 Eagles Peak in
7    Canyon Lake that night --
8    A.    Yes, ma'am.
9    Q.    -- or I guess that morning?
10   A.    Yes, ma'am.
11   Q.    Where is that located generally?
12   A.    It is off of FM 32 up near Canyon Lake High
13   School.
14   Q.    Is that in Comal County?
15   A.    Yes, ma'am.
16   Q.    When you arrived at that location, what did you
17   do?
18   A.    When I arrived on location, I -- I -- I met
19   with an individual who had come walking down from one of
20   the side roads to the property.
21   Q.    And were you able to identify that individual?
22   A.    Yes, ma'am.
23   Q.    Who was that person?
24   A.    Gerard Nance.
25   Q.    Without going into anything that was said to

GABRIEL SEPEDA - JUNE 5, 2017
Direct Examination by Ms. Doyer

1    you, after you met with Mr. Nance, what did you do?

2        A.   I spoke with my partner Deputy McClure who was

3    on scene with me and we made our way to the main house.

4        Q.   Okay.  When you went to the main house,

5    generally what was your understanding of why you were

6    out there?  What was the nature of the call?

7        A.   We were dispatched out there for a disturbance.

8        Q.   Okay.  So when you went to the main house, what

9    did you do?

10       A.   We went to the main house and -- and knocked on

11   what was left of a front door and announced our presence

12   as deputies calling out to the occupants in the house to

13   see if anybody would come out and make contact with us.

14       Q.   You said what was left of a front door.  Can

15   you describe kind of the -- the home or the layout of

16   the home?

17       A.   The home is set -- it's kind of a square house

18   with a -- almost like kind of a trailer attached to the

19   side of it.  The front doors are what used to be a

20   French door, but there's only one door left.  Like the

21   stationary to the French door -- the stationary door is

22   still there.  The open door is -- was off the hinges.

23       Q.   Okay.  So what did y'all do when you got up

24   there?

25       A.   I knocked on the door that was left, announced

GABRIEL SEPEDA - JUNE 5, 2017
Direct Examination by Ms. Doyer

1    our presence, the sheriff's office, and was calling out

2    to the -- whoever was in the house.

3         Q.   Anybody respond to you?

4         A.   No.

5         Q.   Okay.  So what did you do?

6         A.   Deputy McClure went back and asked Gerard if he

7    was the owner of the house.  He said he was and he gave

8    us consent to go in and see if we could make contact

9    with who he said was in the house.

10        Q.   Okay.  So did you go inside the home?

11        A.   Yes, ma'am.

12        Q.   Describe what happened when you went inside the

13   home.

14        A.   We walked into that front door.  You walk in.

15   There's a big open living room with a small dining room

16   attached to it.  Immediately to the left is a -- a door

17   with another curtain.  We went in through that.  There's

18   a kitchen.  To the left of the kitchen is another

19   doorway with a curtain.  There's a small hallway.  In

20   that hallway there's two bedrooms, a bathroom, and --

21   and that's where we made contact with whoever was in the

22   house.

23        Q.   So walk me through.  When you get into the

24   house, what pathway do you take?

25        A.   When we go into the house, we walk towards --

GABRIEL SEPEDA - JUNE 5, 2017
Direct Examination by Ms. Doyer

1    into the living room through the left door into the

2    kitchen.  As we walk into the kitchen, we hear stuff

3    going on.  We hear loud music going on.  Where we hear

4    the music coming from is to the left of the kitchen.  We

5    go through that door.  It's a hallway.

6              Once we get into that hallway, the music

7    is louder.  We start announcing ourselves again,

8    sheriff's office, calling out.  Somebody responds to us.

9    We have them come out and that's who we made contact

10   with.

11       Q.   You said that somebody responded to you.  Was

12   this person male or female?

13       A.   Female.

14       Q.   Were you later able to identify this

15   individual?

