1               REPORTER'S RECORD
                VOLUME 3 OF 5 VOLUMES
2          TRIAL COURT CAUSE NO. CR2016-233
            COURT OF APPEALS NO. 01-17-00534-CR
3

4   STATE OF TEXAS              ) IN THE DISTRICT COURT
                                )
5   vs.                         ) COMAL COUNTY, TEXAS
                                )
6   DEREK DALE PORTER           ) 207TH JUDICIAL DISTRICT

7

8

9        ------------------------------------------------

10                     TRIAL ON MERITS

11       ------------------------------------------------

12

13       On the 6th day of June, 2017, the following

14   proceedings came on to be held in the above-titled and

15   numbered cause before the Honorable Dibrell W. Waldrip,

16   Judge Presiding, held in New Braunfels, Comal County,

17   Texas.

18       Proceedings reported by computerized stenotype

19   machine.

20

21

22

23

24

25

<pre>
 1                    APPEARANCES

 2
     Counsel for the State of Texas:
 3
     Ms. Jacqueline H. Doyer
 4   SBOT NO. 24086703
     Ms. Kiera L. Kilday
 5   SBOT NO. 24090854
     Comal County District Attorney's Office
 6   150 N. Seguin Street
     Suite 307
 7   New Braunfels, Texas 78130
     Telephone: 830-221-1300
 8   Fax: 830-620-5599

 9

10   Counsel for the Defendant:

11   Mr. James E. Millan
     SBOT NO. 24031569
12   Law Office of James E. Millan, PLLC
     816 Camaron, Suite 1.15
13   San Antonio, Texas 78212
     Telephone:  210-223-1060
14   Fax:  210-738-1000

15
     Mr. Edwin Matias
16   SBOT NO. 13196700
     Attorney at Law
17   8600 Wurzbach Road
     Suite 1000
18   San Antonio, Texas 78240
     Telephone:  210-331-3132
19   Fax:  210-568-4518

20

21

22

23

24

25
</pre>

1                        VOLUME 3

2                   TRIAL ON MERITS

3     June 6, 2017
                                              PAGE VOL.
4     NATALIE RAMIREZ              Direct    Cross   V.Dire

5        By Ms.Doyer                9 v3

6     RONNIE WOMACK                Direct    Cross   V.Dire

7        By Ms.Doyer               11 v3

8     OLIVER MEEK                  Direct    Cross   V.Dire

9        By Ms. Kilday             19 v3

10    State rests                  ................24    3

11    GREGORY McCLURE              Direct    Cross   V.Dire

12       By Mr. Millan             44 v3
         By Ms. Doyer                        56 v3
13       By Mr. Millan             56 v3

14    GEORGANNE SHIRELY           Direct    Cross   V.Dire

15       By Mr. Millan             57 v3
         By Ms. Doyer                        58 v3
16
      Reporter's Certificate ..........................67    3
17

18              ALPHABETICAL INDEX OF WITNESSES

19                               Direct    Cross   V.Dire

20    McClure, Gregory             44 v3    56 v3
                                   56 v3
21
      Meek, Oliver                 19 v3
22
      Ramirez, Natalie              9 v3
23
      Shirley, Georganne           57 v3    58 v3
24
      Womack, Ronnie               11 v3
25

CINDY CUMMINGS, CSR
OFFICIAL COURT REPORTER - 433RD DISTRICT COURT
TEL. (830) 221-1279   FAX (830)608-2030

Trial on Merits
June 6, 2017

EXHIBITS OFFERED BY STATE

| EXHIBIT | DESCRIPTION | OFFERED | ADMITTED |
|---------|-------------|---------|----------|
| 20 | Hays County jail records | 11 v3 | 11 v3 |
| 21 | CR-11-0347 Plea bargain agreement redacted | 24 v3 | 24 v3 |
| 21-A | CR-11-0347 Plea bargain agreement unredacted | 24 v3 | 24 v3 |
| 22 | CR-11-348 Plea bargain agreement redacted | 24 v3 | 24 v3 |
| 22-A | CR-11-348 Plea bargain agreement unredacted | 24 v3 | 24 v3 |
| 23 | Ten-print card | 14 v3 | 14 v3 |

1          **P R O C E E D I N G S**

2                    (Open court, defendant present, no jury)

3                    THE COURT:  Are y'all ready to proceed?

4                    MR. MILLAN:  Yes, sir.

5                    MS. DOYER:  Yes, Your Honor.

6                    I've got two witnesses, one of which is

7    still -- Ronnie Womack is working on something over at

8    the sheriff's office, so there might be a delay on that.

9    I told him to get here as soon as possible.  I'm told

10   there's only one of him now.  Where there were two

11   evidence techs, he's now down to the only person and

12   someone is coming to pick up evidence this morning.  I'm

13   doing my best.

14                   THE COURT:  Okay.  Well, where is -- who

15   is it that's coming?

16                   MS. DOYER:  Ronnie Womack.

17                   THE COURT:  I know, but you said someone

18   is coming for evidence.

19                   MS. DOYER:  I don't -- they said a diver.

20   I don't know what that means.  It was in relation to

21   another case.

22                   THE COURT:  Well, the jurors may take

23   precedence over the diver.

24                   MS. DOYER:  I've communicated that

25   information.

1      THE COURT:  We're not going to sit here

2  all day long --

3      MS. DOYER:  Yes, sir.

4      THE COURT:  -- waiting on -- is there any

5  objection, Mr. Millan, if we had to just proceed and

6  take him out of order or -- and if there is, that's

7  fine.  It's understandable.  I don't know if you have

8  witnesses, so that's my point.

9      MR. MILLAN:  I'd rather wait to hear

10  everything in order.  I don't want to be doing stuff out

11  of order, Judge.

12      THE COURT:  Okay.  Well, who is the first

13  witness?

14      MS. DOYER:  A records custodian.  If I

15  could get a minute, I'm going to talk to Ronnie.

16      THE COURT:  Okay.  So my point is that

17  person is probably not going to take too long.

18      MS. DOYER:  The two I have won't take

19  long.

20      THE COURT:  Chances are he can be back by

21  9:30 if he'll just get here rather than keeping the jury

22  waiting.

23      MS. DOYER:  He said 30 minutes is his best

24  estimate -- the best he can do is 30 minutes.

25      THE COURT:  Find out who it is, who he's

1  waiting on.

2  MS. DOYER:  I'm sorry, sir?

3  THE COURT:  Can you find out who it is

4  that he's waiting on?

5  MS. DOYER:  Yes, sir.

6  (Off the record)

7  (Open court, defendant present, no jury)

8  MS. DOYER:  I'm still waiting.  Amber said

9  she's doing her best to get him here.

10  THE COURT:  If they had a murder last

11  night and he's collecting evidence, that's one thing.

12  Do you understand what I'm saying?

13  MS. DOYER:  Yes, sir.

14  THE COURT:  But if this is just something

15  that somebody is coming to pick something up --

16  MS. DOYER:  What I heard is there's a

17  diver coming to pick up some type of computer equipment

18  and that there were two murders last week.  I don't

19  know.

20  THE COURT:  I mean -- okay.  It's not

21  emergent.  It's not happening right now.  It's something

22  from last week.

23  MS. DOYER:  Your Honor, while we're

24  waiting, if we move into the punishment phase for

25  scheduling purposes, we're prepared to go straight into

1  punishment.  Would you want us to have people lined up

2  or would you want us to wait as far as if you want to do

3  a PSI?

4          THE COURT:  We can probably do it either

5  way, it doesn't matter, so as to prevent having to -- if

6  there are witnesses anticipated that have already been

7  subpoenaed --

8          MS. DOYER:  Yes, sir.

9          THE COURT:  -- unless you're going to

10  leave them under the same subpoena and we can make sure

11  they understand the case has not been reset.

12          MS. DOYER:  I don't know that we'll get

13  another block of time sufficient to present the

14  punishment case, if we reset it.

15          THE COURT:  Okay.  Bring them on in.

16          (Jury enters courtroom)

17          THE COURT:  All right.  Thank you.

18  Everybody can be seated.

19          Next witness, please?

20          MS. DOYER:  State calls Natalie Ramirez.

21          THE COURT:  Let me get you to raise your

22  right hand.

23          (Witness sworn)

24          THE COURT:  Thank you.  You may be seated.

25  If you would just make sure you get close up to that

1    mike.

2                You may proceed.

3                      NATALIE RAMIREZ,

4    having been first duly sworn, testified as follows:

5                      DIRECT EXAMINATION

6    BY MS. DOYER:

7        Q.   Ms. Ramirez, would you please state your name

8    for the record.

9        A.   Natalie Ramirez.

10       Q.   And, Ms. Ramirez, how are you presently

11   employed?

