REPORTER'S RECORD
VOLUME 4 OF 5 VOLUMES
TRIAL COURT CAUSE NO. CR2016-233
COURT OF APPEALS NO. 01-17-00534-CR

STATE OF TEXAS              ) IN THE DISTRICT COURT
                           )
vs.                        ) COMAL COUNTY, TEXAS
                           )
DEREK DALE PORTER          ) 207TH JUDICIAL DISTRICT


_____

TRIAL ON MERITS

_____



On the 7th day of June, 2017, the following

proceedings came on to be held in the above-titled and

numbered cause before the Honorable Dibrell W. Waldrip,

Judge Presiding, held in New Braunfels, Comal County,

Texas.

Proceedings reported by computerized stenotype

machine.

1                    APPEARANCES

2  Counsel for the State of Texas:

3  Ms. Jacqueline H. Doyer
   SBOT NO. 24086703
4  Ms. Kiera L. Kilday
   SBOT NO. 24090854
5  Comal County District Attorney's Office
   150 N. Seguin Street
6  Suite 307
   New Braunfels, Texas 78130
7  Telephone: 830-221-1300
   Fax: 830-620-5599

8

9
   Counsel for the Defendant:
10
   Mr. James E. Millan
11 SBOT NO. 24031569
   Law Office of James E. Millan PLLC
12 816 Camaron, Suite 1.15
   San Antonio, Texas 78212
13 Telephone:  210-223-1060
   Fax:  210-738-1000
14

15 Mr. Edwin Matias
   SBOT NO. 13196700
16 Attorney at Law
   8600 Wurzbach Road
17 Suite 1000
   San Antonio, Texas 78240
18 Telephone:  210-331-3132
   Fax:  210-568-4518
19

20

21

22

23

24

25

1                         VOLUME 4

2                      TRIAL ON MERITS

3   June 7, 2017
                                                    PAGE VOL.
4   DEREK DALE PORTER              Direct    Cross   V.Dire

5      By Mr. Millan               15 v3
       By Ms. Doyer                         25 v3
6
    GERARD NANCE                   Direct    Cross   V.Dire
7
       By Mr. Millan               45 v3
8      By Ms. Doyer                                 51 v3
       By Mr. Millan               64 v3
9      By Ms. Doyer                         67 v3

10  Defense rests                  .................71     3

11  State rests                    .................72     3

12  Defense rests and closes       .................74     3

13  State rests and closes         .................74     3

14  Charge conference              .................74     3

15  Defendant sworn                .................75     3

16  Court's charge read            .................75     3

17  State waives closing argument  .................86     3

18  Closing Statement by Mr. Millan .................86    3

19  Rebuttal Closing Statement by Ms. Doyer..........93    3

20  Jury Retired for Deliberations .................100    3

21  Verdict .......................................100     3

22  Jury released                  .............103       3

23  Enhancement paragraph read     .............103       3

24  Defendant enters plea          .............103       3

25  Opening Statement by Ms. Doyer .................104    3

TRIAL ON MERITS
June 7, 2017

1  Opening Statement by Mr.Millan ..................104    3

2  FRANK ALLENGER                 Direct    Cross    V.Dire

3     By Ms. Kilday               105 v3
      By Mr. Millan                         111 v3
4
   RUSSELL SMITH                   Direct    Cross    V.Dire
5
      By Ms. Kilday               113 v3
6
   MIKE WELLMAN                    Direct    Cross    V.Dire
7
      By Ms. Doyer                117 v3
8     By Mr. Millan                         120 v3

9  RONNIE WOMACK                   Direct    Cross    V.Dire

10    By Ms. Doyer                122 v3

11 WILLIAM BUSTOS                  Direct    Cross    V.Dire

12    By Ms. Kilday               134 v3
      By Mr. Millan                         138 v3
13
   PHILIP GAGNON                   Direct    Cross    V.Dire
14
      By Ms. Doyer                139 v3
15    By Mr. Millan                         143 v3
      By Ms. Doyer                143 v3
16    By Mr. Millan                         144 v3

17 State rests                     ...............144    3

18 DEREK DALE PORTER               Direct    Cross    V.Dire

19    By Mr. Millan               147 v3
      By Ms. Doyer                          153 v3
20    By Mr. Millan               157 v3
      By Ms. Doyer                          157 v3
21
   State waives closing            ...............162    3
22
   Closing Statement by Mr. Millan ...............162    3
23
   Closing Statement by Ms. Doyer ................164    3
24

25

**TRIAL ON MERITS**
**June 7, 2017**

1   Court's Ruling ...............................166   3

2   Reporter's Certificate ......................170   3

3

4               ALPHABETICAL INDEX OF WITNESSES

| | Direct | Cross | V.Dire |
|---|---|---|---|
| Allenger, Frank | 105 v3 | 111 v3 | |
| Bustos, William | 134 v3 | 138 v3 | |
| Gagnon, Philip | 139 v3 | 143 v3 | |
| | 143 v3 | 144 v3 | |
| Nance, Gerard | 45 v3 | 67 v3 | 51 v3 |
| | 64 v3 | | |
| Porter, Derek Dale | 15 v3 | 25 v3 | |
| | 147 v3 | 153 v3 | |
| | 157 v3 | 157 v3 | |
| Smith, Russell | 113 v3 | | |
| Wellman, Mike | 117 v3 | 120 v3 | |
| Womack, Ronnie | 122 v3 | | |

17               EXHIBITS OFFERED BY STATE

| EXHIBIT | DESCRIPTION | OFFERED | ADMITTED |
|---|---|---|---|
| 24 | Cause Number 49-03 plea bargain | 111 v3 | 111 v3 |
| 25 | Cause Number 49,359, judgment of conviction | 120 v3 | 120 v3 |
| 26 | Cause Number CR-00-485, judgment and sentence | 120 v3 | 120 v3 |
| 27 | Ten-print card | 125 v3 | 125 v3 |

1             EXHIBITS OFFERED BY STATE

| EXHIBIT | DESCRIPTION | OFFERED | ADMITTED |
|---------|-------------|---------|----------|
| 28 | Cause Number 129-98, deferral of adjudication | 125 v3 | 127 v3 |
| 29 | Cause Number 143-98, judgment | 125 v3 | 127 v3 |
| 30 | Cause Number 62,844, judgment of conviction | 125 v3 | 127 v3 |
| 31 | Cause Number 67,196, judgment of community service | 128 v3 | 128 v3 |
| 32 | FBI Universal Control Number 495695BD8 judgment | 130 v3 | 130 v3 |
| 33 | Cause Number SA-03-CR-218-EP judgment | 130 v3 | 130 v3 |
| 34 | Cause Number 14-2105CR, judgment of conviction | 132 v3 | 132 v3 |
| 35 | Cause number 14-2106CR, judgment of conviction | 132 v3 | 132 v3 |
| 36 | Cause Number 14-2759CR, judgment of conviction | 132 v3 | 132 v3 |
| 37 | Cause Number CR-15-0025, judgment of conviction | 133 v3 | 133 v3 |
| 38 | D. Porter letter to Satanic Temple | 136 v3 | 136 v3 |

1      P R O C E E D I N G S

2              (Open court, defendant present, no jury)

3              THE COURT:  I'm told we have a witness.

4              MR. MILLAN:  Yes, Judge.  And I'm

5      withdrawing the writ of attachment request.

6              THE COURT:  Very good.

7              Mr. Mault just indicated to me that he was

8      here and he wanted to know if I wanted him attached and

9      I said no.

10              MR. MILLAN:  Okay.

11              THE COURT:  So are we ready to proceed?

12              MR. MILLAN:  Yes, Judge.

13              MS. DOYER:  We need to have that hearing

14      outside the presence of the jury to see what relevance

15      the pending assault case might have before that gets

16      waived in front of them.

17              THE COURT:  Well, I won't know until I

18      hear the -- probably the other testimony that he gives.

19              MS. DOYER:  Okay.  I just want to make

20      sure before he gets into that.

21              MR. MILLAN:  And I'm -- I'm letting the

22      Court know right now that I'm planning on going into

23      404(a)(2), whether the -- Ms. Shirley has a violent

24      nature according to him.  And I think that's -- that's

25      as far as I'm going with the question.

1            I may try to get into specific acts at

2    some point.  And before I do that, I may approach and

3    see how far I can go as far as that goes.

4            MS. DOYER:  Then I definitely want a

5    hearing because as far as 404(a)(2), it can't be based

6    off of a specific act.  It has to be based on

7    conversations with people in the community to render

8    either reputation or opinion testimony.  So I need to be

9    able to examine the -- his competency to testify as to

10   that aspect.

11           MR. MILLAN:  Judge, there's a lot of case

12   law that says that -- my toner cartridge went out last

13   night.  I got through the Dempsey case, but there's

14   about seven or eight cases that I think are on point

15   that get into -- state that specific acts of violence or

16   misconduct committed by the alleged party are

17   admissible.  I can give you the citations on them and --

18   the names and citations on them for you to review.

19           MS. DOYER:  I can give you the actual

20   cases, and that's not actually what the law says.

21           THE COURT:  What issue, Mr. Millan, is it

22   that you're asking that this testimony be considered

23   for?

24           MR. MILLAN:  To show that she has a

25   violent nature and that there are specific acts of

1    conduct that he -- against him and against -- and that

2    he witnessed as to her violent nature.

3            MS. DOYER:  Which would be inadmissible

4    because there are specific instances of conduct offered

5    to not only impeach the victim, but to show character

6    conformity.

7            MR. MILLAN:  Judge, 404(a)(2) overrides

8    that.

9            MS. DOYER:  No.  That's not what the case

10   law says.  What it actually says is that it's only

11   admissible if there's a relevant purpose other than

12   character conformity.  That's how 404(b) and (a)(2) are

13   supposed to be read together.

14           Also, there has to be evidence of a

15   violent or aggressive act by the victim that tends to

16   raise the issue of self-defense.  All we've heard so far

17   is that she bit him in self-defense.  That's not a

18   violent or aggressive act that raises --

19           MR. MILLAN:  We've also heard that she cut

20   him on his elbow according to the officer.

21           MS. DOYER:  Yes.  We heard that he had a

22   cut that was pre-existing.

23           MR. MILLAN:  And the officer said --

24           MS. DOYER:  It has nothing do with this

25   particular incident.

1          THE COURT:  And I really don't know that

2    for sure one way or the other yet.  The officer did give

3    a nonresponsive answer that she cut him.

4          Do you anticipate him being able to

5    enlighten us as to when that may have been?

6          MR. MILLAN:  That -- that specific cut?

7    No, not as to that specific cut.  All they -- and that's

8    just based on --

9          THE COURT:  Are we -- are we going to

10   otherwise be able to raise self-defense for some reason?

11   I don't know what the evidence is.

12          MR. MILLAN:  Oh, Judge, I -- I'm just

13   going to let everybody know right now that I'm planning

14   on calling Mr. Porter after Mr. Nance.  We've discussed

15   this.  So I don't think there's going to be any question

16   that we're going to be able to get a self-defense

17   instruction.

18          THE COURT:  With that understanding, can

19   they not also --

20          MR. MILLAN:  If you feel more --

21          THE COURT:  -- bring --

22          MR. MILLAN:  If you feel more

23   comfortable --

24          THE COURT:  -- out her aggressive nature?

25          MS. DOYER:  What's admissible as violent

1    character, through reputation or opinion, specific

2    instances to show the reasonableness of the defense --

3    the defendant's fear with regards to his state of mind

4    or a -- or another purpose under 404(b), but there has

5    to be evidence of -- a violent act of the victim in

6    evidence before any of that comes in.

7                    So where we stand right now, that's --

8    we're not there yet; maybe after, and we'll get there

9    then.  But like you said, there's a stair step to --

10                   THE COURT:  Do you have a specific case

11   that says it does have to come in first?

12                   MS. DOYER:  Yes --

13                   MR. MILLAN:  And, Judge --

14                   THE COURT:  -- rather than a proffer and

15   assurance that it would --

16                   MS. DOYER:  Yes, sir.

17                   THE COURT:  -- such that it -- and if they

18   fail to do so, that it would probably entitle you to a

19   mistrial?

20                   MS. DOYER:  So one of -- the very top one

21   I have, and it's citing other cases, but it's 1992 West

22   Law 133830, Mendoza v. v. State, the rule on the

23   admission of such evidence is that specific acts of

24   violence by the deceased would show his violent

25   character is admissible where there is evidence of some

1    act of aggression by the deceased which gives rise to a

2    claim of self-defense or defense of third person citing

3    to Lowe v. State, which is Court of Criminal Appeals

4    1981, still good law.  So there has to be that evidence

5    of an aggressive act by the victim before it's

6    admissible.

7             And then the other cases that discuss the

8    character, when that's admissible, would be Ex Parte

9    Miller, Court of Criminal Appeals, 330 S.W.3d 610 going

10   into it has to be what the defendant knew as far as his

11   apprehension or reputation or opinion or as an exception

12   to 404(b), but not for character conformity; and it

13   specifically discusses that.

14             THE COURT:  I'm going to -- Mr. Millan, is

15   there -- I'm not asking you to reveal it, but -- if

16   there is, but just as far as the order of the receipt of

17   the testimony --

18             MR. MILLAN:  Uh-huh.  It will -- I

19   would -- I can understand that it would be easier to get

20   into a lot of these other areas if Mr. Porter testified

21   first.

22             THE COURT:  Correct.  In other words, just

23   for ease of flow of the trial --

24             MR. MILLAN:  Right.

25             THE COURT:  -- because otherwise --

 1          MR. MILLAN:  We're going to be doing the

 2     yo-yo thing.

 3          THE COURT:  -- depending on these

 4     different issues as they arise --

 5          MR. MILLAN:  I understand.  We can just do

 6     it in a different order than I had originally

 7     anticipated.  We'll go with Mr. Porter first and then

 8     call Mr. Nance.

 9          THE COURT:  Because otherwise I have to --

10     I'm not doubting your assurance at all, but that --

11     simply that -- a proffer that there would be testimony

12     to that effect.  But yet there's three or four issues

13     that are -- hurdles that are probably going to have to

14     be established --

15          MR. MILLAN:  I understand.

16          THE COURT:  -- so it would just greatly

17     facilitate the flow and the receipt of the evidence.

18          MR. MILLAN:  I understand.

19          THE COURT:  The only concern I have is

20     we -- we know that our witness is unattached, but --

21          Mr. Mault, he needs to understand that

22     he's going to remain with us today --

23          MR. MAULT:  Yes, Your Honor.

24          THE COURT:  -- until called.

25          MR. MAULT:  Yes, Your Honor.

1          THE COURT:  And so with that then, are we

2     ready to go?

3          MR. MILLAN:  Yes, Your Honor.

4          THE COURT:  Bring them in.

5          (Jury enters courtroom)

6          THE COURT:  Mr. Millan, your next witness?

7          MR. MILLAN:  Your Honor, at this time the

8     defense calls Derek Porter.

9          THE COURT:  I guess, Counsel, could y'all

10    just approach real quick?

11          (At the bench, on the record)

12          THE COURT:  I think just one other thing

13    that I might should have covered outside the presence of

14    the jury, but you have adequately advised him of his

15    Fifth Amendment right?

16          MR. MILLAN:  Absolutely, Judge.

17          THE COURT:  Do I need to cover that at all

18    in front of the jury?

19          MR. MILLAN:  We discussed Fifth

20    Amendment right during voir dire.  I mean -- I mean, he

21    knows he has the right to remain silent.  And he's

22    actually --

23          THE COURT:  You're satisfied that --

24          MR. MILLAN:  Absolutely, Judge.

25          THE COURT:  -- that the bases are covered?

1        MR. MILLAN:  Yes.  And he was advised

2   prior to the examining trial as well.

3        THE COURT:  Okay.  I'm not aware of that,

4   so --

5        (At the bench, concluded)

6        DEREK DALE PORTER,

7   having been duly sworn post-testifying, testified as

8   follows:

9        DIRECT EXAMINATION

10  BY MR. MILLAN:

11      Q.   Good morning, Mr. Porter.

12      A.   Morning.

13      Q.   Please state your name for the record.

14      A.   Derek Dale Porter.

15      Q.   Mr. Porter, I want to take you back to -- to

16  November of 2015, okay --

17      A.   Yes, sir.

18      Q.   -- towards the end of November of 2015.  Do

19  you -- did you have a chance to go to 150 Eagles Peak?

20  Do you know where that is?

21      A.   Yes, sir.

22      Q.   And when did you arrive at 150 Eagles Peak?

23      A.   I arrived sometime in the morning.

24      Q.   Which day do you think that was?

25      A.   Maybe on the 29th.

1    Q.   Of November?

2    A.   Yes, sir.

3    Q.   And who was present at 150 Eagles Peak when you

4    arrived?

5    A.   Georganne was present when I arrived.  She was

6    outside working.

7    Q.   Okay.  And what did you do when you arrived?

8    A.   We talked a little bit.  I told her I was tired

9    and if I could come in and get some sleep and she said

10   it was fine.

11   Q.   Okay.  And so you went and -- you went to

12   sleep?

13   A.   Yes, sir.  Yes.  We talked briefly probably for

14   about an hour.  We hung out.  And Gerry, he was in his

15   bedroom the whole time.  He was resting, sleeping.

16   Q.   Okay.  And do you know approximately how long

17   you slept?

18   A.   I slept for -- for all -- all night -- all that

19   day and all night until that morning.  And I woke up

20   periodically when she was working in the house.  She was

21   moving furniture.

22   Q.   Okay.  What did you do when you woke up?

23   A.   I just woke up and we ate.  I remember she made

24   something.  She had some leftover Thanksgiving dinner.

25   She made a plate and she brought it to bed and we ate in

1    bed.  Then I went back to sleep after that.

2        Q.   Okay.  And that -- so after you went to sleep a

3    second time, What happened?  How long did you sleep

4    then?

5        A.   I slept until I was woke up by her.

6        Q.   Okay.  And how were you woken up?

7        A.   She was poking me in my face.

8        Q.   With -- with what?

9        A.   Her fingers telling me to wake up.

10       Q.   Now -- so what did you do?

11       A.   I woke up.

12       Q.   Okay.  What happened next?

13       A.   She was demanding drugs and money.

14       Q.   Do you know what drugs and money she was

15   referring to?

16       A.   No, I don't.  I'm assuming she thought I had

17   methamphetamines.

18       Q.   So what happened after that?

19       A.   I had my hands behind my head like this.  We

20   got into an argument.  I told her I didn't have none and

21   she kept demanding and she jumped on me.  She bit me

22   right here on my arm.  I grabbed her -- I grabbed her

23   out of instinct.  I grabbed her and knocked her off.

24   She got upset.  She started screaming and she went and

25   woke Gerry up.  And Gerry got up and they were demanding

1    for me to leave.

2        Q.   Okay.  So what happened after that -- after

3    they demanded that you leave?

4        A.   She went outside.  I got dressed and -- we went

5    outside briefly and came back in.  I was in the bedroom.

6    And when I laid back down and -- that was all I remember

7    until the cops got there.

8        Q.   Okay.

9        A.   Oh, she grabbed a hoe.  She did grab a hoe.

10   She came back into the bedroom with a hoe and threatened

11   me with a hoe.

12       Q.   Okay.  Now, did -- so you -- she bit you on

13   your left arm; right?

14       A.   Yes, sir.

15       Q.   Did you have any other injuries on you at that

16   time?

17       A.   I had a laceration right here on my arm from a

18   machete attack two weeks prior.

19       Q.   Where did that occur?

20       A.   That occurred at Gerry's house.

21       Q.   Was anybody else present when that happened?

22       A.   No, sir.

23       Q.   Did -- going back to -- well, after she comes

24   back with -- with the garden hoe -- what did you do when

25   she had the garden hoe?

1      A.   She was standing in the doorway with it.  I

2   asked her to put it down.  At the time I was scared.  At

3   that time I was nervous.  I was worried about her

4   hitting me and assaulting me again with a weapon.  And

5   once she calmed down and everything was fine, I went

6   back to sleep.

7      Q.   And what do you -- what do you remember after

8   you -- after you -- so you went back to sleep.  What do

9   you remember next?

10      A.   I remember being woke up by the sheriff's

11   office.  They were standing in the doorway and they

12   called my name.

13      Q.   Okay.  And what did you do when they called

14   your name?

15      A.   I immediately was concerned about warrants

16   because I know the procedure.  They run your ID when

17   they talk to you.  So I got up and I ran straight out

18   of -- they asked me to come out to talk to them.  And

19   when I walked out of the bedroom -- I tied my shoes.

20   When I walked out of the bedroom and got into the

21   kitchen, that's when I ran from them.

22      Q.   Okay.  And you said you ran because you thought

23   you had a warrant?

24      A.   Yes, sir.

25      Q.   Now, did -- where did you run?

1    A.    I run -- I ran to the side of the house, down a

2   hill.  I don't know exactly the street.  I ran down the

3   street.  And then there's a -- the officer testified

4   that he -- he -- I was coming across the street when he

5   was driving and he came at me in his vehicle and I

6   ran -- I turned around and ran the other way.  And then

7   I pretty much gave up at that point.  I was tired and I

8   just stood there and he came and he -- he restrained me.

9   We went to the ground and then the other officers showed

10  up.

11   Q.    Okay.  And would it be fair to say that you --

12  you didn't exactly submit immediately to -- to the

13  arrest?

14   A.    Yes, sir.

15   Q.    At some point did you -- did you submit to the

16  arrest?

17   A.    Yes, sir.

18   Q.    Now, what happened after you were restrained

19  and everything calmed down?

20   A.    Okay.  They immediately asked me why I was

21  running.  I told them I thought I had arrest warrants.

22  They ran my name.  And then after that, they asked me

23  what was going on.  They had a call for a burglary

24  disturbance.  They were all shook up.  They were

25  wondering why I ran.  I said, my girlfriend jumped on me

1  and bit me.  I showed them the bite mark.

2              He tried to pull my sweater up to look at

3  the bite mark.  They had me in cuffs and then the

4  officer, the first one that testified -- I don't

5  remember his name, I apologize -- he went and -- he

6  initially went up there and started talking to them and

7  one kept me there.

8              When the ambulance came, they looked at my

9  injuries and put a bandage on it.  And I explained to

10 him -- tried to talk to him about what was going on, but

11 they pretty much never talked to me after that.  That's

12 all there was.

13     Q.   Did you tell them that -- did you tell the

14 officers that Georganne attacked you?

15     A.   Yes, sir, I did.

16     Q.   Did you tell them about the -- the injury to

17 your elbow and how that happened?