16       A.   Yes, ma'am.

17       Q.   And how -- who was that?

18       A.   Georganne Shirley.

19       Q.   You said that she came out.  Could you describe

20   her demeanor when she came out?

21       A.   When we called her name, initially she had

22   answered from the bedroom.  I called out her name.  She

23   answered.  She said, who is it?  I said, sheriff's

24   office.  I asked her who was in there with her.

25              At that time she came rushing out of

GABRIEL SEPEDA - JUNE 5, 2017
Direct Examination by Ms. Doyer

1   bedroom, kind of not running, but hurriedly walking.

2   She walked up towards me.  She made contact with me.

3   She got within about a foot of me, looked kind of

4   scared, kind of nervous and she started whispering

5   that --

6           MR. MILLAN:  Objection, hearsay.

7           THE COURT:  Sustained.  Try not to refer

8   to any matters that you were told.

9           THE WITNESS:  Yes, sir.

10      Q.   (BY MS. DOYER) So she came out.  And just

11  describe how her emotional state was.

12      A.   She seemed just scared, nervous.

13      Q.   After you made contact with her, what did you

14  do?

15      A.   We had her wait in the living room and went to

16  go make contact with the person in the bedroom.

17      Q.   Okay.  When you went into the bedroom, what did

18  you see?

19      A.   We saw a bed, a dresser.  There was a male

20  individual laying underneath the covers.

21      Q.   Okay.  Did you attempt to make contact with

22  that individual?

23      A.   Yes, ma'am.

24      Q.   Okay.  How did you do that?

25      A.   We called him by his name.

GABRIEL SEPEDA - JUNE 5, 2017
Direct Examination by Ms. Doyer

1    Q.   Did he respond?

2    A.   I -- he -- he sat up.  He was laying under the

3  covers.  We called his name.  He bolted up, asked what

4  was going on.  I told him that's what we're there to

5  find out.

6    Q.   What did he do next?

7    A.   At that point I asked him to come and talk to

8  us.  He got out of the bed, walked around the bed.  As

9  he was walking towards me, he -- he bent down to tie his

10  tennis shoe that he was wearing under the covers.

11    Q.   Was that unusual to you?

12    A.   Yeah, a little bit.  He was completely dressed.

13  He had a hoodie on, sweat pants and tennis shoes.

14    Q.   Okay.  You mentioned that he tied his shoe.

15  What did y'all do next?

16    A.   At that point I asked him if he had any ID.  He

17  said no.  I had him walk into the kitchen where me and

18  McClure were so we could talk to him about what was

19  going on.

20         As we were walking in the kitchen, I asked

21  him to keep his hands out of his pockets.  Walking into

22  the kitchen, there's a counter.  In front of the counter

23  was a chair.  I asked him -- I told him, hey, come sit

24  on this chair so we can talk to you.  He didn't respond.

25  I told him again, hey, have a seat in this chair.  Again

GABRIEL SEPEDA - JUNE 5, 2017
Direct Examination by Ms. Doyer

1   he didn't respond, just started to -- continually

2   walking towards the kitchen door leading into the living

3   room.  Once he got to the threshold of the door, he took

4   off running.

5       Q.   Now, you said that you and your partner McClure

6   were there.  Where was Deputy McClure?

7       A.   Deputy McClure was standing by the counter

8   right next to the chair.

9       Q.   So how was the defendant able to exit the home?

10      A.   He ran out through the kitchen, out through the

11  front door and out through the open door that -- where

12  the door was missing, he went out that door and onto the

13  porch.

14      Q.   Had y'all announced yourselves as peace

15  officers --

16      A.   Yes.

17      Q.   -- in his presence?

18      A.   Yes.

19      Q.   And were you wearing a uniform much like what

20  you're wearing here today?

21      A.   Yes, ma'am.

22      Q.   Was Deputy McClure also wearing a uniform?

23      A.   Yes.

24      Q.   Now, after he took off running, what did you

25  and your partner do?