12       A.   I am employed with the Hays County Sheriff's

13   Office.

14       Q.   And what is your current position with the Hays

15   County Sheriff's Office?

16       A.   Custodian of jail records.

17       Q.   What are some of the duties that are associated

18   with that position? [stop

19       A.   Maintaining the fingerprints, making reports,

20   any incarceration paperwork that is processed for the

21   jail, booking information.

22       Q.   Those records that are made -- say, for

23   example, a jailing record, are those records made at or

24   near the time of incarceration?

25       A.   Yes, ma'am.

1    Q.   Are those records made by someone with personal
2  knowledge of the events?
3    A.   Yes.
4    Q.   And are those records kept in the ordinary
5  course of Hays County jail's business?
6    A.   Yes.
7    Q.   Did you bring a record here with you today
8  related to an arrest of Derek Dale Porter on November
9  23rd, 2010?
10    A.   Yes, ma'am.
11         MS. DOYER:  May I approach the witness,
12  Your Honor?
13         THE COURT:  Yes, ma'am.
14    Q.   (BY MS. DOYER) This item that I've just marked
15  as State's Exhibit 20, can you describe what's contained
16  in that record?
17    A.   Yes.  The first page is a booking report that
18  identifies the individual's first, middle name, last
19  name, identifying information and states the date
20  booked, the date of arrest, emergency contact
21  information.
22    Q.   And the next page of that record?
23    A.   Would be the fingerprints from the booking
24  process of when he was arrested and brought in.
25    Q.   Is this a true and accurate representation of

1  the records that are maintained by the Hays County

2  Sheriff's Office?

3       A.   Yes, ma'am.

4                 MS. DOYER:  State offers

5  State's Exhibit 20.

6                 MR. MILLAN:  No objection.

7                 THE COURT:  It's admitted.

8                 MS. DOYER:  Pass the witness.

9                 MR. MILLAN:  No questions.

10                THE COURT:  Okay.  Thank you.  You may

11  step down.

12                MS. DOYER:  State calls Detective Ronnie

13  Womack.

14                Your Honor, may this witness be excused?

15                THE COURT:  You may.

16                MS. DOYER:  Thank you.

17                (Witness sworn)

18                THE COURT:  Thank you.

19                      RONNIE WOMACK,

20  having been first duly sworn, testified as follows:

21                   DIRECT EXAMINATION

22  BY MS. DOYER:

23       Q.   Detective Womack, could you please state your

24  name for the record.

25       A.   Ron Womack, W-O-M-A-C-K.

1    Q.   And, Detective Womack, how are you presently
2  employed?

3    A.   I'm a sergeant detective with the Comal County
4  Sheriff's Office.

5    Q.   And what are some of the duties associated with
6  your current position, sir?

7    A.   My current position mainly involves fingerprint
8  processing, fingerprint work and identification.

9    Q.   Do you go through any special training or
10 education to be able to hold that position?

11   A.   I've had basic, immediate, advanced and then
12 ultra advanced through some of the best instructors in
13 the world.  I've been doing it for about 22 years.

14   Q.   Can you describe generally when a fingerprint
15 is.

16   A.   Well, a fingerprint -- what I'm doing today is
17 a known -- what we call an inked or a live scan with
18 just like a scanner.  That's basically what it is.

19   Q.   And how do you use a fingerprint to conduct a
20 comparison and subsequently an identification?

21   A.   When I have a fingerprint, I always consider it
22 to be an unknown until I look at the ten-print card or a
23 suspect or a defendant.  I take that -- I take that
24 fingerprint and I start evaluating it first for -- for a
25 pattern.  And then if the pattern matches, then I go

1  from there to second-level detail, which is any ridges,

2  bifurcations on the fingerprint.  We map that out.

3  Particularly -- ten-print cards are very easy to do

4  because of the information that is involved in a

5  ten-print versus working a crime-scene latent with only

6  maybe seven, eight, nine second-level details.

7      Q.    Did you conduct an analysis of fingerprints in

8  this particular case?

9      A.    Yes, ma'am.

10          MS. DOYER:  May I approach the witness,

11  Your Honor?

12          THE COURT:  Yes, ma'am.

13      Q.    (BY MS. DOYER) Detective Womack, I'm going to

14  show you what I've marked as State's Exhibit 23.  Do you

15  recognize this?

16      A.    Yes, ma'am.

17      Q.    What is this?

18      A.    This is a known live scan ten print from

19  Mr. Derek Porter taken yesterday in the jail.

20      Q.    The individual whose prints you took on -- on

21  June 5th, 2017, do you see him here in the courtroom

22  today?

23      A.    Yes.  It's the gentleman with the blue shirt.

24          MS. DOYER:  For the record, the witness

25  has identified the defendant.

1    Q.   (BY MS. DOYER) Can you describe what a live

2  scan is?

3    A.   If any of you have ever used a Xerox machine, a

4  live scan is an updated, more technical version of that.

5  It's usually set at 500 dpi, dots per square inch.  It

6  captures all of the information here which is regulated

7  by the FBI.  The FBI signs off on those live scan

8  machines to be regulated and approved by them.  The live

9  scan system that we use is approved by the FBI.

10   Q.   I'll take that for a moment.

11        MS. DOYER:  State offers State's

12 Exhibit 23.

13        MR. MILLAN:  No objection.

14        THE COURT:  It's admitted.

15   Q.   (BY MS. DOYER) Detective Sergeant Womack, did

16 you compare these prints to another set of prints of a

17 Derek Porter?

18   A.   Ma'am?

19   Q.   Did you compare State's Exhibit 23, the prints

20 that you took, to another set of prints?

21   A.   Yes, ma'am.

22        MS. DOYER:  May I approach the witness,

23 Your Honor?

24        THE COURT:  You may.

25   Q.   (BY MS. DOYER) I'm handing you back

1  State's Exhibit 23.  I'm going to show you what's been

2  admitted as State's Exhibit 20.  The prints that are

3  State's Exhibit 20, are those the same prints that you

4  used to conduct the comparison?

5      A.   That is correct, ma'am.

6      Q.   Okay.  Looking at State's Exhibit 20, what is

7  the date of arrest for that particular offense?

8      A.   Give me a moment here.  Let's see.  It shows to

9  be 11-23-2010.

10     Q.   Okay.  And does it identify the individual who

11  was printed on that date?

12     A.   Yes, ma'am.

13     Q.   Okay.  And who is that individual?

14     A.   It shows to be a Derek Dale Porter.

15     Q.   Now, using those two prints -- two sets of

16  prints, Detective Womack, did you conduct an analysis to

17  see if there was a match?

18     A.   Yes, ma'am, I did.

19     Q.   Okay.  And can you describe how you went about

20  that process?

21     A.   I use a special software program on a -- on a

22  24-inch ultra screen and I -- you'll see the old school

23  ways where they use glasses.  I use a screen.  And I

24  have state-of-the-art equipment, state-of-the-art

25  software.  So what I did is I scanned the -- the

1  known -- and I still consider this to be an unknown.

2  Even though his name is on it, it's still an unknown to

3  me.  I know what this card is because I watched him

4  print it.

5  So what we do is we do the -- we conduct

6  the comparison.  We have ten digits that we deal with.

7  On those ten digits, the tips of the fingers -- there's

8  150 to 350 second-level details, excluding third-level

9  detail.  These are basic prints to work.  They're some

10  of the easiest things to do in identification, and it is

11  a match.

12  Q.   That was my next question.  In your opinion,

13  Detective Womack, are the prints from State's Exhibit 23

14  the same individual contained in State's Exhibit 20?

15  A.   That is correct, ma'am.

16  MS. DOYER:  May I approach again,

17  Your Honor?

18  THE COURT:  Yes, ma'am.

19  Q.   (BY MS. DOYER) Detective Womack, I'm going to

20  show you what I've marked as State's Exhibits 21 and 22.

21  Without reading anything, could you flip through those

22  and tell me generally what they are?

23  A.   It shows to be a plea bargain.

24  Q.   Okay.  These court documents related to -- and

25  if you look back at the first page of both -- an offense

1  occurring on November 23rd, 2010.

2      A.   I see that, yes, ma'am.  That is correct.

3      Q.   Okay.  Thank you.

4                MS. DOYER:  I'll pass the witness.

5                MR. MILLAN:  No questions.

6                MS. DOYER:  May this witness be excused?

7                THE COURT:  You may.  Thank you.

8                MS. DOYER:  May we approach briefly,

9  Your Honor?

10               THE COURT:  Yes, ma'am.

11               (At the bench, on the record)

12               MS. DOYER:  I'm anticipating an objection

13 because of this here, so I just thought I'd take this up

14 now.

15               THE COURT:  I'm presuming -- what is this

16 that's marked as State's Exhibit 22?

17               MS. DOYER:  21 and 22.

18               THE COURT:  Okay.

19               MS. DOYER:  And this was what I was

20 concerned about here.