18     A.   Yes, sir, I did.

19     Q.   Do you remember them doing anything to document

20 your injuries?

21     A.   No, sir.  When they came into the vehicle --

22 after they spoke with Gerry and Georganne, they came

23 back and briefly talked to me.  And I asked them -- I

24 made sure that when they told me they were charging me,

25 that they were documenting my injuries.  And the officer

1  said that they were going to do that.

2      Q.   Okay.  But did that ever happen?

3      A.   No, sir, it did not.

4      Q.   Now, you said that EMS saw you; right?

5      A.   Yes, sir.

6      Q.   Did -- did -- after speaking with EMS, did you

7  have an idea as to the extent of your injury?

8      A.   No, sir, I did not.

9      Q.   Okay.  Which officers at -- who were at the

10 scene did you speak to?

11     A.   I spoke with the two officers that testified.

12     Q.   Sepeda and McClure?

13     A.   Yes, sir, but it was real -- the only -- the

14 only discussion we had is when they initially arrested

15 me and I told them that she assaulted me and I was

16 injured.  They put me in a vehicle and there was no --

17 like no investigation, no -- there was nothing there.

18 They left me in the vehicle.  Then he came and gave me

19 water a couple of different times.

20             And the only thing -- the last thing that

21 they did is they came to the vehicle and told me they

22 were charging me for evading arrest and -- and felony

23 assault.  And I asked them to make sure they were

24 documenting my injuries.  And that was the only

25 conversation we had.

1     Q.   Now, after all of this happened, did that --

2  first of all, who transported you at that point?

3     A.   The officer that testified last, yesterday.

4     Q.   That would be McClure?

5     A.   McClure, yes, sir.

6     Q.   Okay.  And where did you go?

7     A.   We went to Resolute Hospital -- no, we first

8  went to the county jail.  And then when we went to the

9  county jail, the medics came over there and said they --

10  they would not accept me because of the severity of the

11  injury.

12     Q.   Okay.  So where did you go from there?

13     A.   They went to the ER at Resolute, the emergency

14  room.

15     Q.   Okay.  Now, when you went to Resolute to be

16  treated, were you -- were you restrained with cuffs?

17     A.   When -- initially when I got there, I was

18  restrained, yes, sir.

19     Q.   At some point did -- did they have to take off

20  your restraints?

21     A.   They sure did, yes, sir.  They took an X-ray of

22  my arm, so they took the restraints all the way off the

23  arms.

24     Q.   So approximately how long was it that you had

25  the restraints off of you?

1    A.    The restraints were off during the X-rays.  The

2  restraints went back on.  After the X-rays, I was laying

3  down in the hospital and -- and the nurse that -- I

4  wasn't notified until I -- I think they notified the

5  officer first and said we need to put a splint on your

6  arm.  And I didn't understand why they wanted to put a

7  splint because --

8    Q.    Stop there real quick.  Listen to the question.

9    A.    Yes, sir.

10    Q.    How long do you think you did not have

11  restraints on?

12    A.    15 minutes --

13    Q.    Okay.

14    A.    -- during the X-rays.

15    Q.    So would there have been times during those 15

16  minutes in your opinion for them to have taken photos to

17  document your injuries?

18    A.    Many times.

19    Q.    And you said that they put a splint on your

20  arm?

21    A.    Yes, sir.  They put a full-arm split.  It went

22  from my wrist all the way up to my arm right here.

23    Q.    And did they explain why it was necessary to --

24  to put the splint on you?

25    A.    Because the fracture went into the -- the cut

1  went into the bone.  My arm was fractured.

2      Q.   Okay.  So what happened after that?

3      A.   They put the splint on my arm.  And then me and

4  the officer, we went -- I was unrestrained.  We went

5  into his vehicle, got in his vehicle and we went to the

6  Comal County jail where I was booked in.

7      Q.   Okay.  Now, did -- was there any communication

8  between you and Georganne after this incident?

9      A.   She wrote me two different times.  She sent me

10 pictures while I was in the county lockup, yes, sir.

11              MR. MILLAN:  Pass the witness.

12                   CROSS-EXAMINATION

13 BY MS. DOYER:

14     Q.   Mr. Porter, you would agree with me that you

15 are, in fact, Derek Dale Porter?

16     A.   Yes, ma'am.

17     Q.   And that on November 30th, 2015, you were at

18 150 Eagles Peak in Canyon Lake?

19     A.   Yes, ma'am.

20     Q.   You would agree with me that you had been in a

21 dating relationship with Georganne Shirley?

22     A.   Yes, ma'am.

23     Q.   And that you have been previously convicted

24 twice, by looking at those judgments, of family

25 violence; is that right?

1    A.   Well, it was -- it was a concurrent conviction.
2  It was one incident, but -- it was two convictions, but
3  one incident.
4    Q.   But you are, in fact, the same Derek Dale
5  Porter who was convicted in both of those cause numbers;
6  correct?
7    A.   Yes, ma'am.
8    Q.   Okay.  Now, I want you to walk me through this
9  assault, I guess, by Georganne as you characterized it.
10  You testified that you went over there and she was
11  working?
12    A.   Yes, ma'am.
13    Q.   You went inside the home and you went to sleep?
14    A.   Briefly -- after I got there, we -- we
15  communicated.  We talked.  I can't remember the
16  conversation we had.  And yes, ma'am, I did lay down and
17  went to sleep.
18    Q.   Where were you sleeping?
19    A.   I was sleeping in the bedroom.
20    Q.   And you testified that she woke you up and you
21  ate some food?
22    A.   Yes, ma'am.  She had -- there was some leftover
23  Thanksgiving dinner.  I guess her and Gerry had ate.
24  And she woke me up and she had a plate of food for me
25  and we ate.  Mostly I ate the food and I went back to

1  sleep.

2     Q.   And then you said the next time you were woken

3  up was he was -- she was poking you in the face with

4  fingers, is that right --

5     A.   Yes, ma'am.

6     Q.   -- and demanding drugs and money; is that

7  right?

8     A.   Yes, ma'am.

9     Q.   Now, Mr. Porter, she had already been with you

10  the whole entire evening; correct?

11     A.   Yes, ma'am.

12     Q.   So why now at this point in the morning was she

13  waking you up asking you for drugs and money?

14          MR. MILLAN:  Objection.  Calls for

15  speculation.

16          THE COURT:  Sustained.

17     Q.   (BY MS. DOYER) You testified that she -- tell

18  me how you got the bite mark on your arm, Mr. Porter.

19     A.   After she was poking me in my face, I woke up

20  and I asked her to stop.  We got into an argument.  I

21  told her I didn't have any drugs and money and she

22  jumped on top of me and she bit me on my arm.

23     Q.   Jumped on top of you how?

24     A.   She jumped across my body, straddled me and got

25  right here and bit me.

1    Q.    So it's your testimony that this woman

2  straddled you, was able to get into a position where her

3  head was by your bicep and she bit your arm?

4    A.    Yes, ma'am.

5    Q.    That was her method of attacking you?

6    A.    Yes, ma'am.

7    Q.    And what did you do when she did this?

8    A.    I grabbed her and knocked her off of me.

9    Q.    Grabbed her how?

10    A.    I grabbed her by the hair like this.  It was

11  real quick.  It was real quick.  Best I can remember, I

12  grabbed her like this and I pulled her and knocked her

13  off.

14    Q.    So you did pull her hair?

15    A.    Yes, ma'am, out of the instinct I did.

16    Q.    Did you punch her in the head?

17    A.    No, ma'am, I did not.

18    Q.    How did she get the bumps on her head that the

19  officers saw?

20    A.    I'm assuming from when I knocked her off and --

21          MR. MILLAN:  Objection.  Calls for

22  speculation.

23          THE COURT:  Don't assume, please.

24          It's sustained.

25          THE WITNESS:  Yes, sir.

1    Q.    (BY MS. DOYER) Now, you would agree with me

2    that after that, Gerry comes into the room or comes into

3    the picture; right?

4    A.    Yes, ma'am.

5    Q.    Okay.  Now, how does Gerry -- do you know how

6    Gerry knew to come over there?

7    A.    How -- he was woken up.

8    Q.    He was woken up.  What was he woken up by?

9    A.    By Georganne.

10   Q.    What was Georganne doing that you believe

11   caused him to wake up?

12   A.    She went to his bedroom and woke him up.

13   Q.    Okay.  What did Georganne say?

14   A.    She told him to kick me out of the house.  She

15   was being vindictive.

16   Q.    Now, you would agree with me that Gerry asked

17   you to leave his home, didn't he?

18   A.    Yes, ma'am, he did.

19   Q.    You would agree with me that Gerry told you he

20   was going to call 911, didn't he?

21   A.    Yes, ma'am, he did.

22   Q.    And when he told you that, you told Gerry you

23   were going to come back and get him with your friends;

24   isn't that right?

25   A.    Yes, ma'am, I did.

1      Q.   And that was because Gerry was going to call
2  and report an assault; is that right?
3      A.   No, ma'am.  He didn't call to report an
4  assault.
5      Q.   Why did you tell Gerry you were going to come
6  back and get him with your friends?
7      A.   Because I was concerned.  I had arrest warrants
8  and they were going to come out there and get me on
9  arrest warrants.
10      Q.   So you were concerned that if Gerry called law
11  enforcement, that -- that on account of law enforcement
12  responding and you having warrants, you might get
13  arrested; is that right?
14      A.   Yes, ma'am.
15      Q.   Okay.  And so because Gerry called 911, you
16  were going to have -- the friends and you were going to
17  come back and get him?
18      A.   Yes, ma'am.  That's what I said.
19      Q.   You understand that that's a felony called
20  retaliation in the state of Texas?
21      A.   No, ma'am.
22      Q.   You understand that you just confessed to that
23  on the stand?
24      A.   No, ma'am.
25      Q.   So after Gerry had asked you to leave and you

1  threatened him, you said that Georganne went outside; is

2  that right?

3      A.   Yes, ma'am.

4      Q.   Okay.  And that she grabbed a hoe and

5  threatened you with a hoe; is that correct?

6      A.   Yes, ma'am.

7      Q.   Now, Mr. Porter, this -- this weapon, I

8  suppose, a hoe, did you say anything about that to -- to

9  Deputy McClure or Deputy Sepeda that night?

10     A.   About the hoe?

11     Q.   Yes, sir.

12     A.   Yes, ma'am, I did.

13     Q.   So in the -- in the hours of -- of COBAN

14 footage from the police vehicles, then there would

15 surely be mention of a hoe if you had told them that

16 night; right?

17     A.   Yes, ma'am.

18     Q.   Now, with regards to these other injuries that

19 you had from a machete attack -- is that correct?

20     A.   Yes, ma'am.

21     Q.   Now, Mr. Porter, this machete attack, did you

22 ever call law enforcement to respond or report it?

23     A.   The reason I didn't call law enforcement is I

24 was concerned about the arrest warrants.

25     Q.   Stop.

1     A.    Yes, ma'am.

2     Q.    Listen to my question.

3     A.    Okay.

4     Q.    Did you ever call law enforcement to report the

5   machete attack?

6     A.    No, ma'am.

7     Q.    Okay.  In fact, you only reported it after you

8   were apprehended by law enforcement; isn't that right?

9     A.    Yes, ma'am.

10    Q.    And you said you were concerned about warrants.

11  What types of warrants were you concerned about?

12          MR. MILLAN:  Objection, Your Honor.  May I

13  approach?

14          THE COURT:  Yes.

15          (At the bench, on the record)

16          MR. MILLAN:  I'm concerned that this

17  question could elicit a response that would be something

18  that would not be admissible under 404(b).

19          THE COURT:  I don't know.  Do we need to

20  have a hearing?

21          MR. MILLAN:  I'm just telling you, Judge.

22  I would ask you to change the question because

23  there's -- there's potentially a warrant out of the

24  Fayette County for a stolen vehicle and it's not in the

25  404.  I'm just saying it wouldn't be admissible because

1   it's not a conviction or anything and -- and the -- the

2   way that the question was worded, he could answer that

3   he thought that that was what --

4               MS. DOYER:  Which would go to his state of

5   mind.

6               MR. MILLAN:  I understand that, Judge, but

7   still --

8               THE COURT:  It's the same thing.  Why

9   don't -- why don't we just ask him if it was for a

10  felony just like we did with his witness.

11              (At the bench, concluded)

12      Q.   (BY MS. DOYER) Mr. Porter, the warrant that you

13  were concerned about, was it for a felony offense?

14      A.   Yes, ma'am, it was.

15      Q.   Mr. Millan asked you if at some point you

16  submitted to the arrest.  You would agree with me,

17  Mr. Porter, that you did not quote, unquote submit to

18  the arrest until officers had you down on the ground;

19  isn't that right?

20      A.   Yes, ma'am.

21      Q.   Lean up into that mike.

22      A.   Yes, ma'am.

23      Q.   And you testified that Georganne wrote you and

24  sent you pictures; is that right?

25      A.   Yes, ma'am, she did.

1     Q.    And -- and where did she send those items?

2     A.    Comal County jail.

3     Q.    You were aware that all of your mail has been

4 flagged by the district attorney's office and the

5 sheriff's office?

6     A.    Yes, ma'am, I am.

7     Q.    So if that was, in fact, the case, then we

8 would have copies of those items, wouldn't we?

9     A.    Guaranteed.

10     Q.    Now, Mr. Porter, you are a nine-time convicted

11 felon; isn't that right?

12     A.    I'm -- I'm -- I'm not real sure how many

13 felonies I have.  Yes, ma'am, I have convictions.

14     Q.    1998, theft of a firearm, sentenced to state

15 jail in 2000; is that right?

16     A.    Yes, ma'am.

17     Q.    1998, burglary of a building, sentenced to

18 state jail in 2000; is that right?

19     A.    Yes, ma'am.

20     Q.    2000, possession of a controlled substance,

21 state jail felony, sentenced in 2001; is that right?

22     A.    Yes, ma'am.

23     Q.    Theft in 2002, convicted?

24     A.    Yes, ma'am.

25     Q.    2003, burglary of a building -- three counts of

1    burglary of a building, one count unauthorized use of a

2    motor vehicle, sentenced to four years in TDCJ; is that

3    right?

4         A.   Yes, ma'am.

5         Q.   2003, federal bank robbery; correct?

6         A.   Yes, ma'am.

7         Q.   And then 2010, two assault family violence

8    convictions; correct?

9         A.   Yes, ma'am.

10        Q.   And 2014, possession of a controlled substance,

11   sentenced in 2015; is that right?

12        A.   Yes, ma'am.

13        Q.   And in fact, just before this incident

14   occurred, there was an emergency protective order

15   keeping you from being with Georganne; isn't that right?

16        A.   Where was it from?

17        Q.   Out of Hays County.

18        A.   Yes, ma'am, it was.

19        Q.   Mr. Porter --

20        A.   But at that time there's not --

21        Q.   Stop.  I didn't ask you a question.

22        A.   Right.

23        Q.   You also have an affiliation with a gang known

24   as the --

25                  MR. MILLAN:  Objection, Your Honor.  May I

1    approach?

2              THE COURT:  Yes, sir.

3              (At the bench, on the record)

4              MR. MILLAN:  Gang affiliation, I'm sorry,

5    Judge, but this -- unless he's a documented gang member,

6    I think they need to --

7              MS. DOYER:  He admitted it on the COBAN to

8    Deputy McClure, which Mr. Millan has.

9              MR. MILLAN:  I didn't hear that.

10             MS. DOYER:  I can give you the time stamp.

11             THE COURT:  What gang?

12             MS. DOYER:  The Peckerwoods.

13             THE COURT:  Did you check to see if it is

14   documented?

15             MS. DOYER:  He admitted it.  That would be

16   sufficient.  There was also a tattoo.

17             MR. MILLAN:  Well, I think that they need

18   to bring in an expert on that.  I'm going to --

19             MS. DOYER:  It's his admission.

20             THE COURT:  I mean, if he admitted it --

21             MR. MILLAN:  I didn't hear the admission.

22   So if you want to impeach him, that's fine, but I'm --I

23   didn't hear that.  I mean, do you know what the time

24   stamp is on it?

25             MS. DOYER:  Yeah.

1          MR. MILLAN:  Just ask him the question.

2    That's fine.

3              (At the bench, concluded)

4    Q.   (BY MS. DOYER) Mr. Porter, you also told

5    Deputy McClure when you were arrested that you were

6    affiliated with the Peckerwood prison gang; isn't that

7    right?

8    A.   No.  That's not a gang.  I'm not affiliated

9    with a gang.

10   Q.   So it's your testimony you never told

11   Deputy McClure you were --

12   A.   I told him -- he asked me if I was a Wood.  I

13   said yes, I have a Wood tattoo, but I'm not affiliated

14   with no organized criminal gangs -- prison gangs,

15   period.

16   Q.   What type of tattoo do you have?

17   A.   It says Wood on my arm, but it's not classified

18   as a security threat group in the state of Texas.  That

19   is not -- that's a misconception.

20   Q.   So, Mr. Porter, is it your testimony that

21   you're not affiliated or that the Peckerwoods are not a

22   security threat?

23   A.   They're not a -- they're not listed as an

24   organized criminal gang in TCJ.  Peckerwood is just a

25   slang word for white trash pretty much.

1    Q.   So, Mr. Porter, you do consider yourself a

2  Peckerwood then?

3    A.   Well, now, 15 years ago I -- I got it when I

4  was -- 15 years ago at that time, yes, ma'am, I did.

5    Q.   And -- and what -- what larger gang are the

6  Peckerwoods a recruiting ground for?

7    A.   The recruiting grounds?  I'm sorry, I don't

8  understand your question.

9    Q.   You would agree with me that the Peckerwoods

10  are a recruiting ground for the Aryan Brotherhood of

11  Texas?

12         MR. MILLAN:  Objection, Your Honor.  She's

13  asking --

14    A.   No, ma'am, it is not.

15         MR. MILLAN:  I think this gets into

16  something that's outside of his realm of expertise.

17         THE COURT:  He answered no.

18    Q.   (BY MS. DOYER) Mr. Porter, it seems like you're

19  always having to defend yourself against women; isn't

20  that true?

21    A.   No, ma'am.

22    Q.   Always having to strangle women like Latoya

23  Branecky; isn't that right?

24         MR. MILLAN:  I object to the form of the

25  question, always having to.  It's unnecessarily

1  combative.

2            THE COURT:  Just try not to be

3  argumentative.  Thank you.

4      Q.   (BY MS. DOYER) Mr. Porter, you testified at the

5  examining trial to determine if there was probable

6  cause; correct?

7      A.   Can you repeat your question, please?

8      Q.   You testified at that probable cause hearing

9  about a year ago.  Do you remember that?

10     A.   Yes, ma'am, I do.

11     Q.   And your testimony there was that the assaults

12 on LaToya, you were just defending yourself then;

13 correct?

14     A.   I don't remember saying that.  Can you show me

15 the -- the statement I made so I can clarify it, please?

16     Q.   I can't show it to you because that's

17 considered attorney work product.  I'm sure you can

18 listen to it if you need to be refreshed.

19     A.   Sure.  I would like to listen to it.

20     Q.   You also told Detective Phillips that you just

21 constantly get in violent relationships where you're

22 having to defend yourself; isn't that true?

23     A.   I don't remember saying that.

24     Q.   Do you have any reason to disagree with me that

25 you did say that to Detective Phillips?

1     A.    I'm not disagreeing with you.  I'm just saying

2   I don't remember -- recall saying that.

3     Q.    Well, Mr. Porter, do you feel like you're

4   always getting into relationships with women who have

5   violent tendencies and you have to defend yourself?

6     A.    No, ma'am.

7     Q.    You would agree with me that you feel like you

8   have -- you felt like you had to defend yourself from

9   Latoya Branecky; correct?

10     A.    I'm not agreeing to that.

11     Q.    So your testimony at the examining hearing that

12   you had to defend yourself from LaToya Branecky, is that

13   true or untrue?

14     A.    I do not recall saying that.  And I would like

15   to listen to it.  If you have the evidence there, it

16   would be more preferable so we can hear it.

17     Q.    Okay.

18     A.    You're claiming you have the evidence; right?

19         THE COURT:  There's not a question right

20   now.

21         THE WITNESS:  Okay.

22     Q.    (BY MS. DOYER) Are you always having to defend

23   yourself from other individuals when you assault them in

24   the jail?

25     A.    Periodically, yes, ma'am.

1      Q.    So you were defending yourself from Georganne

2   Shirley.  Is that your testimony?

3      A.    Yes, ma'am, it is.

4      Q.    And you were defending yourself the three times

5   you were written up for assaulting others in the jail;

6   is that correct?

7      A.    Ma'am?

8      Q.    You have been written up three times for

9   fighting or assaulting another individual in the Comal

10  County jail; correct?

11     A.    Yes, ma'am, I have.

12     Q.    In those instances, you either admitted to

13  fighting with them or would not admit to fighting with

14  them; correct?

15     A.    We -- you would have to be more specific about

16  the incidents.

17            THE COURT:  It's probably either one or

18  the other, so --

19            MS. DOYER:  Sure.

20     Q.    (BY MS. DOYER) You've been written up three

21  times for fighting in the jail; is that right?

22     A.    Yes, ma'am.

23     Q.    Okay.  So in those instance, Mr. Porter, were

24  you defending yourself?

25            MR. MILLAN:  Objection, Your Honor.  Once

1  again, she's asked him about three different incidents.

2  And she's asking him to give one answer about the three

3  incidents.

4  THE COURT:  That's my point is --

5  MS. DOYER:  Sure.

6  Q.   (BY MS. DOYER) Mr. Porter, June 7th, 2016,

7  where you got into a fight with Brian Clanton, were you

8  defending yourself then?

9  A.   I was never in a fight with Brian Clanton.

10  Q.   So when you told officer -- Corrections Officer

11  Gonyer that you got into a fight with Brian Clanton over

12  the TV, you were lying to him?

13  A.   No.

14  Q.   So did you get into a fight with Brian Clanton?

15  A.   No, ma'am.  I did not get into a fight with

16  Brian Clanton.

17  Q.   How did Brian Clanton get injured?

18  A.   Can you show me the injuries?

19  Q.   How did he get injured?

20  A.   I don't know what injuries you're talking

21  about.

22  Q.   So it's your testimony you don't know about any

23  injuries to Brian Clanton?