GABRIEL SEPEDA - JUNE 5, 2017
Direct Examination by Ms. Doyer

1      A.    We -- we chased after him.  Once we got out of

2  the house onto the porch, he -- we took a right towards

3  Eagles Peak, went down the embankment that is right next

4  to the house.  It's about an eight-foot embankment, made

5  it down to the street, continued down Eagles Peak

6  towards Sunset View.

7              Once we got to the intersection, the

8  individual we were chasing took a left onto Sunset View.

9  And that's when the other witness from Austin PD, an

10  off-duty officer, in his truck assisted us in -- in

11  catching Derek.

12     Q.    Okay.  So what did the -- the off-duty officer

13  do to assist y'all?

14     A.    Once we were approaching Sunset View and the

15  individual took a left, he sped through the

16  intersection, drove towards the individual, kind of cut

17  him off with his truck, jumped out and then chased him

18  into another empty lot there at the corner of Eagles

19  Peak and Sunset View.  He ended up tackling him, held

20  him there until we got to the corner.  And once we got

21  there, we restrained him in handcuffs.

22     Q.    After he was restrained, who was primarily

23  tasked with just keeping track of him or custody of him?

24     A.    I had him secured while I had McClure go get

25  his vehicle from the top of the house to bring it closer

GABRIEL SEPEDA - JUNE 5, 2017
Direct Examination by Ms. Doyer

1   so we could put him in the vehicle.

2        Q.   And then after McClure had brought his vehicle,

3   where was the defendant placed?

4        A.   We stood him up, walked him to the street on

5   Eagles Peak where the vehicle was, placed him against

6   the car to pat him down to make sure he didn't have any

7   weapons on him.  While we were doing this, he got angry

8   and started banging his head on the passenger window.

9        Q.   What did y'all do due to his behavior?

10       A.   Told him to stop.  Told him to calm down.

11  Tried to push him against the car to keep him from

12  banging.  He was -- obviously wasn't going to stop so we

13  placed him down on the ground on his stomach, told him

14  to calm down and stop resisting.  At that point he was

15  able to calm down.

16       Q.   At this point where was he placed?

17       A.   After he calmed down, said he was going to calm

18  down, said he was going to being okay, cooperative, we

19  stood him back up and we were able to sit him in the

20  back of McClure's patrol car.

21       Q.   Once he was secured in McClure's patrol

22  vehicle, what did you do as part of your investigation?

23       A.   Once he was secured, McClure took custody of

24  him, called for EMS because of the -- from banging his

25  head on the window, he caused a small laceration on his

GABRIEL SEPEDA - JUNE 5, 2017
Direct Examination by Ms. Doyer

1    forehead.  McClure called EMS to come check him out.  At

2    that point I went back to the house to finish talking to

3    Georganne.

4         Q.   Now, when you were talking to Georganne --

5    don't tell me anything that she said, but can you

6    describe what her demeanor was like when she was

7    discussing the events with you?

8         A.   She still seemed a little shaken, a little

9    nervous, kind of had a shaky voice, not as scared as she

10   was at the beginning, a little more relieved, but still

11   nervous.

12        Q.   Did you do anything to document -- or did you

13   assess her for injuries?

14        A.   From what -- from talking to her, I could see

15   that she had a couple of red marks on her neck at first.

16   At that point I had a female officer, Deputy Peavey,

17   take her inside just to make sure she didn't have

18   anything else elsewhere.

19        Q.   And what did you do to document the injuries

20   that were visible?

21        A.   I took photos of what I could see on her head

22   and neck.

23        Q.   Did you also feel her head for any injuries?

24        A.   Yes.

25        Q.   Did you feel any?

GABRIEL SEPEDA - JUNE 5, 2017
Cross-Examination by Mr. Millan

1        A.    There was a small little bump that was starting

2    to -- to come up on her head.

3        Q.    Are those photos still up there, Deputy, with

4    you?