21               MR. MILLAN:  Yeah.  I'm concerned about it

22 as well.  I mean, I don't have a problem if it's somehow

23 redacted.

24               THE COURT:  So that's a big difference

25 in --

1          MS. DOYER:  Let me see.  Are you objecting

2     to it?

3          MR. MILLAN:  My thing is, I'm concerned

4     that even if it's redacted, there's going to be -- it's

5     going to look like something was scratched out.

6          MS. DOYER:  Well, I can -- what I can do

7     is just show it to the probation officer and then we can

8     only introduce the judgments.

9          THE COURT:  Would it just -- be

10    permissible just to -- just to introduce those two

11    pages?

12         MS. DOYER:  I was thinking I'd just pull

13    off the front page.

14         THE COURT:  That, too.

15         MR. MILLAN:  Okay.

16         THE COURT:  Okay.  You can just -- those

17    stickers go -- I mean, will they come off of there or do

18    we need to reprint the stickers?

19         MS. DOYER:  Yeah, probably reprint them.

20         THE COURT:  I don't know.  And then --

21    just so the record -- the record is clear, too, if you

22    want to, just -- so the record reflects what -- what

23    we're removing, it -- it can be either just a court

24    exhibit --

25         MS. DOYER:  Sure.

1          THE COURT:  -- the front page of each --

2          MR. MILLAN:  Uh-huh.

3          THE COURT:  -- and that you're objecting

4    to -- as I'm understanding looking at the dates, it's

5    not real clear, but yet a different potential family

6    violence enhancement.  So what will go back to the jury

7    is just the judgment package without reference to that.

8          (At the bench, concluded)

9          MS. KILDAY:  State calls Oliver Meek.

10          THE COURT:  Let me get you to raise your

11   right hand.

12          (Witness sworn)

13          THE COURT:  Thank you.

14                    OLIVER MEEK,

15   having been first duly sworn, testified as follows:

16                  DIRECT EXAMINATION

17   BY MS. KILDAY:

18      Q.   Good morning.  Could you please spell your name

19   out for the record.

20      A.   Oliver Kent Meek, O-L-I-V-E-R, K-E-N-T,

21   M-E-E-K.

22      Q.   Mr. Meek, where are you currently employed?

23      A.   City of Corpus Christi.

24      Q.   How long have you worked there?

25      A.   Three years.

1    Q.   Where did you work prior to working for the

2  City of Corpus Christi?

3    A.   Nueces County.

4    Q.   And prior to working for Nueces County?

5    A.   Hays County.

6    Q.   How long did you work for Hays County?

7    A.   Eight years.

8    Q.   Do you remember the time span or -- or were you

9  working for Hays County around 2011?

10    A.   Yes.

11    Q.   What was your position?

12    A.   Adult probation officer.

13    Q.   And in your capacity as an adult probation

14  officer, did you have the opportunity to supervise an

15  individual named Derek Dale Porter?

16    A.   I did.

17    Q.   Do you recognize Mr. Porter in the courtroom

18  here today?

19    A.   I do.

20    Q.   Please identify him and a piece of clothing

21  that he's wearing.

22    A.   He's sitting adjacent wearing a light blue

23  button-down shirt.

24         MS. KILDAY:  Let the record reflect that

25  the witness has identified the defendant.

1    Permission to approach the witness?

2    THE COURT:  You may.

3    Q.   (BY MS. KILDAY) Mr. Meek, I'm handing you

4  what's been marked as State's Exhibit 21.  Do you

5  recognize this?

6    A.   I do.

7    Q.   Okay.  So we're going to speak in very limit

8  purposes for it.  What's the cause number that this is

9  related to?

10    A.   CR-11-0347.

11    Q.   And what is the case name, state versus who?

12    A.   Derek Dale Porter.

13    Q.   You can please tell me the offense date that is

14  listed in this information?

15    A.   23rd of November, 2010.

16    Q.   And who is the -- the listed complaining

17  witness or victim in this offense report or information?

18    A.   LaToya Branecky.

19    Q.   Secondly, I'm going to turn your attention to

20  what's marked as State's Exhibit 21-A.  Do you recognize

21  this?

22    A.   I do.

23    Q.   What is it?

24    A.   It's a plea bargain agreement.

25    Q.   And now we're going to look through -- do you

1  recognize this page here?

2      A.   Yes, I do.

3      Q.   What was the final date the judgment was

4  entered for this plea bargain?

5      A.   It was filed on February 3rd of 2012.  The

6  judgment was dated February 2nd of 2012.

7      Q.   And this was a -- this is a judgment of

8  conviction that we're referring to?

9      A.   Correct.

10     Q.   And do you see in the header what court this

11 was in?

12     A.   22nd District Court.  I believe that was Judge

13 Ramsay at the time.

14     Q.   Of Hays County?

15     A.   Of Hays County.

16     Q.   Next I'm going to turn your attention here to

17 State's Exhibit 22.  What's the cause number in

18 State's Exhibit 22?

19     A.   CR-11-0348.

20     Q.   Same -- what's the case style, State versus

21 who?

22     A.   Derek Dale Porter.

23     Q.   What is the offense listed in this information?

24     A.   Assault family violence, strangulation, repeat

25 offender.

1    Q.    And who is the victim that's listed in -- in
2    the offense -- the information?
3    A.    It's the same as the previous cause, LaToya
4    Branecky.
5    Q.    And the offense date as listed in the
6    information?
7    A.    November 23rd of 2010.
8    Q.    I'm going to turn your attention to
9    State's Exhibit 22-A.  Do you recognize it?
10   A.    Yes.
11   Q.    Do you recognize this page that I'm showing
12   you?
13   A.    Yes, I do.
14   Q.    What are we looking at here?
15   A.    The judgment for Cause CR-11-038.  It's the
16   judgment of conviction.
17   Q.    And what's the offense he was convicted for?
18   A.    Lesser-included offense of assault family
19   violence.
20   Q.    What was the date the judgment was entered on?
21   A.    February 2nd of 2012.
22   Q.    And the Court that this judgment was entered
23   into?
24   A.    It was also the 22nd District Court of Hays
25   County.

1    Q.   Finally, you had the opportunity to supervise

2    the defendant for these two cause numbers?

3    A.   I did.

4    Q.   The -- the same -- the individual that you

5    supervised, is it the same individual that you see here

6    in the courtroom today?

7    A.   Yes, it is.

8             MS. KILDAY:  State offers Exhibits 21-A

9    and 22-A.

10            THE COURT:  Any objection to the -- to the

11   As?

12            MR. MILLAN:  No objection to the As,

13   Your Honor.

14            THE COURT:  Okay.  Very good.  They'll be

15   admitted.

16            MS. KILDAY:  Pass the witness.

17            MR. MILLAN:  No questions.

18            THE COURT:  Thank you.  You may step down.

19            MS. DOYER:  May this witness be excused,

20   Your Honor.

21            THE COURT:  Yes.

22            MS. DOYER:  State rests.

23            THE COURT:  Do you wish to make an

24   opening?

25            MR. MILLAN:  No, Your Honor.  I'll go

1    straight into testimony.

2                    THE COURT:  Okay.

3                    MR. MILLAN:  I'm going to call Gregory

4    McClure.

5                    May I approach, Your Honor?

6                    THE COURT:  Yes, sir.

7                    (At the bench, on the record)

8                    MR. MILLAN:  The witnesses on call are all

9    under subpoena.  They were called as State's witnesses,

10   but the State never called them.  I'm calling Gregory

11   McClure, Gerry Nance and I'm re-calling Georganne

12   Shirley.

13                    I've informed them so that they get the

14   people over here as quickly as they can.  I couldn't

15   anticipate when they were going to --

16                    THE COURT:  Do we know where they're at?

17                    MS. DOYER:  I don't, no.

18                    MR. MILLAN:  They're working on it right

19   now.

20                    (At the bench, concluded)

21                    THE COURT:  Ladies and gentlemen, some of

22   the witnesses that have been subpoenaed have apparently

23   decided to not be here at the present time.  We're

24   working on it.  We'll just take a short break.

25                    (Jury leaves courtroom).

1          THE COURT:  Okay.  Who is Greg McClure?

2          MR. MILLAN:  He's the -- the officer who

3    transported Derek to -- he was one of the original

4    officers at the scene and he transported Mr. Porter to

5    the jail from the scene.

6          MS. DOYER:  I have a concern about

7    re-calling Georganne.  If it's just for the purposes of

8    impeachment, obviously I'm going to object to that.

9          MR. MILLAN:  Judge, we can have a hearing

10   on that right now.

11         THE COURT:  Okay.  I mean, it's their case

12   in chief.  They can call the witness.