24  A.   No, ma'am.  There never was no injury to Brian

25  Clanton.

1    Q.    So then why did you admit to Corrections

2   Officer Gonyer that you got into a fight with Brian

3   Clanton?

4    A.    I'm not sure about that incident.

5    Q.    What about July 7th, 2016, an assault on Benson

6   Griffin.  Were you defending yourself then?

7    A.    No, ma'am.  It was an assault.

8    Q.    February 12th, 2017, an assault on Jesus

9   Gallegos, were you defending yourself then?

10    A.    I wasn't real -- there was a fight.  It was not

11   an assault write up.

12    Q.    But the busted eyebrow that he had, were you

13   defending yourself then?

14    A.    Well, I mean, there's -- let me explain

15   something to you.

16    Q.    No.  Let me explain something to you.  I get to

17   ask the questions.

18    A.    Yes, ma'am.

19    Q.    My question to you --

20    A.    I apologize.

21    Q.    My question to you is, were you defending

22   yourself on February 12th, 2017, when you punched Jesus

23   Gallegos in the face?

24    A.    I may have been -- no.  I may have been

25   defending myself.  I don't recall that incident.  I

1   don't even know that guy. I might know his face. I

2   don't recall the incident. It could have been an -- a

3   fight -- a mutual fight or it could have been him

4   assaulting me or coming at me attacking me. There was

5   several incidents.

6               I'm not real clear on the guy's name. If

7   I saw a picture of him, I could clarify and say, yeah,

8   this is what's happening, but I'm not clear on the

9   incidents because there were several incidents inside

10   the county jail. County jails are violent.

11      Q. You would agree with me, Mr. Porter, that you

12   have been in several fights in the jail?

13      A. Yes, ma'am, I do agree with you, mutual fights.

14      Q. And several times you were written up for

15   assaulting the other individual?

16      A. No. One time I was wrote up for an assault.

17   The rest of the times they were mutual fights.

18      Q. Just like the fight with Georganne was a mutual

19   fight?

20      A. No, ma'am. It was not mutual.

21      Q. You would agree with me that you pulled her

22   hair and threw her off of you. That's your --

23      A. Out of self-defense, yes, ma'am.

24             MS. DOYER: Pass the witness.

25             MR. MILLAN: No further questions,

1  Your Honor.

2          THE COURT:  Thank you.  You may step down.

3          MR. MILLAN:  At this time we'll call

4  Gerard Nance.

5          THE COURT:  Mr. Nance, if you'll just come

6  right on up here -- over here to my right, please, sir.

7  Let me just get you to raise your right hand, if you

8  would.

9          (Witness sworn)

10          THE COURT:  Thank you.  If you'll have a

11  seat.  And you do need to probably move the chair and

12  the microphone such that -- you see if I get like right

13  on top of that mike, it does a better job to make sure

14  the folks over there on the back row can hear you.

15          THE WITNESS:  I can't hear anyway.

16          THE COURT:  All right.  I appreciate it.

17                  GERARD NANCE,

18  having been first duly sworn, testified as follows:

19                  DIRECT EXAMINATION

20  BY MR. MILLAN:

21     Q.   Good morning, Mr. Nance.  Please state your

22  name for the record.

23     A.   Gerard Michael Nance.

24     Q.   And -- and, Mr. Nance, I want to ask you, did

25  you at one time live at 150 Eagles Peak?

1      A.   Yes, sir.

2      Q.   And did you live there in November of 2015?

3      A.   Yes, sir.

4      Q.   Now, do you remember an incident involving

5   Georganne Shirley and -- and Derek Dale Porter at the

6   end of November of 2015?

7      A.   Yes.

8      Q.   Okay.  Now, I want to take you back to that --

9   to that day.  Did -- were you aware that Derek Dale

10  Porter was in the house at the time of the incident?

11     A.   They -- in a different room, but I heard them

12  yelling.

13     Q.   But you were aware that he was there before the

14  incident; is that correct?

15     A.   Excuse me?

16     Q.   Were you aware that he was there before the

17  incident?

18     A.   Yeah, I think so.

19     Q.   And had Derek been to your house previous to

20  that?  Did you know him?

21     A.   I -- I didn't know him until I met him through

22  her.

23     Q.   About how long before this incident did you

24  meet him?

25     A.   I don't know, maybe a month or two.  I don't --

1    Q.   Okay.  So you knew him for a month or two

2  before this incident; is that right?

3    A.   Yeah.

4    Q.   And he would come to your house periodically

5  during that time?

6    A.   Yes.

7    Q.   Okay.  Now, you said you heard yelling; is that

8  right?

9    A.   It woke me up.

10   Q.   Okay.  And who was yelling?

11   A.   Georganne.

12   Q.   And do you remember what it was that she said

13  to you?

14   A.   That she said to me?

15   Q.   Yes.

16   A.   She asked me to call the cops.

17   Q.   Okay.  So what did you do?

18   A.   I left and went down the street and borrowed a

19  telephone.

20   Q.   Okay.  Before you did that, though, did -- did

21  Derek say anything to you about it?

22   A.   About?

23   Q.   About calling 911.

24   A.   Oh, no.  I don't think so.

25   Q.   Okay.  Did you ever feel threatened by Derek?

1     A.   No.

2     Q.   Okay.  Did -- so did you go and make the 911

3  call?

4     A.   Yeah, I did.

5     Q.   Whose house did you go to?

6     A.   This lady that lives down the hill that worked

7  at the Brookshire Brothers store.  I knew her from over

8  there.

9     Q.   And so after you made the 911 call, what did

10 you do?

11    A.   I walked back towards the house.

12    Q.   Okay.  Now, at any time during this incident,

13 did you see Derek commit an assault against Georganne?

14    A.   Just when I woke up.  I mean, that's the only

15 time.

16    Q.   Now, did you see an actual assault?

17    A.   I didn't see him hitting her or nothing.

18    Q.   Did you see her hitting him?

19    A.   No.  I just seen her hair -- hair in her hand.

20    Q.   Okay.  Now, do you think that Georganne has a

21 violent nature?

22         MS. DOYER:  Objection.

23    A.   Oh, yeah.

24         THE COURT:  You need to probably lay a

25 predicate first.

1           MR. MILLAN:  Okay.

2       Q.   (BY MR. MILLAN) How long have you known

3   Georganne Shirley?

4       A.   Well, the -- in Hays County, the police had

5   to -- had to have her --

6           MS. DOYER:  Objection.  Going into some

7   information that --

8           THE COURT:  The question was, how long had

9   you known Georganne.

10      A.   Oh, I guess for about -- maybe a year or two

11  before all that happened.

12      Q.   (BY MR. MILLAN) Okay.  And how long had she

13  lived with you at 150 Eagles Peak?

14      A.   Well, she had decided to move in.  And I didn't

15  even -- she didn't even ask me, but -- which she --

16  that's the same way she moved into my other house.

17  She --

18      Q.   Okay.  How long before this incident did she

19  move into the house?

20      A.   I guess it was a couple of months maybe.

21      Q.   Okay.  And over that time period, did you get

22  an opportunity to know her?

23      A.   Oh, yeah.

24      Q.   And did you -- did you see her interact with

25  other people?

1    A.    Oh, yes, I did.

2    Q.    Okay.  So do you feel that you -- you have a

3    pretty good idea as to the type of person that she is?

4    A.    I know exactly what type of person she is.

5    Q.    Do you think that she has a violent nature?

6         MS. DOYER:  Objection.  I'd like to take

7    this witness on voir dire outside the presence of the

8    jury.

9         THE COURT:  Okay.

10        Ladies and gentlemen, we'll have to take a

11   short break.

12        (Jury leaves courtroom)

13        THE COURT:  Everybody does remain present,

14   save and except the jury.

15        I guess, Mr. Nance, we do have -- this is

16   kind of a sterile environment of a courtroom.  And

17   there's just certain rules that we do need to abide by.

18   And one of -- one of them is to just answer the question

19   that's asked.

20        So I would just ask you to be careful in

21   listening.  If you can't hear a question or you're not

22   sure of the entirety of the question because you can't

23   hear it or something, just let us know and we'll reask

24   the question.  Okay?

25        THE WITNESS:  All right.

1          THE COURT:  Because what -- we have a

2     very -- kind of a stair-step approach as to how things

3     occur.  I know it's not like the real world sometimes.

4     It's very sterile.  It's very strict in here.

5          And so -- anyway, you may proceed.

6          MS. DOYER:  Thank you, Your Honor.

7               VOIR DIRE EXAMINATION

8     BY MS. DOYER:

9          Q.   Mr. Nance, it sounds like -- do you have an

10    opinion as to Georganne's character for violence?

11         A.   Her character --

12         Q.   Yes, sir.

13         A.   -- for violence?

14         Q.   Yes, sir.

15         A.   Yes.

16         Q.   Okay.  And what is that opinion?

17         A.   That -- I don't know.  I guess you'd say -- I'd

18    have to say one minute she could be heavenly.  The next

19    minute she could be torturing the devil himself.

20         Q.   Now, Mr. Nance, that opinion that you have, it

21    sounds like it's based on something that you've observed

22    by Georganne?

23         A.   Yes.

24         Q.   Okay.  Have you had any conversations with

25    people about Georganne's character?

1     A.   Yes.

2     Q.   Who?

3     A.   Anybody -- anybody who -- they always told me

4  how she was.

5     Q.   And who are these people?

6     A.   Everybody in Wimberley knows her.

7     Q.   And what are these discussions about?

8     A.   Her what?

9     Q.   What are these discussions about?

10    A.   What?  When they're talking about her?

11    Q.   Yes.

12    A.   That she has multiple personalities.

13    Q.   Okay.  So if -- nothing about her character for

14 violence?

15    A.   About her violence?

16    Q.   These conversations that you have with other

17 people, they're about her multiple personalities; is

18 that right?

19    A.   They're about her being violent.

20    Q.   Okay.  What were those conversations?

21    A.   Well, I -- just that everybody tells me that I

22 shouldn't have -- shouldn't let her move in my house.

23 You know, they said how come you did this, you know,

24 because she lived in your house before and the cops had

25 to get her out.

1    Q.   Okay.  So then did you have conversations

2  specifically with those people about Georganne's

3  character for violence?

4    A.   Yeah.  Yeah.  They all told me I was crazy for

5  letting her move back in, but I didn't.  She just

6  decided to move back in.  She said she's a squatter --

7  using the squatter law.

8    Q.   So your knowledge of her character, Mr. Nance,

9  is based on these specific acts that you've observed.

10  Is that right?

11    A.   Do what?

12    Q.   Your knowledge of Georganne's character, is

13  that based on the specific acts that you have observed?

14    A.   Acts of -- say it again, act of what?

15    Q.   Let me change the question.  The -- what you

16  know about Georganne's character, is that based on

17  things that you have observed Georganne do?

18    A.   What I've observed?  Yes.

19    Q.   Okay.  The conversations you've had with these

20  other people, have those been about things that they

21  know about Georganne?

22    A.   Yeah.

23    Q.   Okay.  And have you discussed how they know

24  those things?

25    A.   Well, yeah.  They all grew up together in

1  Wimberley.

2      Q.   And when you have these conversations, what do

3  these other people tell you about Georganne's character

4  as far as violence?

5      A.   That she is -- you know, that she's violent.  I

6  know that.  I've heard her cussing the cops.

7      Q.   Okay.  Mr. Nance, you said that these people

8  have said to you, why did you let Georganne move in with

9  you; is that right?

10     A.   That -- that -- that they got mad because she

11  moved in with me?

12     Q.   That they were saying, why did you let

13  Georganne move in with you.  You knew how she was.  Is

14  that what these people were saying to you?

15     A.   Yeah.  Yeah.

16     Q.   Okay.  So before Derek Porter was arrested that

17  day, did you know any of this information?

18     A.   Did I know what?

19     Q.   Did you know any of this information?

20     A.   About her being violent?

21     Q.   Yes.

22     A.   Yeah.  I didn't ask her to move in.

23     Q.   How did you know that information before Derek

24  was arrested?

25     A.   Before -- before who was arrested?

```
1     Q.    Derek Porter.

2     A.    Oh, I knew -- yeah, I guess I did.

3     Q.    How did you know?

4     A.    How did I know that she was violent?

5     Q.    Okay.

6     A.    She --

7     Q.    Let me clarify, Mr. Nance.

8              MR. MILLAN:  He was starting to answer.

9              THE WITNESS:  Huh?

10             THE COURT:  I mean, I think he has already

11    established that she had lived in his house once before.

12             MS. DOYER:  Yes.  And I need to make sure

13    that his familiarity is before the -- the date of the

14    offense, not post.

15             THE COURT:  And it would have been before.

16             MS. DOYER:  If that's when he had those

17    conversations.

18             THE COURT:  Well, no.  I mean, that's not

19    the question that you asked.  You said, how did he know.

20    Part of that knowledge is from his personal experience

21    because she had been living with him before and had been

22    violent.

23             MS. DOYER:  Which would be inadmissible as

24    specific instances of conduct.  You can only do

25    reputation or opinion.
```

1          THE COURT:  But that goes to his opinion,
2    his personal experience.
3          MS. DOYER:  But the case law does not
4    allow specific instances to form the opinion, simply
5    conversations with others in the community.  And I have
6    the cases right on point, Jackson v. State, Court of
7    Criminal Appeals, 628 S.W.2d 446, and Lopez v. State,
8    Court of Appeals San Antonio, 860 S.W.2d 938.
9          MR. MILLAN:  Judge, I have about ten cites
10   for you, if you like.
11         MS. DOYER:  Turner v. State, Court of
12   Criminal Appeals, 805 S.W.2d 423.  Those are all with
13   regards to the basis of reputation or opinion.
14         MR. MILLAN:  Judge, I would have you look
15   at Mozon v. State, 991 S.W.2d 841, 1999 case; Gutierrez
16   v. State, 764 S.W.2d 796.
17         THE COURT:  I'm going to be honest with
18   you -- both of you, a string cites to a bunch of
19   opinions without any -- any specific --
20         MR. MILLAN:  Judge, I --
21         THE COURT:  -- specific point of relevance
22   is going to be meaningless.
23         MR. MILLAN:  Judge, I'm going to tell
24   you -- I'll tell you exactly what my argument is.  In a
25   self-defense case where there is some evidence of an act

1   on the part of the alleged injured party sufficient to

2   raise the issue as to who was the first aggressor,

3   evidence of both the general reputation of the alleged

4   injured party for being a violent or dangerous person

5   and prior specific acts of violent misconduct committed

6   by the alleged party are admissible.

7         And the cases that I would cite are Mozon

8   v. State, 991 S.W.2d 841; Gutierrez v. State, 764 S.W.2d

9   796; Thompson v. State, 659 S.W.2d 649; Navarro v.

10   State, 639 S.W.2d 945; and Dempsey v. State, 266 S.W.2d

11   875.

12         In addition to that, Your Honor, I would

13   also have you look at Gonzales v. State, 838 S.W.2d 848.

14   It actually states in Thompson, which I previously

15   cited, 659 S.W.2d 649, on page 654 that -- that the

16   evidence is admissible regardless of whether the

17   evidence -- whether the defendant knew about it at the

18   time of the alleged offense in question.  So it has

19   nothing to do with the defendant knew about it.

20         MS. DOYER:  So, Your Honor, Mozon v. State

21   is probably one of the best ones because it goes through

22   Dempsey and continues on.  And what it says is that

23   when -- whatever the defendant claims, the rules of

24   evidence supersede Dempsey.  So we're looking at whether

25   it's admissible under the rules of evidence.

1          MR. MILLAN:  The rules of evidence codify

2     Dempsey.

3          MS. DOYER:  Mr. Millan, please let me

4     finish what I'm trying to say.

5          So the Texas Rules of Criminal Evidence

6     superseded the Dempsey case.  I'm citing from Mozon.

7     Under the evidentiary rules, evidence of other crimes,

8     wrongs or acts are inadmissible to prove character

9     conformity.

10          An exception to this general ban, however,

11    a defendant may offer evidence of the victim's character

12    or pertinent character trait.  However, evidence of a

13    victim's character for violence remains admissible to

14    show the victim was a first aggressor.  Victim's

15    extraneous acts remain invisible to show defendant's

16    mind.

17          Though 404(a) prohibits the use of

18    extraneous acts to prove character conformity, evidence

19    may be admissible for purposes other than character

20    assuming the purpose is relevant.  Because appellate's

21    purpose in offering victim's extraneous act of violence

22    was to show her state of mind, evidence was admissible.

23          And then here they go into a 403 analysis

24    because the State objected under 403, which I'm going to

25    do, and said that the -- the trial court was required to

balance the probativeness versus the prejudicial effect
and that 403 was -- was a valid objection and that was
upheld.

        And then in Schuman v. State, which is an
unpublished opinion out of the Court of Appeals in
Austin -- this is, for the record, 1999 West Law
977065 -- they talk about that case, Tate, where there
was this threat that was communicated but the defendant
never knew about it.  Here they say, Unlike Tate, the
proffered evidence of defendant's or deceased's violent
confrontations were offered to show the deceased's
violent propensity towards persons other than appellate
that were not probative of the deceased's state of mind
or motive at the time appellate shot the deceased.

        The excluded evidence had no relevance
apart from its tendency to prove character of the
deceased in order to show the act of inconformity.
Consequently, the evidence was inadmissible and the
trial court did not err in exclusion.

        So there is -- there are ways that this
stuff comes in.  But the way the law works is that it's
not just a free-for-all, has this person been violent on
separate occasions.  There has to be some relevance.
There has to be some exception to those prohibitions in
404(b).  That's what I'm trying to get at is unless we

1  have that, this is just impeachment with specific

2  instances of conduct.

3          MR. MILLAN:  Judge, I think it goes to her

4  intent at the time that she bit him, which was a

5  specific way to get -- now, there's -- it goes beyond

6  character conformity.  When she bit him, was she acting

7  in self-defense or was she the primary aggressor?

8          THE COURT:  And this witness can testify

9  about his opinion, which outside the presence of the

10 jury has been established to be based upon personal

11 experience.  That's how you develop a personal opinion.

12 Correct?

13         MS. DOYER:  Well, that's what this -- no,

14 sir, actually.  Under the case law that I was citing

15 earlier with regards to reputation or opinion testimony,

16 the witness' testimony about reputation must be based on

17 discussions with others or --

18         THE COURT:  Exactly.

19         MS. DOYER:  -- hearing others discuss the

20 reputation and not just on personal knowledge.  So it

21 has to be based on those discussions --

22         THE COURT:  Correct.

23         MS. DOYER:  -- not his personal

24 experience, not --

25         THE COURT:  I'm talking about opinions.

1          MS. DOYER:  And then -- let me see.

2  There's a case that went into, well, is it different for

3  reputation versus opinion --

4          THE COURT:  Exactly.

5          MS. DOYER:  -- and I'm getting to that.

6          Okay.  The State here tried to argue that

7  Rule 405 permits opinion testimony as to character.  We

8  agree, however the rule must be read in its entirety.

9  The rule plainly sets a requirement that before a

10  witness may give his opinion of the accused character,

11  based on the witness' knowledge of the accused's

12  reputation, he must have been substantially familiar

13  with that reputation and the familiarity before the date

14  of the offense.

15          So both of the witnesses the State

16  proffered admitted they had not discussed the

17  reputation, but they only discussed prior bad acts when

18  called upon to testify.  So they were not competent as

19  reputation or opinion witnesses.  That's what is going

20  on here is these are all based on specific acts.

21          THE COURT:  I'm going to allow him to

22  testify.

23          MS. DOYER:  It's my objection, Your Honor,

24  now given what we've just discussed, that under 401, I

25  don't know how it's relevant to any fact in consequence.

1          THE COURT:  Overruled.

2          MS. DOYER:  And 403, that it's more

3 prejudicial than probative and confusing to the jury as

4 far as what this individual saw on some other day.

5          THE COURT:  Overruled.

6          MR. MILLAN:  So, Your Honor, just so we're

7 clear, it means I can get into reputation, opinion and

8 specific acts?

9          THE COURT:  Well, why should you go into

10 the details of specific acts?

11          MR. MILLAN:  Well, I mean --

12          THE COURT:  I think it's established that

13 he has a personal knowledge regarding -- and from that

14 personal knowledge, he's developed an opinion and that

15 he's also had prior discussions such that he can

16 develop -- he knows of the person's reputation within

17 that community.

18          MR. MILLAN:  What about whether the

19 event -- whether it -- whether it happened to him or to

20 other people?

21          MS. DOYER:  I think that would be more

22 prejudicial than probative.

23          THE COURT:  I think you can -- without

24 going into details, you can just say, in your experience

25 with her, without describing the details of the

1  experience --

2                  MR. MILLAN:  Okay.

3                  THE COURT:  -- just such that there is a

4  foundation, that there is a predicate --

5                  MR. MILLAN:  Okay.

6                  THE COURT:  -- but we don't need to go

7  into song and verse.

8                  MR. MILLAN:  Okay.  I understand, Judge.

9                  THE COURT:  With that, are we ready to

10  proceed?

11                  MS. DOYER:  Your Honor, briefly, would you

12  explain that to Mr. Nance?

13                  THE COURT:  Yes, ma'am.

14                  Mr. Nance, do you understand -- and Mr. --

15  I'm directing Mr. Millan -- Mr. Millan as well to make

16  sure that your questions are as clear as possible.  Make

17  sure that you specify, if you're seeking opinion --

18  personal opinion of the witness or his knowledge of the

19  reputation within the community.

20                  And so when the question is asked, you

21  have to, again as I mentioned before, listen closely.

22  And he -- he may -- and, Mr. Millan, you also need to

23  be -- don't just -- Mr. Millan, don't just throw out a

24  question, why do you believe this to be true, because if

25  you do that --

1           MR. MILLAN:  I understand.

2           THE COURT:  -- it's just an open door.

3           MR. MILLAN:  I will try to keep the

4    questions as --

5           THE COURT:  It may need to be a bit of a

6    leading question such that it is constrained --

7           MR. MILLAN:  I understand.

8           THE COURT:  -- the answer is constrained.

9           And so please, again, just listen to the

10   question and don't -- we just can't have a runaway

11   freight train.  Does that make sense?

12          THE WITNESS:  Yeah.  Yeah.

13          THE COURT:  Okay.  All right.  Thank you.

14          Bring them on in.

15          (Jury enters courtroom)

16          THE COURT:  Okay.  Everybody may be

17   seated.

18          Mr. Millan, you may proceed.

19          MR. MILLAN:  Thank you, Your Honor.

20          DIRECT EXAMINATION (CONTINUED)

21   BY MR. MILLAN:

22      Q.   Mr. Nance, do you have an opinion as to whether

23   or not Georganne Shirley has a violent nature?