5        A.    No, ma'am.

6        Q.    Looking at what's already been admitted as

7    State's Exhibits 1 through 6, are those the photos that

8    you took of Ms. Shirley that morning?

9        A.    Yes.

10       Q.    Okay.  Now, you said that there was some

11   redness on her neck.  Was that able to be fully captured

12   in the photos?

13       A.    The picture that I took of her full frontal on

14   her face from the little bit of distance, you can see it

15   on her neck, the close-up.

16       Q.    Let me go back to this one.  State's Exhibit 1,

17   is that what you're referring to?

18       A.    Yes, ma'am.  If you look right there above her

19   little rope necklace or cord -- cord necklace, you can

20   see the two little red marks on the -- what would be the

21   left side of her neck.

22       Q.    Okay.

23                   MS. DOYER:  Pass the witness.

24                   CROSS-EXAMINATION

25   BY MR. MILLAN:

GABRIEL SEPEDA - JUNE 5, 2017
Cross-Examination by Mr. Millan

1    Q.   Good afternoon, Officer Sepeda.  I want to take

2    you to when you first arrived at the Eagles Peak

3    address.  You were knocking on the door for quite a

4    while, weren't you?

5    A.   No more than five minutes.

6    Q.   Okay.  You were knocking pretty hard, weren't

7    you?

8    A.   We knocked very loud, yes.

9    Q.   Could you hear music from where you were

10   knocking?

11   A.   From where I was knocking, you could hear faint

12   music, yeah.

13   Q.   Okay.  And was -- and you said that there was

14   only one door.  The other door was open; right?

15   A.   Yes.

16   Q.   So -- and it was a pretty cold day you say?

17   A.   I -- I don't recall the temperature.

18   Q.   Okay.

19   A.   It was November.

20   Q.   After Thanksgiving?

21   A.   I think it was after Thanksgiving.

22   Q.   Right.  And there was -- there was a house that

23   had doors open; is that right -- I mean, open doors to

24   it; right?

25   A.   Yes.

GABRIEL SEPEDA - JUNE 5, 2017
Cross-Examination by Mr. Millan

1      Q.   So if it was cold outside, it was probably
2   pretty cold inside as well; right?  You don't recall?
3      A.   No, sir.
4      Q.   Okay.  How far was the bedroom from the front
5   door?
6      A.   We had to go through two rooms.
7      Q.   Okay.  And were there doors in between you and
8   that room or was it just -- just like sheets?
9      A.   Just sheets.
10      Q.   Okay.  And did it seem odd to you that somebody
11   wouldn't have been able to hear the knocking?
12      A.   No.  I just -- like I said, I -- we didn't know
13   what was going on.  We didn't know if a disturbance was
14   actively going on.  We didn't know what was going on,
15   so --
16      Q.   Do you think you could have heard the knocking
17   from that bedroom where you were knocking?
18          MS. DOYER:  Objection.  Asked and
19   answered, calls for speculation.
20          THE COURT:  Overruled.
21      Q.   (BY MR. MILLAN) Do you know?
22      A.   As loud as I knocked, yeah, probably.
23      Q.   Okay.  Now, you talked about documenting the
24   injuries on Ms. Shirley.  Did you document the injuries
25   on Derek Porter?

GABRIEL SEPEDA - JUNE 5, 2017
Cross-Examination by Mr. Millan

1     A.   No, I didn't.

2     Q.   Okay.  Do you know if anybody did?

3     A.   I -- I couldn't tell you.

4          MR. MILLAN:  Okay.  May I approach the

5     witness, Your Honor?

6          THE COURT:  Yes, sir.

7     Q.   (BY MR. MILLAN) Let me show you your report.

8     And I want to take you to page two, number 11.  I want

9     you to just read it to yourself.

10    A.   Okay.

11    Q.   So according to your report, you forced -- the

12    group of officers that were there notified EMS regarding

13    the injuries on -- on Mr. Porter; is that right?