13         And who is the -- the third witness?

14         MR. MILLAN:  I'm sorry?

15         THE COURT:  Who was the third witness?

16         MR. MILLAN:  I said McClure, Nance and

17   Shirley.

18         THE COURT:  Okay.  Nance is the homeowner.

19         MR. MILLAN:  Yes, sir.

20         THE COURT:  Okay.  I'm trying to recall.

21   I guess, have we been in contact with him?

22         MS. DOYER:  He said it's going to take

23   about an hour and a half to get here.

24         The defense can rely on our subpoenas,

25   but -- I mean, I can't control when they want to call

1  people.  I mean they still have an obligation, if

2  they're going to call witnesses, to go to those efforts.

3  Ms. Hardcastle doesn't work for Mr. Millan.

4            MR. MILLAN:  Judge, I'm entitled to rely

5  on the State's subpoenas.

6            MS. DOYER:  On the subpoenas, but not on

7  our staff.

8            MR. MILLAN:  Well, I'll calling people who

9  have been subpoenaed.

10            THE COURT:  You might as well start

11  drafting some writs of attachment or something.  I don't

12  know if you did convey to Mr. Millan how long you

13  thought this morning would be.  We were -- everybody was

14  under the impression we were going to have a hearing

15  regarding some fact witnesses other than just records

16  custodian or probation officers or fingerprint people.

17            I'm not sure that anybody anticipated -- I

18  wasn't anticipating, you know, resting in 30 minutes

19  myself.  So if that had been conveyed to Mr. Millan, I

20  don't know; but otherwise, he can't be ready either.

21            Where is --

22            MR. MILLAN:  They said it's going to take

23  about an hour on Shirley.

24            THE COURT:  She's at the jail, I presume?

25            MR. MILLAN:  McClure, how long?

1          MS. HARDCASTLE:  I just got off the phone

2    with him.  He said he's on his way, but I don't know.

3          THE COURT:  They can bring her in her jail

4    clothes.

5          MS. HARDCASTLE:  He lives in San Antonio.

6    I don't know if he's working today or not.

7          MR. MILLAN:  Judge, I've requested a writ

8    of attachment, Your Honor, if the Court ordered one.

9    But in terms of drafting one, I --

10          THE COURT:  I mean, the sheriff's office

11    is going to have to have something if we're going to

12    issue it to assist in gaining people's presence.

13          MR. MILLAN:  Right.  He's been served.  I

14    made sure.  We're working on a writ of attachment,

15    Your Honor.

16          THE COURT:  Okay.  I don't see that I have

17    any on this particular computer.  I've had --

18          MR. MILLAN:  He found one and we're going

19    to see if we can get it printed out over at the clerk's

20    office.

21          MS. DOYER:  Is there some issue with

22    Georganne that we're going to need to take up that we

23    can just do now?

24          MR. MILLAN:  That's fine.

25          MS. DOYER:  I mean, I don't know.

1          MR. MILLAN:  I -- I told the Court I'm

2    ready -- Judge, if you're ready.

3          THE COURT:  Sure.  Defendant is present.

4          MR. MILLAN:  Defendant's here.

5          THE COURT:  Counsel for both sides are

6    present.  The jury is out.

7          MR. MILLAN:  Judge, I wanted to make what

8    is called an []Alford showing on Ms. Shirley.  I don't

9    know if you remember Alford v. U.S., 1931 case.

10          THE COURT:  I don't right off the top of

11   my head.

12          MR. MILLAN:  Well, what was held in the

13   Alford v. U.S. case was that a proper cross-examination

14   question is where "do you live" to a person who is

15   incarcerated.  And on its face it's an essential step in

16   identifying the witness in their environment.

17          The defense is entitled to show by

18   cross-examination that the testimony of the witness was

19   affected by fear or favor growing out of their

20   detention.  And it's immaterial whether the person was

21   in custody as a result of their participation in the

22   transaction for which the defendant was indicted or for

23   some other offense.

24          It also says that it -- it supersedes any

25   limine.  And if you -- if you look at the line of cases

1 from Alford, they go through Davis v. Alaska, 1974,

2 another supreme court case. And it's also been taken up

3 by the court of criminal appeals in multiple cases,

4 namely Parker v. Texas, 657 S.W.2d 137, Carmona versus

5 Texas, 698 S.W.2d 100. They stand for the proposition

6 that this -- that essentially the -- the -- this case

7 the Alford v. U.S. case, is the precursor to the 613(b)

8 rule, the motive and bias rule.

9 And I am allowed to question the person

10 with, if they're in custody, number one, where -- where

11 are they in custody and what are the circumstances of

12 that confinement. And the jury is allowed to, you know,

13 make whatever inference they want off of that based on

14 whether there's a motive for the person to []embraciate

15 themselves to the prosecution based on the circumstances

16 that they're in.

17 THE COURT: Okay. Just what are the

18 circumstances that -- that the witness is in? I

19 understand she's incarcerated and charged with something

20 unrelated to the defendant, but I don't know where it

21 happened. I don't know --

22 MS. DOYER: She's not incarcerated on

23 those charges anymore. She bonded out. The only reason

24 she's here incarcerated is for her subpoena bond. So if

25 that's the whole basis of the argument, that's

1  completely improper.

2           And everything in Davis v. Alaska, Irby v.

3  State, Carpenter, everything that came after that says

4  in order to even show that she has some type of -- of

5  vulnerable position with the State, you have to

6  establish that there's a causal nexus.

7           So her statement in court yesterday was

8  completely consistent with the statement that night.  We

9  had an examining trial.  Her testimony at the examining

10 trial -- nothing has change because of the fact that she

11 now faces some charges in Hays County, so he can't --

12           THE COURT:  But the State felt it

13 necessary to put her in jail to ensure her appearance.

14           MS. DOYER:  No.  I put a subpoena bond on

15 it so that if she didn't come, I had another way to go

16 and find her.  It had nothing to do with her being in

17 custody for these other charges.

18           THE COURT:  I understand.

19           MR. MILLAN:  She's in custody, Your Honor.

20           MS. DOYER:  But that's not the standard.

21 The standard is --

22           MR. MILLAN:  The State made just an

23 outright incorrect statement stating that her -- her

24 position hasn't changed from the date of the incident

25 until now.  She -- the night -- or the date of this

1    incident, she -- she -- she did an affidavit of

2    nonprosecution.  She said she didn't want to go forward

3    with this case.  Now she's testifying and saying all of

4    these things.

5            MS. DOYER:  She said she wasn't sure and

6    that she didn't know if she should do anything because

7    nothing had been done before, which is on the COBAN

8    statements which Mr. Millan has and was able to review.

9    That's been her position this whole time.

10           You have to show that there's a nexus

11   between what she's facing in some other county and how

12   it colored her testimony here.  There's a case directly

13   on point, Carpenter, where there was an individual who

14   picks up federal charges later.  And the court of

15   criminal appeals there said, hey, that's a different

16   jurisdiction and it happened after the fact.  There is

17   no logical connection or nexus.

18           So my objection is not only does it not

19   meet the standards under the supreme court or court of

20   criminal appeals, it's also under 403 more prejudicial

21   than probative of anything and it's irrelevant.

22           MR. MILLAN:  Judge, I think under 613(b)

23   it's -- it's -- it goes to motive.  I think whatever

24   slight motive even would be admissible.

25           THE COURT:  Where is it that she was

1    charged?

2                    MS. DOYER:  Hays County.

3                    MR. MILLAN:  Hays County.

4                    MS. DOYER:  She was only arrested.

5                    MR. MILLAN:  Aggravated assault and --

6                    THE COURT:  I understand.

7                    MR. MILLAN:  -- and possession.  It says

8    200 to 400 grams.  Was it 200 to 400 grams?

9                    MS. DOYER:  It says first-degree drugs.

10                   THE COURT:  What is the nature of the

11   aggravated assault charge?

12                   MR. MILLAN:  Hitting people with a bat.

13                   MS. DOYER:  Somebody threw needles at her

14   and slammed her hand in the door and she hit somebody

15   with a bat allegedly.

16                   MR. MILLAN:  That's her version of it.

17                   MS. DOYER:  That's the conglomeration of

18   the allegations in the report.

19                   THE COURT:  Well, I don't think all of

20   those details are admissible.  I just was trying to work

21   my way through this process at the moment.  So is not

22   the affidavit of nonprosecution admissible?

23                   MS. DOYER:  From that night that she

24   didn't want to pursue charges?  It would be, but he

25   asked her about that.  I asked her about that and she

1   admitted that.

2                   THE COURT:  I'm not recalling that.

3                   MS. DOYER:  I asked her if she wanted to

4   press charges that night and why it wasn't detailed in

5   her statement.  She said no because nothing had ever

6   happened before, nothing had ever been done with it

7   before.

8                   MR. MILLAN:  The State objected to hearsay

9   on the statement.