24      A.   Yes.

25      Q.   Are you aware of her reputation in the

1  community?  And do you believe that her reputation in

2  the community is that she has a violent nature?

3      A.   Yes.

4      Q.   Now, is the basis of your opinion as to her

5  violent nature based on your personal observations?

6      A.   Yes.

7      Q.   And in terms of your personal observations, is

8  your -- is your opinion as to her violent nature based

9  on things that she's done to you?

10     A.   Yes.

11     Q.   And is your opinion as to her violent nature

12  based on things that you've seen her do to other people?

13     A.   Yes.

14          MR. MILLAN:  Your Honor, may I approach?

15          THE COURT:  Yes, sir.

16          (At the bench, on the record)

17          MR. MILLAN:  Your Honor, I would like to

18  get into the incident where he got arrested based on

19  what --

20          THE COURT:  When was that?

21          MR. MILLAN:  It was a couple of days after

22  this incident.  She -- he got arrested for supposedly

23  assaulting Georganne Shirley.  And he's presently -- he

24  has a case pending.  He's on bond.  He's got a trial

25  setting next month on that case.  I want to ask him

1    questions about that.

2                    MS. DOYER:  He's going to have to be

3    admonished because he doesn't have immunity.

4                    THE COURT:  How would it be relevant?

5                    MR. MILLAN:  Judge, I think it goes to

6    what his motivations are when he testifies.  I think it

7    comes in under of 613(b).

8                    MS. DOYER:  And he just testified

9    favorably for the defense.

10                   THE COURT:  Yeah, I don't understand.

11   That's what I said yesterday, I do not know.

12                   MR. MILLAN:  Judge, I'm swinging for the

13   fences here.

14                   THE COURT:  I gotcha, but it probably

15   would do the witness harm --

16                   MR. MILLAN:  I understand.

17                   THE COURT:  -- regarding his case --

18                   MR. MILLAN:  Okay.

19                   THE COURT:  -- without immunity.  And for

20   him to plead the Fifth wouldn't benefit your testimony

21   here.

22                   MR. MILLAN:  Okay.  And, Judge, I agree --

23   I agree that he would need to have his attorney here

24   present and everything.  They would probably advise him

25   to take the Fifth, and I get that.

1    THE COURT:  And I mean the point is, he

2    has provided you with -- with what I think you sought to

3    have him provide.  And I just don't think that the

4    balance of that is going to be admissible.

5    MR. MILLAN:  I understand, Judge.  Okay.

6    I'm not going to ask the questions.

7    (At the bench, concluded)

8    MR. MILLAN:  Pass the witnesses.

9    CROSS-EXAMINATION

10   BY MS. DOYER:

11   Q.   Mr. Nance, you said that -- that Derek had been

12   to the house before; is that right?

13   A.   Yes.

14   Q.   How did he arrive at that house before?

15   A.   Walking.  He come up walking before.

16   Q.   Has he ever arrived at that location in a

17   vehicle?

18   A.   Do what?

19   Q.   Has he ever arrived at that location in a

20   vehicle?

21   A.   Yes.

22   Q.   What type of vehicle?

23   MR. MILLAN:  I'm going to object to

24   relevance.

25   THE COURT:  Overruled.

1    A.    Well, a couple -- he came -- he came in a -- in

2  a -- in a white Suburban once and he came in a -- in

3  a -- I don't know, just -- I don't even remember, but

4  he's come in a couple of different cars.

5    Q.    (BY MS. DOYER) Mr. Nance, you testified on

6  direct that Derek didn't say anything to you when you

7  said you were going to call 911.  Do you remember that?

8    A.    Do what?

9    Q.    You testified that Derek didn't say anything to

10 you when you said you were going to call 911.  Do you

11 remember that?

12   A.    Yeah, I -- I'm -- but it's happened before.  I

13 mean, he's -- he -- he's told me about -- or calling the

14 cops, she's asked me to call the cops before.

15   Q.    Okay.

16         MS. DOYER:  May I approach the witness,

17 Your Honor?

18         THE COURT:  Yes, ma'am.

19   Q.    (BY MS. DOYER) Mr. Nance, I'm going to show you

20 a piece of paper here.  Do you remember giving a

21 statement to Deputy Peavey the morning of the offense?

22   A.    Yes.

23   Q.    Okay.  Is that a copy of your statement?

24   A.    Yeah.

25   Q.    Could you read over it?  Don't read it out

1    loud.

2              THE COURT:  Just read it to yourself,

3    please, sir.

4       A.   I don't read good, but -- can you read this to

5    me?  I really don't -- I can't see it.

6              THE COURT:  Do you normally wear glasses?

7              THE WITNESS:  Excuse me?

8              THE COURT:  Do you normally wear reading

9    glasses?

10             THE WITNESS:  Yeah -- well, I -- I mean,

11   I --

12             THE COURT:  I don't know if these will

13   help, but I'll let you try them.

14             THE WITNESS:  I'm bad at reading and

15   writing.

16             THE COURT:  Okay.  Well, see if that helps

17   at all.  If that doesn't --

18             THE WITNESS:  Yeah.  Yeah.

19             THE COURT:  Does it help make it easier to

20   read?

21             THE WITNESS:  Yeah.

22             THE COURT:  Your eyes are about as good as

23   mine.

24             Let me just ask you a question.  In the

25   use of my glasses, were you able to read it such that

 1  you believe that it does assist your memory of the

 2  events of that day?

 3              THE WITNESS:  Yes, sir.

 4              THE COURT:  Would it still be better for

 5  us to have somebody read it to you?

 6              THE WITNESS:  No.

 7              THE COURT:  I just want to make sure that

 8  you have an adequate recollection of that event.

 9              THE WITNESS:  Yeah.  Yeah, I do, when I

10  read it that time.

11              THE COURT:  Okay.

12              THE WITNESS:  I usually have to read

13  things two or three times before it makes sense.

14              THE COURT:  Please don't read off the

15  paper, but just listen to the question that's asked.

16  And if it refreshes your memory, then you can testify

17  about your refreshed memory of the events of that day.

18  But if it doesn't refresh your memory, something that

19  you read, it may or may not, just say I -- I still don't

20  recall it.  Okay?  Whatever the answer -- the truth is

21  all we're after.  Okay?

22              THE WITNESS:  Yeah.

23              THE COURT:  Okay.  Ms. Doyer?

24      Q.   (BY MS. DOYER) Mr. Nance, now that you've

25  looked at that, does that help you remember what you

1  told the officers?

2      A.   Yes.

3      Q.   Does that help you remember the events of

4  November 30th a little bit better?

5      A.   Yeah.  Yeah.  Yes, it does.

6      Q.   Mr. Nance, you -- you told Derek that you were

7  going to call the sheriff's office; right?

8      A.   I -- yes, I guess I did.

9      Q.   And -- and Derek told you he was going to come

10 back with his friends to get you if you called the

11 sheriff's office, didn't he?

12     A.   Something like that.

13     Q.   Okay.

14          MS. DOYER:  Pass the witness.

15          MR. MILLAN:  No further questions,

16 Your Honor.

17          THE COURT:  Thank you.  You may step down.

18          MS. DOYER:  May this witness be excused?

19          MR. MILLAN:  Yes, Your Honor.

20          THE COURT:  Thank you, sir.  You may be

21 excused.

22          THE WITNESS:  Okay.  Thank you.

23          MR. MILLAN:  At this time the defense

24 rests.

25          MS. DOYER:  Your Honor, if I may have a

1    moment.

2                    THE COURT:  Okay.  Ms. Doyer --

3                    MR. MILLAN:  You know, subject to re-call.

4                    THE COURT:  Then keep him here then.

5                    Mr. Nance, if you'll just wait in the

6    hall, please.

7                    (At the bench, on the record)

8                    THE COURT:  Ms. Doyer, do you think you

9    have rebuttal evidence or are going to garner that

10   evidence or need to find a witness or something, I can

11   send the jury out.

12                   MS. DOYER:  I just need about two minutes.

13                   THE COURT:  Okay.

14                   (At the bench, concluded)

15                   MS. DOYER:  Your Honor, the State rests.

16                   THE COURT:  Okay.  Mr. Millan ran down the

17   hall.  He'll be right back, I presume.  Chances are

18   we're going to need some time to work on the charge.

19                   Okay.  Mr. Matias, outside of Mr. Millan's

20   presence, do you mind me just excusing the jury just on

21   behalf of y'all's client?

22                   MR. MATIAS:  No, Your Honor.

23                   THE COURT:  Okay.  Very good.

24                   Ladies and gentlemen, we're going to have

25   to work on the charge.  Chances are it may be about 30

1  or 40 minutes, so I'm -- I'm going to endeavor to try to

2  be able to read you the Court's instruction of the

3  charge at 11:00.  I never can formulate that final

4  charge with the assistance of the attorneys until such

5  time as all of the evidence is in.

6          It's my belief at the moment that all of

7  the evidence is in, but I -- I do want to wait for Mr.

8  Millan to formally do that.  But at this time, I'll

9  just -- so you're not waiting right here, I'll go ahead

10  and just excuse you.

11          Feel free to go about the hallways, but

12  understand there may be witnesses, et cetera.  So just

13  be mindful of your admonitions.  If you want to go get a

14  better cup of coffee across the street, you may do so.

15          Nothing wrong with your coffee.

16          THE BAILIFF:  That hurt right there,

17  Judge.

18          THE COURT:  But my point is, just be

19  mindful of the admonitions not to discuss anything with

20  anybody.  So we'll -- we'll -- we're going to shoot for

21  11:00, okay.  Thank you.

22          (Jury leaves courtroom).

23          THE COURT:  And, Mr. Millan, we can --

24  they're not presenting any additional testimony, so both

25  sides rest and close --

1                    MR. MILLAN:  Yes, sir.

2                    THE COURT:  -- as the jury leaves --

3                    MS. DOYER:  Yes, sir.

4                    THE COURT:  -- so to speak?  So we can

5    start working on the charge?

6                    MR. MILLAN:  Yes, sir.

7                    THE COURT:  All right, sir.

8                    Defense is present with counsel and the

9    State is present.  Everybody has seen the proposed

10   charge.  Any objections or requested additions thereto?

11                   MR. MILLAN:  Nothing from the defense,

12   Your Honor.

13                   MS. DOYER:  No, sir.

14                   THE COURT:  Okay.  Thank you.

15                   Let me just get the final copy -- hard

16   copy and we'll call them in here.

17                   Are you going to waive opening?

18                   MS. DOYER:  Yes.

19                   MR. MILLAN:  I'm ready, sir.

20                   THE COURT:  After I read, you be ready to

21   go.

22                   MR. MILLAN:  I'm ready to roll.

23                   (Recess taken)

24                   (Open court, defendant and jury present)

25                   THE COURT:  While we're waiting to hook

1  that up, everybody back in their places, Mr. Porter, you

2  may do so from your seat.  When I was double-checking

3  prior to your testimony regarding making sure you

4  understand all of your rights and your counsel assured

5  me that you did, I then should have sworn you in, but

6  can you raise your right hand.

7                    (Defendant sworn)

8                    THE COURT:  As well, do you promise that

9  all of the testimony you previously gave was the truth,

10  so help you God?

11                    THE DEFENDANT:  Yes, sir.

12                    THE COURT:  Okay.  Anything further from

13  either side in that regard?

14                    MS. DOYER:  No, sir.

15                    MR. MILLAN:  Nothing from the defense,

16  Your Honor.

17                    THE COURT:  Okay.

18                    All right.  Ladies and gentlemen, Adam is

19  working to get it up on the screen.  If that helps,

20  ladies and gentlemen, you may read along.  I can't let

21  you use my glasses because I need them.

22                    This is the charge of the Court in Cause

23  Number CR2016-233, State of Texas versus Derek Dale

24  Porter, in the District Court, 207th Judicial District,

25  Comal County, Texas.

1           Members of the jury, the defendant, Derek

2   Dale Porter, stands charged by indictment with the

3   offense of assault family violence with prior

4   convictions alleged to have been committed on or about

5   the 30th day of November, 2015 in Comal County, Texas.

6   To this charge, the defendant has pled not guilty.

7           In your deliberations, you will consider

8   this charge as a whole.  You are instructed that the

9   grand jury indictment is not evidence of guilt.  It is

10  the means whereby a defendant is brought to trial in a

11  felony prosecution.  Because the indictment is not

12  evidence, you are instructed not to consider the

13  indictment in passing upon the innocence or guilt of

14  this defendant.

15          During your deliberations in this case,

16  you must not consider, discuss or relate to any matters

17  not in evidence before you.  You should not consider or

18  mention any personal knowledge or information you may

19  have about any fact or person connected with this case

20  that is not shown by the evidence.

21          You are not to talk about this case to

22  anyone not of your jury.  And after the reading of this

23  charge, you shall not separate from each other without

24  the Court's permission until you have reached a verdict.

25  That's not to say that you can't take a break.  You need

1    to let Adam know in that regard.

2              All persons are presumed innocent and no

3    person may be convicted of an offense unless each

4    element of the offense is proved beyond a reasonable

5    doubt.  The fact that a person has been arrested,

6    confined or indicted for or otherwise charged with the

7    offense gives rise to no inference of guilt at his

8    trial.  The law does not require a defendant to prove

9    his innocence or produce any evidence at all.

10             The presumption of innocence is sufficient

11   to acquit the defendant unless the jurors are satisfied

12   beyond a reasonable doubt of the defendant's guilt after

13   careful and impartial consideration of all of the

14   evidence in the case.

15             The prosecution has the burden of proving

16   the defendant guilty and it must do so by proving each

17   and every element of the offense charged beyond a

18   reasonable doubt.  And if it fails to do so, you must

19   acquit the defendant.  It is not required that the

20   prosecution prove the defendant's guilt beyond all

21   possible doubt.  It is only required that the

22   prosecution's proof exclude all reasonable doubt

23   concerning the defendant's guilt.

24             You have been permitted to take notes

25   during the testimony in this case.  In the event any of

1  you took notes, you may rely on your notes during your

2  deliberations.  However, you may not share your notes

3  with the other jurors and you should not permit the

4  other jurors to share their notes with you.  You may

5  however discuss the contents of your notes with the

6  other jurors.  In your deliberations, give no more and

7  no less weight to the views of a fellow juror just

8  because that juror did or did not take notes.

9            Your notes are not official transcripts.

10  They are personal memory aids just like the notes of the

11  judge and the notes of the lawyers.  Notes are valuable

12  as a stimulate to your memory.  On the other hand, you

13  may make an error in observing or you may make a mistake

14  in recording what you have seen or heard.  Therefore,

15  you are not to use your notes as authority to persuade

16  fellow jurors of what the evidence was during the trial.

17            When the jury wishes to communicate with

18  the Court, it shall so notify the bailiff who shall

19  inform the Court thereof.  Any communication relative to

20  the case must be written, prepared by the presiding

21  juror and shall be submitted to the Court through the

22  bailiff.  You are the exclusive judges of the facts

23  proved, of the credibility of the witnesses and of the

24  weight to be given to the testimony, but you are bound

25  to receive the law from the Court that is herein given

1  to you and be governed thereby.

2            Your verdict, if any, will be by unanimous

3  vote.  After argument of counsel, you will retire to the

4  jury room and select one of your members as your

5  presiding juror.  It is the duty of the presiding juror

6  to direct your deliberations and to vote with you in

7  arriving at a verdict.

8            Your verdict, if any, must be unanimous.

9  And after you have arrived at your verdict, you may use

10 the verdict form attached hereto by having your

11 presiding juror sign the particular form that conforms

12 to your verdict.

13           Your sole duty at this time is to

14 determine the guilt or innocence of the defendant under

15 the indictment in this case and restrict the

16 deliberations solely to the issue of the guilt or

17 innocence of the defendant.

18           Members of the jury, the testimony

19 regarding the defendant's involvement in another act,

20 you cannot consider such testimony for any purpose

21 unless you first find from the testimony presented

22 beyond a reasonable doubt that the defendant committed

23 these other acts, if any.

24           Therefore, if the State has not proven the

25 defendant's involvement in those other acts, if any,

1  beyond a reasonable doubt or if you have a reasonable

2  doubt of the defendant's involvement, you shall not

3  consider this testimony for any purpose.

4          If you find the State has proven the

5  defendant's involvement in these other acts, if any, you

6  may consider -- you may only consider this testimony as

7  it may aid you, if it does, in determining the

8  defendant's intent, motive, plan, absence of accident or

9  mistake, the nature of the relationship between the

10 accused and the victim or to rebut a defensive theory in

11 relation to the offense on trial and you may not

12 consider those other acts for any other purpose.

13         If a word or term contained herein is

14 given a specific legal definition, you are bound to

15 follow and apply the definition provided.  However, for

16 any word or term not defined herein, you as individual

17 jurors are instructed to apply the common and ordinary

18 meaning to any word or term.  If a specific legal

19 definition is not provided by the law, the Court is

20 precluded from providing any jury with a definition.

21         Culpable mental states:  A person acts

22 intentionally or with intent with respect to the nature

23 of his conduct or to a result of his conduct when it is

24 his conscious objective or desire to engage in the

25 conduct or cause the result.

1          A person acts knowingly or with knowledge
2    with respect to the nature of his conduct or the
3    circumstances surrounding his conduct when he is aware
4    of the nature of his conduct or that these circumstances
5    exist.
6          A person acts knowingly or with knowledge
7    with respect to a result of his conduct when he is aware
8    that his conduct is reasonably certain to cause the
9    result.
10          A person acts recklessly or is reckless
11    with respect to circumstances surrounding his conduct or
12    the result of his conduct when he is aware of but
13    consciously disregards a substantial and unjustifiable
14    risk that the circumstances exist or the result will
15    occur.
16          The risk must be of such a nature and
17    degree that its disregard constitutes a gross deviation
18    from the standard of care that an ordinary person would
19    exercise under all of the circumstances as viewed from
20    the actor's standpoint.
21          Bodily injury means physical pain, illness
22    or any impairment of physical condition.
23          Regarding assault family violence with
24    previous conviction, our law provides that a person
25    commits the offense of assault family violence with

1  previous conviction if he intentionally, knowingly or

2  recklessly causes bodily injury to a person whose

3  relationship to or association with the actor is

4  described by Section 71.0021(b) or Section 71.005 of the

5  Texas Family Code and has been previously convicted of

6  an assault against a person whose relationship to or

7  association with the actor was that of a family or

8  household member.

9          Section 71.0021(b) of the Texas Family

10 Code provides that quote, a dating relationship means a

11 relationship between individuals who have or have had a

12 continuing relationship of a romantic or intimate

13 nature.  The existence of such a relationship shall be

14 determined based upon consideration of the length of the

15 relationship, the nature of the relationship and the

16 frequency and type of interaction between the persons

17 involved in the relationship.

18         Section 71.005 of the Texas Family Code

19 provides that household means a unit composed of persons

20 living together in the same dwelling without regard to

21 whether they are related to each other.

22         A person has previously been convicted of

23 assault against a member of a person's family, household

24 or with whom he has or has had a dating relationship if

25 the person was adjudged guilty of the offense or entered

1   a plea of guilty or nolo contendere, same as no contest,

2   in return for a grant of deferred adjudication,

3   regardless of whether the sentence for the offense was

4   ever imposed or whether the sentence was probated and

5   the person was subsequently discharged from community

6   supervision.

7               As to self-defense, under the law of

8   self-defense, you are instructed that a person is

9   justified in using force against another when and to the

10  degree he reasonably believes the force is immediately

11  necessary to protect himself against the other person's

12  use or attempted use of unlawful force.

13              Our law provides -- or excuse me, defines

14  reasonable belief as a belief that would be held by an

15  ordinary and prudent man in the same circumstances as

16  the actor.

17              Applying the law to the charges:

18  Application, now bearing in mind in the foregoing

19  instructions, if you unanimously believe from the

20  evidence beyond a reasonable doubt that the defendant,

21  Derek Dale Porter, on or about the 30th day of November

22  2015, in the County of Comal and State of Texas did then

23  and there intentionally, knowingly or recklessly cause

24  bodily injury to Georganne Shirley, a person whose

25  relationship to or association with Derek Dale Porter is

1  described by Section 71.0021(b) or Section 71.005 of the

2  Texas Family Code by striking the said Georganne Shirley

3  on her head with the hand or hands of the said Derek

4  Dale Porter, by placing the said Georganne Shirley in a

5  chokehold with the arm of the said Derek Dale Porter or

6  by pulling the hair of the said Georganne Shirley with

7  the hand or hands of the said Derek Porter, and prior to

8  the commission of said offense Derek Porter had been

9  previously convicted of an offense under Section 22.01

10 of the Texas Penal Code against a person whose

11 relationship with the said Derek Dale Porter was that of

12 a family or household member, to-wit, one, on or about

13 the 2nd day of December -- excuse me, February, 2012, in

14 22nd District Court of Hays County in Case Number

15 CR-11-0347, the defendant was convicted of the offense

16 assault family violence, which was alleged to have been

17 committed against Latoya Branecky, a person who was a

18 member of the defendant's family or household, or on or

19 about the 2nd day of February, 2012, 22nd District Court

20 of Hays County in Cause Number CR-11-0348, the defendant

21 was convicted of the offense assault family violence

22 which was alleged to have been committed against Latoya

23 Branecky, a person who was a member of the defendant's

24 family or household, then, and only then, shall you

25 consider whether the prosecution has proven beyond a

1    reasonable doubt that the defendant, Derek Dale Porter,

2    did not act in self-defense.

3              If, however, you have a reasonable doubt

4    of the defendant's guilt of the offense as charged in

5    the indictment, you need not consider the law of

6    self-defense and you shall find the defendant not

7    guilty.

8              If you do unanimously believe beyond a

9    reasonable doubt that the defendant committed the

10   offense as charged in the indictment and that he did not

11   act in self-defense, then you will find the defendant

12   guilty of assault family violence with prior conviction

13   as charged in the indictment.

14             Unless you so find beyond a reasonable

15   doubt or if you have a reasonable doubt thereof, you

16   will find the defendant not guilty of the offense of

17   assault family violence with prior conviction as charged

18   in the indictment.

19             The above and foregoing is the charge in

20   this case.  Same is hereby signed and certified by the

21   Court on this, the 7th day of June, 2017.  I'll ascribe

22   my signature at this time.

23             And then the last page is the verdict form

24   with the -- with the style and heading of the case and

25   the verdict of the jury.  Obviously upon reaching a

1   unanimous verdict, the presiding juror will sign one,

2   and only one, of these forms.  One is for not guilty and

3   the other is for guilty.