14    A.   Yes, sir.

15    Q.   Okay.  And it was in relation to a cut on his

16    arm; is that right?

17    A.   Yes.

18    Q.   I also want to take you to number 14.  I want

19    you to read number 14.

20    A.   Okay.  Okay.

21    Q.   And in number 14 you state that the only

22    injuries that you saw were the injuries on the arm.

23    Those are the only injuries that you could document in

24    terms of the biting, is that right, and that you didn't

25    notice any other signs of him being assaulted?

GABRIEL SEPEDA - JUNE 5, 2017
Cross-Examination by Mr. Millan

```
1        A.   Correct.

2        Q.   So --

3        A.   Correct, other than the -- the cut that he said

4   he had on his arm.

5        Q.   But you're saying here that -- read number 14

6   again and read the last sentence.

7        A.   Uh-huh.  I say I didn't notice any other signs

8   of him being assaulted.

9        Q.   Other than the bite mark; right?

10       A.   Other than what he -- other than the cut that

11  he told me he had and the bite mark that he had on his

12  arm.

13       Q.   So he had a cut on his arm and a bite mark on

14  his upper arm.  Were they on the same arm?

15       A.   No, sir.

16       Q.   Different arms?

17       A.   Yes.

18       Q.   And you didn't document those injuries?

19       A.   I didn't.

20       Q.   And you -- you were not aware of whether they

21  were documented by any other officer?

22       A.   Not that I'm aware of.

23       Q.   Do you think that's important evidence?

24       A.   Could be.

25       Q.   As part of the investigation, do you ever
```

GABRIEL SEPEDA - JUNE 5, 2017
Cross-Examination by Mr. Millan

1   remember it being brought up among the officers whether

2   it should be --

3                   MS. DOYER:  Objection.  Objection.

4   Hearsay.

5                   THE COURT:  All right.  I don't -- I don't

6   know.

7                   MS. DOYER:  I can tell.

8                   THE COURT:  I can't.

9      Q.   (BY MR. MILLAN) Did you ever have any

10  conversation with any of the other officers about

11  documenting the injuries --

12                  MS. DOYER:  Objection.

13     Q.   (BY MR. MILLAN) -- of Mr. Porter?

14                  MS. DOYER:  Objection, hearsay.

15                  THE COURT:  Overruled.

16     A.   No, I didn't.

17                  MR. MILLAN:  Pass the witness.

18                  MS. DOYER:  I have nothing further for

19  this witness.

20                  THE COURT:  Okay.  You can step down.

21                  MS. DOYER:  May this witness be released?

22                  THE COURT:  Yes.

23                  MS. DOYER:  Your Honor, as far as

24  scheduling, we moved a lot quicker than I anticipated

25  this afternoon.  I have one available for tomorrow

```
1    morning.
2                    THE COURT:  Okay.  Do need him back
3    potentially?
4                    MR. MILLAN:  No, not Sepeda, Your Honor.
5                    THE COURT:  Okay.  Very good.
6                    Ladies and gentlemen, we're going to go
7    ahead and break for the day.  Please do be mindful of
8    the admonitions that you received in that set of written
9    instructions.  We have heard a couple of the locations.
10                   If by chance you have to go by any of
11   those, if you can avoid them, take a different route to
12   go home, a different route than you normally do.  Please
13   don't do any drive-bys, no Google Earth, no nothing of
14   that nature.  Just be mindful of your admonitions and
15   we'll see you in the morning about 9:00 and we'll try to
16   get started.  Thank you.
17                   (Jury leaves courtroom)
18                   THE COURT:  Just for scheduling purposes
19   so that we don't -- I don't know who the next witness
20   is, but whoever that may be, is there any reasonable
21   anticipation that we would have any hearings necessary
22   outside the presence of the jury?
23                   MS. DOYER:  Probably, yes.
24                   MR. MILLAN:  Who is next?
25                   MS. DOYER:  Witnesses from Hays County.
```

```
1              THE COURT:  Who from Hays County?

2              MS. DOYER:  The neighbor who called 911

3    when she ran across the street and asked for help, and

4    then an officer who responded to a different assault on

5    her in Hays County.

6              MR. MILLAN:  There will definitely be a

7    hearing outside the presence of the jury.

8              MS. DOYER:  I think by now the cross is

9    clearly put into play in this whole self-defense issue.

10   If there's any evidence of it is one thing, but now I'm

11   offering these things to rebut the defensive theory.

12             THE COURT:  Yes, sir, any response?

13             MR. MILLAN:  If I may review the

14   applicable case law over the evening and get back to you

15   tomorrow morning.

16             THE COURT:  Okay.  Well, then, I guess

17   we're going to need to be here probably about 8:15 or so

18   to try to -- I just don't want the jury unnecessarily

19   cooling their heels back there forever --

20             MR. MILLAN:  I understand, Judge.

21             THE COURT:  -- but I think -- just because

22   I don't know how the evidence and the witnesses may

23   proceed, generally speaking -- that's why I typically

24   say that if there is some good-faith expectation and

25   belief and it's not just a pure fishing expedition, I
```