10                  MS. DOYER:  But we still talked about it.

11  I'm just not seeing the connection or the -- or the

12  motive for her to curry favor with Comal County

13  authorities when she's being charged in another

14  jurisdiction and it's something that happened two weeks

15  ago.

16                  THE COURT:  Well, it's not really a

17  different jurisdiction.  It's a different venue.

18                  MS. DOYER:  I have no authority over Hays

19  County.  I have no ability to make any deals with her in

20  Hays County.  I'm not Hays County.  For her to testify

21  thinking that I'm going to get her a better deal in Hays

22  County, that's not --

23                  MR. MILLAN:  The State's subjective belief

24  in this regard has no bearing.

25                  MS. DOYER:  It's not a subjective belief.

1    We're in different jurisdictions.

2                    MR. MILLAN:  And your objective belief has

3    no bearing.

4                    MS. DOYER:  The fact that I prosecute in

5    Comal County and she faces charges, which have not even

6    been filed in Hays County, has nothing to do with her

7    testimony yesterday.

8                    MR. MILLAN:  And Georganne Shirley has her

9    own mind.

10                   MS. DOYER:  But her subjective belief is

11   irrelevant as well.  You can't --

12                   MR. MILLAN:  Exactly.  Whatever she says

13   is actually irrelevant.  I agree with you.  What's

14   important is that the jury hear this and they can make

15   their own determination and you can argue one way or the

16   other on it.

17                   MS. DOYER:  What's important is that we

18   follow the law.  And the law requires a plausible

19   connection or nexus between her pending charges in

20   another jurisdiction and how she testified yesterday.

21                   MR. MILLAN:  I believe it's plausible.

22                   THE COURT:  When she did, in fact, sign an

23   affidavit of nonprosecution, that does potentially

24   create a nexus.  And I think there's some optional

25   completeness issues probably in regard to that

1  affidavit.  And once you went into them --

2          MS. DOYER:  Whether she had signed an

3  affidavit or not, she would still be here testifying.

4  She's under subpoena.

5          THE COURT:  But yet we had to go to the

6  extent to have her put in jail to ensure that she would

7  be here.

8          MS. DOYER:  I didn't go to the extent to

9  put her in jail.  I put bond on it to ensure that if she

10 didn't show up, I had another set of authorities that

11 could assist me in bringing her to court.

12         THE COURT:  And she's apparently been

13 unable to make that bond.

14         MS. DOYER:  But she's no longer in custody

15 for an aggravated assault charge or a drug case.  So

16 this premise of I should able to ask her why she's in

17 custody, that completely blows out of the water.

18         MR. MILLAN:  No, it doesn't, because the

19 reason that's she's taking -- the means by which you're

20 able to get that bond placed on her was based on the

21 fact that you were able to get her based on the fact

22 that she got picked up on these new charges.

23         MS. DOYER:  Which has nothing do with --

24         MR. MILLAN:  You were unable to get her

25 served with a subpoena until she got picked up on these

1   new charges.

2                MS. DOYER:  Which has nothing do with the

3   Davis v. Alaska analysis.  We're arguing about things

4   that have nothing to do with the law.

5                THE COURT:  Well, I don't think you can go

6   into the details.  I think you can obviously ask her

7   where she's residing and -- and whatever, but -- or that

8   she has recently been arrested just for whatever charges

9   and that's it in Hays County so that it's clear.  That

10  it's a different venue.

11               MS. DOYER:  I have a case directly on

12  point that you're not allowed to ask what the charges

13  are for.  You can simply ask what the range of

14  punishment is.  It's Johnson v. State --

15               THE COURT:  Very good.

16               MS. DOYER:  -- court of criminal appeals.

17  So he can't even ask her about the fact that it's an

18  aggravated assault.

19               MR. MILLAN:  That's fine.  But I can say

20  you're in custody on a first-degree and a second-degree

21  felony.

22               MS. DOYER:  You can't, because she's not

23  on --

24               MR. MILLAN:  It's the range of punishment.

25               MS. DOYER:  She's not in custody on a

1   first- or second-degree felony.  Show me something.  You

2   can't ask someone something if you don't have a

3   good-faith basis to believe it.

4              THE COURT:  She has been charged --

5              MR. MILLAN:  She's been charged with

6   offenses that have a range of punishment of two to 20

7   and five to 99.

8              MS. DOYER:  I'm still objecting under 403,

9   401 and that this is completely abreast of the Davis v.

10  Alaska and subsequent case law.

11             THE COURT:  Overruled.

12             MR. MILLAN:  And, Judge, as to Mr. Nance,

13  he has a pending case from December 20th of 2015,

14  assault family violence, and guess who the complainant

15  is:  Georganne Shirley.  That case has been pending

16  since December of 2015, hasn't been filed by the State,

17  hasn't been rejected by the State.

18             MS. DOYER:  It was filed.

19             MR. MILLAN:  It was filed.  So it's

20  pending?

21             MS. DOYER:  Yeah.  Yeah.

22             MR. MILLAN:  Okay.  So it's still pending.

23  I believe under 613(b) that that's absolutely

24  admissible, that -- if he's up here testifying as to

25  that -- as to the facts of this case, whatever the --

1  that pending charge and the fact that it involves

2  Georganne Shirley, I think that Shirley creates a

3  potential motive one way or the other.

4            MS. DOYER:  Okay.  So why are we -- so the

5  defense is calling witnesses to the stand -- to the

6  stand for the defense to impeach them with a motive or

7  bias on their behalf?

8            MR. MILLAN:  You subpoenaed him and you

9  were going to call him as a witness.

10           MS. DOYER:  No, I wasn't going to call him

11  as a witness.  I subpoena people all the time.

12           THE COURT:  Fine.  That's good.

13           MR. MILLAN:  You said yesterday you were

14  going to call him.

15           MS. DOYER:  I never said that.

16           MR. MILLAN:  You told me yesterday you

17  were going to call him.

18           MS. DOYER:  I did not.  I don't have to

19  tell you my trial strategy.

20           THE COURT:  He was supposedly an

21  eyewitness to this event, right, so he can --

22           MS. DOYER:  He can call him, but not for

23  the purposes of impeachment.  That's not allowed under

24  the law.

25           THE COURT:  Very good.

1          MR. MILLAN:  I'm calling him as a fact

2     witness.  But I also think that the motive of bias is

3     probably going to come up.  I'm letting the Court know

4     and --

5          MS. DOYER:  Okay.  Motive or bias -- okay.

6     So when we're looking at Davis v. Alaska, it's does the

7     witness have a motive or bias to testify favorably for

8     the State.

9          So what he's going to do is call the

10    defense -- the defense witness, Gerry Nance, and then

11    ask him, hey, are you testifying for me because you have

12    a bias in favor of the State?  That doesn't make any

13    sense.

14          MR. MILLAN:  Judge, I will simply ask you

15    to look at Carmona v. State of Texas, 698 S.W.2d 100.

16          MS. DOYER:  In that case the defense

17    called a defense witness and then cross-examined them

18    about motive or bias testifying in favor of the State

19    when the defense called them?

20          MR. MILLAN:  No, because you -- you didn't

21    anticipate --

22          MS. DOYER:  If it didn't, then it's not on

23    point.

24          MR. MILLAN:  You anticipated what was --

25          THE REPORTER:  One at a time, please, and

1　everyone slow down.

2　　　　　　THE COURT:  While we're waiting on

3　somebody to show up, why don't you hand me whatever

4　cases y'all think are most relevant or most on point.

5　Thank you.

6　　　　　　MS. DOYER:  Your Honor, I found a court of

7　criminal appeals case -- let's put this on the record --

8　Murphy v. State, 587 S.W.2d 718.

9　　　　　　THE COURT:  In regard to what issue?

10　　　　　　MS. DOYER:  Defense witness being called

11　and then examine about his -- by his bias and --

12　　　　　　THE COURT:  Okay.  Let me just deal with

13　the writ of attachment first.

14　　　　　　MS. DOYER:  Okay.

15　　　　　　THE COURT:  You probably need to get this

16　down to the clerk's office -- or we have them come down

17　here.

18　　　　　　THE BAILIFF:  I'll call.

19　　　　　　THE COURT:  I'm presuming that this "found

20　at" is just to assist law enforcement.  Somebody is

21　going to have to assist them --

22　　　　　　MR. MILLAN:  Yeah.

23　　　　　　THE COURT:  -- to give them some idea

24　where to look.

25　　　　　　MR. MILLAN:  My understanding was that he

1  may have been on-the-job in Corpus, but he was going to

2  be back here at 2:00.

3             THE COURT:  I mean, my point is I -- I've

4  signed -- we'll get the clerk to issue it.

5             MR. MILLAN:  Do you want me to take it

6  over to the clerk's office?

7             THE COURT:  I think they're going to bring

8  somebody.