4                    And I would just suggest that after

5   everybody's done, pass it around, make sure that your

6   own personal verdict is that as -- as signed off on by

7   the presiding juror.

8                    And with that, the State may open or

9   waive.

10                    MS. DOYER:  We'll waive first close.

11                    THE COURT:  Mr. Millan?

12                         CLOSING STATEMENT

13                    MR. MILLAN:  May it please the Court and

14  counsel for the State.

15                    Ladies and gentlemen of the jury, thank

16  you for paying such close attention throughout this

17  process.  I know that y'all have been like yo-yos going

18  back and forth.  I hope you understand there is a lot of

19  work to be done during those times.

20                    I think the first thing I want to discuss

21  is -- you know, the big elephant in the room is going to

22  be Derek Porter's criminal history.  My God, I mean, he

23  does have a lengthy criminal history, but you're not

24  just looking at one person.  There -- it takes two to

25  tango and you -- you also can consider Georganne's

1    history.

2            What do we know about Georganne?  Well,
3    you can infer that -- well, you got less specificity
4    regarding her history, but what do you know?  You know
5    that -- that she was in custody.  You know that she was
6    facing two charges, one ranging up to 20 years in
7    custody and another one where she's facing up to 99
8    years in custody.

9            You had Mr. Nance testify that -- that he
10   considered her to be a violent person.  He lived with
11   her.  He said that he -- he personally believed she had
12   a character for violence and that -- also, that she had
13   a reputation in the community for having a violent
14   nature.  He also said that it was based on not just
15   things that she did to him, but things that he saw her
16   do to other people.

17           So when you're -- when you're sitting
18   there and saying, Derek Porter, he's got a -- a big
19   criminal history, remember you're talking about two
20   people.  You're not talking just about one person, okay.

21           And -- and so let's talk a little bit
22   about the facts.  Bite on the upper arm, what would be
23   the natural reaction of somebody who was bitten on this
24   part of their arm?  Head's here.  Can't use your left
25   arm.  What do you do with your right arm?

1           Now, we don't know the severity of the

2  bite mark. Why don't we know the severity of the bite

3  mark? They didn't take a picture of it. Why didn't

4  they take a picture of it? Well, if you listen to the

5  testimony of Sepeda and McClure, essentially they were

6  pissed off at him. He ran. And you know what, he --

7  and that was wrong of them and -- and you know, I can

8  understand at an emotional level why they felt the way

9  they did under the circumstances that they had to deal

10  with all of that. I mean, it was their job to

11  investigate this.

12           And when you have a party who is

13  presenting with a bite -- a bite on their arm and a deep

14  gash on the other arm, it takes more I think than a

15  cursory investigation to determine who is really

16  culpable. And -- and it seems to me that they just -- I

17  remember during voir dire, you know, who gets the

18  benefit of the doubt. I think that they gave the

19  benefit of the doubt to the woman.

20           And I would ask you to ask yourself if the

21  roles were reversed and -- and Georganne had run, but

22  she had presented with a bite on her arm and a gash on

23  her elbow, do you think they would even have gone back

24  and checked the scalp of Derek Porter to see if they saw

25  anything, felt for bumps on his head?

1  They would probably say, oh, she's running

2  for her life, you know.  I just think that they would

3  have -- they would have treated it completely

4  differently if the roles were reversed.  I think you can

5  infer that under the circumstances.

6  Derek asked them to take pictures of his

7  injuries, he told you that.  I mean McClure and

8  Sepeda -- I mean -- I mean, you heard their testimony.

9  They just didn't really want to.  They had plenty of

10  opportunity.  You heard that -- that the -- the EMTs

11  came to scene and they checked it out.  And you know,

12  there was a -- they didn't really want to admit the fact

13  of how bad the injuries were; right?  They kind of -- it

14  seemed like they were sandbagging a little bit trying to

15  underplay how bad the injuries were.

16  It wasn't until I showed them the report

17  that -- where it makes it clear that the EMT said, hey,

18  this is too bad for us to deal with here at the scene.

19  This is more than we can handle.  And then he admits,

20  yeah, it was probably bad.  And then they try to take

21  him to the jail and the jail wouldn't take him.  The

22  injury is too bad, very deep gash.  He has to be taken

23  to the hospital.

24  And why is that important?  Well, as you

25  heard the testimony, when they took him to the hospital,

1  they had to unrestrain him and they had to do X-rays.

2  There was plenty of opportunity to take photos of the

3  injuries.  They just weren't interested.  He had to get

4  a splint on his arm.

5              Now, I find it interesting that the State

6  was -- was talking about, hey, well, this -- this

7  machete incident, this happened two weeks ago.  This has

8  nothing to do with anything.  There's a -- what they

9  call a statute of limitations under Texas law.  And the

10  statute of limitations allows the State under these

11  circumstances to charge somebody up to three years after

12  an incident.

13              This was two weeks after he claimed he was

14  attacked with a machete by -- by Georganne Shirley.  It

15  was well within the statute of limitations.  There's

16  delayed outcries all the time.  People don't always come

17  out and say that they were injured by somebody.  The

18  idea that -- that, oh, because she hit him with a

19  machete two weeks ago, it's too late now for us to bring

20  charges against her.  That's ridiculous on its face.

21              I think what's real clear here is that

22  they took sides.  And they took sides -- and I think --

23  I can understand why they were upset with -- with Mr.

24  Porter, but I also understand it was somewhat

25  unprofessional the way they handled the investigation.

1    I can understand what they're thinking and emotionally
2    where they're at, but I think that they could have done
3    a much better job.  And I think you-all should agree
4    with that.
5              In terms of this jury charge, I think
6    it -- it really all comes down to the self-defense
7    issue.  I mean, he's -- he's admitted that he had to
8    pull her hair to get -- get Georganne off of him.  All
9    right.  So -- and she -- fine, she felt pain because of
10   it.  But the question is, was he legally allowed to do
11   that under the circumstances?
12             And I would -- I would point you to the --
13   to the definition of reasonable belief because I know
14   that some of you are going to be like, well, I never
15   would have been in that circumstance to begin with.
16   It's not reasonable to be in that circumstance.  That's
17   not what the law says.
18             The law asks you to place yourself in
19   the -- in those same circumstances.  So you are laying
20   on that bed and -- and if you don't believe beyond a
21   reasonable doubt -- if you believe beyond a reasonable
22   doubt that Georganne Shirley -- there's no way she did
23   that, then fine, you don't believe it.  But if you
24   believe that it's at least a reasonable -- you have a
25   reason to believe that Georganne did that, ask yourself

Closing Statement by Mr. Millan
June 7, 2017

1  what would you have done under those same circumstances.

2        MS. DOYER:  Objection.  That's

3  mischaracterizing the definition.  It's not what they

4  would do.  It's actually a violation of the Golden Rule.

5  It's what an ordinary and prudent person would do.

6        MR. MILLAN:  What an ordinary and prudent

7  person would do.  Ask yourself what an ordinary and

8  prudent person would do if they were laying down on that

9  bed and bitten on the arm and how they would react to

10  it.  I mean, I think it's almost instinctual under those

11  circumstances.  What else are you going to do?

12        Now, like I said, we don't know -- I will

13  say the officers admitted they saw a bite mark, so it

14  was visible.  It was visible that there was a bite mark

15  there.  So they -- they admit to it.  We don't know

16  how -- how -- how bad it was because we can't see

17  pictures.  Once again, it's evidence that you could have

18  had, but you don't have.

19        We never got to see pictures of the elbow

20  to see how bad it was, but we know he had to get a

21  splint for it.  You know -- I mean, this is a situation

22  where you've got two people who have history and you

23  have to decide which one -- which one is worse, which

24  one is better.  But you know what?  One side has a -- a

25  much higher burden in this situation, and that's the

1   State.

2           The State has to prove to you beyond a

3   reasonable doubt that Georganne Shirley is -- is the

4   good person here.  Come on.  You -- you -- you've heard

5   the evidence.  There's no way you can say with certainty

6   beyond a reasonable doubt that Georganne Shirley is

7   telling you the truth, the -- the person who squats

8   in -- in Mr. Nance's home and lies to him about

9   squatter's rights.  Give me a break.  This -- the woman

10  who would do something like that, move into somebody's

11  home without their permission, she's not a good person.

12          You can think what you want about

13  Mr. Porter, but -- but don't see Georganne Shirley as

14  a -- as some angel.  She is not an angel.  She is a very

15  bad person.  And so if you think Derek Porter is a bad

16  person and you're dealing with two bad people, who are

17  you going to believe?  Well, you may not know.  But if

18  you don't know, well, that's a reasonable doubt.

19          There's plenty of reasons here to doubt

20  this case.  I mean, I don't think there's any other

21  verdict than not guilty here.  I think it's -- I feel

22  like I'm in the Twilight Zone here.  This is a not

23  guilty.  Thank you.

24          THE COURT:  Ms. Doyer?

25

1       CLOSING STATEMENT

2           MS. DOYER:  Blaming the victim, red

3   herrings, a smear campaign, that is commonplace in

4   domestic violence cases.  This is something a victim

5   typically lives with when she's in that relationship.

6   It's something that you now know after watching this

7   trial.  It's not something that she's going to escape.

8   She ends up having to be called as a witness.

9           I didn't realize Georganne Shirley was on

10  trial this week for assault family violence with a prior

11  conviction.  I never sold her to you as an angel or a

12  good person.  I told you what I had to prove beyond a

13  reasonable doubt, which is that she was assaulted by

14  this individual and that this defendant had a prior

15  family violence conviction.  That's all I have to prove.

16  That's all I ever promised I would prove.

17          She wanted him out and she wanted him out

18  of her life.  She wanted him out of that home that

19  morning.  He wasn't having it.  So when -- so when you

20  look at the elements that I told you I had to prove

21  beyond a reasonable doubt when we talked on Monday, that

22  it was this defendant, that he committed assault, that

23  he had previously been convicted of committing an

24  assault against a family or a household member, I've

25  proved all of that beyond a reasonable doubt.

1            Now the question does comes down to was it

2     self-defense.  So what are you going to believe?  The

3     body of evidence as a whole or this?  Because when you

4     look at the evidence, you have multiple sources from the

5     victim.  And the victim testified that the defendant

6     came over that night.  He had had an emergency

7     protective order for an assault out of Hays County.  He

8     came just after it expired.  She fed him.  She asked him

9     to leave the next morning.  He pulled her hair, punched

10    her in the head repeatedly, put her in a chokehold and

11    she bit him to get away.

12            You have photos of her injuries that

13    corroborate that account.  You -- even the defense's

14    witness, Gerry Nance, said she came out with hair in her

15    hands.  Officer Sepeda testified that when he responded,

16    she was scared.  She came out and she was grateful to

17    see the officers.

18            They separate them immediately.  And what

19    does he do?  Self-defense, what does he do?  What would

20    a person who was truly self-defending do?  I mean, she

21    attacked me.  It was self-defense.  That is not what

22    Derek Porter did.  What Derek Porter did was he quietly

23    walked into the hallway where he had an exit strategy

24    and he took off running from police.  That's not

25    self-defense.  People who are self-defending are ready

1   to assert that immediately, not after they're

2   apprehended by law enforcement.  People who are

3   self-defending don't threaten the 911 caller.

4           You heard from Gerry Nance.  He didn't

5   like Georganne for being a squatter or whatever it may

6   be.  He didn't see the assault, but he heard Georganne

7   scream for help.  She asked him to call 911.  That's

8   consistent with her account.

9           The hair in her hand -- what's unique

10  about self-defense is it's an admit and avoid defense.

11  Basically you admit to the conduct.  Yes, I punched this

12  person.  Yes, I shot this person, because they were

13  coming in the house to kill me and this was my only

14  choice.

15          That's not what Derek Porter did.  What

16  Derek Porter did is he said, nah, I just pushed her off

17  of me.  That's not admit and avoid.  That's not

18  self-defense.  It's also not consistent with the

19  evidence.  Just pushing her off, how did she end up with

20  a whole handful of hair that was missing?

21          So when you look at his version where he

22  admits some, but not all, his version is that what --

23  he's laying in bed with his arms behind his head and

24  then she jumps over, manages to straddle him and then

25  bites his arm.

1        First let's just look at that as a version

2   of an assault.  In what world is that how somebody

3   assaults another person?  Truly, like jumping on

4   someone, straddling them and then biting them, that

5   doesn't happen.  Biting out of a chokehold, that's a

6   defensive maneuver.  That's what she did.  That's

7   consistent with her account.

8        Second, when we look at his version, you

9   need to think about his credibility and who we're

10  dealing with.  We're dealing with a nine-time convicted

11  felon with two prior family violence assaults,

12  everything to lose, everything on the line.  He ran when

13  police got there.  He threatened the 911 caller.  And

14  only after he gets caught says, hey, it's self-defense.

15  So who are you really going to believe?

16       When this defendant testified about the

17  assault, he also added some details about being

18  assaulted with a hoe.  Mr. Millan had plenty of

19  opportunity to ask officers if there was any evidence of

20  that, if it was ever mentioned to him.  None of that was

21  ever put into evidence.

22       Defense counsel didn't ask Nance about it

23  because Nance would say no, that didn't happen either.

24  So again --

25       MR. MILLAN:  Objection, Your Honor.  It's

1  assuming what a witness is going to testify to a

2  question they were never asked.

3          MS. DOYER:  That's not a legal objection.

4          THE COURT:  Well, it's facts beyond the

5  evidence then -- argument beyond the evidence.

6          MS. DOYER:  All of it was just a smear

7  campaign of this victim.  And it's easy because she's

8  got issues.  She does, but everybody does.  Does that

9  mean that what he did to her is any less horrible?  Does

10  it mean that he's any less guilty?

11          All too often the defense tactic in these

12  types of cases is to throw mud on a victim and hope that

13  some of it sticks, to throw out a red herring and hope

14  that it distracts you.  The fact that he had an old cut

15  on his arm, what relevance does that have to what

16  happened on November 30th?  All of that is just a

17  distraction.  It has no relevance to what happened that

18  night.

19          The fact that he didn't report that he was

20  supposedly attacked with a machete until after he gets

21  caught by law enforcement, that's probably why this case

22  was never investigated against him because he doesn't

23  say anything about it until after he got caught.

24          These are all very specific and

25  manipulative tactics that Derek Porter knew how to use

and tried to use to his advantage.  He had to use them

because he got caught.  He had to explain that bite

mark.  He had a cut that he wanted to explain with a

prior assault.  And none of it changes what happened on

November 30th, 2015:  That he came over there after the

emergency protective order had expired, that he punched

her in the head and the officers felt lumps, that he

ripped out her hair and her hair was missing -- and that

was seen by another witness; and that he put her in a

chokehold and there was redness around her neck.  That's

what the evidence shows.  So the question is, who are

you going to believe?

The evidence is clear that he assaulted

her.  It is clear that he has zero credibility and every

motive to lie.  The only possible verdict in this case

is guilty.  I'll ask you to find him guilty.  Thank you.

THE COURT:  Okay.  Ladies and gentlemen,

first off, I trust that maybe your lunch is nearby.

But also, Mr. Hilliard, you are the

alternate.  I doubt that we'll ultimately need you, but

if you will just either give Reggie or Adam -- make sure

they've got your contact information, which they

probably do, in case we need you.  I would ask you just

to remain, you know, under your admonitions until such

time as we call you and let you know everything is done.

1            As well, if you'll either tell Reggie or

2    Adam if you would like to come back when we do receive

3    the verdict, we'll certainly wait for you to return, if

4    you want to do that.  If you don't, you don't have to.

5    It's up to you.

6            Hopefully as well your lunch is here.

7    You're welcome to do with it as you please.

8            Other than that, ladies and gentlemen of

9    the jury, if you would like any of the evidence, just

10   ask either of the bailiffs for that evidence and -- and

11   we'll get it to you.

12           You may want to take a break, get your

13   lunch, eat your lunch.  It's up to you if you want to

14   have a working lunch or not.  But other than that, I'll

15   turn you loose with the charge and we wish you Godspeed.

16               (Jury retired for deliberations)

17               THE COURT:  With that we'll be in recess.

18               (Recess taken)

19               (Open court, defendant and jury present)

20               THE COURT:  Okay.  Everybody can be

21   seated.

22           Okay.  We've got everybody present and

23   accounted for.

24           And, Mr. Presiding Juror, it's my

25   understanding that the jury has reached a verdict?

1          JUROR:  Yes, Your Honor, we have.

2          THE COURT:  And can you assure me that it

3    is, in fact, a unanimous verdict?

4          JUROR:  Yes, Your Honor, it is.

5          THE COURT:  And did anybody who wants to

6    get a chance to pass around that verdict form to ensure

7    that your own individual verdict was properly reflected

8    on that form?

9          JUROR:  Yes, sir.

10          THE COURT:  Okay.  And if you'll just hand

11    the verdict to the bailiff then.

12          And if the defendant would please rise.

13          We, the Jury, find the defendant, Derek

14    Dale Porter, guilty of the offense of assault family

15    violence with prior conviction as charged in the

16    indictment, signed by the presiding juror.

17          And can everybody assure me that that was,

18    in fact, your intended verdict?  Okay.  I see no

19    dissention, so I accept the jury's verdict and find that

20    you are, in fact, guilty of the offense as charged in

21    the indictment.

22          You may be seated.

23          And, ladies and gentlemen of the jury,

24    it's at this time that I will begin a punishment phase

25    of the trial based upon your verdict and the Court's

1  finding of guilt.

2          You are welcome to remain, if you also --

3  I'm getting ready to release you from your admonitions

4  at this time.  If somebody wants to talk to you, but you

5  choose not to talk to them, it's your choice whether to

6  speak or not to speak with them about the facts of this

7  case.

8          I'll give everybody just a second, if you

9  would like to, once we release you to come back around

10 if you want to join us just in the audience.  Again,

11 that's your choice, or you may have other matters that

12 you need to tend to today.

13         Regardless, I do thank you for your

14 service.  I hope you can see how important it is for us

15 to be willing to participate, to have a cross-section --

16 I'm sure y'all had some diverse ideas and questions back

17 there, and that's why we have 12 people -- a group of

18 people.  Whether it be this court or other courts, the

19 number can be a little bit different, but here it's 12.

20         So I thank you for your service as well as

21 on behalf of those folks in the military that are

22 fighting just to give us the opportunity to safely go

23 down to the grocery store, much less exercise these

24 types of constitutional rights.  So I thank you for

25 that.  And with that, we'll release you.  Thank you.

```
1            (Jury released)
2            THE COURT:  Okay.  Everybody can be
3   seated.  Let me give them a couple of seconds.
4            Okay.  Well, I'm ready to proceed.
5            MS. DOYER:  Your Honor, would you like me
6   to read the enhancement paragraph?
7            THE COURT:  Yes, ma'am.  The clerk has the
8   file.
9            MS. DOYER:  The grand jurors aforesaid do
10  further present into said court at said term, that on or
11  about the 30th day of October, 2003, in the
12  United States District Court, Western District of Texas,
13  San Antonio Division, in Case Number SA-03-CR-218-EP,
14  styled the United States of America versus Derek Porter.
15           Derek Porter, defendant herein, was duly
16  and legally convicted of the felony offense of bank
17  robbery alleged to have been committed on or about the
18  13th day of December, 2002, upon an indictment then
19  pending in said court and of which offense said court
20  had jurisdiction.  And as alleged, said offense occurred
21  prior to and the conviction, therefore, became prior to
22  the conviction of the offense alleged above.
23           THE COURT:  And to that allegation, does
24  the defendant plead true or not true?
25           THE DEFENDANT:  True.
```

1          THE COURT:  Thank you.

2          State have evidence?

3                    OPENING STATEMENT

4          MS. DOYER:  Yes, Your Honor.

5          By way of brief opening, Your Honor, you

6   heard a little bit about this defendant's criminal

7   history through the testimony that he provided.  You're

8   aware of the length of it and how many convictions he

9   has.

10          The evidence that we're going to present

11  today is going to give you a more in-depth look at that,

12  just how much he was involved with, what types of

13  offenses he was committing.  But also, who his victims

14  were and what his ideologies were.

15          I think that all of that information is

16  going to present to you an individual who is extremely

17  dangerous and needs to be taken off the streets for as

18  long as possible.

19          THE COURT:  Thank you.

20          Mr. Millan?

21                    OPENING STATEMENT

22          MR. MILLAN:  Your Honor, I would ask you

23  to obviously take into -- into consideration all of the

24  evidence the State is going to put forward, but also

25  remember what the allegation in this case was, which was

1  basically a pulling of the hair and grabbing of the

2  ears.

3           And I understand that he has history, but

4  also do not, you know, lose sight of the fact of the --

5  of the context of what this charge is.  Thank you, Your

6  Honor.

7           THE COURT:  Ms. Doyer -- or Ms. Kilday,

8  rather.

9           MS. KILDAY:  State calls Frank Allenger.

10          THE COURT:  Mr. Allenger, let me get you

11 to raise your right hand.

12          (Witness sworn)

13          THE COURT:  Thank you.

14                    FRANK ALLENGER,

15 having been first duly sworn, testified as follows:

16                 DIRECT EXAMINATION

17 BY MS. KILDAY:

18    Q.   Mr. Allenger, could you please introduce

19 yourself to the Court.

20    A.   My name is Frank Allenger.  I'm currently

21 employed with the Guadalupe County Attorney's Office in

22 Seguin, Texas.

23    Q.   How long have you worked there?

24    A.   I've worked for the Guadalupe County Attorney's

25 Office for about six months prior to the offices

1  combining, the DA and the county attorney's office.

2      Q.   How were you employed back on August of 1998?

3      A.   I was a deputy assigned to a K-9 unit in

4  Gonzales County, Texas.

5      Q.   And in that capacity, did you have the

6  opportunity to meet with one of the defendant's

7  relatives?

8      A.   Yes, ma'am, I did.

9      Q.   Who was that person?

10      A.   That would be the defendant's mother, Linda

11  Porter.

12      Q.   Please describe the circumstances surrounding

13  your encounter with Ms. Porter.  Why did she meet you?

14      A.   She came in to file a complaint in reference to

15  the defendant.  She came in scared, kind of hysterical

16  indicating that the defendant --

17          MR. MILLAN:  I'm going to object to

18  hearsay, Your Honor.