1    typically allow cross-examination questions that would

2    explore matters so as to prevent us from unnecessarily

3    having to call witnesses back to the stand or take

4    people out of order or whatever and so -- but that also

5    goes both ways, that if they have a reasonable belief

6    based upon the voir dire and some of the

7    cross-examination questions that it appears that there's

8    an open door, it's probably permissible in general to do

9    that.

10               But again, I think it should be a

11   stair-step approach such that we're not simply adding

12   character evidence in here.  And if they're then -- if

13   that evidence is being brought in, again, you can

14   cross-examine.  But if you want to bring me some case

15   law or something --

16               MR. MILLAN:  I have homework tonight,

17   Judge.

18               THE COURT:  Okay.  Let's just -- do you

19   think we're going to have to have testimony proffered or

20   presented outside the presence of the jury --

21               MR. MILLAN:  Judge, I'll tell you right

22   now I --

23               THE COURT:  -- or is it just looking at

24   the case law?

25               MR. MILLAN:  I want to look at the case

```
1    law because if I do call -- I may be calling Georganne
2    Shirley back for some purposes which may -- after all of
3    the testimony has been heard -- have opened the door --
4    that door may have been opened to everything at that
5    point, which is fine.
6               If -- I don't know how the State is
7    planning on bringing Georganne back into this, if
8    they're planning on bringing in that testimony or
9    whether they're planning on doing it through other
10   witnesses.  I guess it depends on how the State proceeds
11   with their witnesses from here on out and how I'm going
12   to deal with it.
13              THE COURT:  I don't know either, so --
14              MR. MILLAN:  Right.
15              THE COURT:  All right.  We'll just see
16   y'all right at about 8:15 in the morning then.
17              (Proceedings adjourned)
18
19
20
21
22
23
24
25
```

1   STATE OF TEXAS

2   COUNTY OF COMAL

3

4       I, Cindy Cummings, Official Court Reporter in and

5   for the 433rd District Court of Comal, State of Texas,

6   do hereby certify that the above and foregoing contains

7   a true and correct transcription of all portions of

8   evidence and other proceedings requested in writing by

9   counsel for the parties to be included in this volume of

10  the Reporter's Record in the above-styled and numbered

11  cause, all of which occurred in open court or in

12  chambers and were reported by me.

13      GIVEN UNDER MY HAND, on this the 9th day of August,

14  2017.

15                          /s/ Cindy Cummings

16                          Cindy Cummings, Texas CSR 3210
                            Official Court Reporter
17                          433 Judicial District Court
                            150 N. Seguin Street
18                          Suite 317
                            New Braunfels, Texas 78130
19                          Tel 830-221-1279
                            Fax 830-608-2030
20                          Expiration:  12/31/17

21

22

23

24

25