9             As to Mr. Nance, he's a fact witness?

10            MR. MILLAN:  Yes, Your Honor.

11            THE COURT:  He's present.  He was

12 subpoenaed by the State.  You indicated that you thought

13 they were calling him; correct?

14            MR. MILLAN:  Yes, Your Honor.

15            THE COURT:  Okay.  I think we'll probably

16 just have to see where his testimony goes.  I don't know

17 if he's going to contradict somebody else or --

18            MR. MILLAN:  I'm just anticipating how

19 things go.  I mean, I wanted to bring it up so that the

20 issue was, you know, in the Court's mind beforehand and

21 we weren't doing this yo-yo thing back and forth.

22            THE COURT:  If his testimony per chance

23 ends up lockstep with what we've heard, then I don't

24 know if his pending charge is going to ultimately be

25 potentially relevant.

1                    Now, I mean, if there's some -- I don't

2    know.  I mean, it may depend.  That might make it more

3    relevant.  I don't know.  I don't know what he's going

4    to testify to.

5                    MR. MILLAN:  I don't either, Judge.

6                    MS. DOYER:  I just want -- if we get him

7    today, then I want to do a hearing outside the presence

8    of the jury.

9                    THE COURT:  Okay.  And if we get him

10   tomorrow?

11                   MS. DOYER:  Same.

12                   THE COURT:  The same, okay.

13                   And did I understand that Ms. Shirley,

14   that -- that she was also arrested that day?

15                   MR. MILLAN:  No.

16                   MS. DOYER:  No.

17                   THE COURT:  No.  Was there --

18                   MS. DOYER:  No.

19                   THE COURT:  Okay.  Well, if you've got all

20   13.

21                   THE BAILIFF:  Yes, sir, Your Honor.

22                   (Jury enters courtroom)

23                   THE COURT:  You may proceed.

24                   MR. MILLAN:  Your Honor, may -- the

25   defense calls Gregory McClure.

1          THE COURT:  Officer McClure?  Deputy

2   McClure?

3          MR. MILLAN:  Deputy, sorry.

4          THE COURT:  Let me get you to raise your

5   right hand.

6          (Witness sworn)

7          THE COURT:  Thank you.  Have a seat.  And

8   you can tell if you get really close to that microphone,

9   it does a lot better job.

10          THE WITNESS:  Yes, sir.

11                GREGORY MCCLURE,

12   having been first duly sworn, testified as follows:

13                DIRECT EXAMINATION

14   BY MR. MILLAN:

15       Q.   Morning, Deputy McClure.

16       A.   Morning.

17       Q.   Could you please state your name for the

18   record.

19       A.   Gregory McClure.

20       Q.   And I want to take you back to November 30th of

21   2015.  Do you remember making a call to the 150 Eagles

22   Peak that day?

23       A.   Yes, sir.

24       Q.   Now, do you remember -- do you remember that

25   day?

1     A.   Yes, sir.

2     Q.   Can you tell me what happened when you first

3 arrived at the scene?

4     A.   I made contact with the caller, advised there

5 had been a disturbance in the residence.

6     Q.   Okay.  And did you approach the -- the

7 residence?

8     A.   Yes.  He gave us permission to go inside.

9     Q.   Okay.  And who -- who else was with you?

10    A.   Deputy Sepeda.

11    Q.   And did you all -- but did you all knock on the

12 door?

13    A.   There was no door.

14    Q.   Okay.  It was a -- it was like a French door,

15 wasn't it?

16    A.   No.  There was sheet.

17    Q.   Do you remember knocking at all before you went

18 in?

19    A.   Into -- their bedroom was separate from the

20 kitchen area.  We went into the home, which the

21 homeowner gave us permission to go into his home.

22    Q.   Okay.

23    A.   There was no knocking.  There was loud music

24 playing.  We announced ourselves as deputies.

25    Q.   Okay.  And -- and can you describe as you were

1   entering into the residence going back towards the

2   bedroom what did you see?

3       A.   Furniture everywhere, pretty messy.

4       Q.   Did anybody else -- did you see anybody else in

5   the house?

6       A.   Until we made the bedroom, no.

7       Q.   Okay.  What did you see when you -- when you

8   got to the bedroom?

9       A.   Deputy Sepeda was in front of me.  He was

10  saying hello, sheriff's office.  A female came out, like

11  opened the curtain.  I had just partial visual of the

12  bed -- or the room.  She came out and was like, thank

13  you, and --

14      Q.   Without getting into anything she said --

15      A.   Okay.

16      Q.   -- just what you saw.

17      A.   Just a female and then a gentleman here laying

18  down on the bed.

19      Q.   Okay.  At some point did the -- did the

20  gentleman laying down on the bed, did he get up or did

21  he stay in the bed or what did he do?

22      A.   The female came out first.  And then Deputy

23  Sepeda was like, hey, wake up.  Wake up.  He got up out

24  of bed.  He was fully clothed and he bent down and

25  started tying his shoes immediately.

1    Q.    Okay.  And at that -- did he make any

2    movements?

3    A.    He started -- we asked him to step outside the

4    bedroom into the kitchen area.  He walked in front of

5    Deputy Sepeda and behind me.

6    Q.    Okay.  And -- and did you -- did you talk to

7    him?

8    A.    I just asked him to remove his hands from his

9    pockets.  He had his hands in his pockets.  And then we

10   entered the kitchen area where he started walking

11   towards me and I kind of bladed off of him.

12   Q.    And after that point, what happened?

13   A.    I was kind of looking around.  There were a

14   couple of knives in the kitchen.  I didn't know who we

15   were dealing with or what the situation of the call was.

16         At that time he -- he kind of started

17   walking towards me.  So I kind of side-stepped to move

18   away from him.  He started getting close to me.  And at

19   that time, Deputy Sepeda realized he's going to run.  He

20   said he's going to run and he took off immediately as he

21   was saying it.

22   Q.    Okay.  And did you chase after him?

23   A.    Yes, sir.

24   Q.    How far did you chase after him?

25   A.    I stopped at the doorway, hit something, a

1  Foosball table or something and then he tripped at the

2  doorway.  I chased him down the street to the first stop

3  sign and he made a left on -- I can't remember -- sunny

4  something street name.  And then an off-duty police

5  officer chased him down.  He had maybe ten yards in

6  front of me and was able to stop him.

7      Q.   Okay.  And -- and at the -- at the point

8  that -- that you-all took him into custody, he was -- he

9  was -- would you say that he was in an excited --

10              MS. DOYER:  Objection, leading.

11              THE COURT:  Overruled.

12      Q.   (BY MR. MILLAN) Would you say that he was in an

13  excited state of mind?

14      A.   I mean, he seemed exhausted.  He was running.

15  He ran about a good 200 yards, as much as I was.

16      Q.   After you took him into custody, did he seem

17  angry?

18      A.   At the beginning, yes.

19      Q.   Was he agitated?

20      A.   Yes.  He started banging his head against my

21  Tahoe.

22      Q.   Okay.  And so he -- he was in an excited state;

23  right?

24              MS. DOYER:  Objection, leading.

25              THE COURT:  I mean, I think it's already

1  pretty well-established, but overruled.

2      Q.    (BY MR. MILLAN) Okay.  And so while he was in

3  his state, did he -- did he tell you why he ran?

4                  MS. DOYER:  Objection, hearsay.

5                  THE COURT:  Overruled.

6      Q.    (BY MR. MILLAN) Did he tell you why he ran?

7      A.    He said he thought he had a warrant.

8      Q.    Okay.  Now, at some point did he calm down?

9      A.    Yeah.  After we picked him back up off the

10  ground, called EMS, he started to calm down.  We gave

11  him some water.

12      Q.    Why did you call EMS?

13      A.    It's protocol.  He ran.  He was tackled by

14  another officer.  He hit the ground.  We have to check

15  him out, make sure he's okay.

16      Q.    Did you witness any injuries on him?

17      A.    Yeah.  He had a laceration to his forearm --

18  and he refused medical attention at the time when they

19  got there -- and then whatever scrapes he might have got

20  from his knees when he hit the ground.

21      Q.    What if -- did you notice any bite marks on

22  him?

23      A.    No.  He mentioned it.  But at that time, from

24  him evading, I wasn't going to take off his handcuffs

25  and check for any other injuries.  All I could see is

1    what EMS pulled up from his long-sleeved shirt.

2         Q.   Did you do anything to memorialize the injuries

3    that he had, took photos, anything?

4         A.   We -- we document photos.  But due to his

5    behavior from running from us, I'm not going to take

6    that chance and take him out of handcuffs to document

7    anything like.

8                   He was treated by EMS and he refused.

9    Then once they make down to the jail, they see medical.

10   They take over from there and they're supposed to

11   document any pre-existing injuries before they enter the

12   jail.

13        Q.   Did you ask any questions of -- without getting

14   into anything that was said, did you ask Ms. Shirley

15   about the incident?