19          THE COURT:  Overruled.

20      A.   She indicated that the defendant had -- was

21  addicted to cocaine and that the defendant had said he

22  was going to kill her.  And in addition to that, she

23  said she feared that the defendant would actually kill

24  her.

25      Q.   (BY MS. KILDAY) So she was legitimate.  She

1  seemed scared that he would follow through on the

2  threaten to end her life?

3      A.  Yes.  She was crying and very upset.

4      Q.  At that point what did you do?

5      A.  I -- I advised her that I would go ahead and

6  take the report.  And at that time, she advised me she

7  wasn't sure she wanted to file charges.  She also

8  indicated that he had stolen a VCR -- or taken a VCR

9  from her place and had pawned it at a pawnshop.

10          She indicated that she wanted to get with

11  her mother who was en route from Comfort to discuss the

12  charges prior to actually filing charges against him and

13  she left the office.

14      Q.  Did Linda Porter ever follow through with

15  pressing charges against her son?

16      A.  No, ma'am, she did not.

17      Q.  Did you have the opportunity to meet with the

18  defendant?

19      A.  No, I did not.

20      Q.  Not on that date?

21      A.  Not on that date.

22      Q.  Okay.  Can you discuss another time when you

23  did have the opportunity to interact with Derek Porter?

24      A.  In December of 2000 -- I'm sorry, in December

25  of 1998, a few months after this incident with the

1  mother, there was a warrant issued for his arrest for a

2  burglary of a building, that building being a store in

3  Cost, Texas.  Myself and Deputy David Furr were

4  basically patrolling the county.  And seeing the subject

5  Mr. Porter in a vehicle, we conducted a traffic stop and

6  that's where I seen him next.

7      Q.   Do you recall an incident involving the

8  burglary -- a different burglary of a building,

9  specifically an auto store?

10     A.   Yes.

11     Q.   Can you tell the Court a little bit about that

12 incident?

13     A.   Sure.  When he resisted arrest or the auto?

14     Q.   Let's discuss the resisting.

15     A.   Okay.  When we stopped the vehicle to effect

16 his arrest, I -- he got out of the vehicle -- or I

17 ordered him out of the vehicle because we had the

18 warrant.  I told him to put his hands behind his back.

19 I was able to get one handcuff on him and then he

20 started fighting with me and broke loose.

21         David Furr grabbed -- grabbed him.  And we

22 took him to the ground and we fought with him a little

23 bit as he resisted.  We got him in handcuffs and we took

24 him to jail.

25     Q.   And again, that was back in 1998?

1        A.    Yes, ma'am.

2        Q.    Okay.  Now, fast-forward to 2003.  Do you

3    remember the burglary of a building at an auto store?

4        A.    Yes, ma'am.

5        Q.    Okay.  Can you tell the Court about that

6    incident?

7        A.    When we were called out -- at that time I was a

8    chief deputy of the sheriff's office, so I was over the

9    investigation division.  I believe I got a call --

10   called out in reference to a burglary of the auto -- it

11   was an automobile lot -- a car lot.  They sold cars.

12   They had been broken into.  A vehicle was stolen.

13            And -- and within the office area of the

14   car lot, a weapon was stolen.  So I was called out, got

15   to the location.  I believe I started taking

16   fingerprints or attempting to get fingerprints.  While I

17   was out, we got a -- a call on a gas run where the --

18   the subject was later seen on video stealing gas from a

19   gas station about three miles up the road.

20            Later that evening, we did the

21   investigation and found that he broke into a store in

22   Cost using that vehicle -- I'm sorry, it was in

23   Leesville, Texas.  He broke into the store in Leesville.

24   I think he stole some beer and some meat.  And we put

25   the stolen vehicle in the system and -- and I believe a

1  day later he was stopped maybe between here and Austin

2  and arrested for those offenses.

3          MS. KILDAY:  Permission to approach

4  Mr. Allenger.

5          THE COURT:  You may.

6      Q.   (BY MS. KILDAY) I'm going to refer to this

7  whole packet that I'm handing you as State's Exhibit 24.

8  Do you recognize it?

9      A.   Yes, ma'am.

10     Q.   What is it?

11     A.   This is the indictment for those offenses that

12  I just explained in reference to the -- to the

13  unauthorized use of a vehicle and then the theft of the

14  firearm and then the burglary down in Leesville, Texas.

15     Q.   What was the offense date for all of those?

16     A.   The offense date was January -- excuse me,

17  January 9th, 2003.  All three offenses occurred on that

18  day.

19     Q.   What was the cause number associated with that?

20     A.   Gonzales County Cause Number 49-03.

21     Q.   And the defendant's name listed on there?

22     A.   Derek Dale Porter.

23     Q.   And -- and actually included in this, do you

24  see the defendant's photograph listed?

25     A.   Yes, ma'am.

1    Q.   Do you recognize that individual here in the

2    courtroom?

3    A.   Yes, ma'am.

4    Q.   Can you identify him and a piece of clothing?

5    A.   He's wearing an aqua-colored shirt there.

6    Q.   And is that the same individual that you

7    arrested for all three of these offenses in January of

8    2003?

9    A.   He was arrested for those offenses and -- and

10   was convicted on those offenses.

11   Q.   Okay.  It's the same person?

12   A.   Yes, ma'am.

13            MS. KILDAY:  I'll tender them to defense

14   counsel.

15            MR. MILLAN:  No objection.

16            THE COURT:  They're admitted -- or it's

17   admitted.

18            MS. KILDAY:  State passes this witness.

19                 CROSS-EXAMINATION

20   BY MR. MILLAN:

21   Q.   Good afternoon, Investigator Allenger.  Do you

22   remember going to visit Mr. Porter in -- in Williamson

23   County jail?

24   A.   I may have.

25   Q.   Do you remember anything about the meeting?

1    A.   I don't recall him being in Wilson County, I

2  guess.

3    Q.   Williamson County.

4    A.   No.  I did not go to Williamson County.  That's

5  up near Austin.  No.

6    Q.   Okay.  Do you remember meeting with -- with

7  Mr. Porter at -- in relation to any of these incidents?

8    A.   Just the two where he fought me and the second

9  one where he confessed to the burglary of the Cost

10 store.

11   Q.   So he confessed to you basically to get you --

12 he gave up -- he gave himself up on the offenses; is

13 that right?

14   A.   He confessed to those offense, yes, sir.

15   Q.   Okay.  And so do you remember any discussion

16 with him regarding his -- his use of drugs at the time?

17   A.   It's been like 19 years.

18   Q.   I understand.

19   A.   I think he -- he may have said something about

20 having drugs issues.

21   Q.   Okay.  And do you remember what drug issues

22 they were:  Crack cocaine, heroin, anything?  Do you

23 remember what kind of drug issues he said he had?

24   A.   Maybe cocaine.  I don't --

25        MR. MILLAN:  Pass the witness.

1      MS. KILDAY:  No further questions from the

2  State.

3      THE COURT:  Thank you.  You may step down.

4      May this officer be released?

5      MS. KILDAY:  From the State, yes.

6      MR. MILLAN:  Yes, Your Honor.

7      THE COURT:  Next witness?

8      MS. KILDAY:  State calls Russell Smith.

9      THE COURT:  Let me get you to raise your

10  right hand.

11      (Witness sworn)

12      THE COURT:  Thank you.

13              RUSSELL SMITH,

14  having been first duly sworn, testified as follows:

15              DIRECT EXAMINATION

16  BY MS. KILDAY:

17      Q.  Morning.  Could you please introduce yourself

18  for the record.

19      A.  My name is Russell Smith.

20      Q.  Mr. Smith, how are you currently employed?

21      A.  With the Rusk County Sheriff's Office.

22      Q.  How long have you worked there?

23      A.  Nine years.

24      Q.  And -- and what's your capacity there with the

25  Rusk County Sheriff's Office?

1    A.    I'm a sergeant in investigations.

2    Q.    So you were employed by the Rusk County

3  Sheriff's Office on August 31st of 2008?

4    A.    Yes, ma'am.

5    Q.    At that time you were a deputy?

6    A.    Yes, ma'am.

7    Q.    And in your capacity as a deputy, did you have

8  the opportunity to interact with the defendant, Derek

9  Porter?

10   A.    Yes, ma'am.

11   Q.    And do you recognize him in the courtroom here

12  today?

13   A.    Yes, ma'am.

14   Q.    Okay.  Can you please describe the context of

15  your interactions with the defendant on August 31st of

16  2008.

17   A.    I was actually traveling through the town of

18  Henderson to get to the other side of the county and

19  I -- I happened to be behind him in front of what --

20  between Wal-Mart and Sonic.  He was in the inside lane.

21  I could tell -- there were two people in the vehicle.

22  You could tell they were getting nervous, and I was just

23  behind them.

24           And when the light turned green, he made a

25  left-hand turn into the Sonic, not from the turning

1  lane.  So I went ahead and initiated a traffic stop on

2  him.  When we got inside the Sonic into a parking spot,

3  he got out of the driver's side.  I hollered at him at

4  the time to -- that I needed to talk to them, that I

5  needed his driver's license and insurance.  He stopped

6  briefly.  As I got out of the car and was walking

7  towards him, he took off running on me.

8      Q.    Where did he take off running to?

9      A.    He ran across a couple of parking lots, a

10 church yard and then across the highway nearly causing

11 both of us to be hit by several vehicles.  He then ran

12 into a shopping center parking lot behind it and into

13 the woods.

14     Q.    Okay.  Were you ever able to catch up with the

15 defendant?

16     A.    No, ma'am, not at that time.

17     Q.    Okay.  Not at that time.  But when did you

18 eventually catch up to him?

19     A.    Well, he made it through a fence and into

20 the -- into the woods pretty quick.  It was real thick.

21 I turned around, went back to the truck.  There was a

22 passenger in it.  I spoke to him.  He told me who the

23 driver was.  He was very intoxicated, the passenger was,

24 so I took him in.  All I did was drop him off at the

25 jail.

1    On my way to the jail, I received a call

2  from my -- my dispatch letting me know that they had

3  received phone calls of an individual on FM 225 standing

4  in the middle -- or walking down the middle of the road

5  waving his hands trying to stop people.

6    Based on the description of his clothing,

7  I knew it was going to be him.  So I just dropped the

8  passenger off at the jail, went back and he was -- it

9  was him.  He was walking down the middle of the road

10  trying to flag me down.  It was almost midnight, so I

11  was able to -- to get him then.

12    Q.   At that time you placed him under arrest?

13    A.   Yes, ma'am, I did.

14    Q.   Do you know if he was ever prosecuted for that

15  offense?

16    A.   No, ma'am, I don't know.

17    MS. KILDAY:  Pass the witness.

18    MR. MILLAN:  No questions, Your Honor.

19    THE COURT:  Thank you, sir.  You may step

20  down.

21    May he be released?

22    MS. KILDAY:  From the State, yes, sir.

23    MR. MILLAN:  Yes, Your Honor.

24    THE COURT:  Thank you, sir.

25    MS. DOYER:  State calls Officer Mike

1  Wellman.

2                  THE COURT:  Good afternoon.  Let me get

3  you to raise your right hand.

4                  (Witness sworn)

5                  THE COURT:  Thank you.  You may have a

6  seat.

7                  MIKE WELLMAN,

8  having been first duly sworn, testified as follows:

9                  DIRECT EXAMINATION

10  BY MS. DOYER:

11      Q.  Sir, could you please state your name for the

12  record.

13      A.  It's Michael Ray Wellman.

14      Q.  And, Mr. Wellman, how are you employed?

15      A.  I'm a police officer with the City of San

16  Marcos, Texas.

17      Q.  And how long have you been with the City of San

18  Marcos?

19      A.  Since 1992.

20      Q.  And do you recall an incident involving a Derek

21  Dale Porter in April of 2000?

22      A.  From the report, yes.

23      Q.  Okay.  Can you tell us what happened in April

24  of 2000 regarding Derek Porter?

25      A.  Okay.  Other than referring to my notes -- I'm

1  just going off of what I recently read -- there was

2  another officer, Officer Clark, that received a call

3  about a family violence situation.  He went to speak

4  to -- to two females and he found out that Derek Porter

5  had apparently gained entry to a house -- to their house

6  by using a pocketknife to pry open the door to gain

7  entry and -- and his -- his mother had sent a message or

8  something to her -- her daughter saying, don't come here

9  because Derek's here.

10             Well, the daughter came anyways.  And when

11  the daughter got to the house, her and Derek got into a

12  verbal argument.  Then Derek, it was told, had a knife

13  and -- and threatened if you call the police, then I'll

14  kill myself.  I'll kill the police officers and -- and

15  he also, while holding the knife, making a flinching

16  movement with the knife towards his sister, was

17  threatening his sister.

18     Q.   So the two females that you mentioned -- the

19  home that was broken into, who were the two females?

20     A.   It was Derek Porter's mother and sister.  Do

21  you need the names?

22     Q.   Well, I can just ask you.  Would that be Linda

23  and Kelly Porter?

24     A.   I believe that's right.  I need to look at my

25  report just to make sure.  Linda and Kelly Porter.

1    Q.   Now, Officer Wellman, after law enforcement

2    responded out there, was there some other criminal

3    activity that was discovered?

4    A.   Yes.   They also searched his vehicle

5    subsequent.   He was arrested for aggravated assault at

6    the time, family violence.   And he gave permission to

7    search his vehicle and they -- the officers located

8    several hits of LSD in the vehicle.

9    Q.   And, Officer Wellman, what date was -- in April

10   did these offenses occur?

11   A.   It was April the 24th of 2000.

12        MS. DOYER:  May I approach the witness,

13   Your Honor?

14        THE COURT:  Yes, ma'am.

15   Q.   (BY MS. DOYER) Sir, I'm going to show you what

16   I've marked as State's Exhibit 25.

17   A.   Okay.

18   Q.   Could you just look through those briefly?

19   A.   Okay.   This one is apparently -- he was found

20   guilty of the offense of terroristic threat.

21   Q.   So are these court documents related to that

22   call that you were talking about you had responded to?

23   A.   I'm trying to find where it refers to that

24   date, the 22nd or 24th, I'm sorry -- oh, yes, ma'am.

25   Q.   Okay.

1    A.   I'm sorry.

2    Q.   And then looking at State's Exhibit 26, are

3 these the court documents referencing possession of LSD?

4    A.   Yes.  That's what it appears to be, yes, ma'am.

5    Q.   Okay.  Both State's Exhibits 25 and 26, are

6 these certified court copies of these judgments of

7 conviction?

8    A.   I see -- yes.

9         MS. DOYER:  State offers State's

10 Exhibits 25 and 26.

11         MR. MILLAN:  No objection.

12         THE COURT:  They're admitted.

13         MS. DOYER:  Pass the witness.

14              CROSS-EXAMINATION

15 BY MR. MILLAN:

16    Q.   Afternoon.  So the initial arrest may have been

17 for an aggravated assault, but it ultimately was pled to

18 terroristic threat and possession charges; correct?

19    A.   Apparently, sir.  Yes, sir.

20    Q.   And -- and were you at the scene of this

21 incident?

22    A.   Afterwards.

23    Q.   Okay.  So no personal knowledge of anything

24 that happened; is that right?

25    A.   We sent several officers to the scene because

1  there was a history of -- of violence.  And with the

2  nature of the -- the claims with knives and he was going

3  to kill the police if they called them, there were

4  several officers that were sent.  Three or four officers

5  were at the front of the house and made entry.  The --

6  the mother gave a key to the house.  Myself and another

7  officer were around the back side of the house in case

8  someone tried to flee out the back.

9      Q.   Okay.

10     A.   After they finished, then later on I went -- I

11 took written statements from -- from the mother and the

12 daughter -- and her daughter.  And I also located

13 several knives throughout the house.

14     Q.   Do you -- you said you work for San Marcos PD;

15 correct?

16     A.   Yes, sir.

17     Q.   Are you familiar with Georganne Shirley?

18     A.   I'm sorry, who?

19     Q.   Georganne Shirley.

20     A.   Not off the top of my head, no.

21               MR. MILLAN:  Okay.  Pass the witness.

22               MS. DOYER:  Nothing further for this

23 witness.

24               THE COURT:  Thank you.

25               MS. DOYER:  May this witness be excused,

1  sir?

2          MR. MILLAN:  He may.

3          THE COURT:  Yes.  Thank you, sir.

4          THE WITNESS:  Thank you.

5          MS. DOYER:  We'll re-call Ronnie Womack.

6          THE COURT:  He remains under oath.

7                    RONNIE WOMACK,

8  having been previously duly sworn, testified as follows:

9                  DIRECT EXAMINATION

10  BY MS. DOYER:

11      Q.  Detective Sergeant Womack, you testified here

12  yesterday that you had taken prints of the defendant,

13  Derek Porter, on June 5th, 2017; is that right?

14      A.  Yes, ma'am.

15      Q.  Were you asked to look at any other

16  fingerprints or report documents to conduct a

17  comparison?

18      A.  I was.

19      Q.  Were you able to identify a match to several of

20  those court documents?

21      A.  Yes, ma'am.

22          MS. DOYER:  May I approach the witness,

23  Your Honor?

24          THE COURT:  Yes, ma'am.

25      Q.  (BY MS. DOYER) Detective Sergeant Womack, I'm

1  going to show you what I've marked as

2  State's Exhibit 27.  Do you recognize that?

3      A.  Yes, ma'am.

4      Q.  Okay.  And what is that?

5      A.  That's the known live scan ten-print of the

6  defendant.

7      Q.  Okay.  Now, looking at what I've marked as

8  State's Exhibit 30, can you tell me what that is?

9      A.  It's a judgment of conviction.

10     Q.  And was there a print on that judgment that you

11 were able to analyze?

12     A.  On this one there was not one attached to --

13 right here, okay.  Let me --

14     Q.  No?

15     A.  No.

16     Q.  Okay.  Looking at this judgment of conviction,

17 who was the named defendant?

18     A.  Derek Porter.

19     Q.  And does it have an offense for which he was

20 charged or convicted?

21     A.  It shows a charge of assault bodily injury.

22     Q.  And what was the date of offense on that case?

23     A.  I'm looking for the dates.  There's two dates

24 right here.

25     Q.  Okay.

1    A.   It shows to be May 13th of 2001.

2    Q.   And who was the victim?

3    A.   Ruben Peralez, III.

4    Q.   Okay.  I'm going to go back to

5  State's Exhibits 28 and -- and 29.  Did either -- were

6  you able to make an identification on either of these?

7    A.   This one I was unable to.

8              THE COURT:  Which is this one?

9              THE WITNESS:  Sorry, Your Honor.

10              THE COURT:  Just by number, 28 or 29?

11              THE WITNESS:  It's 28, Your Honor.

12              THE COURT:  Okay.

13    Q.   (BY MS. DOYER) Okay.  And 29 -- was there a

14  print on State's Exhibit 29?

15    A.   I did not find one.

16    Q.   Okay.  Looking at State's Exhibits 28 and 29,

17  however, who are -- who is the named defendant in both

18  cause numbers?

19    A.   Derek Dale Porter.

20    Q.   And where are both of these cases out of?

21    A.   It shows Gonzales County.

22    Q.   And looking at State's Exhibit 28, what is the

23  offense?

24    A.   Theft of a firearm.

25    Q.   And does it show you the offense date?

1    A.   8-13-1988 -- I mean, 1998, correction.

2    Q.   And then looking at State's Exhibit 29, what --

3  what is the offense?

4    A.   It shows to be burglary of a building.

5    Q.   And the offense date of that?

6    A.   It shows to be the 17th day of November, 1998.

7         MS. DOYER:  State offers State's

8  Exhibits 28, 29 and 30.

9         MR. MILLAN:  I guess -- I mean, he -- he

10 stated -- I guess I'm objecting to the ones he couldn't

11 match a fingerprint on.  I'm trying to figure out if

12 they need to be matched up correctly.

13        MS. DOYER:  So the -- the two state jails,

14 the burglary of a building and the theft of a firearm in

15 1998, I asked Derek Porter about both of those while he

16 was on the stand.  He admitted to being convicted to

17 both of these.  I'm just trying to move through this in

18 chronological order.

19        I'm actually offering 27 through 30.  I

20 said the wrong number.

21        THE COURT:  Well, I guess the fingerprint

22 card -- any objection to the fingerprint card?

23        MR. MILLAN:  No objection to the

24 fingerprint card.

25        THE COURT:  It's admitted.  But then 28

1   and 29 and 30 -- I guess let me just kind of see the

2   format.

3             Ms. Doyer, can I get you to refresh my

4   recollection best of your remembrance.

5             Mr. Millan, you can have whatever input

6   you think you need to have.

7             But when you asked the question this

8   morning, did you reference a date, do you recall, or how

9   did you ask that question about the convictions?

10           MS. DOYER:  I have a list of his

11   convictions and I went through --

12           THE COURT:  I just didn't know how you

13   asked the question.

14           MS. DOYER:  -- 1998, theft of a firearm,

15   convicted, such and such date; 1998, burglary of a

16   building, convicted, 2000.  And the way the dates line

17   up, there is no way for them to overlap with the other

18   convictions for those same offenses.

19           THE COURT:  Okay.

20           MR. MILLAN:  I can't -- I cannot object

21   to -- to them.  But under the circumstances of the

22   testimony of -- of a witness, I -- I don't recall the --

23   the dates the witness -- I'm sorry, of the -- the way

24   the State presented the dates and all that.

25           THE COURT:  I might double-check.  And it

1   would just affect the credibility of it at that

2   juncture.  We have a name and possibly a date, so -- I

3   mean, with the understanding that I'm going to maybe

4   take whatever time might be necessary to try to

5   verify --

6          MR. MILLAN:  I understand, Judge.

7          THE COURT:  -- I'll admit these exhibits

8   overruling the objection.

9      Q.   (BY MS. DOYER) Now looking at what I marked as

10  State's Exhibit 31, did this have a print that you were

11  able to match?

12     A.   No, ma'am.

13     Q.   Who is the named defendant in this particular

14  case?

15     A.   Derek Porter.

16     Q.   And where did this occur?

17     A.   Hays County.

18     Q.   And what offense was he convicted of?

19     A.   Criminal mischief, 50 under 500.

20     Q.   Going back to the charging instrument, who is

21  the named victim in this case?

22     A.   It says to be Linda Porter.

23     Q.   And what -- what was the manner and means?

24     A.   Damage, destroyed tangible property, to-wit, a

25  window by striking said window with a crowbar.

1    MS. DOYER:  State offers State's Exhibit

2  31.

3    MR. MILLAN:  Same objection as to the

4  fingerprints.

5    THE COURT:  Did you ask about that this

6  morning as well?