16        A.   That's the victim?  Is she the victim?

17        Q.   The complainant, yes.

18        A.   I didn't speak to her.  I watched him the whole

19   time at my vehicle.

20        Q.   Okay.  So your job was to be watching Derek

21   Porter; is that right?

22        A.   I took over that -- or I assumed that position.

23   I placed him in custody for evading and held him in my

24   vehicle until he interviewed her.

25        Q.   So in your role, I mean, are you supposed to --

1  to -- to help gather evidence for -- for a case like

2  this also in -- with the role that you were in as the

3  officer at the scene?

4      A.   As far as -- I don't understand the question.

5      Q.   Is part of your role in being an officer at a

6  scene like this to gather evidence?

7      A.   Yeah, or -- what I was -- where I was at, yeah.

8  I mean, I -- I did what I did and -- and stayed with him

9  at the vehicle and detained him while the other deputy

10  interviewed the victim.

11     Q.   And you actually were in control of Derek

12  Porter.  You had him the entire time up until he -- you

13  went to the station house; is that right?

14     A.   Yeah.  I mean a couple of times I might have

15  walked from my vehicle.

16     Q.   Now, EMS came to the scene at 150 Eagles Peak;

17  is that right?

18     A.   Yes, sir.

19     Q.   And did you witness them treat -- any treatment

20  of Derek Porter by EMS?

21     A.   I stood by while they treated him for whatever

22  injuries he had.  I know that he was bleeding from some

23  pre-existing injury.  And he said he didn't want any

24  treatment.  I asked if they wanted to put gauze on it or

25  pack it because it was bleeding.  He was wearing a white

1   sweater and it was bleeding.

2      Q.   You said he didn't want treatment; right?

3      A.   Yeah, he refused treatment.

4            MR. MILLAN:  May I approach the witness,

5   Your Honor?

6            THE COURT:  Yes, sir.

7      Q.   (BY MR. MILLAN) I want you to look at number 11

8   and read number 11 to yourself, the whole paragraph.

9      A.   Yes, sir.

10     Q.   Okay.  May I have that page back, please?

11     A.   Okay.

12     Q.   According to your report, EMS felt that the

13  wound was too deep to treat; is that right?

14     A.   Yes.

15     Q.   So it wasn't just necessarily that he didn't

16  want to be treated.  It's that they -- EMS didn't feel

17  that they could treatment him; right?

18            MS. DOYER:  Objection, leading.

19            THE COURT:  Overruled.

20     A.   I can't answer that.  I'm not medical

21  personnel.

22     Q.   (BY MR. MILLAN) You put it in your report,

23  didn't you?

24     A.   That he was -- had a laceration, yes.

25     Q.   And that EMS said it was too deep to treat;

1   right?

2       A.   Yes.

3       Q.   So after that you -- you took Derek Porter to

4   the -- to the jail; is that right?

5       A.   Yes.

6       Q.   Without getting into anything that Derek Porter

7   said, did you ask him about the incident and what

8   happened?

9       A.   As far -- I didn't know what had happened.

10      Q.   Okay.

11      A.   My whole job was to watch him.

12      Q.   So you didn't do any investigation to determine

13  whether -- based on those injuries, how they got there

14  and whether somebody was at fault for them?

15      A.   That was the other deputy's job that was

16  interviewing her.  And they came to the conclusion that

17  there was assault involved and those charges were added

18  on.  I'm not the reporting office who took all of them.

19      Q.   And that was Sepeda; correct?

20      A.   And Deputy Bailee, I believe.

21      Q.   And did you ever Sepeda talking to Derek

22  Porter?

23      A.   Yes.

24      Q.   Okay.  You're saying he took Derek Porter's

25  statement?

1      A.    No.   He came and talked to him after that -- at

2   the vehicle where I was at.

3      Q.    And then after that, did you -- what did you do

4   with Mr. Porter after EMS left?

5      A.    I -- we waited while they interviewed the

6   victim.   I gave him water a couple of times.   He was out

7   of breath, so I kept giving him water.   And I took

8   him -- transported him to the jail.

9      Q.    Okay.  Would the jail accept him?

10     A.    No.   I told them he had a laceration that he

11  had on his forearm.   They said it was too deep -- or

12  they told me they couldn't treat it.   So I took him to

13  the -- I think it was Resolute and they treated him as

14  Resolute.

15     Q.    And this whole time -- so you're going back to

16  the jail.   They're telling you that the cut is too deep.

17  You never thought, maybe I should take a picture of this

18  cut?

19     A.    Not -- like I said before, he evaded from me

20  from the beginning.   He was irate, banging his head on

21  my Tahoe.   I'm not going to take the chance of taking

22  him out of handcuffs.

23     Q.    Was he in handcuffs when he was at Resolute?

24     A.    If they did, we put them in the front.

25     Q.    If they did, but you don't remember whether he

1  was in handcuffs or not?

2      A.   Sir, that's two years ago.  I can't tell you if

3  I put them towards the front or not.  Depending on his

4  behavior if I let them -- if I took them off to treat

5  him, I don't know.  It might have just been one handcuff

6  while they X-rayed it.  I think they took an X-ray.

7      Q.   And do you remember what the X-ray showed?

8      A.   I didn't look at the X-rays.  I just know that

9  they told me there was something wrong with his elbow.

10      Q.   Okay.  And he actually had to -- did you notice

11  how they treated his injury?

12      A.   No.  I just stand by and make sure nothing

13  happens.

14      Q.   Did you see anything on his arm after they got

15  through with it?

16      A.   Just the cut that I saw before.

17      Q.   Did you -- you didn't see the treatment put on

18  the cut?

19      A.   No.  I just know that they treated his

20  injuries.  I don't know what they did to it.

21              MR. MILLAN:  May I approach the witness,

22  Your Honor?

23              THE COURT:  Yes, sir.

24      Q.   (BY MR. MILLAN) I'd like you to read number 14

25  to yourself.

1    A.   Okay.  Like I said, I haven't seen this in

2  almost two years.

3    Q.   I understand.  Based -- I mean, do you

4  recollect now what was on his arm?

5    A.   Yeah, they put a splint.  I mean, I wrote that

6  in my report --

7    Q.   Okay.

8    A.   -- and bandaged it.

9          MR. MILLAN:  Pass the witness.

10             CROSS-EXAMINATION

11  BY MS. DOYER:

12    Q.   Deputy McClure, what led you to believe it was

13  a pre-existing injury as far as what you observed?

14    A.   It was -- it wasn't bleeding.  You know, it

15  looked like it was dried-up blood on it.  It looked like

16  it had been trying to heal but reopened.  It was in a

17  bad spot where it bends a lot.

18          MS. DOYER:  Pass the witness.

19             REDIRECT EXAMINATION

20  BY MR. MILLAN:

21    Q.   Without getting into what was said, what -- do

22  you remember whether Mr. Porter said what the source of

23  the injury was?

24          MS. DOYER:  Objection.  That calls for

25  hearsay.

1          MR. MILLAN:  No.

2          THE COURT:  Overruled.

3          MS. DOYER:  It's back-door hearsay.

4     Q.   (BY MR. MILLAN) Without getting -- do you

5 remember what he said what the source of the injury was?

6     A.   That she cut him.

7          MR. MILLAN:  Pass the witness.

8          MS. DOYER:  No further questions.

9          THE COURT:  Thank you.  You can step down.

10          THE WITNESS:  Thank you.

11          THE COURT:  Next witness?

12          MR. MILLAN:  Georganne Shirley,

13 Your Honor.

14          THE COURT:  Where is she?

15          THE BAILIFF:  She is in the hallway.

16          THE COURT:  If you'll just return to the

17 stand, please, ma'am.  And do get closely to the mike,

18 if you would.  Recall that you are under oath.

19          Mr. Millan?

20          You remain under oath.  Thank you.

21          THE WITNESS:  Okay.

22

23

24

25

1              GEORGANNE SHIRLEY,

2   having been previousy duly sworn, testified as follows.

3                DIRECT EXAMINATION

4   BY MR. MILLAN:

5       Q.   Good morning, Ms. Shirley.

6       A.   Good morning.

7       Q.   Where are you residing right now?

8       A.   Excuse me?

9       Q.   Where are you residing right now?

10      A.   987 -- 975 Palomino Drive in Kyle, Texas.

11      Q.   Where did you sleep last night?

12      A.   I slept at the Hays -- at the Comal County as

13  a -- on a bench warrant.

14      Q.   Okay.  And -- and you're bench warranted for

15  this case; is that right?

16      A.   Yes.

17      Q.   And as of now, you have pending charges in Hays

18  County for a charge that has a range of punishment of

19  five to 99 years and a charge -- a case that has range

20  of punishment of two to 20 years; is that correct?