7    MS. DOYER:  I did not, but I asked what

8  the name of the victim was and it's Linda Porter who

9  Investigator Allenger testified is the defendant's

10  mother.  There's also date of birth information in here,

11  which is consistent with the other documents that have

12  already been admitted --

13    THE COURT:  Okay.

14    MS. DOYER:  -- and Social Security.

15    THE COURT:  Pending verification

16  application of some credibility, in face of the

17  testimony we had some morning and -- I think we can

18  probably justify authentication at the very least,

19  I'll -- I'll overrule the objection and admit the

20  exhibit.

21    Q.   (BY MS. DOYER) Now, looking at State's Exhibit

22  32, what is that?

23    A.   It shows to be a -- I'm trying to find where

24  it's at.  I call these -- it's basically a pen pack from

25  the federal government, FBI.

1      Q.   Were you able to conduct an analysis between

2 the prints that were provided there and the prints that

3 you took in State's Exhibit 27?

4      A.   Yes, ma'am, I was.

5      Q.   And do you have an opinion as to whether or not

6 that is the same individual?

7      A.   Yes, ma'am.  They are matches to the ten prints

8 versus the known ten print.

9      Q.   Looking at the print card itself, is there an

10 offense date listed and an offense?

11      A.   It shows the date of arrest to be 03-25 of

12 2003.

13      Q.   Okay.  And what was the offense for which the

14 person was arrested?

15      A.   It shows to be robbery.

16      Q.   And then is there a second set of prints in

17 there?

18      A.   Yes, ma'am.

19      Q.   And what specifically is listed under the

20 offense?

21      A.   18 USC 2113, large A.  It's going to be bank

22 robbery, also.

23      Q.   Now, looking at State's Exhibit 33, do these

24 documents appear to be court documents related to that

25 same offense, bank robbery, 18 USC, Section 2113A,

1  defendant Derek Dale Porter?

2      A.   Yes, ma'am.

3           MS. DOYER:   State offers State's

4  Exhibits 32 and 33.

5           MR. MILLAN:   No objection to 32 and 33.

6           THE COURT:   They're admitted.

7      Q.   (BY MS. DOYER) Now, looking at what I've just

8  marked as State's Exhibit 34, were you able to make an

9  identification using a fingerprint in that court

10 document?

11     A.   Yes, ma'am, I was.

12     Q.   Do you have an opinion as to whether the

13 individual who was printed in this document is the same

14 individual whose prints you took on June 5th?

15     A.   Yes, ma'am.  It was a match.

16     Q.   Now, looking at State's Exhibit 34, what is the

17 offense for which this defendant was convicted?

18     A.   It shows to be a criminal trespass of a

19 habitation.

20     Q.   When did this occur?

21     A.   It shows on the 28th day of August 2014.

22     Q.   And looking at the charging document, who was

23 the victim?

24     A.   Regina Burroughs.

25     Q.   And I'll show you State's Exhibit 35.  Were you

1  able to make a match with the fingerprints contained in

2  State's Exhibit 35?

3       A.   Yes, ma'am.

4       Q.   Okay.  Do you have an opinion as to whether the

5  individual who was printed in State's Exhibit 35 is the

6  same individual you printed on June 5th?

7       A.   I did make a match, yes, ma'am.

8       Q.   And what offense was the defendant convicted of

9  in this case?

10      A.   It shows to be a theft over 50 -- actually 50

11 under 500.

12      Q.   And what was the offense date for this case?

13      A.   It shows to be the 28th day of August, 2014.

14      Q.   Finally, looking at State's Exhibit 36, was

15 there a fingerprint you were able to use to match to the

16 prints that you had already taken from Derek Porter?

17      A.   Yes, ma'am.

18      Q.   Do you have an opinion as to whether it is the

19 same individual?

20      A.   Yes, ma'am.  It was a match.

21      Q.   And what is the offense date for this case?

22      A.   It shows to be a criminal trespass of a

23 habitation.

24      Q.   And what date did this occur?

25      A.   It shows to be November 20th, 2014.

1    Q.    And looking back at the charging instrument,

2    who is the named victim?

3    A.    Linda Porter.

4            MS. DOYER:  State offers State's

5    Exhibits 34, 35 and 36.

6            MR. MILLAN:  No objection to 34, 35 and

7    36.

8            THE COURT:  They're admitted.

9    Q.    (BY MS. DOYER) Now, Detective Womack, are you

10   familiar with what a pen pack is?

11   A.    Yes, ma'am.

12   Q.    Okay.  So the pen pack contained in

13   State's Exhibit 34, does that -- does the pen pack

14   include information about an individual's state ID or

15   CID number?

16   A.    Yes, ma'am.

17   Q.    Looking in this packet, what is this particular

18   defendant's state ID or CID number?

19   A.    It shows the DPS number of 05743384.

20   Q.    Now, Detective Womack, looking at what I've

21   marked as State's Exhibit 37, who is the named defendant

22   in State's Exhibit 37?

23   A.    It will be Derek Dale Porter.

24   Q.    And what is the CID or state ID number that's

25   listed on that particular document?

1    A.    It will be 05743384.

2    Q.    Is that consistent with the number that you saw

3  in State's Exhibit 24?

4    A.    That is correct.

5    Q.    And does State's Exhibit 24 also contain photos

6  of this defendant?

7    A.    Yes, ma'am.

8    Q.    Okay.  Now State's Exhibit 37, what offense was

9  that that he was convicted of?

10    A.    It says to be possession of methamphetamine,

11  less than one gram.

12    Q.    And the date of conviction?

13    A.    The judgment was entered 7-9-2015.

14            MS. DOYER:  Pass the witness.

15            MR. MILLAN:  No questions, Your Honor.

16            THE COURT:  Is 37 being offered?

17            MS. DOYER:  I'm sorry, State offers

18  State's Exhibit 37.

19            THE COURT:  Did he see 37?

20            MR. MILLAN:  I'm sorry, did you say you

21  were able to match the print?

22            THE WITNESS:  There isn't any print on

23  that one.  Let me look at it.

24            MR. MILLAN:  This one.  You matched the

25  CID number, okay.  No objection.

1          THE COURT:  It's admitted.

2          MS. DOYER:  May this witness be excused?

3          Do you have any questions?

4          MR. MILLAN:  No questions.

5          THE COURT:  You may be excused.  Thank

6    you.

7          THE WITNESS:  Thank you, Your Honor.

8          MS. KILDAY:  State calls Mr. Bustos.

9          THE COURT:  Let me get you to raise your

10   right hand.

11          (Witness sworn)

12          THE COURT:  Thank you.  You may have a

13   seat.

14          THE WITNESS:  Thank you.

15                WILLIAM BUSTOS,

16   having been first duly sworn, testified as follows:

17                DIRECT EXAMINATION

18   BY MS. KILDAY:

19      Q.   Please introduce yourself to the Court.

20      A.   Sergeant William Bustos, Comal County Jail

21   Department.

22      Q.   So where do you report to work every day?

23      A.   To the jail.

24      Q.   What's your specific duties within the jail?

25      A.   I'm in charge of inmate housing, inmate

1  classifications, mail department, commissary.

2     Q.   So in your duties as a mail department -- first

3  of all, does each individual who is inside the Comal

4  County jail receive a specific identification number?

5     A.   Correct.

6     Q.   What's that number referenced as?

7     A.   It's a SPN number.

8     Q.   And when you're working in the mail department,

9  can you apply a jail mail cover?

10    A.   What do you mean a jail mail cover?

11    Q.   Essentially a hold.  Is there a way to put a

12  hold on all of the defendant's -- or an inmate's mail

13  that comes in and out of the jail?

14    A.   For us, if -- if they're on certain types of

15  restrictions, if they break any mail rules, but

16  nothing -- no privileged mail can be suspended.

17    Q.   Can mail be flagged, reviewed or monitored?

18    A.   Yes.

19         MS. KILDAY:  Permission to approach,

20  Deputy Bustos.

21         THE COURT:  Yes, ma'am.

22    Q.   (BY MS. KILDAY) I'm handing you what's been

23  marked as State's Exhibit 38.  What is it?

24    A.   Mail -- outgoing mail from Inmate Porter.

25    Q.   Can you please identify the SPN number that's

1   listed there?

2       A.   Yes, ma'am, 631833.

3       Q.   And if we turn to the actual contents of the

4   letter, who is it signed by?

5       A.   It is signed by Inmate Porter.

6       Q.   Who is this letter to?

7       A.   Satanic Temple.

8       Q.   Located at which address?

9       A.   3118 Bluefield Drive, San Antonio, Texas 78230.

10      Q.   And who is this letter addressed to in the

11  listing on the actual written portion?

12      A.   On the actual written portion, to Satanic

13  Temple.

14      Q.   And that first sentence, does it identify the

15  writer of this letter and where he's located?

16      A.   Yes, ma'am.

17      Q.   Can you please state the identification and

18  where he's located?

19      A.   Yes.  It says, My name is Derek Porter.  I'm

20  currently in Comal County jail.

21            MS. KILDAY:  Tender to defense counsel.

22            MR. MILLAN:  No objection.

23            THE COURT:  It's admitted.

24      Q.   (BY MS. KILDAY) At this time, Deputy Bustos,

25  could you please read the letter in for the record?

1     A.    Yes, ma'am.

2               MR. MILLAN:  Judge, I'm going to object to

3     reading it into the record.  It's something the Court

4     can do, if it's placed in evidence.

5               THE COURT:  If it's in evidence, it may be

6     read.

7     A.    All right.  Dated 10-6-2016.  To Satanic

8     Temple.  My name is Derek Dale Porter and I am currently

9     in Comal County jail.  I'm sending this letter because

10    I'm interested in the religion of Satanic worshiping.  I

11    would highly appreciate any literature y'all could send

12    me so I can study and practice the religion of Satanic

13    worshiping.

14               I can receive pamphlets or any literature

15    that is printed out on paper.  I would really enjoy as

16    much literature as y'all can send me because I have

17    plenty of time to study.  It would be a privilege to

18    correspond with a member of y'all's temple to mentor me

19    in the religion of satanic worshiping.

20               I want to start with all of the basic

21    information to get started.  I appreciate y'all's time

22    with my letter.  It would be perfect if y'all could send

23    me corresponding lessons through the mail.  If y'all

24    don't have any lessons together in a packet, maybe y'all

25    can put one together with a test for me to complete.  I

1  can send the test back where y'all can grade lessons and

2  send me more lessons as I advance.

3          This would be an awesome opportunity if

4  the member of y'all's temple could mentor me and teach

5  me about satanic worshiping.  I hope to hear from y'all

6  soon.  Derek Porter.

7      Q.   (BY MS. KILDAY) Thank you.

8      A.   Yes, ma'am.

9              MS. KILDAY:  Pass the witness.

10                  CROSS-EXAMINATION

11  BY MR. MILLAN:

12      Q.   Are you aware of whether Derek Porter ever

13  practiced satanic worship in the Comal County jail?

14      A.   I'm not aware, sir.

15      Q.   Did you ever get any -- anything from -- so

16  you're getting the mail for Derek Porter.  Did you see

17  anything from the Satanic Temple?

18      A.   Not that I remember.

19              MR. MILLAN:  Pass the witness.

20              MS. KILDAY:  No further questions from the

21  State.

22              THE COURT:  Thank you, sir.  You may step

23  down.

24              MS. KILDAY:  May he be excused, sir?

25              THE COURT:  Yes.

1          MS. DOYER:  State calls Philip Gagnon.

2          THE COURT:  How are you this afternoon?

3          MR. GAGNON:  All right.

4          THE COURT:  Let me get you to raise your

5   right hand.

6          (Witness sworn)

7          THE COURT:  Thank you.  You may be seated.

8                    PHILIP GAGNON,

9   having been first duly sworn, testified as follows:

10                   DIRECT EXAMINATION

11  BY MS. DOYER:

12     Q.   Mr. Gagnon, if I could get you to scoot right

13  up into that mike.  And would you please state your name

14  for the record.

15     A.   Philip Gagnon.

16     Q.   Mr. Gagnon, where are you from originally?

17     A.   New York, New Jersey.

18     Q.   Mr. Gagnon, back in December of 2014, were you

19  living with Georganne Shirley and Ben Ray?

20     A.   No.  I wasn't living there.  I was just was

21  visiting.

22     Q.   Do you recall an incident on December 3rd, 2014

23  to which Hays County officers responded?

24     A.   Yes.  Yes, ma'am.

25     Q.   Were you, in fact, injured in that incident?

1   A.   Yes, ma'am.

2   Q.   Mr. Gagnon, what happened that night?

3   A.   They had an argument earlier in the day and he

4   had left and I -- and I think he was told not to come

5   back.  And -- and we went -- we took off and -- we were

6   going to the store.  He called up and said he's at the

7   house.  She didn't want him in the house alone with the

8   old man.

9   Q.   I want to slow you down.  When you say that

10  they had an argument, who are you talking about?

11  A.   Georganne and Derek.

12  Q.   Derek.  Do you see him here in the courtroom

13  here today?

14  A.   Yes.

15  Q.   Could you please identify him by an article of

16  clothing he's wearing?

17  A.   He's got a blue shirt on.

18      MS. DOYER:  For the record, the witness

19  has identified the defendant.

20  Q.   (BY MS. DOYER) Now, you said that y'all had

21  left to go get cigarettes or something?

22  A.   Yes.

23  Q.   Okay.  And she got a call while you were out?

24  A.   Yes, ma'am.

25  Q.   What happened when -- after that?

1    A.   We went back to the house and -- and she went
2  upstairs.  I stayed downstairs.  There were a couple of
3  other people there and -- and they left and I -- and I
4  was just sitting downstairs.  It started getting a
5  little loud so I went up in the other bedroom.  And it
6  wasn't long before she yelled -- called my name and
7  asked -- you know, yelled for help.  And so I went in
8  there and they were fighting over a golf club.  She was
9  on the ground.  There was blood on the ground and -- and
10  I -- I told Derek to leave, but no, he wasn't -- he
11  wasn't going to leave.
12    Q.   Did Derek say anything to you?
13    A.   He told me to stay out -- stay out of it.
14    Q.   Now, you said that when you walked in, they
15  were wrestling over a golf club and Georganne was on the
16  floor.  Where was Derek?
17    A.   He was on top of her.
18    Q.   And who was bleeding, if you could tell?
19    A.   She was bleeding.  It was from a mirror that
20  fell over.
21    Q.   Now, after you told him to leave and he
22  wouldn't leave, what happened next?
23    A.   I went and called 911 and -- and I -- I let it
24  ring once and a hung up.  I told him -- I said, you
25  know, you've got a chance to leave now and -- and

1  they -- you know, they just kept on arguing and -- and

2  fighting over the golf club.  And I -- I got a phone

3  call and I -- I -- I answered and told them I can't talk

4  right now.  It was the 911 operator, so I hung up on

5  them and I -- they called back again and told me who it

6  was.

7              And by this time, I had picked up a

8  hammer -- and I didn't write this in there, but I had

9  hit him a couple of times on the legs to try to get him

10 off her.  And he got the hammer away from me and he hit

11 me in the back with it and -- and I dropped the phone.

12 I picked it up and I -- and the operator was still on

13 there and -- and he was wanting me to give information.

14 I was just telling him that -- get -- to hurry up and

15 get there.

16             The old man had finally woke up and he was

17 yelling, what's going on.  And I asked him if he had a

18 gun and told him to go get his gun.  He didn't do that.

19 But I told Derek that I was going to shoot him if -- if

20 he didn't leave.  And he started going out the door and

21 Georganne headed for the bathroom to lock herself in.

22 He went back up and -- and went in the bathroom and --

23 and the door was shut.

24             So I went up there and started kicking the

25 door in and that's when the sheriffs showed up.  And I

1    went outside with the hammer and -- in my hand and they

2    had me get on the ground and they handcuffed me.

3                    MS. DOYER:  Pass the witness.

4                    CROSS-EXAMINATION

5    BY MR. MILLAN:

6        Q.    How long have you known Georganne Shirley?

7        A.    About four years.

8        Q.    Okay.  Have you witnessed Georganne get violent

9    with people?

10       A.    Yes.

11       Q.    How many times?

12       A.    Quite a few.

13       Q.    In terms of Derek and Georganne, would it be

14   fair to say that she gave as good as she got?

15       A.    Yes.

16       Q.    So they both had a problem.  Would that be fair

17   to say?

18       A.    They sure do, yes.

19       Q.    Was she ever violent with you?

20       A.    No.

21       Q.    But you witnessed her be violent?

22       A.    Yes.

23                    MR. MILLAN:  Pass the witness.

24                    REDIRECT EXAMINATION

25   BY MS. DOYER:

1    Q.   Mr. Gannon, what types of injuries did you

2  sustain for stepping in for Georganne?

3    A.   I got hit in the back.  I just got a big

4  black-and-blue mark on my -- to my chest.

5    Q.   Mr. Gagnon, how old are you, sir?

6    A.   I'm 62.

7    Q.   And what did Derek use to strike you?

8    A.   He used a hammer.

9         MS. DOYER:  Pass the witness.

10              RECROSS-EXAMINATION

11  BY MR. MILLAN:

12    Q.   He used the hammer that he grabbed from you

13  after hitting him with it; right?

14    A.   Uh-huh.  Yes.

15         MR. MILLAN:  Pass the witness.

16         MS. DOYER:  I have no other questions of

17  this witness.

18         THE COURT:  Thank you, sir.  You may step

19  down.

20         MS. DOYER:  May he be excused, sir?

21         MR. MILLAN:  Yes, sir.

22         THE COURT:  You may be excused.

23         MS. DOYER:  State rests.

24         THE COURT:  Mr. Millan, any evidence?

25         MR. MILLAN:  No, Your Honor.  I am going

1  to request a PSI for -- mainly because I want -- I want

2  a determination of his past drug use, alcohol use, how

3  it may have impacted his state of mind up to this point

4  in his life.  I think that might be important for the

5  Court, so I -- I don't know if we want to make argument

6  now or after.  If -- if the Court would see fit to order

7  a PSI, I think we can maybe do argument after that.

8              THE COURT:  Is it mandatory?

9              MS. DOYER:  I don't believe so,

10 Your Honor.  I would say also he's been in custody for

11 so long.  He's got another pending case in Fayette

12 County.  If we can wrap this up and get him shipped, it

13 would resolve the entire thing.

14             THE COURT:  Mr. Millan, are you of the

15 impression that a PSI would be mandatory?

16             MR. MILLAN:  I don't know that a PSI would

17 be mandatory.  I'm asking the Court if it is

18 discretionary to at least maybe a -- a TAIP evaluation

19 or do a SASSI, you know.

20             THE COURT:  Your client certainly has a

21 Fifth Amendment right to not testify, but that is an

22 option just to inform the Court, just like he would

23 inform -- if you would like to have an opportunity to

24 speak with him about that, then --

25             MR. MILLAN:  I would like to talk to him.

1            THE COURT:  Okay.  You may.  My point is

2    he can inform me just as well as he could a probation

3    officer.

4            MR. MILLAN:  Sure.  Okay.  I'm going to

5    talk to him just a few minutes, Your Honor.

6            MS. DOYER:  Your Honor, it looks like it's

7    42.12, Section 9, Subsection B.

8            THE COURT:  Are we now in 42(a)?  I mean,

9    that --

10            MS. DOYER:  That's the new codified

11    version, yes, sir.

12            THE COURT:  Okay.  So I mean, the section

13    number may be a little bit different, but --

14            MR. MILLAN:  Your Honor, Mr. Porter is

15    going to testify.

16            THE COURT:  Okay.  Very good.

17            Mr. Porter, if you'll come on back up here

18    to the stand.

19            THE DEFENDANT:  Yes, sir.

20            THE COURT:  You may have a seat.  And just

21    like I checked with your counsel this morning -- and I

22    know y'all just had a moment to talk, you do understand

23    you have a Fifth Amendment right to remain silent in

24    both phases of a trial?

25            THE DEFENDANT:  Yes, sir.

1      THE COURT:  Okay.  And I'll certainly

2  afford you that right in this phase of the trial as

3  well.  But by being here, you remain under oath as we

4  did eventually put you under oath this morning; correct?

5      THE DEFENDANT:  Yes, sir.

6      THE COURT:  Okay.  And it's your choice to

7  testify?

8      THE DEFENDANT:  Yes, sir.

9      THE COURT:  Okay.  You may proceed.

10      DEREK DALE PORTER,

11  having been previously duly sworn, testified as follows:

12      DIRECT EXAMINATION

13  BY MR. MILLAN:

14      Q.   Mr. Porter, I want to talk to you about your

15  drug history, okay?

16      A.   Yes, sir.

17      Q.   When -- at approximately what age, if any, did

18  you start using drugs?

19      A.   Around 16 to 17 years old I started using crack

20  cocaine.

21      Q.   Did you use anything before crack cocaine?

22      A.   I used marijuana.

23      Q.   Okay.  For how long did you use marijuana?

24      A.   I used marijuana probably -- around a year

25  before I started doing cocaine.

1   Q.   Okay.  And approximately how long did you use
2   cocaine?
3   A.   I used cocaine pretty consistent for -- until
4   the time I got locked up in around 2003 on the bank
5   robbery.
6   Q.   And so how old were you when that happened?
7   A.   I was around 23, 24 years of age at that time.
8   Q.   So you had been with -- how often would you use
9   crack cocaine?
10  A.   Crack cocaine is -- any time I could get it.
11  You know, whatever it took to get it, I was doing it.
12  Q.   Would it be fair to say that your crimes were
13  influenced by your drug use?
14  A.   Yes, sir.
15  Q.   Did you ever get any type of in-patient
16  treatment?
17  A.   No, sir.
18  Q.   What kind of treatment did you get?
19  A.   I got -- when I got out of prison, I took
20  medical treatment and -- it was an intravenous
21  treatment.  It was done by The Right Step Company -- not
22  Right Step.  Right Step is like a treatment facility
23  they have throughout the country here in the
24  United States.  It's a treatment that my mom had found
25  for the crack cocaine addiction.  And that's what it was

1   supposed to -- it treated cravings -- it was supposed to

2   cure the cravings, the drug cravings.

3       Q.   And what would they do?

4       A.   Sir, it was an intravenous treatment.  It was a

5   two-day treatment.  I took the first treatment the day I

6   got out of prison in Houston.  And the second day I took

7   another treatment at their office.