21      A.   I'm not really sure.

22      Q.   Okay.  But if I told you that, would you -- do

23  you have any reason to deny that?

24      A.   No.

25               MR. MILLAN:  Pass the witness.

1                    CROSS-EXAMINATION

2    BY MS. SHIRLEY:

3        Q.    Ms. Shirley, those charges that are pending in

4    Hays County, you and I have discussed those charges;

5    right?

6        A.    Yes.

7        Q.    And you understand I don't have jurisdiction in

8    Hays County?

9        A.    Yes.

10       Q.    You understand that nothing has been promised

11   here to you in exchange for your testimony against the

12   defendant?

13       A.    Yes.

14       Q.    Those charges, did they arise after the

15   incident with Mr. Porter you testified about yesterday?

16       A.    Yes.

17       Q.    Is everything that you told this jury yesterday

18   about what happened to you the truth?

19       A.    Yes?

20                    MS. DOYER:  Pass the witness.

21                    MR. MILLAN:  No further questions.

22                    THE COURT:  Okay.  You can step down.

23                    MS. DOYER:  Can this witness be excused at

24   this time?

25                    MR. MILLAN:  I'm going to say subject to

1  re-call because I have no idea where this thing is

2  going, Your Honor.

3                    THE COURT:  Okay.  Very good.

4                    You may step down.

5                    MR. MILLAN:  Your Honor, at this time we'd

6  call Gerard Nance.

7                    May we approach, Your Honor?

8                    THE COURT:  You may.

9                    (At the bench, on the record)

10                   MR. MILLAN:  He may be my last witness,

11 so --

12                   THE COURT:  Who -- who informed him he

13 could go to Corpus Christi?

14                   MS. DOYER:  No one.

15                   THE COURT:  Well, he's been subpoenaed to

16 be here this week --

17                   MS. DOYER:  Yes.

18                   THE COURT:  -- by the State; right?

19                   MS. DOYER:  He was subpoenaed, yes.

20                   THE COURT:  Has anybody been able to make

21 any contact with him by phone --

22                   MS. DOYER:  Not that I'm aware of.

23                   THE COURT:  -- text or anything?

24                   I mean, do you have reason to believe -- I

25 don't know, did he make a statement, give a written

1  statement?

2           MS. DOYER:  He did.

3           THE COURT:  Is there some indication about

4  this fight, this cut or whatever --

5           MS. DOYER:  No.

6           THE COURT:  -- that he may or may not -- I

7  don't know.  What's in the statement?

8           MR. MILLAN:  Judge, the fact that he was

9  in the house, he was right -- real close to where

10  supposedly the incident took place and did not see any

11  physical altercation whatsoever.

12           THE COURT:  Where did this alleged cut

13  come from?

14           MS. DOYER:  Two weeks prior.

15           MR. MILLAN:  Well, there was a bite mark

16  on the arm from the same day.

17           THE COURT:  Okay.  But I'm talking about

18  the cut.

19           MS. DOYER:  It is not from this incident.

20           MR. MILLAN:  He told me -- he told the

21  police that she cut him from a previous incident.

22           THE COURT:  Okay.  On a previous incident.

23           MR. MILLAN:  Yeah, but she could have been

24  charged.

25           THE COURT:  But we don't know where it

1  was?

2          MR. MILLAN:  I'm sorry?

3          THE COURT:  We don't know when or where

4  that happened.

5          MR. MILLAN:  Same house.

6          THE COURT:  Okay.  I thought she testified

7  yesterday that was the first time he had been there, or

8  he just showed up unannounced or something.

9          MR. MILLAN:  I'll double-check on that,

10  Judge, but I thought it was at 150 Eagles Peak.  It

11  might have been a different address.

12          THE COURT:  I thought they had broken up

13  two weeks prior.

14          MS. DOYER:  There are some serious issues

15  with his version of events as far as the timeline is

16  concerned.

17          THE COURT:  And so this guy is only going

18  to be able to testify about what's in his statement.  It

19  has nothing to do with the potential cut or anything?

20          MR. MILLAN:  I mean, Judge, he heard the

21  sounds.  He called 911.

22          MS. DOYER:  But not from this -- this

23  alleged cut that --

24          MR. MILLAN:  We don't know.  We don't

25  know.  I mean, I haven't gotten into detail on this --

1   on crossing this guy.  The only thing I've heard is what

2   he testified to at the examining trial and that wasn't

3   much.

4                    MS. DOYER:  Because he has an observation,

5   his estimate --

6                    MR. MILLAN:  Well, Esman could have gone

7   into more detail, but whatever.

8                    THE COURT:  So Mr. Esman, I take it,

9   represented your client previously?

10                   MR. MILLAN:  He got off the case and then

11  I got the case.

12                   THE COURT:  I'm just trying to ascertain

13  exactly what is this guy potentially going to testify

14  about.

15                   MS. DOYER:  That's why I didn't call him.

16                   THE COURT:  Yeah, but -- I mean, he needs

17  to know from the State's behalf that -- I mean,if he's

18  been subpoenaed by the State, he needs to be readily

19  available and not --

20                   MS. DOYER:  I'm sure that was

21  communicated --

22                   THE COURT:  -- away.

23                   MS. DOYER:  -- to him.

24                   THE COURT:  I mean, even if you decide not

25  to call some witness, they need to be within -- they

1  need to know ahead of time.  If they've been subpoenaed,

2  they need to be within 30 minutes or so of the

3  courthouse.

4            MS. DOYER:  We tell all of our witnesses

5  that.

6            THE COURT:  I mean, I think the best thing

7  to do is send the jury home for the day and let them go

8  on about their business.

9            MR. MILLAN:  That's fine, Judge.

10            THE COURT:  I mean, the only other

11  alternative is just for us maybe to call them between

12  2:00 and 3:00 and let them know if we can finish today,

13  but -- well, do you want me just to send them back and

14  let Adam ask them if they would rather be back at 9:00

15  or kind of be on hold until 2:00 or 3:00 --

16            MR. MILLAN:  Up to you, Judge.

17            THE COURT:  -- to see if there is a

18  consensus.  Do you refer that I do it from the bench or

19  just let Adam do it?

20            MR. MILLAN:  My concern is if we tell them

21  to come back at 2:00 or 3:00, they might not be able to

22  get him here.

23            THE COURT:  I'm going to say that we can

24  call them between 2:00 and 3:00 --

25            MR. MILLAN:  To let them know to come back

1    if --

2                 THE COURT:  -- or just stand down until in

3    the morning.  Would you rather me just have them stand

4    down until in the morning?

5                 MR. MILLAN:  We have 13 people.  Having

6    them on call, I would rather have them stand down until

7    morning because of the uncertainty.

8                 THE COURT:  Any objection?

9                 MS. DOYER:  I'm going to check with Amber

10   really quick before you do that.

11                THE COURT:  Okay.

12                (At the bench, concluded)

13                THE COURT:  Ladies and gentlemen, rather

14   than keep you back here cooling your heels or anything

15   of that nature, there is a witness that has been

16   subpoenaed that -- that we are doing our best, including

17   assistance through law enforcement, to get him here,

18   and -- but I'm not going to keep you just sitting here

19   on pins and needles so to speak.

20                So what I'm going to do is just recess

21   this matter.  I had one option that I was thinking maybe

22   we'd call y'all between 2:00 and 3:00.  But rather than

23   just kind of keeping y'all on hold this way, if you want

24   to go about your business this afternoon, you may and

25   we'll just come back at 9:00 in the morning.

1          I need you just to be mindful of your

2   admonitions not to do any drive-bys, not to do any

3   independent investigation and not to talk with anybody

4   about anything to do with this offense.  Stay off the

5   Internet, et cetera, regarding this case at least.

6          I trust everybody will be mindful of those

7   admonitions and we'll just see y'all in the morning at

8   9:00.  Thank you.

9          (Proceedings adjourned)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   STATE OF TEXAS

2   COUNTY OF COMAL

3

4       I, Cindy Cummings, Official Court Reporter in and

5   for the 433rd District Court of Comal, State of Texas,

6   do hereby certify that the above and foregoing contains

7   a true and correct transcription of all portions of

8   evidence and other proceedings requested in writing by

9   counsel for the parties to be included in this volume of

10  the Reporter's Record in the above-styled and numbered

11  cause, all of which occurred in open court or in

12  chambers and were reported by me.

13      GIVEN UNDER MY HAND, this the 9th day of August,

14  2017.

15                          /s/ Cindy Cummings

16                          Cindy Cummings, Texas CSR 3210
                            Official Court Reporter
17                          433 Judicial District Court
                            150 N. Seguin Street
18                          Suite 317
                            New Braunfels, Texas 78130
19                          Tel 830-221-1279
                            Fax 830-608-2030
20                          Expiration:  12/31/17

21

22

23

24

25