8       Q.   And what did that treatment consist of?

9       A.   It consisted of -- it's an intravenous

10  treatment and -- and they -- it treats the -- the

11  receptors in the brain.  It's supposed to cure the

12  cravings of an addiction to crack cocaine.  I don't know

13  all of the details on -- on the treatment.  My mom

14  could -- she knows more about the treatment.

15      Q.   What kind of follow-up was there after that?

16      A.   There was really no aftercare follow-up because

17  they said I was -- I was -- I just got out of prison.  I

18  did a five-year sentence.  They said it was really --

19  since I had been off cocaine that long of a period of

20  time, that I really maybe didn't need it.

21      Q.   Okay.  So at some point did you -- did you get

22  to go back to using drugs?

23      A.   Yes, sir, I did.

24      Q.   And when was that?

25      A.   Here the last probably three years I went back

1   to using -- I started experimenting with

2   methamphetamines.

3       Q.    And when did you start experimenting with

4   methamphetamines?

5       A.    I would say about three years ago.

6       Q.    Okay.  So approximately 2014?

7       A.    Around about '13, '14, yes, sir.

8       Q.    And would you say that the -- that the offenses

9   that -- that you committed in that time span up until

10  the time of your arrest for this offense, were they

11  influenced by your -- by your drug use?

12      A.    I would say so, yes, sir.

13      Q.    And did you have any sort of treatment during

14  that time period?

15      A.    No, sir, I did not.

16      Q.    Did you have any drug arrests during that time

17  period?

18      A.    Yes, sir, I did have an arrest for

19  methamphetamines.  I was going into psychosis and I did

20  it.  I went to an MHMR place -- crisis center twice in

21  Kerrville.  I was admitted.

22      Q.    When was this?

23      A.    This was around the same period of time.  I

24  don't know the exact dates.

25      Q.    Now, the crisis center, did you do any sort of

1  inpatient treatment?

2      A.   Yes, sir.  I stayed there at the facility the

3  first time.  I believe it was ten days before I was

4  released.  They gave me some medicine to take and -- and

5  the second time it was a short -- it was a short stay.

6      Q.   How long?

7      A.   I think it was a three-day stay.

8      Q.   Did you do any sort of aftercare follow-up with

9  them?

10     A.   No, sir.  I was -- I went to jail recently

11  after that.

12     Q.   Did you ever do a 12-step program?

13     A.   No, sir.

14     Q.   In terms of this letter about this Satanic

15  Temple, I'll -- I want you to explain that.

16     A.   I saw -- the reason I got that information was

17  Georganne Shirley and -- and this guy that she was

18  seeing periodically, he was a Satan worshiper.  They

19  were leaving different stuff around the house when I was

20  there at the house.  They were leaving peacock feathers.

21  I found peacock --

22             THE REPORTER:  I'm sorry, you need to slow

23  down.

24             THE DEFENDANT:  I'm sorry, ma'am.

25             THE COURT:  If her fingers start smoking,

1   we're all in trouble.  She's trying to take down

2   everything you're saying, right?  So just slow down.

3   Okay.  It will be okay.

4       A.   I found a peacock feather in the backyard one

5   day and -- and there was no peacocks in a hundred miles

6   of this house.  And so I -- it was only a quill and I

7   was wondering why -- what it was back there for because

8   Georganne practices witchcraft.  I mean, she has full

9   faith in it.  It was left by an individual it looked to

10  me.  And I asked her about it and she said it was out

11  there to ward off evil spirits.

12              Here when I was in Comal County -- it had

13  my curiosity if somebody was coming around the house.

14  When I was in Comal County, there was a guy there that

15  was a Satan worshiper.  I asked him -- I said, if he

16  was -- he told me -- I asked him what -- what

17  significance a peacock feather represented and he said

18  that it -- it symbolizes Satan worshiping.

19              So it -- it got my curiosity when I seen

20  that article in the newspaper, San Antonio Express-News.

21  They talk about a Satanic church -- or a thing that was

22  being organized in Oregon, I believe, into the schools.

23  They had a temple over there.  And -- and when I seen

24  that article, I thought, well, maybe it's a good idea.

25  I could write them and get some information to see more

1   on what's going on, maybe, you know, evidence of what

2   these people -- maybe they know something about a

3   peacock feather.

4        Q.   (BY MR. MILLAN) So it was basically to

5   investigate what Georganne was up to?

6        A.   Yes, sir.

7             MR. MILLAN:  Pass the witness.

8                  CROSS-EXAMINATION

9   BY MS. DOYER:

10       Q.   Mr. Porter, you testified you have never been

11  to any type of intensive treatment; is that correct?

12       A.   Yes, ma'am.

13       Q.   So in Cause Number 129-98 out of Gonzales

14  County, you were ordered to attend SAFP after you were

15  adjudicated guilty; correct?

16       A.   Yes, ma'am.

17       Q.   So then your testimony earlier that you had not

18  had any intensive treatment is it incorrect?

19       A.   I was incarcerated.

20       Q.   SAFP is a lockdown facility, isn't it?

21       A.   Yes, ma'am.

22       Q.   So did you attend SAFP while you were

23  incarcerated?

24       A.   Yes, ma'am.

25       Q.   So you have had drug treatment?

1    A.    Yes, ma'am.  In incarceration I did.

2    Q.    Now, Mr. Porter, you have been in custody over

3  500 days now; is that right?

4    A.    Yes, ma'am.

5    Q.    During these 500-and-some-odd days, have you

6  had access to methamphetamine or any other hard

7  narcotics?

8    A.    No, ma'am.

9    Q.    So in June of 2016 when you assaulted Brian

10  Clanton, was that because of your drug use?

11    A.    I didn't assault Brian Clanton.

12    Q.    In July of 2016 when you assaulted Benson

13  Griffin, was that because of your drug use?

14    A.    It was an altercation inside the jail.  There

15  were no drugs involved in these incidents.

16    Q.    In -- in October of 2016 when you were making

17  homosexual advances on your fellow cellmates, was

18  that --

19    A.    That's absolutely not true.

20    Q.    You were removed from your cellblock because

21  all of this --

22    A.    Because it's an allegation that --

23    Q.    Stop.

24          THE BAILIFF:  One at a time.  Hold on.

25    Q.    (BY MS. DOYER) You were removed from your

1   cellblock because your cellmates asked for you to be

2   removed due to sexual advances; isn't that right?

3       A.   It was not --

4             MR. MILLAN:  I'm going to object,

5   Your Honor, because it calls for speculation.

6             THE COURT:  I don't know.  I'll sustain

7   the objection.  It is cross-examination.  I'm trusting

8   she -- she -- she has a good-faith basis for it, but --

9       Q.   (BY MS. DOYER) Mr. Porter, in October of 2016,

10  were you housed in L-2 --

11      A.   I believe so.

12      Q.   -- with inmates Austin Wiley, Richard Garner

13  and Cody Cummins?

14      A.   Yes, ma'am.

15      Q.   Were you removed from that cellblock in October

16  of 2016?

17      A.   Yes, ma'am, I was.

18      Q.   Now, in February of 2017, were drugs involved

19  when you assaulted Jesus Gallegos?

20      A.   It was not an assault.  It was a mutual fight.

21      Q.   Now, you testified that the letter to the

22  Satanic Temple was just to investigate what a peacock

23  feather meant; is that right?

24      A.   Yes, ma'am, in Satanic worshiping.

25      Q.   Mr. Porter, you didn't write this letter until

1    you had been in custody for nearly a year; correct?

2        A.    Yes, ma'am.

3        Q.    Why the sudden need to investigate the Satanic

4    Temple then?

5        A.    Because I saw it came out in the San Antonio

6    Express-News.  I didn't know they had temples.  When I

7    seen the article I was like, well, maybe I could write

8    them and get information, some literature from them on

9    their church or their temple.

10       Q.    Mr. Porter, you didn't say, Dear Satanic

11   Temple, can you send me information about your religion,

12   did you, in that letter?

13       A.    I don't remember exactly how it -- I addressed

14   the letter.

15       Q.    In fact, what you actually said is, it would be

16   a privilege to correspond with a member of y'all's

17   temple to mentor me in the religion of Satanic

18   worshiping; isn't that right?

19       A.    I believe that's what I said, yes, ma'am.

20       Q.    It would be perfect if y'all could send me

21   corresponding lessons through the mail; correct?

22       A.    Yes, ma'am.

23       Q.    That would -- this would be an awesome

24   opportunity if a member of y'all's temple could mentor

25   me and teach me about Satanic worshiping; is that

1  correct?

2      A.   Yes, ma'am.

3      Q.   So, Derek, it is not necessary for you to -- to

4  request to be mentored in order to get information about

5  this peacock feather, is it?

6      A.   I -- I guess not.  I mean --

7              MS. DOYER:  Pass the witness.

8                  REDIRECT EXAMINATION

9  BY MR. MILLAN:

10     Q.   Mr. Porter, did you have a minister come and

11 counsel you at the jail?

12     A.   Yes, sir, I do.  I have a minister out of the

13 Gonzales County that comes from the Methodist church.

14 His name is Paul Smith.  He comes up there periodically

15 to see me and visit me and check on me.

16     Q.   And do you-all talk about religion?

17     A.   Yes.  We talk about Christ all the time, every

18 time he comes up there.

19     Q.   And do you consider yourself a Satanist?

20     A.   No, sir, I do not.

21     Q.   Do you consider yourself a Christian?

22     A.   Yes, sir, I do.

23              MR. MILLAN:  Pass the witness.

24                  RECROSS-EXAMINATION

25 BY MS. DOYER:

1    Q.   Mr. Porter, have you discussed your interest in

2  the Satanic Temple with Mr. Smith?

3    A.   With the pastor?

4    Q.   Yes.

5    A.   No, ma'am.  I didn't think that was appropriate

6  to bring that up with a pastor.

7    Q.   Now, Mr. Porter, you're also currently under

8  indictment out of Fayette County, isn't that right --

9    A.   Yes, ma'am.

10    Q.   -- for stealing Judge Steinhauser's Suburban;

11  correct?

12    A.   Those are the allegations.

13    Q.   Now, have you ever been to Gerry Nance's house

14  in a white Suburban?

15    A.   Ma'am?

16    Q.   Have you ever been to Gerry Nance's house in a

17  white Suburban?

18          THE DEFENDANT:  Can I ask you a question

19  real quick, Your Honor?

20          THE COURT:  You can ask your --

21          MR. MILLAN:  Your Honor, I'm going to

22  object to this line of questioning.  There is a pending

23  case out of county and -- and I -- I don't think it's

24  appropriate for him to be answering questions regarding

25  this matter.

1          MS. DOYER:  It goes to punishment, Your

2     Honor, all of his bad acts.

3          THE COURT:  Regardless of the testimony,

4     I'm not sure that that alone would have much bearing and

5     just -- I think the safe thing would be just to sustain

6     an objection to that line of questioning.

7          MS. DOYER:  Pass the witness.

8          MR. MILLAN:  No further questions,

9     Your Honor.

10         THE COURT:  Thank you.  You can step down.

11         MR. MILLAN:  We have no further witnesses,

12    Your Honor.

13         THE COURT:  Okay.  I know they have

14    shifted everything around from Article 42 to now what's

15    called 42(a) and the subsections and the -- and the

16    sub-subsections, but do y'all have -- if you want to

17    look at my derivation of moving those code sections

18    around just to double-check.

19         But as I -- as I have been listening to

20    the testimony and -- and let's see, under 42(a) point

21    252, that new section that is entitled presentence

22    report required, it says that there shall be one, except

23    as provided for by subsections B and C.  As I read it, B

24    would apply to a misdemeanor and C would apply to a

25    felony.

1        In this situation, if at all, under then

2  Subsection 3, the only available punishment is

3  imprisonment.  So then the old 42.3(g), which has now

4  been moved, I believe, to 42(a) point 054, which

5  obviously has subsection after subsection after

6  subsection and the indictment in this case alleges a

7  violation of Section 22.01(b)(2)(a) of the penal code --

8  and just correct me if I'm wrong, but that's not one of

9  those mini subsections as I've checked it.

10        MR. MILLAN:  I would not think it is.

11        MS. DOYER:  You're right, Your Honor.

12        THE COURT:  It's a two to 20.  So

13  technically speaking, the law would allow a probated

14  sentence; correct?

15        MR. MILLAN:  Correct, Your Honor.

16        THE COURT:  So I mean just to make sure

17  that we're complying with the law --

18        MS. DOYER:  Yes, sir.

19        THE COURT:  -- then I think before I

20  pronounce sentence as required by .252, it says that

21  there shall be one completed.  So to make sure that

22  we're complying with the law, we'll just have probation

23  do that.

24        Okay.  With that understanding, we'll be

25  in recess and we'll reset this matter for a presentence

1    investigation.

2              MR. MILLAN:  Should I get with Jeannie or

3    Megan to get a date about rescheduling?

4              THE COURT:  Yes.

5              MR. MILLAN:  How long do you want to give

6    them?

7              THE COURT:  Just whatever probation needs.

8              MR. MILLAN:  Can we call somebody from

9    probation over, Judge?

10             THE COURT:  We will.

11             Let's just stay on the record just a

12   second -- so I don't forget for just a second.

13             Mr. Millan --

14             MR. MILLAN:  Your Honor, if I may,

15   Mr. Porter is asking if we -- he's saying he doesn't

16   want a PSI.

17             THE COURT:  He can waive it.  He certainly

18   can waive it.

19             MR. MILLAN:  Is that what you want to do?

20             THE DEFENDANT:  Yes, sir.

21             THE COURT:  Okay.  Then we'll -- I'll

22   approve the waiver.  But again, that's up to him.

23             I will say, though, that I did go through

24   these exhibits in which initially Detective Womack was

25   at first blush only able to connect the dots, so to

1    speak, by way of name.  But there is either a birth date

2    and/or a social number and/or signatures that are

3    relatively close, unscientific, that I think certainly

4    would just -- if you want to look at that --

5                   MR. MILLAN:  Judge, I trust your judgment

6    on that.

7                   THE COURT:  Okay.  I think there's ample

8    identifiers that would, again, connect the dots just for

9    a layman's use of those words.

10                  MR. MILLAN:  I understand.

11                  THE COURT:  And so I guess if you want to

12   begin, I -- do you want to reserve --

13                  MS. DOYER:  Yes, sir.

14                  THE COURT:  -- argumentwise?

15                            CLOSING STATEMENT

16                  MR. MILLAN:  Judge, I understand

17   Mr. Porter has a lengthy criminal history and -- and I

18   would -- he has long-term drug issues.  Apparently he

19   did go to SAFP.  Apparently it didn't stick.  He -- he

20   went and -- and got out and started using

21   methamphetamine again.  And it looked like it affected

22   his mind-set after that.  He committed a lot of offenses

23   that he claims were -- were a direct result of his drug

24   use.

25                  Judge, what I would ask you to do, though,

1  is -- is try and compartmentalize the actual offense

2  that the State is alleging here and what it consists of,

3  the facts consist of and -- and think about the pictures

4  that you saw of Georganne Shirley, of the marks on her

5  scalp and the mark on her ear and think to yourself -- I

6  mean, what is the appropriate punishment for -- for the

7  injuries that she sustained putting it in context of who

8  Georganne Shirley was and the things that she did and --

9  and the type of person that she was.

10              I mean, I think it is a balancing test

11  here that -- I mean, it's -- it's -- he didn't commit

12  this act in a vacuum.  There was factors that played --

13  another person that played -- who is apparently a pretty

14  violent person, even according to the State's witnesses

15  that they put on in sentencing who saw her commit

16  violent acts.  I think that's pretty -- I mean, you've

17  got more than one person talking about her being a loud

18  person and -- and, you know -- and what Mr. Porter did

19  in reaction to the potentially violent acts on her part.

20              Well, the jury found him guilty of doing

21  it, but at the same time it's in -- it's in context.

22  And I think this Court can take into -- take into

23  account that context and how mitigating it is based on

24  who the person was that committed the act against and

25  how they reacted to him or potentially started with him.

Closing Statement by Ms. Doyer
June 7, 2017

1            So looking at those factors, Judge, I

2     would ask you to consider something on the low end of

3     the -- of the range of punishment on this case.  He's

4     been in jail for, gosh, 550 and something days.  He's --

5     he's spent a lot of time in jail.  I would ask the Court

6     to consider something in the low end of the range of

7     punishment, five years or less, that -- I think that's

8     what -- what these facts -- these particular

9     circumstances warrant.  It doesn't warrant a high number

10    based on the actual facts of this case.

11            REBUTTAL CLOSING STATEMENT

12            MS. DOYER:  Your Honor, when we look at

13    Derek Porter and we look at the evidence that the State

14    presented in punishment, I'm always hearing as a

15    prosecutor, they've already been punished for this or

16    they've already been punished for that.  Let's look at

17    this one particular offense.

18            And with Derek Porter, what is unique

19    about him is that it's just not the offense that he's

20    already been punished for that he has in his history,

21    he's already done his time for.  But the offenses he got

22    away with and the people he's endangered, it makes this

23    so much more dangerous.  It exposes his danger to the

24    community.

25            Going back to 1998 when his mother had to

1   go to the police station crying because she was afraid
2   he was going to kill her; in 2000 when he threatens his
3   mother and sister; and in 2000 when he assaults another
4   man; and then in 2010 and here in 2014 and 2015,
5   assaulting women he was in a romantic relationship with,
6   that makes him dangerous, not just to women he's in a
7   relationship with, but apparently to strangers and his
8   own family.  That's what is the biggest concern with
9   Derek Porter.
10                  In addition to that, you have a lengthy
11  history of evading arrest, some of which he got away
12  with.  The one that happened here should have been a
13  felony.  But for whatever reason in 2008, they didn't
14  file that case.
15                  He's had an opportunity for probation.
16  Most of those judgments up there, he was given probation
17  to start and then violated by not only using drugs, but
18  also committing multiple other offenses and not
19  attending the treatment programs or not attending the
20  violent rehabilitation programs that were ordered.
21                  So at some point we have to look at, yes,
22  what happened to Georganne Shirley.  And somehow
23  Mr. Millan is saying, well, let's look at her and what
24  type of person she was.  She's not less of a person
25  because she's got drug issues or she has been violent in

the past. What matters is what is this defendant
capable of and what did he do. And the jury found him
guilty of that offense.

So the danger he poses because of his
complete lack of regard for the law and his complete
lack of regard for the value of human life by the
repeated assaults mandates that we protect the community
as long as possible. Because of that, I'm asking you to
sentence him to the maximum, to 20 years, to give this
community the safety and assurance of knowing that
someone who has this type of violent history, who has
this type of felony and thievery convictions, who is an
affiliated member of the Peckerwood gang by his own
admissions, who seeks to align himself with the ideology
of the Satanic Temple, and then comes in here and seeks
to manipulate the Court by saying he's never been to
treatment, that person needs to be held accountable and
sent away for 20 years.

THE COURT: Just to make sure that my
consideration of part of the evidence is correct,
Mr. Millan and/or Ms. Doyer, if you can enlighten me in
regard to his testimony here during the punishment
phase, I understand probably better than -- or just I'll
put it that way, just as well as anybody the effects of
drug addiction. But did I hear any testimony either

earlier today or during the punishment phase from the defendant that -- and I asked the question in regard to the charge, there's not been any evidence of intoxication or drug use at the time of the offense; correct?

MR. MILLAN:  Judge --

MS. DOYER:  That's correct, Your Honor.

MR. MILLAN:  -- we weren't going to admit that he was high on methamphetamine during the trial. That's correct, Your Honor.

THE COURT:  I guess my point, though, is I -- I listened to not only what is said, but I'm also listening to what is not said and I have to weigh that for what it's worth.

MR. MILLAN:  And you'll remember his testimony was Georganne Shirley came in and asked him where the drugs and money were.

THE COURT:  That could be a double-edged sword.

Having received the jury's verdict of guilt in regard to the underlying offense and having listened to all of the punishment phase evidence, I'm going to sentence the defendant to 15 years in TDC and remand him to the custody of the sheriff to have that sentence carried out.

1          And unless there's anything further, we'll
2     be in recess.
3          MS. DOYER:  Nothing further from the
4     State.
5          THE COURT:  May I ask, Ms. Doyer -- you
6     mentioned earlier the possibility of getting this
7     wrapped up and sending him on down to some other county.
8          MS. DOYER:  Yes, sir.
9          THE COURT:  I know there is a pending
10    indictment.  Do you -- do you have anything in regard to
11    that such that maybe we can accomplish that?
12         MS. DOYER:  I spoke to actually both of
13    his defense attorneys in Hays and in Fayette County.
14    They were trying to figure out when we would be done so
15    they can bench him up there and resolve those other
16    matters.
17         MR. MILLAN:  And Judge Peschel called me.
18    He's the visiting judge over there on the case because
19    the judge had to recuse himself.  He was asking me what
20    was going to happen with the case.  And I told him, we
21    should be done this week.
22         MS. DOYER:  We can try and expedite the
23    judgments.
24         I would ask Your Honor, for the record, do
25    you find the prior to be true?

```
 1              THE COURT:  Yes, I do.  It is true.  He
 2    pled true.  It is true.
 3              MS. DOYER:  Yes, sir.
 4              THE COURT:  But I mean as far as our
 5    current pending indictment, the other indictment?
 6              MS. DOYER:  That other one will be
 7    dismissed.
 8              THE COURT:  Okay.  So I mean if you'll get
 9    me the order, then I will --
10              MS. DOYER:  Yes, sir.
11              THE COURT:  -- certainly sign it ASAP.
12    Thank you.
13              MS. DOYER:  Thank you.
14                  (Proceedings adjourned)
15
16
17
18
19
20
21
22
23
24
25
```

1  STATE OF TEXAS

2  COUNTY OF COMAL

3

4      I, Cindy Cummings, Official Court Reporter in and

5  for the 433rd District Court of Comal, State of Texas,

6  do hereby certify that the above and foregoing contains

7  a true and correct transcription of all portions of

8  evidence and other proceedings requested in writing by

9  counsel for the parties to be included in this volume of

10  the Reporter's Record in the above-styled and numbered

11  cause, all of which occurred in open court or in

12  chambers and were reported by me.

13      GIVEN UNDER MY HAND, this the 9th day of August,

14  2017.

15                          /s/ Cindy Cummings

16                          Cindy Cummings, Texas CSR 3210
                            Official Court Reporter
17                          433 Judicial District Court
                            150 N. Seguin Street
18                          Suite 317
                            New Braunfels, Texas 78130
19                          Tel 830-221-1279
                            Fax 830-608-2030
20                          Expiration:  12/31/17

21

22

23

24

25